SUSAN I. MONTGOMERY (SBN 120667)
LAW OFFICE OF SUSAN I. MONTGOMERY
1925 Century Park East, Suite 2000
Los Angeles, CA 90067
Telephone: (310) 556-8900
Facsimile: (310) 556-8905
susan@simontgomerylaw.com

Attorneys for Respondent CAROL MILNER

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA, LOS ANGELES DIVISION

| | |
|---|---|
| In re | Case No. **2:12-bk-15665-RK** |
| CRYSTAL CATHEDRAL MINISTRIES, a California non-profit corporation, | Chapter 11 |
| | **APPENDIX OF EXHIBITS IN SUPPORT OF SUPPLEMENTAL BRIEF** |
| Reorganized Debtor. | **Hearing** |
| | **Date: September 18, 2019** |
| | **Time: 11:00 a.m.** |
| | **Place: Courtroom 1675** |

Respondent Carol Milner submits the attached Appendix of Exhibits to the Sanctions Supplemental Brief.

Dated: October 25, 2019

Respectfully submitted,

LAW OFFICE OF SUSAN I. MONTGOMERY

By _____/s/ Susan I. Montgomery_____
         Susan I. Montgomery
         Attorneys for Carol Milner

# APPENDIX OF EXHIBITS TO SANCTIONS SUPPLEMENT

**Page**

TRIAL TRANSCIPT ……………………………………………………………......1

TRIAL EXHIBIT 8 …………………………………………………………………353

TRIAL EXHIBIT 9 ………………………………………………………………....356

TRIAL EXHIBIT 39 ………………………………………………………………..360

# Trial Transcript

Trial Transcipt

UNITED STATES BANKRUPTCY COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| IN RE: | . | Case No. 2:12-bk-15665-RK |
| | . | |
| CRYSTAL CATHEDRAL | . | |
| MINISTRIES | . | Los Angeles, California |
| | . | Thursday, September 20, 2018 |
| | . | 10:42 a.m. |
| Debtor. | . | |
| | . | |
| | . | |

. . . . . . . . . . . ..

TRANSCRIPT OF TRIAL RE: REORGANIZED DEBTOR'S MOTION FOR
ISSUANCE OF ORDER DIRECTING CAROL MILNER AND HAROLD J. LIGHT,
ESQ. TO SHOW CAUSE WHY THEY SHOULD NOT BE HELD IN CONTEMPT
(FRBP 9020); AND FOR DAMAGES AND ATTORNEYS' FEES FOR
INTENTIONALLY VIOLATION THE PERMANENT DISCHARGE INJUNCTION

BEFORE THE HONORABLE ROBERT N. KWAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:            Mahaffey Law Group, PC
                           By:  DOUGLAS L. MAHAFFEY, ESQ.
                           20162 SW Birch Street, Suite 300
                           Newport Beach, CA 92660
                           (949) 833-1400

For Carol Milner and       Law Office of Susan I. Montgomery
Harold J. Light:           By:  SUSAN I. MONTGOMERY, ESQ.
                           1925 Century Park East, Suite 2000
                           Los Angeles, CA 90067
                           (310) 556-8900

Court Recorder:            Shafari Tatum
                           U.S. Bankruptcy Court
                           255 East Temple Street, Room 940
                           Los Angeles, CA 90012
                           (855) 460-9641

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311     Fax No. (609) 587-3599**

2

# I N D E X

**PAGE**

**WITNESSES:**

CAROL MILNER
    Cross-Examination by Mr. Mahaffey                    97
    Redirect Examination by Ms. Montgomery              252
    Recross-Examination by Mr. Mahaffey                 277

3

## E X H I B I T S

| | | I.D. | EVID. |
|---|---|---|---|
| 1 | Leadership team meeting | 273 | -- |
| 5 | Emails | -- | 261 |
| 7 | Settlement agreement | -- | 261 |
| 8 | Emails | 258 | 262 |
| 9 | Emails | 127 | 146 |
| 10 | Fish Richardson letter | 316 | 317 |
| 12 | Emails | 200 | 274 |
| 13 | Response to Exhibit 12 | 223 | 275 |
| 14 | Emails | 208 | 275 |
| 15 | Unidentified | 276 | -- |
| 16 | Unidentified | 276 | -- |
| 17 | Emails - Milner | 230 | -- |
| 18 | Emails exchange Milner/Stolarz | 227 | -- |
| 28 | Letter 6/25/10 | 239 | 240 |
| 29 | Letter | 240 | 240 |
| 39 | Emails | 222 | 223 |

4

1          THE COURT:  The Court will now call its 9:00 o'clock

2    calendar.  This is te evidentiary hearing in the Crystal

3    Cathedral Ministries matter regarding the contested matter of

4    reorganized debtor's motion re: contempt as to Carol Milner and

5    Harold Light.

6          Appearances?

7          MS. MONTGOMERY:  Susan Montgomery appearing for Carol

8    Milner and Harold Light.  Mr. Light and Ms. Milner are both in

9    the courtroom.

10         THE COURT:  All right.

11         MR. MAHAFFEY:  Good morning.  Douglas Mahaffey on

12   behalf of the reorganized debtor, and our CEO, Russ Jacobson,

13   is with me.

14         THE COURT:  All right.  Good morning.  All right.

15         Are we ready to proceed this morning?

16         MR. MAHAFFEY:  Yes, Your Honor.

17         MS. MONTGOMERY:  Yes.

18         THE COURT:  All right.  So for the reorganized

19   debtor, how many witnesses are you calling?

20         MR. MAHAFFEY:  We weren't going to be calling any

21   witnesses on our side.  The declarant, Gwyn Myers, was not

22   available today, was out of town, and the attorney that is in

23   India is not available.  So we'll submit on our declarations

24   and cross-examine Ms. Milner.

25         THE COURT:  Well, they're not admissible unless --

Trial Transcript, Page 4

1  unless cross-examination is waived by the respondents.

2          MS. MONTGOMERY:  Which it is not, Your Honor.  It is

3  not waived.

4          THE COURT:  So their declarations are not admissible.

5          MR. MAHAFFEY:  I was aware of that risk and

6  communicated that to my witness, but there was no opportunity,

7  because of the gentleman that was actually the counsel at the

8  time has been in India and unavailable for me to contact, we

9  switched to another declarant, Gwyn Myers, and she was simply

10  not available today.  And I did bring --

11          THE COURT:  You didn't have her under subpoena?

12          MR. MAHAFFEY:  We did not subpoena her.  We had tried

13  to coordinate her as a friendly witness.  And the Court had

14  indicated that this morning, in its most recent order, when the

15  Court had denied the continuance for Mr. Gibson, that -- we

16  really considered this to be an oral argument on the executory

17  contract.

18          THE COURT:  Well, that's what I thought.  It's really

19  -- it's really the issue or whether or not the contract is

20  executory, pretty much, isn't it?

21          MR. MAHAFFEY:  It is.  And I think what the -- I

22  apologize for sitting.

23          THE COURT:  Well, you can sit down and argue if you

24  want.  It doesn't matter.  Or it can be at the lectern.  Your

25  choice.

1    MR. MAHAFFEY:  So my interpretation -- and I

2  understand the Court's ordinary procedure and have been in it

3  many times when a declarant needs to be present for cross-

4  examination.  But I really interpreted in good faith the

5  Court's most recent order and then the denial of the extension

6  based on that order on the basis that we really are just going

7  to be arguing the face of the contract.

8    The Court had indicated before that it didn't need

9  further exhibits and that if there was going to be parol

10  evidence necessary in the future on ambiguities --

11    THE COURT:  Right.  We can have a future hearing.

12    MR. MAHAFFEY:  Right.

13    THE COURT:  Well, the idea was to have a streamlined

14  hearing to -- so we wouldn't have to have a full-blown

15  evidentiary hearing.  That's my understanding.

16    I thought the idea was to determine whether or not

17  the contract was executory, which is on the face of the

18  contract.

19    MR. MAHAFFEY:  Correct.  And we're prepared to --

20    THE COURT:  And if parol evidence was needed, we

21  could have a further hearing.  But it seemed to the Court that,

22  unless the contract was ambiguous, and, you know, we can hear

23  argument about that, you know, the Court should be able to

24  determine whether or not executory, so -- which would save

25  enormous litigation resources and having to litigate factual

1  issues regarding the contract.

2        If the contract can be interpreted on its face as

3  executory or not, it would seem to me that would eliminate a

4  lot of the unnecessary work that would be entailed in fully

5  litigating this matter.

6        And I thought that was the whole idea -- the whole

7  purpose of this hearing.

8        MR. MAHAFFEY:  I understood that, and so we were

9  prepared with our briefs and argument to argue why on its face

10  it's clearly executory.  And then the Court had allowed the

11  preliminary issue, which both sides briefed, which is that the

12  contract, even before we get to the executory analysis, simply

13  is not a bill of sale and doesn't transfer ownership, which

14  integrates with the executory nature --

15        THE COURT:  I'm sorry.  The contract doesn't do what?

16        MR. MAHAFFEY:  What we had discussed before is that

17  this equipment was paid for by the reorganized debtor for

18  millions of dollars, approximately $9 million of personal

19  equipment, audio, video equipment.  The initial position that

20  we had taken in our contempt proceeding and that when we set

21  this hearing was the reorganized debtor's position that their

22  --

23        THE COURT:  Well, I thought your position in state

24  court it was the respondent's property.

25        MR. MAHAFFEY:  Well, we --

1          THE COURT:  Isn't that what you said in the complaint

2  in state court?

3          MR. MAHAFFEY:  In state court we have alternative

4  theories on the complaint, which you complete in state court as

5  alternative.  It is not in any manner a bar to proceed.

6          THE COURT:  Well, isn't that an admission that it's

7  -- it is her property?

8          MR. MAHAFFEY:  No, it's not, because the -- the law

9  is unequivocally favorable against that conclusion on the basis

10 that unverified pleadings pled in the alternative for different

11 purposes, the primary claim in that action --

12         THE COURT:  Right.  Did you plead it in the

13 alternative?

14         MR. MAHAFFEY:  We did.  We pled in the alternative --

15         THE COURT:  In state court, in the complaint?

16         MR. MAHAFFEY:  Yes.  In the complaint what we did was

17 plead that the request was that the executory contract was

18 rejected in bankruptcy court and that if that's not the case,

19 then there is a --

20         THE COURT:  All right.

21         MR. MAHAFFEY:  -- breach of the contract to retrieve

22 Milner's property.  But if it was rejected, it was rejected on

23 the basis, among other things, that the contract never conveyed

24 ownership.

25         You can't convey ownership, Your Honor, in a contract

1  that doesn't specify personal property.  The basis of the

2  executory nature is integrated in the fact that there was never

3  a schedule.

4          THE COURT:  Well, let me ask you, so -- so you're

5  saying there wasn't a transfer, that the contract didn't

6  effectuate a transfer?

7          MR. MAHAFFEY:  Absolutely not.  I mean --

8          THE COURT:  And you're saying because there's no bill

9  of sale, is that what you're --

10         MR. MAHAFFEY:  Well, the bill of sale concept is the

11 most common process by which transfer of ownership.  But just

12 looking at the schedule, looking at the schedule, the language

13 of the schedule is very clear, these are examples.

14         The entire executory nature is there is a binder of

15 thousands of pages to identify thousands of separate objects

16 that cost millions and millions of dollars.  The entire concept

17 of the executory nature integrated with the bill of sale

18 concept was that there could never be a determination under

19 case law or simple analysis that this transferred ownership.

20 It was a to do.

21         In the future, the parties have contracted to sit

22 down, create binders, describe the property, and then transfer

23 possession of it.  And there was going to be a holding period

24 --

25         THE COURT:  So you're saying that in order to

1  transfer the property that's listed on the schedule to the

2  contract, you have to transfer possession?

3           MR. MAHAFFEY:  Well, two points.

4           THE COURT:  Is that a requirement?

5           MR. MAHAFFEY:  And I apologize if I'm not being

6  articulate.  Two points.

7           THE COURT:  Well, that's what I was trying to

8  understand because, you know, you cited a case regarding a bill

9  of sale, and so I was interpreting your argument as the

10 transfer required the bill of sale, and that no bill of sale,

11 no transfer.  I thought that was -- did I misunderstand your

12 argument?

13          MR. MAHAFFEY:  You -- you interpreted it slightly

14 different than the way it was written.  The bill of sale

15 concept is integrated into contract law on personal property

16 transfers.

17          THE COURT:  So in order to transfer personal

18 property, you have to have the bill of sale?

19          MR. MAHAFFEY:  You have to describe it.  No, no.  Let

20 me back up.

21          The entire argument is where is the description of

22 one thousand separate items that comprise seven tractor

23 trailers full?

24          If we were to move the personal property into this

25 courtroom, not only would it fill this courtroom and the one

1  next-door, because that's how many trailers are at stake, there

2  is a thousand separate transferrable items of personal property

3  that cost the debtor eight plus million dollars to purchase.

4          Any common sense is that if you think that you have

5  acquired ownership of one thousand separate widgets that cost

6  eight million dollars, a transfer --

7          THE COURT:  Well, can't you -- can't you just ascribe

8  categories of -- you don't have to list each and every object.

9          MR. MAHAFFEY:  That's not the law.  I mean, that's

10  the entire premise of the concept of law.  Cases with much

11  greater descriptions have rejected transfer of ownership.  And

12  then you're back to was the party's intent to --

13          THE COURT:  Well, let me give you a hypothetical.

14  What if the authorized party, the church, says, we're giving

15  this property to Ms. Milner to resolve our dispute, and we're

16  transferring it to her, we're giving it to her?  Isn't that

17  enough, orally, just say --

18          MR. MAHAFFEY:  No.

19          THE COURT:  -- giving her all the property that we

20  bought for the play production, we're giving it to her, isn't

21  that enough under California law to transfer that property?

22          MR. MAHAFFEY:  In that hypothetical, which doesn't

23  apply here, because the --

24          THE COURT:  Yeah, I know it doesn't apply here,

25  but --

1        MR. MAHAFFEY:  No.  So, I mean, I guess the simple

2   answer is no.  A verbal transfer of personal property that's

3   non-specified is insufficient as a matter of law --

4        THE COURT:  Well, it can be categories, so --

5        MR. MAHAFFEY:  If you categorically stated that you

6   were going to transfer property that was identifiable, in that

7   hypothetical, not applicable here --

8        THE COURT:  Well, I can just say, you know, all the

9   stuff that we bought for the play, we're giving it to Ms. Miler

10  now.  Isn't that enough?

11       MR. MAHAFFEY:  No, because the contract was we're

12  going to divide the ownership --

13       THE COURT:  No.  What I'm saying is that,

14  hypothetically, it could have been an oral transfer.  They just

15  describe the stuff generically, and wouldn't that be enough to

16  transfer the property?

17       MR. MAHAFFEY:  I am not aware of any experience in my

18  career nor contract where an individual was able --

19       THE COURT:  Well, now --

20       MR. MAHAFFEY:  -- to obtain a judgment --

21       THE COURT:  I'm just looking at --

22       MR. MAHAFFEY:  -- on a verbal --

23       THE COURT:  -- the California Civil Code that says

24  that property can be acquired by transfer.  That's Civil Code

25  Section 1000.  That property can be acquired by transfer.  A

1  transfer is an act where the parties say which title is

2  transferred from one party to another under Civil Code Section

3  1039, and it can be done orally.

4          MR. MAHAFFEY:  Well, I think -- so let me understand

5  --

6          THE COURT:  So under Civil Code Section 1052.

7          MR. MAHAFFEY:  Okay.  I -- I under --

8          THE COURT:  And so there's a case that stated that

9  while no particular form of transfer is required, it must be a

10  manifestation to one person by the owner of the right

11  indicating his intent to transfer without further action or

12  manifestation of intent the right to such other person or a

13  third person.

14      And there's a California Supreme Court case that's

15  called <u>Cockerell v. Title Insurance & Trust</u> 42 Cal. 2d 284 at

16  291, 1954, that basically said that.

17          You know, you don't have to the particular form to

18  transfer as long as, you know, you have a manifestation of

19  intent --

20          MR. MAHAFFEY:  Well, that's our whole case.

21          THE COURT:  -- to transfer.  And that can be -- it

22  can be in a contract.  You know, we can interpret the contract

23  or as not, and I think your argument is that the contract

24  doesn't manifest the present intent to transfer.

25          MR. MAHAFFEY:  It does not.  I think your

1    hypothetical --

2         THE COURT:  Well, we can -- we can read the contract

3    and decide that, but it can be done by contract, and you don't

4    have to list out each and every item.  You know, you can have

5    categories of items.

6         You know, it's just like, okay, I have a box of

7    nails.  You don't need to describe, you know, every nail.

8         MR. MAHAFFEY:  If I gave you the ownership in my

9    garage of everything in it and gave you a key and said

10   verbally, "I am transferring to the Court all the contents in

11   my garage, here is the key," there is no question I have

12   manifested an intent, I have described the location, and I have

13   delivered you means of possession.

14        Here, the contract said, "We're going to divide play

15   related versus non-play related."  We have eight million

16   dollars of audiovisual equipment, some of which we're keeping.

17        THE COURT:  Well, we can talk about what the contract

18   means.

19        MR. MAHAFFEY:  But that's the point is that in this

20   --

21        THE COURT:  Well, that's the -- that's the idea, so

22   we can see if there manifests a present intent to transfer the

23   property.

24        MR. MAHAFFEY:  Correct.  And that's why I wanted to

25   segue --

1          THE COURT:  So that's the other issue that we can

2   talk about, two issues, is whether or not there was a present

3   intent to transfer the property, and then, secondly, whether or

4   not the contract is executory.

5          MR. MAHAFFEY:  That's all I was saying.

6          THE COURT:  All right.

7          MR. MAHAFFEY:  And that's correct.

8          THE COURT:  So let me ask you a foundational

9   question, and I'll ask both sides.  You know, there are

10  different versions of the settlement agreement.  So which one

11  is the operative one?  Is there agreement between the parties

12  which is the operative one?

13         MS. MONTGOMERY:  Your Honor, I have an explanation

14  that Ms. Milner has explained to me, which is that the two --

15  we have compared the two agreements, the text of the two of

16  what we have identified as number five and number seven in our

17  exhibits.  The text is identical.

18         And you -- and you asked why is number five -- why is

19  there a difference in the position of some of the handwritten

20  interlineations on the two agreements.  And the reason is they

21  are identical, but one is identified and has at the top

22  Schuller copy, and number seven has CSM copy.

23         And apparently, when they walked into the meeting in

24  July 2005, they had two copies.  Carol had one copy, her mother

25  had the other copy for the church.  And when they decided they

1  needed to interlineate, they both interlineated the same thing,

2  but one is in her mother's handwriting, one is in Carol's

3  handwriting, identical.

4      They signed -- everyone but Gwyn Myers signed the

5  agreement on July 8, 2005.  Gwyn said she needed to add her

6  signature to it, and she's added her initials and she's added

7  her signature to the final agreement.

8      And then Gwyn and Ms. Milner agreed on the Exhibit 1,

9  which was the -- which is the definitive --

10      THE COURT:  I'm sorry.  Exhibits -- which one, 5 or

11  7?

12      MS. MONTGOMERY:  I'm sorry.  Scheduled -- it's

13  schedule 1 was added to what we put in as Exhibit 7.  We put in

14  Exhibit -- it says, "Schedule 1 distribution of Creation

15  assets."

16      That was changed between the agreement that was

17  signed July 8, 2005, and the one that Gwyn signed and put her

18  initials on on August 25, 2005.  That is a change.  And the

19  Exhibit A to the agreement was added, which just definitively

20  stated the amounts.  That was added, and that was signed.

21      THE COURT:  Well, I just noticed the differences that

22  were pointed out that Exhibit 5 doesn't have Gwyn Myers'

23  signature, and Exhibit 7 does.

24      MS. MONTGOMERY:  No, that's the change.  Gwyn Myers

25  signed -- went ahead and signed it, but the text of it was

1  identical.  Gwyn added her --

2          THE COURT:  Well, the contract, it seemed like the

3  text was identical.  It's the schedule that's different, right?

4          MS. MONTGOMERY:  That's right.  And the schedule --

5          THE COURT:  And the schedule -- you know, you have

6  this thing about the Martin MAX, I guess the lights, and so

7  before it was to be split, and the --

8          MS. MONTGOMERY:  It is split.

9          THE COURT:  -- later version apparently decided the

10  ones that are hanging in the cathedral go to the church, and

11  the ones not hanging in the cathedral go to Ms. Milner.

12          MS. MONTGOMERY:  Well, those were the same -- those

13  are the same lights that they're talking about, and they just

14  --

15          THE COURT:  Right.

16          MS. MONTGOMERY:  -- divided them up.

17          THE COURT:  But the difference is that, you know, the

18  prior -- it looked like the prior version was the parties would

19  split, you know, the Martin MAX, and then they decided what to

20  do with the Martin MAX, and when they're hanging in the church,

21  the church will keep and the ones not hanging in the church

22  were Ms. Milner.

23          MS. MONTGOMERY:  That was just the -- that was just

24  the identification -- that was just the split.

25          THE COURT:  Well, but that's the -- that's the

1  difference in the way the schedule is written.

2          MS. MONTGOMERY:  Well, schedule -- the schedule

3  that's attached to the version in Exhibit 7, that is the final

4  agreement.

5          THE COURT:  That would seem to make sense, because

6  the parties had a discussion --

7          MS. MONTGOMERY:  Right.

8          THE COURT:  -- and then they decided how they were

9  going to split it.

10          MS. MONTGOMERY:  Right.

11          THE COURT:  And that was -- that reflects a split

12  before thee wasn't a split.

13          MS. MONTGOMERY:  Right.

14          MR. MAHAFFEY:  That's not correct at all.  I mean,

15  Your Honor, with all due respect to counsel's interpretation,

16  this record is established.  The schedule -- there is two

17  Schedule 1's.

18          THE COURT:  Well --

19          MR. MAHAFFEY:  I mean, the main point that we made in

20  our brief is that --

21          THE COURT:  Well, but Ms. Myers signed the one that's

22  Exhibit 7, so -- but it seems to me that they're waiting for

23  Ms. Myers to sign it as sort of like the outside board member.

24          MR. MAHAFFEY:  No.  They've not explained -- the most

25  material difference -- this is basic contract law.  Ms. Milner

1    didn't sign the second contract.  And we're back --

2            THE COURT:  She didn't sign --

3            MR. MAHAFFEY:  We're full circle that --

4            THE COURT:  Oh, I'm sorry.  She didn't sign which

5    one?

6            MR. MAHAFFEY:  No, she didn't.  If you look at the

7    schedule on Exhibit 7, that was the number one point we made.

8    There is five initials on one and four on the other.  The very

9    one missing is Ms. Milner's.  She did not initial the second

10   schedule.

11           So it begs the question how do we split -- this is

12   barred by claim preclusion, was our number one point.  Part of

13   this contract was litigated.  This court entered a judgment in

14   favor of the debtor.

15           Now we're coming back some seven years later, after

16   this event of the petition was filed, eight years after the

17   petition was filed, and Ms. Milner, who doesn't initial the

18   schedule that she now claims is the binding schedule says that

19   that's the one controls, but the one she initialed is another

20   schedule, meaning the dispute as to the enforceability of this

21   contract was the very argument the plan administrator made,

22   which is that this contract is uneforceable on its face, it's

23   an insider agreement, and they prepared a trial.

24           Now, that trial was focused on the other paragraph

25   that Ms. Milner was claiming, which is that there was

1 intellectual property.  So those contracts were identified.

2 Witnesses were lined up, and this court issued a judgment.

3         Now the reorganized debtor --

4         MS. MONTGOMERY:  Excuse me, Your Honor.

5         MR. MAHAFFEY:  Let me finish.

6         MS. MONTGOMERY:  He is misstating --

7         MR. MAHAFFEY:  I'm not finished.

8         MS. MONTGOMERY:  I --

9         MR. MAHAFFEY:  I'm not finished.

10         THE COURT:  Well, wait, wait --

11         MR. MAHAFFEY:  I'm not finished.

12         THE COURT:  -- wait, wait, wait.

13         MR. MAHAFFEY:  I'm not finished.  I'm not finished.

14         THE COURT:  Let's --

15         MR. MAHAFFEY:  I mean, I will wait for counsel to

16 interrupt.

17         THE COURT:  Well, what I was going to say is we're

18 trying to figure out which is the version of the contract.

19         MR. MAHAFFEY:  And the point I'm trying to make is

20 that the --

21         THE COURT:  Well, you're -- what you're saying is

22 that Exhibit 7 -- well, Exhibit 7 has her initials, except --

23         MR. MAHAFFEY:  On the schedule, which is what we're

24 here for.

25         THE COURT:  On the schedule.

1          MR. MAHAFFEY:  Right.  So if you were step --

2          THE COURT:  Well, I guess we can hear from her as to

3 why her initials aren't on the final schedule.

4          MR. MAHAFFEY:  Well, I think it begs --

5          MS. MONTGOMERY:  It's her copy.

6          MR. MAHAFFEY:  It begs the --

7          THE COURT:  What's that?

8          MS. MONTGOMERY:  This is her copy, is number 7.  So

9 if I didn't sign my own copy, it could certainly be corrected

10 if necessary.  And Ms. Milner is here.

11          THE COURT:  Well, I guess the thing is that --

12          MR. MAHAFFEY:  There's not mutual --

13          THE COURT:  Well, I guess we don't have Ms. Myers

14 here, but it would seem to me that the final version --

15 everyone -- it seemed to be everyone who was involved in the

16 transaction wanted Ms. Myers to sign off on it, right?

17          MS. MONTGOMERY:  Right.  And they're the party that

18 was to be bound by this, and they all signed off.

19          THE COURT:  Well, okay.  Maybe you can explain to me,

20 because we have signatures on behalf of the church by -- I

21 guess we call it --

22          MS. MONTGOMERY:  Well, Dr. --

23          THE COURT:  Well, okay.  You know, I guess he liked

24 to be called Dr. Schuller, even though even though he is an

25 honorary doctor.

1          MS. MONTGOMERY:  Revered Schuller.

2          THE COURT:  Reverend Schuller seems to be more

3  appropriate, because he was recognized as, right, a church -- I

4  guess the leader of this particular church.

5          MS. MONTGOMERY:  Yes.

6          THE COURT:  By the parent -- I guess you call it --

7  organization.

8          MS. MONTGOMERY:  He was the -- he was the founder.

9          THE COURT:  He was the founder of the church.

10         MS. MONTGOMERY:  He was the CEO.

11         THE COURT:  Right.  And wasn't the church also

12 affiliated with another national organization?

13         MS. MONTGOMERY:  I don't know.  I don't think -- I

14 don't think it's ever come into this.

15         THE COURT:  All right.

16         MS. MONTGOMERY:  It's not like the Catholic Church.

17         THE COURT:  Yeah.  Yeah, I think --

18         MR. MAHAFFEY:  It was submitted.

19         THE COURT:  -- he was known as Reverend.

20         MS. MONTGOMERY:  Yes.

21         THE COURT:  Right.

22         MR. MAHAFFEY:  It was submitted -- that question is

23 excellent, Your Honor, because the primary overlay of this is

24 we're post plan confirmation.  We have a dispute as to the

25 mutual assent of the parties.  We have different issues,

1  different --

2          THE COURT:  Well, I guess --

3          MR. MAHAFFEY:   -- versions of --

4          THE COURT:  Well, I guess what I'm trying to figure

5  out is it seems to me that the hearing was supposed to be about

6  interpreting the contract, whether it was executory or not.

7          And so I'm trying to figure out now, you know, what

8  is the definitive final version of the contract so we can talk

9  about whether or not, you know, it's executory or not.

10          MS. MONTGOMERY:  The testimony in the declaration,

11  admissible testimony with foundation from Ms. Milner is Exhibit

12  7 is the final agreement that was agreed upon.

13          THE COURT:  And -- and this is her copy, and --

14          MS. MONTGOMERY:  This is her copy.  She can be --

15  come up for cross-examination --

16          THE COURT:  All right.

17          MS. MONTGOMERY:  -- for -- they have absolutely

18  nothing, as Your Honor correctly --

19          THE COURT:  Well, just hold on for a second.  Okay.

20  So, basically, her testimony -- your offer of proof is her

21  testimony would be Exhibit 7 is the final version.

22          MS. MONTGOMERY:  Yes.

23          THE COURT:  And that's her copy, which she just

24  didn't initial the schedule, because it was her copy.

25          MS. MONTGOMERY:  Yes.

1            THE COURT:  That would be her testimony.

2            MS. MONTGOMERY:  Yes.

3            THE COURT:  And do we have somebody from the church

4    who would -- we don't have --

5            MR. MAHAFFEY:  We don't.  You know, I -- again, I --

6            THE COURT:  Well, I was going to say, in Ms. Myers'

7    --

8            MR. MAHAFFEY:  The ambiguity --

9            THE COURT:  -- declaration, did she talk about the

10   version of the contract?

11           MR. MAHAFFEY:  She did.  So her -- the church's

12   position is the offer of proof is that these --

13           THE COURT:  Well, no, I'm just asking about her --

14           MR. MAHAFFEY:  Her declaration stated that --

15           THE COURT:  Let's take a look at her declaration.

16   All right.  Her declaration -- if you can just refer, everyone,

17   her declaration as to -- let's see.  What did I do with it?

18           MS. MONTGOMERY:  She doesn't even address it, Your

19   Honor.

20           THE COURT:  Well, that's why I want to look for it,

21   so we're on the same page.

22           MR. MAHAFFEY:  So she starts at page 2 of her

23   declaration, which is docket 2068, starting at paragraph 7, and

24   through paragraph 12, 12 saying, "I'm aware of at least two

25   different versions of the July 8th document, one of which has a

1  handwritten entry at the top that says "Final," and one with

2  different handwriting entries."

3          And the balance of her declaration talks about there

4  was no board approval because of the difference between --

5          THE COURT:  I'm sorry.  Which paragraph, Mr.

6  Mahaffey?

7          MR. MAHAFFEY:  So the first --

8          THE COURT:  Which paragraph are you talking about?

9          MR. MAHAFFEY:  The paragraph I just read, Your Honor,

10  was paragraph 12, where she --

11          THE COURT:  All right.  Paragraph 12.  All right.

12  Right.  She said that she's aware of two different versions of

13  the contract, one that says final and one with different

14  handwritten entries.

15          And I saw that paragraph, but it didn't say which one

16  is the one that is operative.  Did she given an opinion about

17  that?

18          MR. MAHAFFEY:  No.  She stated the opposite in

19  paragraph 11, which is that the board didn't approve this, and

20  it was considered to be --

21          THE COURT:  The board didn't approve --

22          MR. MAHAFFEY:  Paragraph 11 reads as follows, "On

23  August 3rd, 2006, upon learning of this document, other board

24  members expressed concerns about transferring this amount of

25  substantial personal property to Ms. Milner, which CCM had paid

1  millions of dollars to purchase.  I understood that Ms. Milner

2  as a family member was legally considered an insider to CCM and

3  nonprofit --

4            THE COURT:  Well, just hold on a second.  All right.

5  So she doesn't really -- you know, the -- well, I guess that

6  sort of begs the question is that if everyone was concerned,

7  including her, was concerned about the transfer of property,

8  why did she sign, you know --

9            MS. MONTGOMERY:  Exactly.

10           THE COURT:  -- the -- right.  Why did she sign the

11 final version?

12           MR. MAHAFFEY:  There's a different --

13           MS. MONTGOMERY:  22 days --

14           THE COURT:  Right.

15           MS. MONTGOMERY:  22 days later.

16           THE COURT:  Right.  That's why I'm saying, why was --

17 if she was concerned about it, why did she sign it?

18           MR. MAHAFFEY:  Because the difference --

19           THE COURT:  And isn't her initials on the schedule,

20 too?

21           MS. MONTGOMERY:  Yes.

22           MR. MAHAFFEY:  But the difference is is that this --

23           THE COURT:  No, but what I was going to say is that

24 if everyone is concerned about it -- you know, from my

25 understanding, from what it looks like, is that the church

1  bought these assets.  All right.  I don't think there's

2  probably any dispute about that.

3           MR. MAHAFFEY:  Correct.

4           THE COURT:  And then to settle the dispute, you know,

5  it agreed that Ms. Milner would get the assets.

6           MR. MAHAFFEY:  Not true.

7           MS. MONTGOMERY:  Yes.

8           MR. MAHAFFEY:  Not true.

9           THE COURT:  Well, that's --

10          MR. MAHAFFEY:  The church said they bought the assets

11 and the exact language is there is play related --

12          THE COURT:  Well, then -- then we just talk about --

13 then we just talk about -- this is the -- okay.  So we should

14 hear testimony about this is the contract.

15          MR. MAHAFFEY:  Well, how is this not ambiguous?

16 Again, and I apologize if I misread the Court's last order.

17          THE COURT:  Well, then we can argue -- if we can talk

18 -- we can make a determination, you know, that this is the

19 contract, then we can argue about what it means.

20          MR. MAHAFFEY:  Right.  But if you have two versions,

21 by definition, aren't we in a textbook example of ambiguity?

22          THE COURT:  No, no, no.  I guess --

23          MR. MAHAFFEY:  One with initials and one --

24          THE COURT:  Well, I guess we should figure out if

25 they're -- I think we should figure out, you know, is there --

 1  is there a contract or there is not.

 2          MS. MONTGOMERY:  Well, Carol Milner is testifying.

 3          THE COURT:  Well, that's what I'm asking is can we

 4  just -- I guess we should take testimony and --

 5          MS. MONTGOMERY:  But you have -- but you asked for --

 6  you asked for declarations.

 7          THE COURT:  Yes.

 8          MS. MONTGOMERY:  And for trial.

 9          THE COURT:  That's what I was going to say is that,

10  you know, the Court should make a finding based on the

11  evidence, you know, what is the contract, if a contract exists.

12          MS. MONTGOMERY:  And --

13          THE COURT:  And then we can go on from there.  Then

14  we can argue whether -- you know, what it means.  But the first

15  question is, you know, was there a contract.  And the church is

16  suggesting there wasn't a contract because there are different

17  versions.

18          But --

19          MS. MONTGOMERY:  Your Honor, you said --

20          THE COURT:  Well, why don't we just take evidence,

21  and then the Court will make a finding?

22          MS. MONTGOMERY:  But, Your Honor, you said and agreed

23  that there is no --

24          THE COURT:  Well, I didn't realize that there was

25  this dispute over the versions of the contract, and --

1          MS. MONTGOMERY:  There isn't a dispute.  There isn't

2    anything --

3          THE COURT:  Well, it sounds like there -- well, he is

4    saying there's a dispute.

5          MS. MONTGOMERY:  He's making up --

6          MR. MAHAFFEY:  We're not making up anything.  The

7    reorganized debtor has --

8          THE COURT:  Well --

9          MR. MAHAFFEY:  -- succinctly stated because the

10   versions were never --

11         THE COURT:  Well, why don't we just do this.  All

12   right.

13         MR. MAHAFFEY:  We're prepared to proceed --

14         THE COURT:  So the church doesn't have -- is not

15   calling any witnesses at this point because their witnesses are

16   unavailable.

17         MS. MONTGOMERY:  Not only are they not available, in

18   the declaration --

19         THE COURT:  Well, let's -- let's --

20         MS. MONTGOMERY:  -- there is no --

21         THE COURT:  Let's not argue whether or not they're --

22   they're not here.  They're not available.

23         MS. MONTGOMERY:  I understand.

24         THE COURT:  So why don't we just hear from the

25   respondent's witness.

30

1            MS. MONTGOMERY:  That's fine.

2            THE COURT:  All right.  So --

3            MS. MONTGOMERY:  But her declaration -- her

4    declaration is her direct testimony.

5            THE COURT:  That's right.  That's right.  I

6    understand that.

7            MS. MONTGOMERY:  Okay.

8            THE COURT:  Okay.  So --

9            MS. MONTGOMERY:  So --

10            THE COURT:  But there are objections to her --

11            MS. MONTGOMERY:  No, there aren't.

12            THE COURT:  There are no objections to her

13    declaration?  All right.

14            MS. MONTGOMERY:  Well, the only objection is he's --

15            THE COURT:  Well, were there any filed -- were there

16    any --

17            MR. MAHAFFEY:  We filed a set of objections on the

18    basis that the declaration incorporates exhibits that were

19    specifically not allowed by the Court.

20            THE COURT:  All right.  So --

21            MR. MAHAFFEY:  Your language was --

22            THE COURT:  Okay.  Now --

23            MR. MAHAFFEY:  The Court's language was --

24            THE COURT:  -- where are those stated?  Are they

25    stated in your reply?

1          MR. MAHAFFEY:  They are stated in a separate

2  evidentiary objection that we filed to the declaration itself.

3          THE COURT:  So it says -- well, you have this

4  objection to request to strike the declarations of Carl Grumer

5  and Harold Light.

6          MR. MAHAFFEY:  And all exhibits.  So our --

7          THE COURT:  Oh, okay.  So that's -- okay.  So not to

8  the testimony, but to the exhibits?

9          MR. MAHAFFEY:  Well, the testimony we're going to

10  cross-examine.

11          THE COURT:  Right.  You get to cross-examine her.

12          MR. MAHAFFEY:  Right.  But we weren't -- we weren't

13  asking the Court to strike --

14          THE COURT:  And that you've objected to the exhibits

15  that --

16          MR. MAHAFFEY:  Right.

17          THE COURT:   -- in your declaration, right, Mr.

18  Mahaffey?  Your declaration, you state --

19          MR. MAHAFFEY:  No, the Court's -- I quoted the

20  Court's language, and that's why I think we're in a position to

21  where I think both attorneys objectively were confused.

22          The Court's language was, "I don't need further

23  exhibits.  I'll look at the ones" -- that was your exact

24  language -- "I will look at the ones you have already filed

25  with your moving petition and the status conference.  I don't

1  want additional exhibits."

2         Now, we have 50 exhibits that we believe prove, among

3  other things, there was no meeting of the minds.  But when the

4  Court made those statements and we --

5         THE COURT:  Well --

6         MR. MAHAFFEY:  -- we relied on them, I don't know how

7  else I could have --

8         THE COURT:  But I think that if we go back to --

9         MS. MONTGOMERY:  Your Honor, I need to -- I need --

10         THE COURT:  Just hold on for a second, Ms.

11  Montgomery.  But if we go back to, you know, your client's

12  original exhibit, your original declaration filed back to June,

13  that it has a copy of Exhibit 7, it looks like, attached as

14  Exhibit A.

15         MS. MONTGOMERY:  It didn't have -- I don't think it

16  had the trust agreement attached, because, basically, we just

17  attached the same document that Mr. Mahaffey attached -- had

18  attached to his motion for an OSC re: contempt.

19         THE COURT:  Oh, is it the same document?

20         MS. MONTGOMERY:  Yeah.

21         MR. MAHAFFEY:  It's not the same document, because

22  their Exhibit 7 --

23         THE COURT:  Well, why don't we just take a look at --

24  okay.  So we have Exhibit A to Ms. Milner's original

25  declaration, and we have --

33

1          MS. MONTGOMERY:  You can also look at the complaint

2  that -- that Mr. Mahaffey --

3          THE COURT:  Well, why don't we look at the document

4  -- the documents that are attached to the motion.  So we have,

5  I believe --

6          MS. MONTGOMERY:  I don't have the original motion, or

7  maybe --

8          THE COURT:  Well, it was, I believe, docket number

9  2031.  That's what I have.  That was filed on June 4, 2018.

10  And that's the original -- that's -- as I understand it, your

11  exhibit, right, Mr. Mahaffey, is that the original -- your

12  original motion, right, had exhibits, and then I believe that

13  you're also asking for the Court to take judicial notice of

14  certain exhibits?

15          MR. MAHAFFEY:  We have two -- we have two groups of

16  exhibits that the Court had stated in our last hearing were the

17  only exhibits it was going to consider at that time.

18          THE COURT:  Well --

19          MS. MONTGOMERY:  That is not --

20          THE COURT:  Well, on your side.  On your side.

21          MR. MAHAFFEY:  Well, no, the --

22          MS. MONTGOMERY:  Yes.  That is --

23          THE COURT:  On your side.

24          MR. MAHAFFEY:  If I may, I know Ms. Montgomery wants

25  to disagree.

1          THE COURT:  Well, I was going to say on your side.

2   Okay.  So we have, on your side, the exhibits are attached to

3   the original motion and your request for judicial notice,

4   right?  Those are your exhibits?

5          MR. MAHAFFEY:  And the exhibits attached to the

6   status conference report.

7          THE COURT:  The status conference report.  All right.

8   So there is a status conference report.

9          MR. MAHAFFEY:  May I be briefly heard on --

10          THE COURT:  Well, I'm trying to locate all -- I want

11  to make sure that I have all your exhibits properly identified.

12  So before we move to the next thought --

13          MR. MAHAFFEY:  So --

14          THE COURT:  So we have the status report that was

15  filed by both sides with exhibits attached?

16          MR. MAHAFFEY:  That's 20 -- that's 2059.

17          THE COURT:  Yeah, 2059.

18          MR. MAHAFFEY:  And the moving party's exhibits are at

19  the back of that document, starting with our Exhibit 1 at page

20  47.

21          THE COURT:  Right.  All right.  Are those essentially

22  the same as attached to the original motion?

23          MR. MAHAFFEY:  No.  These were documents indicating

24  that there was specific communication that this contract was

25  objected.

1          THE COURT:  All right.  So your exhibits would be

2     motion Exhibits 1 through 6, this is tabbed 1 through 6, and

3     then the request for judicial notice filed on the same day,

4     Exhibits A and B.  And then we have the joint status report

5     exhibits that are Exhibits A and B and 1 through 7, right?

6     Those are the movant's exhibits, right?

7          MR. MAHAFFEY:  Those are the exhibits that the Court,

8     when it made --

9          THE COURT:  Well, those are the exhibits that --

10    those are your exhibits, right?

11         MR. MAHAFFEY:  When you said, quote, "You don't need

12    to submit additional exhibits," --

13         THE COURT:  Well --

14         MR. MAHAFFEY:  -- "I will just look at the exhibits

15    you have" --

16         THE COURT:  Well, but then again, I couldn't have

17    meant that no exhibits could be presented by the respondents.

18    That wouldn't make any sense.

19         MR. MAHAFFEY:  No, you're addressing to both of us.

20    The question was from counsel.

21         THE COURT:  Well --

22         MR. MAHAFFEY:  And the point is --

23         THE COURT:  Well, right.  Right.

24         MR. MAHAFFEY:  -- is that I don't want to

25    disadvantage my --

1          THE COURT:  I probably was trying to streamline this,
2  but --
3          MR. MAHAFFEY:  I don't want to --
4          THE COURT:  All right.  So let me --
5          MR. MAHAFFEY:  -- disadvantage my --
6          THE COURT:  Okay.  Now let me turn to the
7  respondents.
8          MS. MONTGOMERY:  Okay.
9          THE COURT:  Now, the exhibits on the respondents'
10 side, are -- those are attached to originally Ms. Milner's
11 declaration, right?
12         MS. MONTGOMERY:  Yes.  But why don't you -- if you go
13 back to Mr. Mahaffey's papers --
14         THE COURT:  Well, why don't we just -- why don't we
15 just go step by step.  I just want to understand your side,
16 instead of having to argue back and forth.
17         MS. MONTGOMERY:  I'm not arguing.
18         THE COURT:  I'm just --
19         MS. MONTGOMERY:  I'm not arguing.
20         THE COURT:  Right.  So I don't want to argue.  I
21 mean, his argument is -- is that it's only the exhibits that
22 his side presented, apparently, which I don't agree with, so --
23         MS. MONTGOMERY:  Okay.  But you asked for which
24 contract is the final contract, okay.  And --
25         THE COURT:  Well --

1          MS. MONTGOMERY:  I -- excuse me.

2          THE COURT:  -- just hold on for a second.

3          MS. MONTGOMERY:  Excuse me.

4          THE COURT:  I'm going to let counsel -- Mr. Mahaffey,

5  I'm going to let counsel for the respondents use the lectern.

6  All right.  Thank you.

7          All right.  So, Ms. Montgomery, we have the

8  declarations of your clients, Ms. Milner and Mr. Light, that

9  were filed in the original opposition that was filed on June

10  12, 2018, and you have exhibits that are tabbed --

11          MS. MONTGOMERY:  A through --

12          THE COURT:  -- A through L.

13          MS. MONTGOMERY:  True.

14          THE COURT:  All right.  So those are part of what I

15  would consider, you know --

16          MS. MONTGOMERY:  Those are basically duplicative of

17  what we did.  We made -- we tried to make this easy for the

18  Court.  We have a single decla --

19          THE COURT:  Well, I was going to say, these are the

20  exhibits that were before the Court when the Court set this

21  hearing.

22          MS. MONTGOMERY:  Yes.  And --

23          THE COURT:  All right.

24          MS. MONTGOMERY:  And --

25          THE COURT:  Now, the other exhibits that --

1              MS. MONTGOMERY:  Many of them are the same exhibits

2  that are currently -- we provided a notebook.  Those just

3  follow the --

4              THE COURT:  Well, right.

5              MS. MONTGOMERY:  -- filed for this hearing.

6              THE COURT:  And then we have -- let's see.

7              MS. MONTGOMERY:  Your Honor, I --

8              THE COURT:  Then we have -- do you also have -- let's

9  see.  Other exhibits -- you have the second set of declarations

10 from your client as well -- your clients, as well as Mr.

11 Grumer.

12             MS. MONTGOMERY:  Yes.

13             THE COURT:  Which were filed on --

14             MS. MONTGOMERY:  Timely, on the 7th.

15             THE COURT:  -- September 7th.  All right.

16             MS. MONTGOMERY:  But --

17             THE COURT:  So are there other exhibits that we're

18 talking about?  Because those exhibits are numbered 1 through

19 38.

20             MS. MONTGOMERY:  Yes.  Those are all our exhibits.

21             THE COURT:  Right.  Now, Exhibit 7, which was the one

22 that we were discussing earlier as -- from the respondents'

23 perspective, is the definitive contract.

24             Is that -- is that an exhibit that was submitted

25 previously?

1                    MS. MONTGOMERY:  Yes.

2                    THE COURT:  Which is --

3                    MS. MONTGOMERY:  Your Honor --

4                    THE COURT:  I know Exhibit A was most of it, except

5    for the trust agreement part, right?

6                    MS. MONTGOMERY:  Yes.  But if you look at Mr.

7    Mahaffey's request to take judicial notice that was part of his

8    motion for contempt --

9                    THE COURT:  Right.

10                   MS. MONTGOMERY:  -- it is his state court complaint,

11   Exhibit 1 to his state court complaint is the agreement, and it

12   is the Exhibit 7.  It is the same agreement.

13                   THE COURT:  Okay.  Why don't -- can I -- let me just

14   take a look at that just to confirm that.  So we have Mr.

15   Mahaffey's request for judicial notice, docket number 2032,

16   filed on June 4, 2018, and Exhibit A, as part of the request

17   for judicial notice, is the complaint for declaratory

18   injunctive relief filed in the Superior Court of California,

19   County of Orange, on November 7, 2017, right?

20                   MS. MONTGOMERY:  Yes.

21                   THE COURT:  And you're saying is that the -- one of

22   the exhibits to the complaint is the same contract that's

23   Exhibit 7 to the --

24                   MS. MONTGOMERY:  Yes.

25                   THE COURT:  -- later declarations filed by

1  respondents and Mr. Grumer, right?

2          MS. MONTGOMERY:  Yes.

3          THE COURT:  And so that is which exhibit to the --

4          MS. MONTGOMERY:  The first one.

5          THE COURT:  -- Exhibit A?

6          MS. MONTGOMERY:  The first one.

7          THE COURT:  The first one?  All right.  So -- oh,

8  you're right.  Okay.  So -- because I -- Exhibit 2, which

9  apparently is the second amended plan in this case, is

10  voluminous.

11          MS. MONTGOMERY:  Yes.

12          THE COURT:  So the exhibit before that is -- all

13  right.  So Exhibit 1 to the state court complaint that the

14  church had filed --

15          MS. MONTGOMERY:  Yes.

16          THE COURT:  -- is the same thing as Exhibit 7?

17          MS. MONTGOMERY:  Yes.

18          THE COURT:  All right.  So that's already before the

19  Court.  So Exhibit 1 as to Exhibit A to the request for

20  judicial notice is the same as Exhibit 7?

21          MS. MONTGOMERY:  Yes.  And his complaint specifically

22  incorporates that.

23          THE COURT:  Okay.  So -- so it's already before the

24  Court?

25          MS. MONTGOMERY:  Yes.

41

1          THE COURT:  Okay.

2          MR. MAHAFFEY:  We disagree respectfully with that.

3          THE COURT:  Well, you disagree with, you know,

4  whether it is or it isn't, but it's part of the record.

5          MR. MAHAFFEY:  It's not the same --

6          THE COURT:  Because you asked the Court to take

7  judicial notice of that.

8          MR. MAHAFFEY:  Okay.  So let me see if I can

9  articulate this further.

10          THE COURT:  Well, I'm not asking you to articulate --

11          MR. MAHAFFEY:  It's missing ten pages.

12          THE COURT:  Can I just say --

13          MR. MAHAFFEY:  It's missing ten pages.

14          MS. MONTGOMERY:  It's missing the trust agreement.

15          THE COURT:  Okay.  It's missing the trust agreement.

16          MR. MAHAFFEY:  Okay.  So let's stop.

17          THE COURT:  So is --

18          MR. MAHAFFEY:  They're not the same.

19          THE COURT:  Okay.

20          MR. MAHAFFEY:  Because the trust agreement says --

21          THE COURT:  Okay.  Let's just stop.  Why don't we all

22  stop.

23          So is the trust agreement material?

24          MS. MONTGOMERY:  No.

25          MR. MAHAFFEY:  It is.  It says it supersedes the

1 | other document.

2 | THE COURT:  No, I was going to say it's --

3 | MS. MONTGOMERY:  Not.

4 | MR. MAHAFFEY:  It does.

5 | THE COURT:  What I was going to say is that your --

6 | Ms. Montgomery, the trust agreement is not material?

7 | MS. MONTGOMERY:  It is not material.  It was never --

8 | it was signed.  It was notarized by --

9 | THE COURT:  Okay.  So what i was going to say --

10 | MS. MONTGOMERY:  -- Ms. Myers.

11 | THE COURT:  -- is that -- okay.  So we can disregard

12 | the trust agreement?

13 | MS. MONTGOMERY:  Yes.

14 | MR. MAHAFFEY:  Our position is the trust agreement on

15 | its face says it's the controlling document.

16 | THE COURT:  Well, but it's not in evidence, because

17 | you're not offering it, and apparently she says she may not be

18 | offering it.

19 | So do you want Exhibit 7 in?

20 | MR. MAHAFFEY:  Yes.

21 | THE COURT:  Okay.  So he agrees that Exhibit 7 is in.

22 | MS. MONTGOMERY:  Okay.

23 | (Exhibit 7 Received in Evidence)

24 | MS. MONTGOMERY:  So now we have a contract.

25 | THE COURT:  And we can argue what it means.  Okay.

1        MS. MONTGOMERY:  So now we can argue what it means.

2        THE COURT:  All right.  So Exhibit 7 is in.

3        MR. MAHAFFEY:  And we have no objection to Exhibit 5,

4   because that's the other version that's been already --

5        MS. MONTGOMERY:  No.  The final one is Exhibit 7, and

6   that's --

7        THE COURT:  Well --

8        MR. MAHAFFEY:  -- the ambiguity --

9        MS. MONTGOMERY:  No.

10       THE COURT:  All right.  Just hold on for a second.

11  Now, Exhibit 5, are you offering that?

12       MS. MONTGOMERY:  No, other than as an explanation as

13  to what the document itself, minus the schedule, is --

14       THE COURT:  So do you have any objection to letting

15  them offer Exhibit 5?

16       MS. MONTGOMERY:  I object to them offering Exhibit 5

17  to the extent that they want to -- they claim that that's in a

18  final --

19       THE COURT:  Well, they want to offer -- well, it's

20  your exhibit and --

21       MS. MONTGOMERY:  It doesn't have their client -- it

22  doesn't have Ms. Myers' signature on it or her initials.

23       THE COURT:  Yeah.  It doesn't have Ms. Myers'

24  signature.  Just because someone handwrote it final doesn't

25  mean it's final.

1            MS. MONTGOMERY:  No, it doesn't.

2            THE COURT:  Yeah.  That's what I understood.

3   Logically, because if Ms. Myers was supposed to sign it, and

4   she didn't sign it, that doesn't necessarily mean it's final.

5            MS. MONTGOMERY:  Not until she signed it.

6            THE COURT:  Well, I don't know.  I don't know.

7            MR. MAHAFFEY:  But the point is is Exhibit 5, which

8   was offered by the respondent, Schedule 1, which is what we're

9   looking at today --

10           THE COURT:  Well, she's not offering it.  She's not

11  offering it.

12           MS. MONTGOMERY:  Not for that purpose.

13           MR. MAHAFFEY:  No, she did offer it.  She attached it

14  to her exhibits, and she attached it --

15           THE COURT:  Well, what I was going to say, if it's --

16  if it's -- if it's offered, it's going to be offered for all

17  purposes.  It's going to be considered for all purposes.

18           MS. MONTGOMERY:  It has to follow the testimony that

19  came in, which is this --

20           THE COURT:  Well, you know, you can argue -- you

21  know, if it's in, it's in, and you can argue what it means with

22  the testimony that concerns that exhibit, and the Court can

23  determine what it means.

24           MS. MONTGOMERY:  That's fine.

25           THE COURT:  All right.  So Exhibit 5 and Exhibit 7

1  are in that were attached to the respondent's supplemental

2  declarations.

3              (Exhibit 5 Received in Evidence)

4         MS. MONTGOMERY:  Should all of -- all of our exhibits

5  should be in, and I would ask that you make a finding or that

6  you overrule the objection that Mr. Mahaffey filed.

7         THE COURT:  No, we haven't got that yet.  We haven't

8  --

9         MS. MONTGOMERY:  But we should start with it.

10        THE COURT:  We haven't got there yet.  Okay.  The

11 first --

12        MS. MONTGOMERY:  Shouldn't we start with it?

13        THE COURT:  The first, where we are, we're trying to

14 do it in a methodical way, first to identify whose -- who is

15 offering what exhibits, and then, secondly, you know, if there

16 are any disputes whether or not any of the exhibits should be

17 received.

18        And so --

19        MS. MONTGOMERY:  Okay.  But we have --

20        THE COURT:  Well, let -- well, let's start with the

21 movant's exhibits that are attached to the original motion,

22 request for judicial notice, and the status report.

23        MS. MONTGOMERY:  We don't --

24        THE COURT:  Are there any objections to any of those

25 exhibits?

1          MS. MONTGOMERY:  No.  No.

2          THE COURT:  Okay.  So --

3          MS. MONTGOMERY:  I'm not sure that they were

4    authenticated.

5          THE COURT:  All right.  So --

6          MS. MONTGOMERY:  I don't know that they were

7    authenticated, but we don't object to them.

8          THE COURT:  All right.  So it doesn't matter if they

9    were authenticated or not.  You can just argue what they mean.

10   They're in.  All right.  So the exhibits that are attached to

11   the church's original motion, reorganized debtor's original

12   motion that are attached to the request for judicial notice and

13   the exhibits -- all the exhibits that are attached to the joint

14   status report are all received.  There is no objection by the

15   respondents.  All right.

16         MR. MAHAFFEY:  Our objection is, of course, to the

17   hearsay and lack of foundation as they come up.

18         THE COURT:  Well, no, I'm asking now are there any

19   objections to those, any of those, because it would seem to me,

20   aren't you offering the ones that you attached to your motion

21   and the request for additional notice?

22         MR. MAHAFFEY:  We are.  We are offering those, and

23   they are --

24         THE COURT:  Right.  So those are received.  And then

25   the status report, the ones that are attached to the status

1  report --

2          MR. MAHAFFEY:  I see.  The Court already, I thought,

3  indicated he was going to review those, and we have no

4  objection.

5          THE COURT:  All right.  So there are no objections.

6  Those are all received.

7          Now let's turn to the ones that are identified by the

8  respondents.  Okay.  So we have the exhibits that are attached

9  to the original --

10         MS. MONTGOMERY:  I would just focus on --

11         THE COURT:  Right.  The original -- the original

12 respondent's declaration, that would be the declarations of Ms.

13 Milner, Mr. Light, the Exhibits A through L, that are -- are

14 there any objections to those?

15         MR. MAHAFFEY:  Just on the same basis, we have a

16 response exhibits to all of those, but understood the Court was

17 not allowing us, so we didn't -- now, that understanding --

18         THE COURT:  Well, I'm just asking, are there any

19 objections to A through L, to the original declarations?

20         MR. MAHAFFEY:  Yes, the --

21         THE COURT:  Okay.  So what are the grounds?

22         MR. MAHAFFEY:  The Court specifically told both

23 attorneys --

24         THE COURT:  No, no.  Well, I was going to say, the

25 hearing was afterwards, and I said you don't need to submit any

1  additional declarations -- exhibits, and this was filed before

2  the Court said that.  So it's already in the record.

3         So do you have any objections?  That's not an

4  objection.

5         MR. MAHAFFEY:  I didn't realize what A through L was.

6  I apologize.

7         THE COURT:  Yeah.  A through L, as I said, was part

8  of the original opposition that were --

9         MR. MAHAFFEY:  Oh, no objection.

10         THE COURT:  Okay.  There are no objections to A

11  through L.  So the Respondent's Exhibits A through L attached

12  to their original declarations are received.

13         (Exhibits A through L Received in Evidence)

14         MS. MONTGOMERY:  Okay.  But I would like to -- I

15  would prefer that we discuss the exhibits that are 1 through

16  38.

17         THE COURT:  Yeah.  We haven't gotten there yet.

18  We're going --

19         MS. MONTGOMERY:  All right.

20         THE COURT:  Because his objection is that they went

21  beyond the Court's permission when this hearing was set up,

22  which doesn't apply to that.

23         So I want to make sure that, one, exhibits that are

24  not contested are received.  And we can talk about the

25  contested ones.  And so we're going to get to those in a

1  methodical way.

2          MS. MONTGOMERY:  Okay.

3          THE COURT:  All right.  So now your -- respondents

4  are offering 1 through 38 attached to their subsequent

5  declarations, right?

6          MS. MONTGOMERY:  Yes, but understand that they are

7  most of the same exhibits that were A through L, but they are

8  complete.  They were based on what the Court said this hearing

9  was to be about.  They follow Ms. Milner's decision, and those

10 are the citations in our brief to the specific Exhibits 1

11 through 38.

12         THE COURT:  All right.  And the objections are on

13 grounds that they -- the objections by the reorganized debtor

14 are they went beyond the scope of what the Court authorized at

15 the hearing scheduling this hearing.

16         MR. MAHAFFEY:  Well, that objection is primarily not

17 just that the Court stated that, but I have approximately 30 to

18 50 exhibits with me that respond that prove our points, and I

19 deliberately did not file them at risk of violating the Court's

20 order and receiving sanctions because you made it clear --

21         THE COURT:  Well, what exhibits --

22         MR. MAHAFFEY:  -- that you didn't --

23         THE COURT:  All right.  So what are you -- what were

24 you considering offering?

25         MR. MAHAFFEY:  All the responsive exhibits that

1 really respond to theirs that show that these were ongoing

2 disputes.  The totality of the exhibits that reorganized debtor

3 did not file, that we would ask for leave of court to file if

4 the Court is willing to consider it, prove that there was a

5 contempt at issue.

6          MS. MONTGOMERY:  No.

7          THE COURT:  Well, it seems to me that -- and the

8 Court has already received 5 and 7 of these exhibits.  So can

9 we just talk about 5 and 7 and --

10          MS. MONTGOMERY:  No.  I mean, we can talk about 5 and

11 7, but --

12          THE COURT:  And what 5 and 7 mean?  Because isn't

13 that why we're here today is to see what 5 and 7 mean and --

14          MS. MONTGOMERY:  But there are additional -- there

15 are additional documents that further prove that this is the

16 final document that No. 7 --

17          THE COURT:  Well, why don't we -- why don't we just

18 hear the testimony, then, and then you can offer them as we go

19 along.

20          MS. MONTGOMERY:  How do you want to hear -- when you

21 say "hear the testimony," do you --

22          THE COURT:  Right.

23          MS. MONTGOMERY:  -- want us to read in her declar --

24          THE COURT:  No, no, no.  What I mean is you're being

25 a little too literal.  You know, there weren't any objections

1  to Ms. Milner's trial declaration or supplemental declaration,

2  so that's going to be received.  But counsel gets the right to

3  cross-examine.

4          It's going to be received as her direct.  So hearing

5  from her, you know, the Court has to receive Ms. Milner's

6  direct testimony, which is in her declaration, and that's

7  received.

8          MS. MONTGOMERY:  But we need all of the exhibits that

9  are attached to her declaration.

10         THE COURT:  No, but there are objections to those, so

11  --

12         MS. MONTGOMERY:  But, Your Honor, first of all, he is

13  misleading the Court when he says that he relied on your testi

14  -- on your statement in the Court.  He did not -- on the day

15  before this was due --

16         THE COURT:  Well, why don't -- why don't we just --

17         MS. MONTGOMERY:  -- he took my tape --

18         THE COURT:  Well, why don't we do this.  Because

19  there are objections to these exhibits --

20         MS. MONTGOMERY:  But there are no specific

21  objections.  The objection is you weren't allowed to put

22  anything in, and you could only have one testimony.  Therefore,

23  knock out Mr. Grumer, knock out Mr. Light.

24         That's a ridiculous --

25         THE COURT:  Well --

1          MS. MONTGOMERY:  That's a ridiculous suggestions.

2          THE COURT:  Well, I'm not sure what -- you know, Mr.

3    Grumer is not here, so his testimony can't be received, because

4    he's not available, unless cross-examination is waived.

5          Is cross-examination waived for Mr. Grumer?

6          MR. MAHAFFEY:  No, Your Honor.

7          THE COURT:  All right.  So his declaration can't be

8    received, because he is not here for cross-examination.

9          MS. MONTGOMERY:  I think I asked whether or not you

10   wanted -- you wanted the witnesses present in court --

11         THE COURT:  Of course.

12         MS. MONTGOMERY:  -- and your answer was no.

13         THE COURT:  Of -- no, I didn't say that.  I never

14   would have said that.

15         MS. MONTGOMERY:  Okay.

16         THE COURT:  All right.

17         MS. MONTGOMERY:  The tape -- the tape would

18   illustrate that, but I ordered the tape and paid for the tape,

19   and Mr. Mahaffey --

20         THE COURT:  All right.

21         MS. MONTGOMERY:  -- took it.  So I'm entitled to it.

22         THE COURT:  Well, I guess we can read -- do you have

23   the transcript or we have the tape, so --

24         MR. MAHAFFEY:  We had the entire transcript

25   transcribed.  I have no idea what counsel is talking about.

1  There is no way to take a tape.

2          MS. MONTGOMERY:  Excuse me.  My --

3          THE COURT:  Well, just hold on.  You can just listen

4  to it.  All right.  So you can tell --

5          MS. MONTGOMERY:  We do not have it.

6          THE COURT:  What I was going to say is that then --

7          MR. MAHAFFEY:  I have it, Your Honor.

8          THE COURT:  Okay.  You have a copy of the tape?

9          MR. MAHAFFEY:  I have an audio version.

10          THE COURT:  Yeah, I can listen to it.  Okay.  But --

11          MS. MONTGOMERY:  Your Honor, we -- we need that audio

12  version.  I ordered it.  I followed the Court's rules.  I paid

13  the $31.

14          THE COURT:  Okay.  Well, let me ask you -- okay.  Let

15  me ask you this.  If I said that and in your recollection is I

16  said you needn't have your witnesses present because -- all

17  right.

18          MS. MONTGOMERY:  I don't think it really makes any

19  difference.

20          THE COURT:  Yeah.  I don't think it makes any

21  difference either, so -- because we're arguing about what the

22  contract means.  The contract is in evidence.  And whether or

23  not it's 5 or 7 --

24          MS. MONTGOMERY:  That makes a difference.

25          THE COURT:  -- you know, I suppose that's an issue.

1          MS. MONTGOMERY:  Well, no, it shouldn't be an issue.

2   It's 7.

3          MR. MAHAFFEY:  Your Honor --

4          THE COURT:  Well, it is an issue, because the other

5   party disputes it.

6          MS. MONTGOMERY:  But the other party introduced it in

7   state court as --

8          THE COURT:  Well --

9          MS. MONTGOMERY:  -- the settlement.

10         THE COURT:  -- there's a factual issue as to which

11  version is the governing document.

12         MS. MONTGOMERY:  But he introduced it.

13         THE COURT:  And so the Court apparently has to make a

14  determination, because they dispute it.  They're saying it's

15  the other one.

16         MS. MONTGOMERY:  How can they dispute it when they

17  put it -- it is a judicial admission when they incorporated No.

18  7.

19         THE COURT:  Well, why is it a judicial -- okay.  It's

20  not a judicial -- it's an admission.

21         MS. MONTGOMERY:  I'm sorry.  It's an admission by

22  party.

23         THE COURT:  Right.  It's a party admission.  It's not

24  a -- it's not a judicial stop hold.

25         MS. MONTGOMERY:  Right.

```
 1            THE COURT:  It's not a judicial -- because there's
 2  been no --
 3            MS. MONTGOMERY:  Right.
 4            THE COURT:  -- judicial determination based on that
 5  argument.
 6            MS. MONTGOMERY:  Correct.  But my -- but I have cited
 7  in our brief --
 8            THE COURT:  Well, it's an admission that -- yeah,
 9  it's an admission that goes to weight.  It goes as to weight.
10  It's not --
11            MS. MONTGOMERY:  How can he go ahead suddenly say,
12  "This is the contract"?
13            THE COURT:  It goes as to weight.  All right.  All
14  right.
15            So --
16            MR. MAHAFFEY:  We're prepared to cross-examine --
17            THE COURT:  Okay.  Well, let me ask you this.  So
18  you're saying is that I waived appearance of the witnesses, so
19  then -- you know.
20            MR. MAHAFFEY:  That is the reason -- I mean,
21  counsel's point --
22            THE COURT:  Then, if that's -- then --
23            MR. MAHAFFEY:  It's not because you didn't have the
24  normal procedure.
25            THE COURT:  Well, it's --
```

1            MR. MAHAFFEY:  I thought today was going to be oral

2   argument.  That's really why I didn't subpoena Ms. Myers.  I

3   did tell her I needed her here.  I wasn't sure if the Court was

4   going to change its mind and allow witnesses, and she could not

5   be here.

6            THE COURT:  Okay.  So your recollection is that

7   witnesses weren't required to be here, right?

8            MR. MAHAFFEY:  My recollection from the tape is that

9   the Court -- and its subsequent order -- directed counsel that

10  today we would argue on the face of the contracts.  And then if

11  the Court believed -- and I think we've already proven the

12  point -- that there's a disagreement as to which version or

13  language is binding, we would then call witnesses, because

14  we're going to have to solve that first.  We're there.  And if

15  I can get Ms. Myers -- she's out of town, so my hands are tied,

16  and I'm --

17           THE COURT:  All right.  Is it your recollection that

18  I said that witnesses weren't required to be here?

19           MR. MAHAFFEY:  I recall the Court addressing the

20  streamline factors.  I walked away thinking the same as --

21           THE COURT:  Well, I guess I didn't really appreciate

22  the fact that there's a dispute as to the --

23           MS. MONTGOMERY:  There shouldn't be a dispute.

24           MR. MAHAFFEY:  There is a dispute.

25           THE COURT:  -- the version of the contract.

1          MR. MAHAFFEY:  I mean, we raised it.  I mean, to the

2 credit of the reorganized debtor, the first sentence out of my

3 mouth was that we dispute whether this contract ever reached

4 the point of a binding agreement to transfer ownership.

5          And the Court originally was only going to look at

6 the executory.  Then the Court's final order was, okay, I

7 understand your argument, didn't say you agreed with it, but

8 you said you understood it, and that we're going to come back,

9 we're going to get whatever the contract supposedly is in front

10 of the lawyers and the Court, we're going to argue the face of

11 it.

12          If it looks like my point was well taken, that we

13 don't have a meeting of the mind, that is the classic example

14 of ambiguity, we're going to then have a hearing with testimony

15 of the drafters.

16          I contacted one of the drafters.  He's out in India.

17 I contacted another person who didn't draft it, but who signed

18 one of the documents, Ms. Myers.  She did a declaration.

19          We are prepared with witnesses, just not today.

20          THE COURT:  Well let me -- okay.

21          MS. MONTGOMERY:  Your --

22          THE COURT:  Well, let me ask -- all right.  The only

23 difference between 5 and 7, you know, apparently deals with

24 one, which is a procedural thing, whether it has Ms. Myers',

25 you know, initials and signature; and then, secondly, it's what

1  happens with the Martin MAX lighting.  Is that really --

2          MS. MONTGOMERY:  It's not just the Martin MAX

3  lighting.  It's the schedule was negotiated -- Schedule 1 to

4  the Exhibit 7 is the final version that was agreed to and

5  signed off by the church.

6          And Exhibit 7 also has an Exhibit A to it, which just

7  states --

8          THE COURT:  I'm sorry.  Okay.  So we have -- we have

9  Schedule 1.  We have Schedule 1, and -- is the language of the

10 preamble of Schedule 1 the same in both?

11         MS. MONTGOMERY:  Yes.

12         THE COURT:  All right.  Where it just has, The

13 following list is not exclusive.  That would require a binder

14 of information, examples of what would be show specific go to

15 CSM and non-show specific -- CSM, and non-show specific go to

16 CCM?

17         MS. MONTGOMERY:  Yes.

18         THE COURT:  And then, Some areas fall in a gray area

19 and were distributed based on practicality for both parties.

20 All right.

21         And then there is something about, CCM's -- what

22 would be recorded on its books.

23         MR. MAHAFFEY:  Right, because --

24         THE COURT:  All right.  And then -- all right.

25         MR. MAHAFFEY:  Those are the executory provisions

1   that were never completed and weren't complete at the time of

2   the petition.

3           MS. MONTGOMERY:  I --

4           MR. MAHAFFEY:  The books never got finished.  The

5   industry never got finished.  A division of identification

6   never got finished.  This is a class executory contract.  The

7   very essence of it was we're going to have sit down, create a

8   binder, and split it up, because some of these assets will not

9   be given to you.

10          THE COURT:  Right.  So the language of 5 and 7 are

11  the same, pretty much.

12          MS. MONTGOMERY:  Yes.

13          MR. MAHAFFEY:  Except for the fact that the 5 has

14  Carol Milner's initial at the bottom, and 7 does not.

15          7 has a trust agreement that says it supercedes the

16  addendum.  So the trust agreement --

17          THE COURT:  I'm sorry.  The trust agreement -- all

18  right.  So we have a trust agreement that's received.

19          MR. MAHAFFEY:  So the trust agreement, by its own

20  lettering, Your Honor, states that it is going to be the final

21  document -- and there is --

22          THE COURT:  Now, the trust agreement is not part of

23  --

24          MS. MONTGOMERY:  I don't know what you're talking

25  about.  It's not --

1          THE COURT:  The trust agreement was added -- it

2    wasn't part of --

3          MS. MONTGOMERY:  It was added on August 25th as a

4    means to make the financial payments, and it was set up, but it

5    was never used.

6          THE COURT:  All right.  But --

7          MS. MONTGOMERY:  And --

8          THE COURT:  All right.  So --

9          MS. MONTGOMERY:  It's immaterial.

10          THE COURT:  Right.  So --

11          MR. MAHAFFEY:  We disagree with that.

12          THE COURT:  I was going to say the trust agreement

13    wasn't part of Exhibit 5.

14          MS. MONTGOMERY:  No.

15          THE COURT:  It was added on.

16          MS. MONTGOMERY:  It was the first -- I think there

17    may have been a first page.  It was not drafted at that time.

18          THE COURT:  It wasn't -- okay.  So --

19          MS. MONTGOMERY:  A final version was not drafted.

20          MR. MAHAFFEY:  These are all disputed facts.  With

21    all due respect to counsel's --

22          THE COURT:  Well, just hold on for a second.

23          MS. MONTGOMERY:  But --

24          THE COURT:  What I was going to say is that, all

25    right, so the trust -- you have an initial agreement that

1 | apparently was signed by Ms. Milner, Reverend Schuller, Mrs.

2 | Schuller, and I think Reverend Schuller --

3 |          MS. MONTGOMERY:  And another, Mr. Stoddard.

4 |          THE COURT:  -- signed it in two capacities.

5 |          MS. MONTGOMERY:  No, and Mr. Stoddard, I believe.

6 | Fred -- or what is his name?

7 |          MR. MAHAFFEY:  Southard.

8 |          THE COURT:  Fred Southard.

9 |          MS. MONTGOMERY:  Fred Southard.

10 |          THE COURT:  Okay.

11 |          MS. MONTGOMERY:  He's a member of the executive

12 | committee.  All four --

13 |          THE COURT:  There are four -- okay.  So there are

14 | four.

15 |          MS. MONTGOMERY:  Well --

16 |          THE COURT:  Okay.  Mr. Southard, Reverend Schuller,

17 | Mrs. Schuller, and Ms. Milner.

18 |          MS. MONTGOMERY:  Ms. Milner was not on the executive

19 | committee.  Gwyn Myers was a member --

20 |          THE COURT:  No, but she was --

21 |          MS. MONTGOMERY:  She signed it.

22 |          THE COURT:  Right.  She signed because she's a --

23 |          MS. MONTGOMERY:  Yes.

24 |          THE COURT:  -- she's a --

25 |          MS. MONTGOMERY:  Party.

1            THE COURT:  -- counter party --

2            MS. MONTGOMERY:  Yes.

3            THE COURT:  -- right, to the contract?

4            MS. MONTGOMERY:  Yes.

5            THE COURT:  All right.  And then Ms. Myers signed the

6   latter version.

7            MS. MONTGOMERY:  Yes.

8            THE COURT:  Right.

9            MS. MONTGOMERY:  Well, she signed the same version of

10  the agreement that she initially --

11           THE COURT:  The agreement -- okay.  The agreement is

12  the same.

13           MS. MONTGOMERY:  Yes.

14           THE COURT:  The schedules are slightly different.

15           MS. MONTGOMERY:  Yes.

16           THE COURT:  And the trust agreement was a

17  subsequently adopted document.

18           MS. MONTGOMERY:  Notarized, I would say.

19           THE COURT:  But not -- not signed as of July --

20           MS. MONTGOMERY:  July 8th.

21           THE COURT:  It wasn't signed as of July 8th, 2006?

22           MS. MONTGOMERY:  No, it wasn't.  It -- all of the

23  notaries that are attached to it show that it was signed on

24  August 25th.

25           THE COURT:  All right.

63

1          MR. MAHAFFEY:  And we contend that means there was no
2   meeting of the minds, because the document they submitted they
3   said was entered on July 8th.

4          THE COURT:  Well, I don't know if it's a meeting of
5   the minds.  Well, I guess the thing is that --

6          MS. MONTGOMERY:  The agreement required a trust.  It
7   didn't say, here is a trust.  It just said that was going to be
8   a subsequent document.

9          And Ms. Myers signed -- she put her signature onto
10   the settlement agreement at the same time she signed before a
11   notary the trust agreement.

12          THE COURT:  All right.  And then the trust document,
13   this is Ms. Milner's copy, right?

14          MS. MONTGOMERY:  Yes.

15          THE COURT:  And so it doesn't have her initials, her
16   signature on it, on the -- the trust was created on behalf of
17   the church, right?

18          MS. MONTGOMERY:  Yes.  Right.

19          THE COURT:  All right.  The trust is --

20          MS. MONTGOMERY:  She was a beneficiary, I believe.
21   She was going to be a beneficiary, but she did not need to sign
22   the trust.

23          THE COURT:  Right.  The trust is entered into --
24   right.  Right.  The trust didn't require a signature, because
25   the trust was set up by the church as the settlor, and Reverend

1  and Mrs. Schuller as trustees.  And then Ms. Milner was the

2  beneficiary.  So she didn't apparently need to sign the trust

3  agreement.

4          MS. MONTGOMERY:  Correct.

5          MR. MAHAFFEY:  Paragraph 5.2 says, "The parties'

6  financial understanding with respect to this settlement is

7  embodied in a separate trust agreement which the parties are

8  executing and delivering contemporaneously with execution and

9  delivery of this agreement as part of a fully integrated

10 unitary transaction such that the effectiveness and binding

11 nature of this agreement shall be conditioned upon the creation

12 and funding of such trust instrument in a form satisfactory to

13 CSM and CSM's attorneys."

14         That in and of itself proves the debtor's point.  The

15 document that she has submitted, this version three, Exhibit 7,

16 that she now claims a month and a half later had a trust, was

17 contemplated to be executed contemporaneously, superceding and

18 binding --

19         THE COURT:  Well --

20         MR. MAHAFFEY:  -- until counsel --

21         THE COURT:  Well --

22         MR. MAHAFFEY:  -- and not binding until --

23         THE COURT:  All right.  All right.

24         MR. MAHAFFEY:  -- counsel approved.  How do you look

25 at the word "conditioned"?

1          THE COURT:  Okay.  Well, let me -- okay.  Let's step

2  back for a minute.  All right.

3          MR. MAHAFFEY:  So the word "conditioned" is --

4          THE COURT:  So let me ask, Mr. Mahaffey, so your

5  position is that there was or was not a contract?

6          MR. MAHAFFEY:  There was not a contract, because the

7  meaning of --

8          THE COURT:  All right.  And there was no -- neither

9  Exhibit 5 nor Exhibit 7 are binding contracts in your view?

10          MR. MAHAFFEY:  Correct.

11          THE COURT:  All right.

12          MR. MAHAFFEY:  As to this document.

13          THE COURT:  All right.  And so your evidence in

14  supporting that there wasn't a contract would be whose

15  testimony?

16          MR. MAHAFFEY:  Both Robert Gibson, who is in India,

17  and then Ms. Myers, who indicated that the board would not

18  approve this.  And as 5.2 said -- if we just look, this is on

19  page 5.

20          THE COURT:  Okay.

21          MR. MAHAFFEY:  If we look at page 5.  If I can just

22  -- patiently, I'm trying, Your Honor, to streamline this.  If

23  we just look at --

24          THE COURT:  Can you -- can you eliminate the

25  theatrics, please?

1          MR. MAHAFFEY:  Okay.  If we look at 5.2 and look at

2  the word "conditioned," our position is very consistent.  The

3  contract on its face is that it was conditional in terms of it

4  being final.

5          The condition required board and counsel approval of

6  the integrated document, which was the trust agreement.  The

7  dispute that exists is that the trust agreement was not signed

8  contemporaneously as 5.2 said.  Ms. Milner claims it was signed

9  some six weeks later.  Ms. Myers says that's not true.  It

10  wasn't board approved.  The trust agreement was never funded.

11          THE COURT:  Okay.

12          MR. MAHAFFEY:  And --

13          THE COURT:  Well, okay, so where does she say -- Ms.

14  Myers say that it's not board approved?

15          MS. MONTGOMERY:  It doesn't require board approval.

16  She never says it required board approval.

17          THE COURT:  Yeah.  That's why I was going to say, I'm

18  asking -- I'm not asking -- I'm asking Mr. Mahaffey is where

19  does it say?

20          MR. MAHAFFEY:  It's in paragraphs 4 through 11.

21          MS. MONTGOMERY:  Objection to the declaration.  And I

22  have filed specific objections to each paragraph.

23          THE COURT:  Well, I'm asking -- okay.

24          MR. MAHAFFEY:  Your Honor, it's self evident.  Her

25  declaration makes the point that there was a $9 million

1  acquisition of personal property by a nonprofit placed into the

2  ownership of a separate LLC known as the Glory of Creation LLC

3  and booked accordingly as an asset on its balance sheet.

4         The concept was that they were going to transfer off

5  of the balance sheet of a separate California nonprofit the

6  Glory of Creation LLC into Crystal Cathedral Ministries books

7  $9.8 million worth of personal property that had been acquired.

8         That cannot get approved by the parents of Ms.

9  Milner.  An executive committee approval of that is against the

10 law.  The bylaws of CCM require a full board approval because

11 the expenditure is not immaterial.  It's very material.

12        So 5.2 is drafted and 5.2 said it was conditional.

13        THE COURT:  All right.

14        MR. MAHAFFEY:  So if it's conditional --

15        THE COURT:  Okay.  5.2 is in both Exhibit 5 and

16 Exhibit 7?

17        MR. MAHAFFEY:  Correct, with Exhibit 7 being the

18 unfunded trusts that 5.2 considered to be fully integrated as

19 one document.  So on its face, by the parties' choice of

20 wording, when they chose the word "fully integrated and

21 conditioned," and they failed to contemporaneously execute and

22 fund the trust, there cannot be a meeting of the minds.  And,

23 therefore, as a matter of law, no contract can be formed,

24 because they chose the word "conditioned."  They chose the

25 words "fully integrated."

1          There is no possible contract construction that can

2    form a contract when the contract says it's conditioned upon an

3    event that doesn't --

4          THE COURT:  All right.  So your argument is that July

5    and August are not contemporaneous, and then the second -- all

6    right.  That's one argument, right?

7          MR. MAHAFFEY:  Right.

8          THE COURT:  No?

9          MR. MAHAFFEY:  That's correct.  That's one of them.

10         MS. MONTGOMERY:  Your Honor, it's talking about the

11   financial.

12         THE COURT:  No, I'm asking him.  All right.  Okay.

13   Mr. Mahaffey, so --

14         MR. MAHAFFEY:  That's one argument.

15         THE COURT:  -- that's one argument.  And the other

16   argument is that the trust was never funded, right?  That's the

17   other second argument?

18         MR. MAHAFFEY:  No.  That's the -- there's three.  The

19   first one, it's not contemporaneously.  Second, the trust

20   wasn't created.  By definition, we all know as lawyers and

21   courts that you have to fund the trust to create it.  It's not

22   formed until it's funded.  But the third --

23         THE COURT:  Well, that's what I just asked you.  The

24   second argument is that it wasn't funded.  Is that --

25         MR. MAHAFFEY:  I'm sorry.  Yes.

69

1          THE COURT:  You're not listening to what I'm asking

2  you.  Your argument is that the trust was not funded and not

3  operative, because it wasn't funded.  That's your second

4  argument.

5          MR. MAHAFFEY:  Yes.

6          THE COURT:  Do you have a third argument?

7          MR. MAHAFFEY:  Yes, that the language of the sentence

8  says that the binding nature of this agreement, binding, shall

9  be conditioned upon the creation and funding of such trust

10  instrument in a form satisfactory to CSM and CSM's attorneys.

11          THE COURT:  Well, CSM is Ms. Milner.

12          MS. MONTGOMERY:  Yes.

13          MR. MAHAFFEY:  No, no, no.  CSM is --

14          MS. MONTGOMERY:  medical.

15          MR. MAHAFFEY:  -- and CSM's attorneys.

16          THE COURT:  It's Ms. Milner.  It's -- that's Ms.

17  Milner.

18          MR. MAHAFFEY:  Correct, and that's --

19          THE COURT:  CSM is Ms. Milner.

20          MR. MAHAFFEY:  And there was never any document that

21  Ms. Milner has supplied, and Ms. Myers commented on that, to

22  where there was final approval, because the trust was never --

23          THE COURT:  Well --

24          MR. MAHAFFEY:  -- funded, because there was a

25  dispute.  We made the point in our brief.  The first checks she

1  got were ten days before this trust was even allegedly signed.

2          THE COURT:  Well, I was going to say -- all right.

3  So let me ask Ms. Montgomery.

4          MS. MONTGOMERY:  All of the -- all --

5          THE COURT:  Can I ask you a question?

6          MS. MONTGOMERY:  Yes.  I apologize.

7          THE COURT:  The declaration -- your client's

8  declaration, Ms. Milner, that your position is that she has

9  fully performed on her obligations under the agreement, and

10  then, secondly, that she was receiving the payments that were

11  provided for in the agreement?

12          MS. MONTGOMERY:  Yes.

13          THE COURT:  Did she receive those?

14          MS. MONTGOMERY:  She received all of those.

15          THE COURT:  So there was -- there was -- there was

16  execution on behalf of the church?

17          MS. MONTGOMERY:  Yes.

18          THE COURT:  All right.  All right.

19          MS. MONTGOMERY:  Let me point out two other things.

20  One is they chose not to -- ultimately, they chose not to use

21  the trust, and it was simpler for them to write a check to Ms.

22  Milner, which they did, which she accepted, and it was paid for

23  well before --

24          THE COURT:  Okay.  And that's described in her

25  declaration, right?

1          MS. MONTGOMERY:  Yes.

2          THE COURT:  Okay.

3          MS. MONTGOMERY:  Secondly --

4          THE COURT:  So they didn't use the trust.  All right.

5          MS. MONTGOMERY:  They did not use the trust.  It was

6  done, it was set up, but it was because they wanted to make

7  sure that the money would be -- or that there was some security

8  to make those payments.  But --

9          THE COURT:  Okay.  So the money was -- okay.  So the

10  monetary obligation under the agreement was -- was --

11          MS. MONTGOMERY:  Fully satisfied.

12          THE COURT:  -- was fully -- fully consummated by the

13  church?

14          MS. MONTGOMERY:  Prior to bankruptcy.

15          THE COURT:  All right.

16          MS. MONTGOMERY:  And the second thing I just want to

17  point out is the very first page of the agreement, both 5 and

18  7, talks about what this Glory of Creation LLC is that Mr.

19  Mahaffey has referred to.

20          One, it is a party to this settlement agreement; and,

21  two, it's referenced as being a wholly owned subsidiary of CCM.

22  And so how they chose to do it was up to them.  But the

23  agreement was approved by four out of six members of the

24  executive committee, which was determined to be satisfactory,

25  and we have exhibits in here that show from the -- that show it

1   was -- it was satisfied.

2   THE COURT:  And that's one of the 1 through 38

3   exhibits?

4   MS. MONTGOMERY:  Yes.  Yes.

5   THE COURT:  And which counsel for the debtor said

6   that he didn't have a chance to respond to, so.

7   MS. MONTGOMERY:  Your Honor, you said --

8   THE COURT:  Well, it's all right.

9   MS. MONTGOMERY:  -- put in all of your arguments.

10  THE COURT:  It's all right.  I don't need an

11  argument.  I'm just -- I'm just trying to figure out a way to

12  --

13  MS. MONTGOMERY:  He didn't rely on it, because he

14  didn't even get the tape until he showed up in -- down in --

15  THE COURT:  Well, all right.  All right.  Well, it

16  seems to me that we -- the Court needs to determine, one, is,

17  you know, did the parties reach a final contract and, you know,

18  because it sounds like there may be some factual matters that

19  may need to be decided, as opposed to just interpreting the

20  face of the contract.

21  So --

22  MS. MONTGOMERY:  If Your Honor would like at some of

23  these -- or if I could point Your Honor to some of these --

24  THE COURT:  Well, I guess -- yeah, it's kind of

25  interesting here, because one of -- all right.  It would seem

1  to me one of the arguments that you would be made [sic] is that

2  the contract was formed because it was fully performed, at

3  least by Ms. Milner, and mostly performed by the debtor.

4  Wouldn't --

5          MS. MONTGOMERY:  Yes.

6          THE COURT:  -- that be one of your arguments?

7          MS. MONTGOMERY:  Absolutely.

8          THE COURT:  Because, you know --

9          MS. MONTGOMERY:  Everything was done.  I mean, it --

10         THE COURT:  Right.  Right.

11         MS. MONTGOMERY:  -- has even been stored.

12         THE COURT:  Right.  Right.  Right.  So it appears to

13  me that, you know, the Court has to make some, you know,

14  factual determinations, aside from just interpreting, you know,

15  the contract as executory or not, because there are disputes

16  between the parties regarding whether or not there was a

17  contract or not and which one it was.

18         MS. MONTGOMERY:  Your Honor, they have already --

19  they released all of the expensive property to Ms. Milner that

20  was in the warehouse.  They released projectors.  They released

21  all of that stuff.

22         The only thing that they continue to hold --

23         THE COURT:  I'm sorry.  Okay.  So they released --

24  okay.  So Ms. Milner has already been -- she already has a

25  number of the assets, right?  And is that described in her

1 declaration?

2          MS. MONTGOMERY:  Yes.

3          THE COURT:  All right.  So --

4          MR. MAHAFFEY:  That was post-petition, because there

5 was a dispute at the time of the petition about releasing

6 those.

7          MS. MONTGOMERY:  No, there wasn't a dispute.

8          THE COURT:  Just hold -- just hold on for a second.

9 Let me ask Ms. -- Could you sit down, Mr. Mahaffey.

10          I was going to say that -- that, you know, I've seen

11 a number of the emails regarding between bankruptcy counsel for

12 the debtor and -- and Ms. Milner's counsel or Ms. Milner -- the

13 Schuller/Milner parties, I guess I should refer to, regarding,

14 you know, arranging for transfer of the assets, because the

15 debtor didn't want to continue to pay storage costs.  Right?

16          MS. MONTGOMERY:  Yes.

17          THE COURT:  And so --

18          MS. MONTGOMERY:  And that was way after confirmation.

19          THE COURT:  Right.  No, but the -- but, you know,

20 we'll hear testimony then, and your offer of proof -- and

21 you're going to have to remind me where it comes from -- is

22 that assets were already transferred to Ms. Milner by -- from

23 the debtor?

24          MS. MONTGOMERY:  Yes.

25          THE COURT:  All right.  And so what is remaining?

1            MS. MONTGOMERY:  Seven trailers, which are puppets,

2 they are all of the things that are Creation and play related.

3            THE COURT:  All right.

4            MS. MONTGOMERY:  There are separate -- there are

5 separate trailers that have the Creation, that's the one play,

6 the Glory of Easter.

7            THE COURT:  Right.  So --

8            MS. MONTGOMERY:  The Christmas.  They all have their

9 own separate trailers.

10            THE COURT:  All right.  So there -- there are still

11 -- right.  And it was the position of respondents is that the

12 assets weren't made available to them, right, and that's the --

13            MS. MONTGOMERY:  Mr. Mahaffey has said, "If you sign

14 a release, we'll give you all these -- we'll give you

15 everything in the trailers."

16            We said, "Why should we be signing a release before

17 we've even seen what the condition is of our property?"

18            He says, "That's the way it goes," and then he filed

19 a suit.

20            THE COURT:  Well, all right.  All right.

21            MS. MONTGOMERY:  I mean, that's --

22            THE COURT:  Okay.

23            MS. MONTGOMERY:  But there has never been a statement

24 up until bankruptcy court where he suddenly said those don't

25 belong to us.  They have always belonged to us.  They've

1  threatened to get rid of them.  They've threatened that we've

2  abandoned them.

3         THE COURT:  Well, all right.  All right.  All right.

4  So it seems at this point -- all right.  It's -- it's whether

5  or not -- it sounds like you're beyond the point of trying to

6  resolve this consensually, right?

7         MS. MONTGOMERY:  Yes.

8         THE COURT:  Okay.  That's right, Mr. Mahaffey?

9         MR. MAHAFFEY:  We've exhausted every avenue we can

10  think of to resolve it.  We don't believe that there is

11  ownership.  We don't believe there was a duty to transfer.

12         THE COURT:  All right.  Okay.  So that's -- okay.  So

13  my question is whether or not there is -- there is a

14  possibility of consensual resolution, and it sounds like there

15  isn't.

16         MR. MAHAFFEY:  The offer -- I mean, usually you don't

17  talk about settlement discussions.  Without in any manner

18  conceding any of the claims --

19         THE COURT:  Well, right.  No, I'm not -- I'm not

20  asking you to go over terms.  I'm just asking, you know, from

21  the standpoint whether or not there is any prospect of

22  consensual resolution -- you don't need to go into the details,

23  because that may be, you know, settlement negotiations.

24         But I'm just asking just, you know -- you know, aside

25  from getting into the merits is whether or not there is any

1  possibility of that, and it doesn't sound like there is.  So --

2  and so it's whether or not -- all right.  It's whether or not

3  the respondent should be held in contempt or not.  Right?

4         MR. MAHAFFEY:  I'm sorry, Your Honor.  You're

5  addressing that to me or not?

6         THE COURT:  Right.  It's whether or not they should

7  be held in contempt.  That's where we are, right?

8         MR. MAHAFFEY:  It's a -- I think what the Court did,

9  which I thought was a great solution, is that there is a

10  contested proceeding that's been birthed out of a contempt

11  citation.

12         If it's correct --

13         THE COURT:  Well, no, what you're saying is that

14  whether or not they're violating -- they should be held in

15  contempt for violating -- the respondent should be held in

16  contempt for violating the discharge injunction.  That's where

17  --

18         MR. MAHAFFEY:  That's how this initiated, because if

19  the Court agrees with us that this claim was part of the

20  confirmed plan and res judicata and the permanent injunction

21  prevents this relitigation of the very claim that was litigated

22  before on the very evidence that the plan administrator offers

23  --

24         THE COURT:  Well, what I was going to say -- well,

25  that gets to the question of whether or not the contract is --

1          MR. MAHAFFEY:  Correct.

2          THE COURT:  Is executory or not, because it could --

3    the only -- the contract wasn't listed on -- as either being

4    assumed or rejected at the plan confirmation.  It wasn't

5    referred to.

6          MR. MAHAFFEY:  Correct.

7          THE COURT:  And I think there is no dispute about

8    that.

9          MR. MAHAFFEY:  Correct.

10          THE COURT:  So in order for it to be deemed rejected,

11    it has to be executory, right?

12          MR. MAHAFFEY:  Correct, unless on it's face it's not

13    a contract.  If it's not a contract, then the whole bankruptcy

14    system is --

15          THE COURT:  Well, okay, if it's not a contract, then

16    what?

17          MR. MAHAFFEY:  Then there is no need -- we're done.

18    If this court says that the need to list a --

19          THE COURT:  Okay.  You mean we're done that there

20    wasn't a transfer, so -- part of the problem, I guess, with

21    that argument is that there's a partial transfer, except for

22    the seven trailers of items.  There's already been a partial or

23    if not substantial transfer of these assets to Ms. Milner

24    already.

25          MR. MAHAFFEY:  There was an effort post bankruptcy

1  petition, under the guidance of this court, in settlement

2  settings, with counsel from both sides --

3           THE COURT:  Well, I was going to say --

4           MR. MAHAFFEY:  -- disputing --

5           THE COURT:  Well, I was going to say, that's between

6  counsel and both sides.  I don't think the Court was ever

7  involved in that.

8           MS. MONTGOMERY:  No.  That's not true.

9           MR. MAHAFFEY:  Well, the Court --

10          THE COURT:  No, I was going to say, was the Court

11 ever involved in transfer of any of these assets?

12          MR. MAHAFFEY:  When I say "the Court," I mean the

13 bankruptcy court system was in play, because it was post

14 confirmation.

15          MS. MONTGOMERY:  No.

16          THE COURT:  Well, no, that's between counsel -- it's

17 between counsel -- between the parties through counsel, not

18 involving the Court.

19          So there were transfers of these assets.

20          MR. MAHAFFEY:  There were -- there was a partial,

21 subject to reservation --

22          THE COURT:  Right.  And Ms. Milner received some of

23 these assets that are listed on Schedule 1, right?

24          MS. MONTGOMERY:  Yes.

25          MR. MAHAFFEY:  Well, we don't know that.  Okay.  We

1  don't know that.  So that's a dispute.  Schedule 1 doesn't

2  identify --

3            THE COURT:  Well, why --

4            MR. MAHAFFEY:  Because there's --

5            THE COURT:  Well, why don't you know that?  If she

6  has the stuff, then how did she get the stuff?

7            MR. MAHAFFEY:  Okay.  Can I respond or not?

8            THE COURT:  Well, you say you don't know.

9            MR. MAHAFFEY:  I do know.

10           THE COURT:  Okay.  You do know.  All right.  So she

11 did or did not get the stuff?

12           MR. MAHAFFEY:  So may I respond?

13           THE COURT:  Yes.

14           MR. MAHAFFEY:  Okay.  There is not an inventory of

15 the stuff, so we don't know, and they don't know, and they have

16 no evidence that any item listed as an example of what would

17 later be inventoried was actually transferred.

18           What was transferred, ultimately, post petition,

19 arising out of the pre-petition dispute, is not listed on an

20 inventory.

21           So if the Court said today --

22           THE COURT:  Well, we can ask Ms. Milner.  Does

23 anybody in the church know what was transferred to Ms. Milner?

24           MR. MAHAFFEY:  Sure, they know the items.  But the

25 question is not was it on -- you asked whether it was on the

1  schedule or was it in the trailers.

2          THE COURT:  Well, no --

3          MR. MAHAFFEY:  There's three locations.

4          THE COURT:  Well, I --

5          MR. MAHAFFEY:  The partial schedule --

6          THE COURT:  Well, I don't know.  Maybe we're all

7  being too literal, but what I was asking was, you know, were

8  the items on the schedules transferred to Ms. Milner?

9          MR. MAHAFFEY:  No, because the schedule was an

10  example list.

11          MS. MONTGOMERY:  No.

12          MR. MAHAFFEY:  They weren't --

13          THE COURT:  Well --

14          MR. MAHAFFEY:  If I can finish, there is no --

15          THE COURT:  Well, but -- but assets that --

16          MR. MAHAFFEY:  It's disputed.

17          THE COURT:  Well, but assets belonging -- that

18  belonged to the debtor at some point --

19          MR. MAHAFFEY:  Post petition assets belonging to the

20  debtor were transferred to Ms. Milner.  That's true.  Those

21  assets were transferred.  It wasn't because they're on the

22  schedule.  It wasn't because there was a concession.

23          THE COURT:  So why were they transferred to -- why

24  were they transferred?

25          MR. MAHAFFEY:  Because post petition the attorneys

1  were trying to settle --

2          THE COURT:  Well -- well, why were these assets

3  transferred?  What was the purpose?

4          MR. MAHAFFEY:  Because there was a dispute that the

5  CCM was today and then --

6          THE COURT:  They made -- they made post petition

7  transfers in the ordinary course --

8          MR. MAHAFFEY:  According --

9          THE COURT:  Well --

10         MS. MONTGOMERY:  No.

11         THE COURT:  No?  I was going to -- I'm asking counsel

12 for the church, Ms. Montgomery.

13         So if I ask Ms. Milner today, you know, "Did you get

14 the assets that are described on the schedule?" she'll probably

15 testify that she did, right, Ms. Montgomery?

16         MS. MONTGOMERY:  Yes.

17         THE COURT:  All right.  And then -- so these are made

18 post petition, Mr. Mahaffey, as -- right?  Or, Ms. Montgomery,

19 post petition?  Were these transfers made post petition?

20         MS. MONTGOMERY:  The pickup.  The transfer --

21         THE COURT:  No, no.  But these pickups or transfers

22 were post petition?

23         MS. MONTGOMERY:  The pickup was post petition and

24 post confirmation.

25         THE COURT:  Okay.  They were post petition.  So --

1  and that's not in dispute, right?  They were assets transferred

2  to Ms. Milner post petition, right, Mr. Mahaffey?

3      MS. MONTGOMERY:  I would separate -- there's a

4  difference between transfer and pickup, because the ownership

5  was transferred.

6      THE COURT:  Oh, you're right.  You're right.  Okay.

7  Okay.  Pickup.  Respondents say pickup, and Mr. Mahaffey, the

8  debtor says transfer, right?

9      MR. MAHAFFEY:  Correct.

10     THE COURT:  Okay.  So what was the basis -- what was

11 the rational for the transfer, in your view?

12     MR. MAHAFFEY:  The plan administrator approved it.

13     THE COURT:  The plan administrator -- so -- so, for

14 purposes of Section 363 of the Bankruptcy Code, what was the

15 reason for the transfer to Ms. Milner?

16     MR. MAHAFFEY:  I've read the same file that --

17     THE COURT:  That's what I'm asking for.

18     MR. MAHAFFEY:  My understanding --

19     THE COURT:  Was this -- you know, unless it was

20 ordinary course, it had to require court approval.  There is no

21 court approval.

22     MR. MAHAFFEY:  That's correct.  And there was a big

23 dispute between the attorneys for Ms. Milner, who claim that

24 there didn't need to be court approval, and the debtor's

25 approval that claimed --

1          THE COURT:  Well, the attorneys -- the debtor's --

2    apparently the debtor's attorney agreed, because they

3    authorized these pickups or transfers to take place.

4          MR. MAHAFFEY:  The debtor's attorney disagreed, but

5    --

6          THE COURT:  Well, then -- then how did the stuff get

7    to Ms. Milner?

8          MR. MAHAFFEY:  Some -- some staff member at CCM --

9          MS. MONTGOMERY:  Oh, come on.

10         MR. MAHAFFEY:  Okay.  Well, then let's freeze this

11   point right here.  Let's put counsel on -- on the record --

12         THE COURT:  I'm sorry.  I'm sorry.  Who on the

13   record?

14         MR. MAHAFFEY:  The counsel that did this.  So the

15   point that we can --

16         THE COURT:  I'm sorry.  Which counsel that did this?

17         MR. MAHAFFEY:  Well, according to the groans of Ms.

18   Montgomery, this was approved --

19         THE COURT:  Well, we have Mr. -- Mr. Grumer, who was

20   negotiating on behalf of Ms. Milner.

21         MR. MAHAFFEY:  That's true.  But there was no

22   approval by CCM's counsel to transfer these.  And the exhibits

23   that I've lodged with you, they specifically objected.

24         THE COURT:  I'm sorry.  Which counsel for the debtor?

25         MR. MAHAFFEY:  There was --

1          THE COURT:  Are we talking about the bankruptcy

2    counsel for the --

3          MR. MAHAFFEY:  It was bankruptcy counsel and Mr.

4    Gibson.  I'm trying to remember the name of the bankruptcy

5    counsel.

6          THE COURT:  Well, right.  Winthrop Couchot.

7          MR. MAHAFFEY:  Winthrop.  Okay.  So Winthrop firm in

8    the emails that we filed with our initial statement, conference

9    statement, confirmed that these assets could not be

10   transferred.

11         THE COURT:  I'm sorry.  Who -- I'm sorry, who --

12         MR. MAHAFFEY:  Can I direct the Court to --

13         THE COURT:  Well, that's -- it's all hearsay.

14         MS. MONTGOMERY:  Can I explain?

15         THE COURT:  It's all hearsay.

16         MS. MONTGOMERY:  Right.

17         THE COURT:  No, no.  You're not going to explain.

18         MS. MONTGOMERY:  But you have --

19         THE COURT:  You're not going to be heard from until

20   he finishes.

21         MR. MAHAFFEY:  One of the exhibits that the Court has

22   admitted, so it's --

23         THE COURT:  I'm sorry.  Which exhibit are we

24   referring to?

25         MR. MAHAFFEY:  The ones attached to our --

1          THE COURT:  Which document?

2          MR. MAHAFFEY:  -- conference statement.  I'll see if

3  I can find it --

4          THE COURT:  You mean the status report?

5          MR. MAHAFFEY:  -- Your Honor.

6          THE COURT:  All right.  It's attached to the status

7  report, you're saying?

8          MR. MAHAFFEY:  Correct.

9          THE COURT:  All right.  Because there are a number of

10 emails between -- it says Creation pickup, for example.  I

11 don't know who Mr. Sallas (phonetic) is, to Mr. Grumer, with a

12 cc to John Charles that says Creation pickup.

13         MR. MAHAFFEY:  Correct.  So the email I'm referring

14 to is at page 6.

15         THE COURT:  Of what?

16         MR. MAHAFFEY:  It's document 2059, page 60.

17         THE COURT:  Which exhibit number?

18         MR. MAHAFFEY:  2059, Exhibit 6, page --

19         THE COURT:  Exhibit 6.  Okay.  Exhibit 6.  All right.

20 6.  1, 2, 3, 4, 5, 6.  All right.

21         So Mr. Sallas sent an email --

22         MR. MAHAFFEY:  To Mr. Mr. Grumer.

23         THE COURT:  All right.

24         MR. MAHAFFEY:  That says, "Keep in mind that Carol's

25 contract you refer to as rejected as part of the bankruptcy

1  proceedings and therefore CCM has no obligation to continue to

2  store the items for free.  CCM has given statutory notice on

3  several occasions to have the materials received, but they will

4  be disposed of as allowed by law."

5          THE COURT:  Okay.  So you can refresh my recollection

6  who Mr. Sallas is.

7          MS. MONTGOMERY:  He's an attorney for CCM.  He is not

8  a bankruptcy attorney.  And there is no --

9          THE COURT:  Okay.  So it was an outside -- Mr. Sallas

10 was with the firm who represented the church before the

11 bankruptcy.

12         MR. MAHAFFEY:  Correct.  That was --

13         MS. MONTGOMERY:  And during.  But he was -- he was a

14 church attorney.  He was not outside counsel.  He was not

15 bankruptcy counsel.

16         MR. MAHAFFEY:  Right.

17         THE COURT:  Right.  He was the church's pre-petition

18 counsel, one of the firms the church used pre-petition.

19         Is that right, Mr. Light?

20         MR. LIGHT:  And during, I believe.

21         THE COURT:  And -- right.  Right.

22         MR. MAHAFFEY:  During, but not in the bankruptcy

23 court.

24         THE COURT:  Right.  They weren't -- they were not

25 formally retained as bankruptcy counsel.  Only -- but they --

88

1  because they were representing the church pre-bankruptcy, the

2  church apparently, during the ordinary course, to help the

3  church continue operations, still relied on this counsel; is

4  that right?

5       MR. MAHAFFEY:  That's my understanding.

6       THE COURT:  Your understanding.  Okay.  But

7  apparently during the pendency of the bankruptcy case, Mr.

8  Sallas was communicating with Mr. Grumer on behalf of the

9  Schuller and Milner parties, apparently, so --

10      MS. MONTGOMERY:  Those communications are solely with

11 regard to a pickup of the items in the trailers.  And if you

12 look at the -- at the letters that are attached to my --

13      THE COURT:  Well, yeah, and --

14      MS. MONTGOMERY:  They're talking about --

15      THE COURT:  Well, I was going to say, it also assumes

16 that there was a valid contract and the assets were transferred

17 to Ms. Milner.  And it basically says, you know -- you know,

18 taking the position that there was a contract, it was rejected,

19 and we want you to pick up your stuff.  That's what it --

20 that's what this says.

21      MS. MONTGOMERY:  But there was never a rejection.

22 That's just a --

23      THE COURT:  Well, I know -- I know what your position

24 is.  But, you know, the thinking here reflects there was a

25 contract, and there was a transfer, and the stuff belonged to

1 Ms. Milner.  That's what this thinking refers to.

2          Now, whether or not the contract was rejected, you

3 know, that's why we're here.

4          MS. MONTGOMERY:  Okay.

5          THE COURT:  But, you know, the thinking of counsel

6 for the debtor was -- and apparently the marching orders from

7 the reorganized debtor was tell Ms. Milner to get her stuff,

8 because, you know, it's your stuff, Ms. Milner, pick it up, we

9 don't want to continue paying for --

10          MS. MONTGOMERY:  Right.

11          THE COURT:  -- you know, holding onto your stuff, or

12 storing your stuff, pick it up.

13          MS. MONTGOMERY:  Right.

14          THE COURT:  That's what this says.  Okay.  I know --

15 okay.

16          What we're going to do now is normally I take a mid-

17 morning break so the recorder, because she's busy recording --

18 you know, I don't know if you know that we have court recorders

19 here as opposed to court reporters, and she is preparing a log,

20 that's what she's busy typing, of the statements that counsel

21 and the Court are making on the record.  And so she needs to

22 take a break.

23          And so we normally take a mid-morning break.  So

24 we're going to take -- we're going to be in recess for 15

25 minutes.  Okay.  We're going to take a break.  So we'll resume

1 in about 15 minutes, so we'll say 10:45.

2         MS. MONTGOMERY:  Thank you.

3         MR. MAHAFFEY:  Thank you.

4            (Recess 10:28 a.m./Reconvene 10:49 a.m.)

5         THE CLERK:  Please remain seated and come to order.

6 This United States Bankruptcy Court is again in session.

7         THE COURT:  All right.  The Court will recall the

8 Crystal Cathedral matter.

9         I think what I'd like to do now is proceed with Ms.

10 Milner's examination, and then I'll allow -- Ms. Milner's

11 direct testimony by declaration has already been received, and

12 I'll let counsel for the movant, reorganized debtor, conduct

13 cross-examination.

14         I'll allow the respondents to have an expanded

15 redirect so -- to address the issues of the admissibility of

16 the exhibits attached to the declaration.

17         MS. MONTGOMERY:  Okay.  I wanted to make one

18 correction from what we stated before.  During the break, Ms.

19 Milner stated that Mr. Sallas -- that apparently Mr. Gibson's

20 firm had a claim at the time of bankruptcy and, therefore,

21 could not proceed to represent the church and that sometime

22 thereafter Mr. Sallas' firm took on general corporate

23 representation.

24         I don't know what -- I don't know at what point --

25         THE COURT:  Post confirmation.

1          MS. MONTGOMERY:  I assume it was post confirmation,

2  because I've never seen --

3          THE COURT:  Yeah, because confirmation, I believe,

4  was in --

5          MS. MONTGOMERY:  2011.

6          THE COURT:  -- late two thousand --

7          MS. MONTGOMERY:  '11.

8          THE COURT:  '11?  All right.

9          MS. MONTGOMERY:  And I think Mr. Winthrop was

10  counsel, although -- and he continued to be counsel --

11          THE COURT:  Yeah, I think that's right, because the

12  case filed in 2010, and then --

13          MS. MONTGOMERY:  But I don't see an employment

14  application for Mr. Sallas, so I'm assuming it was after

15  confirmation.

16          THE COURT:  Yeah, it was probably -- well, the emails

17  are like 2012.

18          MS. MONTGOMERY:  Right.

19          THE COURT:  So it would have been post confirmation,

20  so there wouldn't have been any prohibition from him being --

21  representing the debtor at that point.

22          And I remember that the claims disputes were after --

23  litigated afterwards.  So --

24          MS. MONTGOMERY:  Well, the date -- there is an

25  exhibit in there, an email, that shows one of the attorneys,

92

1  Mr. Ghan, sending something to Mr. Grumer prior to -- like the

2  day before confirmation.  I don't know.

3          THE COURT:  Yeah.

4          MS. MONTGOMERY:  They -- whatever.

5          THE COURT:  Yeah, I don't think that makes --

6          MS. MONTGOMERY:  Right.

7          THE COURT:  Yeah.  I don't think that really is

8  material.

9          MS. MONTGOMERY:  No.

10          THE COURT:  So --

11          MS. MONTGOMERY:  We just wanted to clarify.

12          THE COURT:  All right.  So, Ms. Milner's trial

13  declaration is received as direct.

14          Does the reorganized debtor want to cross-examine

15  her?

16          MR. MAHAFFEY:  Yes.

17          THE COURT:  All right.  So, Ms. Milner, you're being

18  called to testify live.  Your declaration has been received as

19  your direct testimony.  And then counsel for the moving party

20  is going to ask you questions on cross-examination.

21          So if you would go to the witness stand --

22          MS. MONTGOMERY:  Oh, Your Honor, could we give Ms.

23  Milner's declaration and these exhibits to her up there?

24          THE COURT:  Yes.  Yeah, that's fine.  You don't have

25  a set for -- a court set?

1             MR. MAHAFFEY:  We do.

2             THE COURT:  No, I was going to ask -- you have the

3    Court set, Ms. --

4             MS. MONTGOMERY:  I gave Your Honor a copy -- a

5    notebook I had delivered as a courtesy copy that's a black

6    notebook that had --

7             THE COURT:  Right.  Madam Clerk, do we have that?

8             THE CLERK:  I didn't receive that.

9             MR. MAHAFFEY:  I have them, Your Honor.  I have a

10   set.

11            THE COURT:  No, I was going to --

12            MS. MONTGOMERY:  It was -- oh, here.  It's coming.

13            THE COURT:  Oh, okay.  Yeah.  This is the -- this

14   says, "Original filed, additional courtesy copy."  So it was

15   filed on September 9, so you filed it with the Court or --

16            MS. MONTGOMERY:  Yes.  It was all filed with the

17   Court.  The courtesy copy was sent, but I thought it would be

18   useful for the Court to have a notebook.

19            THE COURT:  Oh.  Did you -- oh, I see.  You filed the

20   exhibits, but you don't have -- oh, all right.

21            MS. MONTGOMERY:  What -- I'm not sure --

22            THE COURT:  Okay.  That's -- okay.  Now I get it.

23   Because it was an evidentiary hearing, I normally would have

24   thought that they would have been, you know, part of an exhibit

25   book, just like a trial.  They are just filed.

1          MS. MONTGOMERY:  Well, they were --

2          THE COURT:  They're filed with her declaration.

3    Okay.  I got it.  Okay.  But you didn't make a separate set,

4    like you would in a trial?

5          MS. MONTGOMERY:  No.

6          THE COURT:  All right.  So -- and is there a set of

7    her exhibits on the witness stand for her to look at as she is

8    asked --

9          MS. MONTGOMERY:  We just gave it -- that's what we

10   just gave her.

11         THE COURT:  Okay.  So -- okay.  And then you made a

12   separate book for me, but it's all attached to what was filed.

13   So --

14         MS. MONTGOMERY:  It's her declaration --

15         THE COURT:  Now, do you have your binder?

16         MS. MONTGOMERY:  We're sharing.  We have it.

17         THE COURT:  Okay.  Because I can use the one -- the

18   courtesy copy one and put it on the witness stand.

19         MR. LIGHT:  She has one.

20         MS. MONTGOMERY:  She's using -- I mean, she's using

21   it.  It you want to introduce --

22         THE COURT:  Well --

23         MS. MONTGOMERY:  -- it into evidence, then at the end

24   -- at the end of --

25         THE COURT:  Yeah, I would use my courtesy copy for

1 that one.

2          MS. MONTGOMERY:  That's fine.

3          THE COURT:  Okay.  So -- all right.  Why don't we do

4 that instead of -- because she's going to be referring to it,

5 I'm going to have her refer to the courtesy copy, Ms. Milner,

6 the courtesy copy, because that's going to be part of the

7 official record.

8          MS. MILNER:  Okay.

9          THE COURT:  Because otherwise you're going to have to

10 leave that one here, and this is staying here, right?

11          MS. MONTGOMERY:  Yes.

12          THE COURT:  All right.

13          MR. LIGHT:  It's got a few notes in it.

14          THE COURT:  Yeah, can I -- can I hand this to you and

15 you can hand it to the witness?

16          MR. LIGHT:  Of course.

17          MR. MAHAFFEY:  Your Honor, we made three separate

18 sets.

19          THE COURT:  Oh, well that's -- that's okay.

20          MR. MAHAFFEY:  So I have three separate --

21          THE COURT:  Yeah, because I have the one that I --

22 for my reference, I can just use the one that -- the courtesy

23 copy of the declarations.

24          MS. MONTGOMERY:  Okay.

25          THE COURT:  All right.  So at this point, we'll let

1  counsel for the debtor cross-examine the witness once the

2  witness is administered the witness oath.

3         So I'm going to ask the clerk to administer the

4  witness oath to Ms. Milner.

5         MS. MILNER:  Excuse me.  There's this -- this was

6  stuck in there.

7         THE COURT:  Okay.

8         Thank you.

9         MS. MILNER:  I don't know what that is.

10        THE COURT:  Oh.

11        MS. MILNER:  I'm sorry.

12        THE COURT:  Oh.  Oh, all right.  You're right.  Thank

13 you.

14        MS. MILNER:  It just was in part of the binders.

15        THE COURT:  Yeah, thank you.  Thank you.  Thank you.

16 You're right.

17        THE CLERK:  Could you raise your right hand?

18                CAROL MILNER, WITNESS, SWORN

19        THE CLERK:  Will you please state your name for the

20 record?

21        THE WITNESS:  Carol Milner.

22        THE CLERK:  Thank you.

23        THE COURT:  All right.  So Mr. Mahaffey, you can

24 proceed.

25                      CROSS-EXAMINATION

Case 2:12-bk-15665-RK    Doc 2128    Filed 10/25/19    Entered 10/25/19 11:30:35    Desc
Main Document    Page 100 of 372

Milner - Cross/Mahaffey                    97

1  BY MR. MAHAFFEY:

2  Q    Ms. Milner, let me direct your attention to Exhibit 5.

3  A    Yes.

4  Q    And, specifically, let me direct your attention to the

5  word "final."

6  A    Yes.

7  Q    Did you write that?

8  A    No.

9  Q    Looking at Exhibit 5, page 5 [sic], paragraph 5.2 --

10 A    Hold on.  I'm sorry.  The agreement is not numbered, so

11 just give real quick the page numbers.  Can you tell me the

12 exhibit page number?

13 Q    Page 54.

14 A    54, thank you.

15 Q    Can you read 5.2 into the record?

16 A    5.2.  "The parties' financial understanding with respect

17 to the settlement is embodied in a separate trust instrument

18 which the parties are executing and delivering

19 contemporaneously with execution and delivery of this agreement

20 as a part of a fully integrated unitary transaction, such that

21 the effectiveness and binding nature of this agreement shall be

22 conditioned upon the creation and funding of such trust

23 instrument in a form satisfactory to CSM and CSM's attorneys."

24 Q    Did you have any understanding of what the word "binding

25 nature" meant in that paragraph?

**WWW.JJCOURT.COM**

Trial Transcript, Page 97

Milner - Cross/Mahaffey                     98

1  A    Yep.

2  Q    Did you have an understanding that the sentence that

3  states that this agreement would not be binding until the trust

4  was funded was the parties' intent?

5  A    Yes, that was intended because the monies were requested

6  by CSM, to be paid over time, rather than at once.  So I wanted

7  to be helpful to the Ministries and said that was fine.

8  Q    And it was true the trust was never funded, correct?

9  A    I was paid every penny that they promised to pay.

10          MR. MAHAFFEY:  Move to strike as nonresponsive.

11          THE WITNESS:  To the satisfaction --

12          THE COURT:  Just hold on.

13          THE WITNESS:  -- of my attorneys.

14          THE COURT:  All right.  Do you want to respond?

15          MS. MONTGOMERY:  I believe it was -- it was

16  responsive, and she's indicating there was a change in the

17  agreement between her and the church, and she should be able to

18  express that.

19          THE WITNESS:  And it was all about -- it was all

20  about --

21          THE COURT:  All right.  No, just --

22          THE WITNESS:  It was all about protecting --

23          THE COURT:  No, just hold on.  All right.  So the

24  motion to strike is granted.

25          Do you want to ask another question?

Trial Transcript, Page 98

Milner - Cross/Mahaffey                    99

1  BY MR. MAHAFFEY:

2  Q    Is it true the trust was never funded?  Yes or no?

3  A    No.  The -- I was --

4           THE COURT:  No, just hold on.

5           THE WITNESS:  -- to my satisfaction.

6           THE COURT:  He just asked yes or no.

7           THE WITNESS:  Okay.  Okay.

8           THE COURT:  Okay.  He just asked yes or no.

9           THE WITNESS:  Sure.

10          THE COURT:  And then -- just answer his questions,

11 and your counsel will ask you questions to elicit testimony

12 that would explain if necessary.  All right, Ms. Milner?

13          THE WITNESS:  Okay.  Sure.

14          THE COURT:  Thank you.

15 BY MR. MAHAFFEY:

16 Q    Did you ever receive any checks that were trustee checks

17 pursuant to this unfunded trust?

18 A    Did I receive checks?

19 Q    That were trustee checks.

20 A    I don't know the difference.  I just know I received

21 checks from CCM.

22          THE COURT:  Well, that's -- what he's asking is did

23 you receive checks from the trust?

24          THE WITNESS:  From the trust account, you mean?

25          THE COURT:  Yes, that's right.

Trial Transcript, Page 99

Milner - Cross/Mahaffey                    100

 1            THE WITNESS:  No, I did not.

 2  BY MR. MAHAFFEY:

 3  Q    When paragraph 5.2 was drafted, did you have counsel that

 4  assisted you in drafting that?

 5  A    5.2?  Yes.

 6  Q    Did you have counsel assisting you in drafting the

 7  entirety of the agreement?

 8  A    Counsel did draft it, yes.

 9  Q    And which attorney was that?

10  A    The attorneys, I believe, Mr. Gibson requested that Mr.

11  Margolis draft it.

12  Q    Okay.  So my question is very specific.  Which attorney

13  for you drafted this agreement?

14  A    Mr. Margolis.

15  Q    And you didn't list him as a witness on your -- strike

16  that.

17            Did you bring a declaration for the Court from Mr.

18  Margolis?

19  A    No, I did not.  He is deceased.

20            THE COURT:  All right.  You answered his question.

21  Thank you.

22            THE WITNESS:  Okay.

23  BY MR. MAHAFFEY:

24  Q    Did anybody else besides Mr. Margolis on your side draft

25  this agreement?

Milner - Cross/Mahaffey                    101

1  A    No.

2  Q    Looking at Exhibit 5, the bottom right-hand corner on page

3  55, are those your initials?

4  A    Yes, they are.

5  Q    What was your intent as to why you initialed that exhibit?

6  A    So that it would memorialize that we were all in agreement

7  about the distribution.

8  Q    Looking at Exhibit 7, page 63?

9  A    Yes, I'm there.

10  Q    Are you initials on that document?

11  A    No, they are not.

12  Q    Referring back to Exhibit 7, is it your testimony that

13  Exhibit 7, as presented to this court, including through page

14  72, is now the document you're relying on for your position of

15  ownership?

16         MS. MONTGOMERY:   Objection.   It misstates her

17  testimony, misstates the evidence.

18         THE COURT:   Overruled.   You can answer.

19         THE WITNESS:   I would need him to ask it again, if

20  that's okay.

21         THE COURT:   Okay.   Exhibit 7, you're relying on

22  Exhibit 7, right, as the operative contract?   Just take a look

23  at Exhibit 7.

24         THE WITNESS:   Yeah, because --

25         THE COURT:   No, no.

Milner - Cross/Mahaffey                    102

1              THE WITNESS:  Okay.

2              THE COURT:  He just asked yes or no, is it your

3    position that Exhibit 7 is the operative contract?

4              Is that a fair statement of your question?

5              THE WITNESS:  But the agreement --

6              THE COURT:  No, I'm just saying, is that what you're

7    relying upon?  That's what he's asking you.

8              THE WITNESS:  Because this is my copy, yeah, I would

9    rely on this, because it was my copy in the files.

10             THE COURT:  Right.  Okay.  The answer is yes.

11             THE WITNESS:  Yes.

12             THE COURT:  All right.

13   BY MR. MAHAFFEY:

14   Q    Directing your attention to Exhibit 7, page 57.

15   A    Yes, I'm there.

16   Q    The bottom right-hand corner.

17   A    Yes.

18   Q    Is that your initials?

19   A    Yes.

20   Q    Why did you initial the bottom right-hand corner on page

21   57?

22   A    Because we were all there, and I initialed it.

23   Q    Any other reason?

24   A    Because I was angry and went with the agreement.

25   Q    Directing your attention to Exhibit 7, paragraph 5.2 --

Milner - Cross/Mahaffey                              103

1  A    Can you give me a page number, please?

2  Q    61.

3  A    Yes.

4  Q    Did paragraph 5.2 ever get modified in writing subsequent

5  to the purported dates on this exhibit?

6  A    I'm sorry.  Did which part get -- nothing.  No.  I need

7  you to say that again.  I'm sorry.

8  Q    Did paragraph 5.2 ever get modified in writing?

9  A    No.

10 Q    When did you place your initials on page 57 of Exhibit 7?

11 A    On July 8th.

12 Q    When did you place your initials on page 50 of Exhibit 5?

13 A    On July 8th.

14 Q    So on July 8th, is it your testimony that you initialed

15 two different copies of the same document?

16 A    Yes.

17 Q    But Exhibit 5, would you agree with the Court, is not the

18 same as Exhibit 7 as to its contents, true?

19 A    No, that's not true.

20 Q    Let me direct your attention to page 52 of Exhibit 5.

21 A    Yes.

22 Q    Paragraph 1.5, subsection E.

23 A    Yes.

24 Q    And then direct your attention to page 59 of Exhibit 7.

25 A    Yes.

Milner - Cross/Mahaffey                    104

1  Q    Paragraph 1.5E.

2  A    Yes.

3  Q    Would you concede to the Court that those two pages are

4  different?

5  A    No.

6  Q    Paragraph 1.5E on Exhibit 5 does not have writing on the

7  left, whereas paragraph 1.5E on Exhibit 7 has writing on the

8  right, you do not concede that those are different?

9  A    No, they're not different, but I can offer an explanation

10 if you would like one.

11 Q    Will you concede that paragraph -- I mean that Exhibit 7,

12 page 59, has only -- I mean, has five initials, and page 52 of

13 Exhibit 5 only has four on the bottom?

14 A    Yes.

15 Q    Would you concede to the Court that four initials are

16 different than five initials on this contract page?

17 A    That I can concede, yes.

18 Q    Is it your testimony that Exhibit 5 and Exhibit 7, page

19 52, were created at the exact same point in time on July 8th?

20 A    Yes, they were.

21 Q    And who are the witnesses that you believe were present

22 when Exhibit 5, page 52, and Exhibit 7, page 59, were created

23 at the exact same time?

24 A    Do you want to know the parties who signed it?  They would

25 be the witnesses.  All the people present at the meeting.  Is

1 that what you're asking me?

2 Q    Did you understand the question?

3            MS. MONTGOMERY:  She just asked --

4            THE COURT:  No, she's wanting clarification of what

5 you're asking.

6 BY MR. MAHAFFEY:

7 Q    Okay.  So if you don't understand, yes --

8            THE COURT:  She's trying to understand your question,

9 so --

10 BY MR. MAHAFFEY:

11 Q    Yes.  So I think you understood it, but who -- who are the

12 witnesses that you believe would support your testimony that

13 Exhibit 5, page 52, and the handwriting on the left was created

14 at the exact same point in time that Exhibit 7, page 59, with

15 the handwriting on the right was created?

16            THE COURT:  Well, let me ask you this, Mr. Mahaffey.

17 What difference does it make?  Because the words that are

18 handwritten are the same.  It's just by two different people.

19 And so if they were -- if the parties who initialed on that

20 day, you know, were trying to keep track of what -- what the

21 changes were and the change is -- it's different handwriting,

22 but it's the same words, what difference does it make?

23            You know, I can understand your difference between,

24 you know, having five sets of initials and four sets.  And I

25 think the one that's the difference is Ms. Myers initialed it

Milner - Cross/Mahaffey                         106

1 maybe later or separately.  But I'm not -- I don't get it, as

2 far as the materiality, because, you know --

3          MR. MAHAFFEY:  I'll rephrase.

4          THE COURT:  Yeah, because the language is the same as

5 for further preservation of the play -- presentation of the

6 play on both versions, but it's written by two different

7 people, but it's the same language.

8          MS. MONTGOMERY:  That's correct.

9          THE COURT:  So if they're in the same room, and

10 they're keeping track, you know, of who -- because one was a

11 Schuller copy and one was Ms. Milner's copy, they were -- you

12 know, you may have had twithout different people writing the

13 same words, and that was the agreement.

14 BY MR. MAHAFFEY:

15 Q    Would you concede to the Court that Ms. Myers was not in

16 the same room at the same time that Exhibit 5 and Exhibit 7

17 were created?

18 A    Yes, I can concede that.

19 Q    So the truth is is that when Exhibit 5 was created, Ms.

20 Myers was not present and, therefore, Exhibit 7 was not created

21 on the same day, true?

22 A    No, that's not true.

23 Q    Would you concede to the Court that Exhibit 5, page 55, is

24 different than Exhibit 7, page fifty -- I mean, page 63?

25 A    Yes, they are different.

Milner - Cross/Mahaffey                                    107

1  Q     What?  They're different?

2  A     Yes, they are different.

3  Q     So your testimony to Judge Kwan is even though they were

4  created at the same time, at the same setting, with the same

5  people, the two different schedules were created differently?

6           MS. MONTGOMERY:  Objection.  That misstates her

7  testimony.

8           THE WITNESS:  Yeah, the schedules --

9           THE COURT:  Yeah, just hold on.  They're different,

10 but, you know, you may want to elicit testimony of why they're

11 different.  You know, I guess you're asking were these pages --

12 they're different, right?

13          THE WITNESS:  Yeah.  Schedule 1 was not the main body

14 of the agreement.  Schedule 1 was a next page of the agreement.

15          THE COURT:  Right.  So they were created at different

16 times, Schedule -- the different schedule --

17          THE WITNESS:  Schedule 1 was changed.

18          THE COURT:  Schedule 1 was changed.  And they were

19 changed not on the same day, right?

20          THE WITNESS:  No.

21          THE COURT:  Okay.  Okay.  So Schedule 1 -- the

22 original -- the Schedule 1 in Exhibit 5 was -- do you know when

23 that was created?

24          THE WITNESS:  That we all signed the same time we

25 signed the July 8th main body of the agreement.

Milner - Cross/Mahaffey                           108

1          THE COURT:  Okay.  And then the Schedule 1 to Exhibit

2 7 was a different date, right?

3          THE WITNESS:  Yes.

4          THE COURT:  Okay.  And when was that?

5          THE WITNESS:  It was on August 25, I believe it was,

6 when everybody --

7          THE COURT:  Okay.  The later date?

8          THE WITNESS:  Yeah.

9          THE COURT:  Okay.

10          THE WITNESS:  Yeah.

11          THE COURT:  Okay.

12 BY MR. MAHAFFEY:

13 Q    I thought you said the later date was August 26 when the

14 trust was signed.

15 A    I -- I'm going off my memory.  I can pull the actual

16 document.

17          THE COURT:  Yeah, whatever the date was when the

18 trust agreement was signed.

19          THE WITNESS:  Yeah.  Yeah.

20          THE COURT:  Okay.  That was reattached --

21          MS. MONTGOMERY:  It's notarized on the 25th.

22          THE COURT:  25th.  July 25th -- August 25.

23          MS. MONTGOMERY:  August 25.

24          THE WITNESS:  Yeah, it was a CCM notary.

25          THE COURT:  Okay.  She was trying to -- she was

Milner - Cross/Mahaffey                    109

1  testifying from memory.

2              THE WITNESS:  Right.

3              THE COURT:  But whatever the date was on the

4  documents, right.  So the new Schedule 1 was attached on August

5  25?

6              THE WITNESS:  Yes.  The CCM had a notary.

7              THE COURT:  All right.

8  BY MR. MAHAFFEY:

9  Q    So it's your testimony now that everyone was in the room

10 when Exhibit 5 was being created except for Gwyn Myers?

11             THE COURT:  Well, do you mean everyone who initialed

12 it and signed it?

13             MR. MAHAFFEY:  Correct.

14             THE WITNESS:  Yes.

15 BY MR. MAHAFFEY:

16 Q    Did everyone who initialed and signed it --

17             THE COURT:  Except Ms. Myers?

18             THE WITNESS:  Yes.

19             THE COURT:  All right.

20 BY MR. MAHAFFEY:

21 Q    And then your testimony is that later on Ms. Myers signed

22 Exhibit 7 at a different date?

23 A    Yes.

24 Q    And is it your testimony that she signed Exhibit 7 after a

25 board meeting approved her to do so?

Milner - Cross/Mahaffey                110

1  A    I was not involved in their governing matters.

2  Q    Do you have any understanding that before a nonprofit

3  ministry could transfer you millions of dollars of assets,

4  since you were a family member, that it needed board approval?

5         MS. MONTGOMERY:  Objection.  That calls for a legal

6  conclusion.

7         THE COURT:  Sustained.

8  BY MR. MAHAFFEY:

9  Q    Were you advised that there needed to be board approval?

10        MS. MONTGOMERY:  Same objection.

11        THE COURT:  Well, that's a factual matter.

12  Overruled.  Were you --

13        THE WITNESS:  No, I --

14        THE COURT:  You were not advised.  Okay.

15        THE WITNESS:  I had no understanding of any of their

16  board matters.

17        THE COURT:  All right.

18  BY MR. MAHAFFEY:

19  Q    So Gwyn Myers did not send you a specific email explaining

20  to you that the rules of nonprofit require certain gates to be

21  opened and closed, and one of them is the requirement of full

22  board approval?

23  A    Would you like to tell me more about that email, please?

24        THE COURT:  Well, he's asking for your testimony.  Do

25  you -- you know, do you recall that?  Yes or no?

Milner - Cross/Mahaffey                    111

1          THE WITNESS:  There were times where Gwyn questioned

2    it, and then Gwyn would take it back, and she went ahead and

3    signed it anyway.

4          THE COURT:  Well, right.  Right.  But do you have any

5    specific recollection of her advising you that through an

6    email?

7          THE WITNESS:  She did occasionally say, you know,

8    about board, and then I would say, "Well, what do we need to

9    do?"  And then she finally said, "We just need to report to the

10   board, because that's what the bylaws saw we can do," that the

11   executive committee -- and then the executive committee acted

12   on behalf of the board.

13         THE COURT:  Mr. Mahaffey, was that responsive to your

14   question.

15         MR. MAHAFFEY:  Indirectly.  Let me see if I can ask

16   it --

17         THE WITNESS:  Okay.

18         MR. MAHAFFEY:  -- more succinctly.

19   BY MR. MAHAFFEY:

20   Q    Did you receive a specific email from Ms. Myers after the

21   July 8th document that advised you that that document was not

22   enforceable because there hadn't been board approval?

23   A    I -- we have emailed so much, me and Gwyn, you have got to

24   be more specific on that.  I'm sorry.

25   Q    On August 21st, 2006, at 9:21 p.m., did Ms. Myers write

Milner - Cross/Mahaffey                          112

1  you the following, "Carol, fortunately, and sometimes

2  unfortunately, the Ministries has grown to the point where one

3  person cannot make decisions that commit the Ministry to large

4  dollar amounts.  The decision process now involves a board when

5  certain conditions are met, these conditions being spelled out

6  in the bylaws.  Your contract is of such an amount that the

7  board needs to approve it."

8          Does that refresh your memory?

9  A    That sounds -- yes.  That sounds like an email I would

10 have received prior to her adding her signature on the 25th.

11 Q    And how many people are on the board of Crystal Cathedral

12 Ministries as of August 25th, 2006?

13 A    I have no idea.  I was not part of their governing

14 structure.

15 Q    You don't know the members?  They weren't your family

16 members?

17 A    Some of them were, but I don't know.  I had nothing to do

18 with that.

19 Q    Well, to the best of your memory, to Judge Kwan, identify

20 -- let's start with the family members that were on the board.

21 Was your brother on the board?

22 A    Oh, yeah, my brother was on the board.

23 Q    Anybody else that you can remember?

24 A    Probably Jim Penner and Jim Coleman and my mother and my

25 father.

1  Q    So out of those five, did the three disinterested board

2  members who were not related to you ever sign an approval as

3  set forth in the email to you from Carol -- Gwyn Myers?

4  A    I was told repeatedly by Gwyn Myers that it needed -- it

5  was the executive committee that had the authority to find the

6  agreement.

7              MR. MAHAFFEY:  Move to strike.

8              THE COURT:  All right.  Sustained.  Move to strike is

9  granted.

10             Do you have any personal knowledge of what he just

11 asked you, personal knowledge that the independent board

12 members voted to --

13             THE WITNESS:  I have --

14             THE COURT:  -- approve the contract?

15             THE WITNESS:  I'm sorry.

16             THE COURT:  Yeah, did you -- do you have any personal

17 knowledge of, you know, the independent board members approving

18 your contract?  Do you have any personal knowledge of that,

19 that they did or did not?

20             THE WITNESS:  I --

21             THE COURT:  You only know because someone told you,

22 right?

23             THE WITNESS:  Right.

24             THE COURT:  All right.

25             THE WITNESS:  And --

Milner - Cross/Mahaffey                    114

1          MS. MONTGOMERY:  And, Your Honor, I have to object.

2   He's -- he's asking about facts that are not in evidence.

3   There is no presentation of any evidence whatsoever.

4          THE COURT:  Well, he's asking her -- he asked her --

5          MS. MONTGOMERY:  He's making assumptions.

6          THE COURT:  He asked her a question that's arguably

7   relevant, so overruled.  But she doesn't have any personal

8   knowledge, so I don't know if she --

9          MS. MONTGOMERY:  But he's making an assumption that

10  board approval is required or that there is some document --

11         THE COURT:  Well, he's just asking her a question.

12  You know, it may or may not be.  I don't know if it is or it

13  isn't.  So he's going to have to probably show that.  But he's

14  asking her a question if she knew.  So overruled.  All right.

15  He can proceed.

16  BY MR. MAHAFFEY:

17  Q    Did you produce for Judge Kwan the bylaws that you're

18  relying on that this required board approval?

19  A    I don't have the bylaws.  I mean, I'm not allowed to --

20         THE COURT:  Well, I don't know if he produced it.

21  Why wouldn't she produce it to the Court?

22  BY MR. MAHAFFEY:

23  Q    It's just a yes or no question.  When you -- let me back

24  up.  I think I heard you testify that you believe the bylaws

25  don't require board approval, and somebody told you that?

1  A     Gwyn Myers.

2  Q     So that's your testimony to this court?

3  A     Gwyn Myers repeatedly said the executive committee, that

4  there was a majority of the executive committee that had signed

5  the document, and so I could rely on the document as being

6  binding.

7  Q     And didn't you tell the Court just a few minutes ago that

8  that's because that was in conformance with the bylaws?

9  A     From what she has told me.

10 Q     So you --

11 A     I have an email from her to me that said we -- it turns

12 out we do not need to call a board meeting, because the by --

13 Greg has told me that the bylaws support that we just need to

14 report it to the board.

15 Q     So would you agree with the Court -- I mean, would you

16 agree, then, that if that was wrong, the bylaws absolutely

17 required board approval, your contract is invalid?

18 A     No, I would not.

19          MS. MONTGOMERY:  Objection.  Legal conclusion.

20          THE WITNESS:  And I --

21          THE COURT:  Sustained.

22          THE WITNESS:  No.

23          THE COURT:  Just hold on, Ms. Milner.  Your counsel

24 objected to the question.

25          THE WITNESS:  Yeah.  Sure.

Milner - Cross/Mahaffey                116

1          THE COURT:  And so I have to rule upon it.

2   Sustained.

3          All right.  Ask a different question.

4   BY MR. MAHAFFEY:

5   Q    After this purported event where Gwyn Myers sent you that

6   email, did you discuss it with any of the disinterested board

7   members?

8          MS. MONTGOMERY:  Objection.  She stated in her

9   testimony she doesn't know the disinterested board members.

10  BY MR. MAHAFFEY:

11  Q    Well, let's start with --

12         THE COURT:  Well, I don't know.  Do you know who the

13  disinterested board members are?

14         THE WITNESS:  I wouldn't be able to remember them.  I

15  mean, if you told me --

16         THE COURT:  Well, do you know who they were?

17         THE WITNESS:  I couldn't -- I couldn't list them from

18  memory.

19         THE COURT:  Well, I was going to say, now do you

20  recall -- well, it's been a long time, I'm sure.

21         THE WITNESS:  I know.

22         THE COURT:  But do you remember who they were?  Do

23  you know what that means, disinterested?

24         THE WITNESS:  Yeah.  Yeah, yeah, yeah.  You know, I

25  know.  I'm trying to remember who they were, because I dealt

Milner - Cross/Mahaffey                    117

1  with the executive committee.

2          THE COURT:  Yeah.  We're only asking for what you

3  remember and what your personal knowledge is.

4          Do you remember?

5          THE WITNESS:  No, I really can't say it confidently.

6          THE COURT:  Okay.  She -- all right.  Okay.  She

7  doesn't remember.  You might want to -- if you want to try to

8  refresh her recollection, Mr. Mahaffey.

9          THE WITNESS:  Yeah.  If you wanted to read me the

10 names of the board members, I could tell you if I knew them or

11 not.

12         THE COURT:  Right.  That's what I'm suggesting to

13 him.

14         THE WITNESS:  Sure.

15         THE COURT:  Right.

16 BY MR. MAHAFFEY:

17 Q    So Mr. Penner, right?

18 A    Yeah, but he's -- I think he's interested, right?  He's

19 brother-in-law.

20         THE COURT:  He's related, right?  I think Mr. Penner

21 is related.

22         THE WITNESS:  But I mentioned him, yeah.

23 BY MR. MAHAFFEY:

24 Q    Mr. Coleman?

25 A    Yeah, he's my brother-in-law.

Milner - Cross/Mahaffey                118

1  Q    You said Mr. Southard or no?

2  A    Mr. Southard was one of the signers of the agreement, yes.

3  He was a board member.

4  Q    And he's not related?

5  A    No, he's not related.

6  Q    So the only two disinterested ones that weren't family

7  members -- well, strike that.

8        Is there a non-family member board member that you

9  can name for the Court at that time?

10 A    A non-family -- I'm sorry.  Repeat the question, please.

11 Q    A non-family member.

12 A    A non-family board member at that time?  Fred Southard.

13 Q    Any others?

14 A    Not with confidence.  That board changed a lot, and I

15 could not -- I would not feel comfortable.

16 Q    And at the time that you were supposedly told that the

17 bylaws allowed the transfer of millions of dollars to you

18 without a disinterested board approval --

19        THE COURT:  Well, I don't know.  I don't know that

20 she was transferred millions of dollars, so -- you said

21 millions of dollars.

22        MR. MAHAFFEY:  I'm sorry.  Let's back up.

23 BY MR. MAHAFFEY:

24 Q    Are you testifying to this court that you think one of

25 these contracts transferred ownership to you?

Milner - Cross/Mahaffey                         119

1  A     Absolutely.

2  Q     And did the items cost millions of dollars that were

3  allegedly transferred to you?

4              MS. MONTGOMERY:  If you know.

5              THE WITNESS:  They cost to fabricate them, yes, but

6  they were -- I won't expand on that.  I can --

7              THE COURT:  Do you know how much it cost --

8              THE WITNESS:  Yes.

9              THE COURT:  -- to create these items?

10             THE WITNESS:  Yes.

11 BY MR. MAHAFFEY:

12 Q     Were they millions of dollars?

13 A     Yes.

14 Q     So your testimony to this court is that -- what date did

15 these millions of dollars, in your opinion, get transferred to

16 you?

17             THE COURT:  You mean the items worth millions of

18 dollars, not the millions of dollars are trans -- millions of

19 dollars were not transferred to her.

20             MS. MONTGOMERY:  She didn't --

21             THE COURT:  Only items --

22             MS. MONTGOMERY:  She didn't testify as to worth.

23             THE WITNESS:  And they --

24             MS. MONTGOMERY:  She testified as to the fabrication

25 cost.

Milner - Cross/Mahaffey                    120

1          THE WITNESS:  Yeah.  That was the fabrication cost.

2          THE COURT:  The fabrication costs.  All right.

3          THE WITNESS:  And so some of them had no value to

4    CCM.

5    BY MR. MAHAFFEY:

6    Q    Okay.  So let's back up.  How many millions of dollars, to

7    your best understanding today, did CCM spend on the Glory of

8    Creation items that you're contending were transferred to you?

9    What's your best estimate?

10   A    Approximately eight -- I mean, I'm going off of your

11   documents.  I have not looked at my budgets, but millions of

12   dollars.

13   Q    So you were the producer, true?

14   A    Yes.

15   Q    You didn't have responsibility for the budget?

16   A    I absolutely did.

17   Q    You don't have any estimate to the Court as to whether it

18   was two million or eight million?

19   A    It would be closer to eight million, but I'm under oath,

20   and to state an exact amount, and not having refreshed myself,

21   I cannot say.

22   Q    My question was an estimate, but let me restate it.

23          Would you agree, so that we can move on, that

24   approximately $8 million --

25   A    Yes, I can -- I can -- sure.

Milner - Cross/Mahaffey                    121

1  Q    So $8 million in checks were written by CCM for these

2  items that you now claim were transferred at some point to you,

3  correct?

4  A    Yes, that's true.

5  Q    And these $8 million of items that were transferred to

6  you, you were the daughter of the founders at that time,

7  obviously, true?

8  A    Yep.

9  Q    Did you consider yourself as an insider?

10 A    Absolutely not.  I felt like very much an outsider,

11 actually.

12 Q    You didn't litigate for four years in the bankruptcy case

13 on the basis of your insider status?

14 A    No, I did not.

15         MS. MONTGOMERY:  Objection.  That is irrelevant.

16         THE COURT:  Well, that's calling for a conclusion.

17 Sustained.  All right.

18 BY MR. MAHAFFEY:

19 Q    Is it your understanding that the bylaws of CCM allow $8

20 million --

21         MS. MONTGOMERY:  Objection.

22         MR. MAHAFFEY:  I haven't finished my question.

23         THE COURT:  Right.  He gets to ask his question.  All

24 right.

25 BY MR. MAHAFFEY:

Milner - Cross/Mahaffey                                      122

1  Q    Is it your testimony to Judge Kwan that the bylaws of CCM

2  allow $8 million of assets to be transferred to a daughter

3  without a disinterested board approval?  Is that your

4  testimony?

5  A    No, that's not my testimony.

6  Q    Do you recall how many months transpired between the July

7  8th original document and when the board was going to

8  ultimately meet to determine whether it approved these

9  transfers or not?

10  A    That's -- I can't answer that, because you're talking

11  again about governance.  I had nothing to do with their

12  governing structure.

13  Q    So does it refresh your memory that in December of 2006

14  Gwyn Myers was still emailing you about the fact that there was

15  going to be a board meeting and that now they were going to do

16  it by electronic ballot because they couldn't get everybody

17  together?  December, six months later.

18       Does that refresh your memory?

19  A    I'd have to see the email.  No, that does not sound

20  familiar.

21  Q    Do you recall that on October 26, 2006, that you were

22  written, "Carol, the last board meeting was not one of my

23  favorite.  It could have been better, but it could have been a

24  whole bunch worse.  An update on your contract was requested by

25  the agenda by Robert A., so it was added at the end.  Much

Milner - Cross/Mahaffey                    123

1  discussion took place about the funding requirements, rather

2  than the settlement dollars, obviously because of a severe cash

3  crunch.  The meeting was adjourned prior to any action."

4           Does that refresh your recollection at all that on

5  October 26th --

6  A    Yes.  That email does.  Yes.

7  Q    So after October 26, when the meeting was adjourned with

8  no action, isn't it true you wrote back to Gwyn Myers and told

9  her that her direct reply was not upsetting, that, to the

10 contrary, you appreciated forthright the detailed report and

11 thanked her and that her reassurance that all would be followed

12 through, that was your email to her back after she sent that in

13 October, true?

14 A    Yes, because she sent me many emails, and many of them

15 reassured me that the agreement was in full force.

16 Q    But it's true that by January 3rd, 2007, almost seven

17 months later, you were copied on emails that included

18 discussion about the fact that they were circulating at that

19 time, "Attached for your signatures is an action by unanimous

20 written consent regarding Carol Shuller Milner."

21           That was in January 2007, true?

22 A    I -- that -- I'm sorry.  That does not sound familiar.

23 Can you show me the email?

24 Q    I certainly can.

25           THE COURT:  Well, do we have it as an --

Milner - Cross/Mahaffey                    124

1            MS. MONTGOMERY:  There's nothing -- he's gone way

2  beyond direct testimony.

3            THE COURT:  Well --

4            MR. MAHAFFEY:  Your Honor --

5            MS. MONTGOMERY:  Go ahead.

6            MR. MAHAFFEY:  Your Honor, there's one issue that has

7  been disconcerting, because I know there was no discovery in

8  this proceeding, and that's fine, and that was, I think,

9  appropriate.

10            But in my state court action that I'm representing

11  Ms. Milner on, we provided over 2,000 pages of documents to

12  counsel in the state court discovery.  And, in fact, most

13  recently we provided, I think --

14            THE COURT:  Well, all right.  So --

15            MR. MAHAFFEY:  What I'm saying is, Your Honor, they

16  did not provide a single document in response to our discovery.

17  Not one.  Now they're claiming that they have documents that

18  they have failed to produce in the state court.  And then

19  they've suggested that they were going to propound them to Your

20  Honor in this court, but they didn't want to do it to offend

21  you, but they could have produced them to us.

22            They didn't produce them to us.

23            THE COURT:  Well, I guess the question is --

24            MR. MAHAFFEY:  It just seems --

25            THE COURT:  Well, all right.  Why don't we go back to

Milner - Cross/Mahaffey                    125

1  the objection that Respondent's counsel made.  It's outside the

2  scope of the direct.  So do you want to respond to that, the

3  question that was asked talking about this January 2007 email

4  as outside the scope of the direct?

5          So how does it relate to the direct?

6          MR. MAHAFFEY:  The direct has an averment, if I can

7  take -- can I take just a moment and find it?

8          THE COURT:  All right.  So why don't we -- why don't

9  we go to the direct testimony, because -- so --

10         MR. MAHAFFEY:  I'm looking at part of the direct, and

11 I need a few moments to find every section.  But part of the

12 direct is this statement --

13         THE COURT:  Well, we have an email -- well, in

14 paragraph 30, we have an email, January 17, "Ms. Myers wrote to

15 me and said it's confirmed that all stipulation of the contract

16 that was signed remain in place."

17         Was that the email you were referring to?

18         MR. MAHAFFEY:  That was the content I was examining

19 on.

20         THE COURT:  Yeah.  So --

21         MR. MAHAFFEY:  So my question specifically was after

22 this purported email, I asked the witness, and I can ask it

23 again if I didn't make it clear.

24 BY MR. MAHAFFEY:

25 Q    After your January 17th alleged email that you have

Milner - Cross/Mahaffey                    126

1  referenced in paragraph 30, isn't it true you --

2          MS. MONTGOMERY:  Objection.  That's not alleged

3  email.  It's attached.

4          THE COURT:  Well -- well, why don't I hear your

5  question.

6  BY MR. MAHAFFEY:

7  Q   Isn't it true that after that date you were told that

8  there still had not been a board vote?

9  A   I don't have -- I don't have memory of that.  I'm sorry.

10 Q   So you do not remember after that date receiving email,

11 such as ones on February 8th, where you were told that Gwyn

12 Myers felt like this was her second career, trying to get board

13 approval, and you said --

14         MS. MONTGOMERY:  Objection.

15         THE COURT:  Well, all right.

16         MS. MONTGOMERY:  It's way outside the direct.

17         THE COURT:  Well, okay.  Isn't that Exhibit 9, the

18 email?  Is that the email that you're talking about?

19         MR. MAHAFFEY:  Your Honor, what I'm -- what I'm

20 asking permission --

21         THE COURT:  Well, you're talking about the --

22 something about a career.  Where is that?

23         MR. MAHAFFEY:  The question to the witness --

24         THE COURT:  No, you're saying -- you're saying --

25         MR. MAHAFFEY:  I am reading -- I am reading what I

Milner - Cross/Mahaffey                    127

1  made a point --

2          THE COURT:  Are you reading one of the exhibits?

3          MR. MAHAFFEY:  I am reading from what is the --

4          THE COURT:  Right.  Yeah, apparently it's already --

5  yeah, a second career -- on the second career.

6          MR. MAHAFFEY:  Right.

7          THE COURT:  So -- let's see.  And Ms. Myers, where

8  does it talk about her -- the second career?  I'm sorry.  Where

9  is --

10         MR. MAHAFFEY:  So if I -- can I start over?

11         THE COURT:  No.  What I was going to say is that, you

12 know, there is an email purportedly from Ms. Milner talking

13 about the second career, and you're referring to Ms. Myers'

14 email, right, Mr. Mahaffey?  And which one is that?

15         MR. MAHAFFEY:  That is part of the documents that we

16 prepared and did not submit based on --

17         THE COURT:  No, but isn't it part of this email

18 string and that's Exhibit 9 to -- it's in Ms. Milner's

19 declaration?

20         MS. MONTGOMERY:  Yes.

21         MR. MAHAFFEY:  Yes.

22         THE COURT:  So which one is that regarding the -- the

23 second career email that Ms. Myers sent?  Because that's what

24 you're asking.  I just want to follow what you're asking.

25         MR. MAHAFFEY:  I was focused on the date, but I'm

Milner - Cross/Mahaffey                    128

1  trying to read the prior emails where Ms. Myers --

2          THE COURT:  Yeah, well --

3          MR. MAHAFFEY:  The phrase -- the reason I asked about

4  the second career is because that's the kind of thing a person

5  might remember, and it's part of her exhibits.

6          The point of the question was the date.

7          MS. MONTGOMERY:  Why don't you point to the exhibits?

8          THE COURT:  Well, what I was going to say, why don't

9  we look at her email?  Okay.  So where is the email that you

10 were -- the statement from the email that you were trying to

11 read?

12         MR. MAHAFFEY:  I was reading from Exhibit 9, page 77.

13         THE COURT:  Page 77.  Which 77?  You've got 77, 77A,

14 and 77B.

15         MR. MAHAFFEY:  77.

16         THE COURT:  Just plain 77?

17         MR. MAHAFFEY:  Just plain 77.

18         THE COURT:  Okay.  So what -- what's the time of the

19 email that you're referring to?

20         MR. MAHAFFEY:  February 8th.

21         THE COURT:  No, time.  Time.

22         MR. MAHAFFEY:  Oh, 11:18.

23         THE COURT:  11:18.  Okay.  So --

24         MS. MONTGOMERY:  This is from Carol to Gwyn.

25         THE COURT:  That's Carol's email, but apparently Gwyn

Milner - Cross/Mahaffey                    129

 1  Myers had an email referring to second career that Ms. Milner

 2  was referring to.  Which one was that?

 3          MR. MAHAFFEY:  That does not seem to be attached to

 4  this email chain.

 5          THE COURT:  Oh, it's not?

 6          MS. MONTGOMERY:  The full email is attached, and

 7  that's why there is an A and B, because there was -- it was

 8  omitted.

 9          THE COURT:  Yeah, that's what I was going to say, is

10  that the second career email, I don't know where that is, so --

11          MR. MAHAFFEY:  Can I just start over?  I don't want

12  to delay this question.  I can start over.

13          THE WITNESS:  I see the second career now in front of

14  me.

15          MS. MONTGOMERY:  What page?

16          THE WITNESS:  Page 77.

17          THE COURT:  Six -- I'm sorry.

18          THE WITNESS:  And I'm writing to Gwyn, the Exhibit 9,

19  page 77.

20          THE COURT:  All right.  Yeah.  Yeah, you wrote to

21  Gwyn, I hear you on the second career.  But apparently Ms.

22  Myers referred to the second career somewhere.

23          Do you see that email that Ms. Myers referred to?

24          THE WITNESS:  The reason it's easy to see the one

25  second career, it's in quotes.

Milner - Cross/Mahaffey                    130

1              THE COURT:  Yeah.

2              THE WITNESS:  There's a lot of words here.

3              MR. MAHAFFEY:  May I rephrase, Your Honor, withdraw

4    that question and rephrase?

5              THE COURT:  Yeah.  I think that's probably best.

6              MR. MAHAFFEY:  All right.

7              THE COURT:  Let's ask a different question.

8              MR. MAHAFFEY:  Okay.  Motion to withdraw and

9    rephrase.

10             THE COURT:  Right.  Yeah, ask a different question.

11             MR. MAHAFFEY:  Thank you.

12   BY MR. MAHAFFEY:

13   Q    So, Ms. Milner, directing your attention to just page 77

14   plain, Exhibit 9, do you have that in front of you?

15   A    Yes, I do.

16   Q    Okay.  Directing your attention to the 12/19 email at the

17   top, the third paragraph.

18   A    Yes, I see it.

19   Q    Where it says, "This is the way that I would see it, but

20   maybe I'm missing something.  Do not think that you should base

21   future actions on past ones, because the contract and trust are

22   not yet in place."

23             Do you see that phrase, "contract and trust are not

24   yet in place"?

25   A    Yes, I do.

Milner - Cross/Mahaffey                131

1  Q    So would you now concede to the Court that after this

2  purported January 7th email that you referred to in Exhibit 30

3  you were being told still by February 8th the contract and

4  trust were not in place?

5  A    No, I won't concede that.

6  Q    Okay.  But you did read this sentence when Ms. Myers wrote

7  it to you that says the contract and trust were not in place?

8  A    Yes, I did, but you would have to go to preceding emails.

9         MR. MAHAFFEY:  Move to strike the balance.  I just

10 want to know if you read it at that time.

11        THE COURT:  All right.  The motion to strike is

12 granted.  So just listen to his question.

13        THE WITNESS:  Okay.

14        THE COURT:  Answer it, and your counsel can ask

15 questions --

16        THE WITNESS:  Yeah.

17        THE COURT:  -- that would elicit testimony that they

18 feel would be responsive to any of the implications raised by

19 this question.

20        THE WITNESS:  Okay.

21 BY MR. MAHAFFEY:

22 Q    Directing your attention to Exhibit 7, paragraph 5.2 on

23 page 61.

24 A    Yep.

25 Q    Do you see the words that the binding nature of this trust

Milner - Cross/Mahaffey                                        132

1  shall be conditioned on the funding of the trust?

2  A    Yes, I do.

3           MS. MONTGOMERY:  Asked and answered.

4           THE COURT:  Overruled.  All right.

5  BY MR. MAHAFFEY:

6  Q    Do you see in this --

7           THE COURT:  That's foundational.  So you're asking --

8  you're leading up to something, Mr. Mahaffey?

9           MR. MAHAFFEY:  Yes, Your Honor.

10 BY MR. MAHAFFEY:

11 Q    So do you see in Exhibit 9, page 77A, that you were being

12 told as of February 8th, 2007, now eight months after the

13 purported transfer of ownership, that the trust has not been

14 funded yet, and they were trying to, quote, how to satisfy your

15 concerns, quote?

16 A    So what's the question?

17 Q    Do you remember getting that?

18 A    Do I remember getting this email?

19 Q    Yes.

20 A    Yes, I remember getting this email.

21 Q    So did you have an understanding as of February 8th, 2007,

22 the trust had not been funded?

23 A    No, the trust was not funded.

24 Q    And did you ever receive any modification to paragraph 5.2

25 that before this entire contract would be binding that that

Milner – Cross/Mahaffey                    133

1  paragraph was modified to not require trust funding?

2  A    Your questions are pretty complicated.

3  Q    Let me rephrase.

4  A    Thank you.

5  Q    I'm going to rephrase.

6  A    Thank you.  Thank you.

7  Q    After this February 8th communication, did all the parties

8  who signed Exhibit 7 sign a modification removing paragraph

9  5.2?

10 A    No.

11 Q    Now, is it true that in June of 2007, because the CCM had

12 not complied in your opinion with this agreement, you hired

13 counsel to sue them?  This is a year later.

14 A    No, I did not hire them to sue them.

15 Q    Let me direct your attention to your declaration,

16 paragraph 31, and the sentence that says, "I was again forced

17 to retain counsel."

18 A    Yes, I retained counsel.

19 Q    So it's true then, is it not, that a year after you claim

20 that there was a purported transfer of ownership, you were

21 disputing the contract and the lack of performance and you

22 retained counsel, true?

23 A    No, I was not retaining counsel to sue them.  At that

24 time, I would have.

25         THE COURT:  That wasn't his question.

1          THE WITNESS:  Okay.  I'm really trying to understand.

2          THE COURT:  That you retained counsel because you

3    were not satisfied with the church's cooperation.

4          THE WITNESS:  Yes, some of their cooperation, that is

5    true.

6    BY MR. MAHAFFEY:

7    Q    Did you read the letter from the counsel that you hired

8    ever?

9    A    I'm sure I did.

10   Q    And did it not say that it was specifically a threat to

11   sue both the Ministry and your parents if they did not fund

12   this trust and comply with this alleged agreement?

13   A    I would have sued.  Yes, I would have sued.  And so she

14   implied it, but that's different than hiring someone to

15   actually perform litigation and file a complaint.

16   Q    So let me see if I can rephrase.  Would you agree to this

17   court that over a year after the purported contract that you

18   claim you're relying on was entered, you hired attorneys, who

19   stated they were going to sue the Ministry because they had not

20   complied with this purported contract, true?

21   A    I hired an attorney.  I would have to read the letter

22   again to tell you what it says.  If you can point me -- I know

23   it's an exhibit, one of our exhibits.  If you can point me to

24   it, that would be great.

25   Q    Let me see if you remember this without seeing the

Milner - Cross/Mahaffey                    135

1 exhibit.  If you don't remember it, we'll find it, but I'm

2 going to read it and see if it refreshes your memory.  Okay?

3 Is that okay?

4 A    I would rather read the exhibit, have it before me.

5 Q    Do you mind if I --

6 A    Oh, I've got it.

7          THE COURT:  No, he was going to read it to you.

8          THE WITNESS:  Okay.  It's just --

9          THE COURT:  He said -- Mr. Mahaffey said he was going

10 --

11          THE WITNESS:  It's just easier for me --

12          THE COURT:  -- read it to you.  So --

13          THE WITNESS:  Sure.  I've got it anyway.

14 BY MR. MAHAFFEY:

15 Q    So do you remember this sentence, "Furthermore, section

16 5.2 of the agreement requires the Ministries to compensate Ms.

17 Milner, as set forth in the trust agreement," with the last

18 sentence, "The Ministries has not fulfilled this obligation."

19          Do you see that?

20 A    Yes, I do se that.

21 Q    And was it after this date of July 5th, was there ever a

22 written document signed by all the same five people that

23 modified the language that this entire contract was conditioned

24 upon this being funded?  After July 5th of 2007, was there a

25 document signed by the same five people that modified paragraph

Milner - Cross/Mahaffey                    136

1  5.2?

2          MS. MONTGOMERY:  Objection, Your Honor.  He's

3  misstating the language of this letter.

4          THE WITNESS:  Yeah.

5          THE COURT:  Well, he's --

6          MS. MONTGOMERY:  He's making up the word "funded."

7          THE COURT:  No, he asked a different question.

8  Overruled.  He asked whether or not -- which is really more

9  asked and answered -- you know, was there any subsequent

10  modification of section 5.2?  And he's asked that a number of

11  times.

12         MS. MONTGOMERY:  He's asked that a number of times,

13  but he keeps asking whether or not there was something about

14  funding.  And this letter that he's referring to does not say

15  anything about funding.

16         MR. MAHAFFEY:  Can I object to --

17         THE COURT:  No, his last question was really was

18  there anything that modified section 5.2.  That's what I

19  understood.

20         MS. MONTGOMERY:  If that's the -- if that's the --

21         THE COURT:  Yeah, it's asked and answered, but --

22         MS. MONTGOMERY:  Okay.

23         THE COURT:  All right.

24         Wasn't that your question?

25         MR. MAHAFFEY:  It was.  It was --

Milner - Cross/Mahaffey                    137

1          THE COURT:  All right.  Then next question then.

2          MR. MAHAFFEY:  After --

3          THE COURT:  Well, can I ask you this, Mr. Mahaffey?

4    How much longer do you need with the witness?  Because, you

5    know, we're approaching the lunch hour, and I didn't want -- I

6    wanted to see whether or not -- because I don't think there are

7    any other witnesses, are there, live witnesses, so --

8          MS. MONTGOMERY:  Unless you want Mr. Light.  He's

9    submitted a declaration.  He's here and present and available

10   if necessary.

11         THE COURT:  Well, we'll get to that point.  Do you

12   need to cross-examine Mr. Light?

13         MR. MAHAFFEY:  No.

14         THE COURT:  All right.  Okay.  So Mr. Light's

15   declaration is received, and there is no cross-examination.

16         But I wanted to make sure that I fully accommodated

17   your need to cross-examine the witness and talk about

18   scheduling, whether or not you wanted to complete the

19   examination.

20         I don't know.  What's your estimate?  I want to make

21   sure that you get your opportunity to examine the witness and

22   then there be an opportunity of redirect, including, you know,

23   trying to lay foundation for the exhibits.

24         MR. MAHAFFEY:  For certain we're not going to be done

25   by the lunch hour, and probably not even today with this cross.

Milner - Cross/Mahaffey                    138

1            MS. MONTGOMERY:  That's ridiculous, Your Honor.

2            THE COURT:  Well, what's your estimate?

3            MR. MAHAFFEY:  I would say two hours of additional

4    cross.

5            THE COURT:  All right.  So --

6            MR. MAHAFFEY:  It depends on the answers, obviously.

7            THE COURT:  All right.

8            MS. MONTGOMERY:  Your Honor, Ms. Milner has come down

9    at her expense from Boulder, Colorado.  So she's here today to

10   try to resolve this.

11           THE COURT:  Well, I think we're going to -- he says

12   two more hours.  So we're going to finish today.

13           MS. MONTGOMERY:  I don't believe --

14           THE COURT:  Because I don't want her to be burdened

15   to have to come back, so --

16           THE WITNESS:  Thank you.

17           MR. MAHAFFEY:  All right.

18           THE COURT:  All right.  Well, I'm just asking.  So

19   we'll just continue on until noon, and then how long do you

20   want for lunch hour break?

21           MS. MONTGOMERY:  Short.  Whatever --

22           THE COURT:  Well, normally I take an hour and a half

23   in trial, but it could just be an hour, 45 minutes, so we can

24   move it along.

25           MS. MONTGOMERY:  Is there any food downstairs?

Milner - Cross/Mahaffey                    139

1          THE COURT:  Because we want to be completed today.

2    She doesn't want to have to come back.

3          So we want to be done today.

4          MS. MONTGOMERY:  We can get something downstairs

5    within the building.

6          MR. MAHAFFEY:  An hour.

7          THE COURT:  An hour?  Okay.  Because you want to

8    probably want some time for, you know, a break, and then have

9    something to eat.  Okay.  So we'll make the lunch hour break an

10   hour.

11         So do you want to continue on to noon, or do you want

12   to take the break now?

13         MR. MAHAFFEY:  Considering the interruption, why

14   don't we just take the break now and then that way --

15         THE COURT:  All right.  And then we'll --

16         MS. MONTGOMERY:  We'd rather go ahead and continue

17   and get as much as --

18         THE COURT:  Well, I was going to say is we take the

19   one hour now, and then you come back.

20         MS. MONTGOMERY:  We'd like to hear the next 20

21   minutes of examination.  We've got the time and want to make

22   sure that we know, you know, what he's already examined her on.

23         MR. MAHAFFEY:  Your Honor, again, coming back to the

24   point that we've not received a single document from them, not

25   one, so we're basing it on --

Milner - Cross/Mahaffey                    140

1          THE COURT:  Well, I don't know if that's really

2     grounds for objection for him to ask about this.  That's a

3     state court matter, right?  So I'm not going to hear argument

4     about that.  It's just whether or not -- okay.

5          So you have two more hours of examination?

6          MS. MONTGOMERY:  He can't -- he can't -- he should

7     not be able to examine Ms. Milner with regard to documents that

8     he has not produced and has not submitted to the Court.  He's

9     sitting there reading documents.

10         THE COURT:  Well, I don't know about that, because

11    he's asking documents that are pertaining to her direct

12    testimony.  And so, you know, it's within his prerogative to do

13    that.

14         MS. MONTGOMERY:  Well --

15         THE COURT:  It relates to her direct testimony.  Are

16    you going to say, well, he didn't produce this in discovery,

17    blah, blah, blah, but, you know, he's asking her questions

18    relating to her direct.  It's within the scope of cross-

19    examination.  So your objections are overruled.  They're

20    overruled.

21         MS. MONTGOMERY:  Okay.

22         THE COURT:  Okay.  There's no further point in

23    argument.  He's asking about what -- you know, you brought it

24    up in the direct, and he's asking her questions about it.  And

25    he can use anything he wants for that.

Milner - Cross/Mahaffey                    141

1          All right.

2          MS. MONTGOMERY:  We would still like to go forward to

3   --

4          MR. MAHAFFEY:  Obviously we're going to interrupt the

5   witness at some point, so whatever the Court's pleasure is.

6          THE COURT:  All right.  We'll go for 15 minutes.  All

7   right.

8   BY MR. MAHAFFEY:

9   Q    Did you have --

10         THE COURT:  Are you all right, Ms. Milner, as far as

11  --

12         THE WITNESS:  Oh, yeah, I'm fine.

13         THE COURT:  All right.  Thank you.

14  BY MR. MAHAFFEY:

15  Q    Did you have an understanding that the Ministry or CCM at

16  that time had an attorney named R-E-G Gibson, Reg?

17  A    Yes.

18         MS. MONTGOMERY:  Objection.  What time period?

19         THE COURT:  At that time, which is --

20         MS. MONTGOMERY:   What's that time?

21         THE COURT:  -- 2006 or '07.  2006, 2007, at the time

22  of the contract.  Overruled.  Okay.  You can answer.

23         Mr. Gibson was the attorney for the -- was the

24  attorney for the church, right?

25         THE WITNESS:  Yes.

1              THE COURT:  All right.

2  BY MR. MAHAFFEY:

3  Q    Is it true that you were advised by Ms. Myers on multiple

4  occasions that before there could be any transfer of the

5  subject equipment that the church's or the Ministries'

6  attorney, Mr. Gibson, would need to approve it?

7  A    No, I don't -- you have to point me to -- there is so much

8  documentation.  It is helpful if you point me to the exhibit.

9  Q    Did you read the email that we just went through, Exhibit

10  9, when the Court was referring to it at all?

11             THE COURT:  Which email?  The date.

12  BY MR. MAHAFFEY:

13  Q    So Exhibit 9, page 77A.

14  A    Yes, I see it.

15  Q    Do you see the reference in the paragraph on 77A to calls

16  with Reg and Fred.

17  A    Yes.  "Just had a call yesterday with Reg and Fred," yes.

18  Q    And Reg is Mr. Gibson?

19  A    Yes.

20  Q    And did you have an understanding that Ms. Myers was

21  communicating to you that the, as she said in her earlier

22  statement, where she said that the contract and trust were not

23  yet formed, that that was because she was contacting the

24  attorney and getting revisions and input?

25             MS. MONTGOMERY:  Objection.  It does not say that.

Milner - Cross/Mahaffey                          143

1              THE COURT:  Yeah, it doesn't say that.

2              MS. MONTGOMERY:  It misstates testimony.

3              THE COURT:  Where does it say the contract was not

4    formed?

5    BY MR. MAHAFFEY:

6    Q    Okay.  Let's go back.  Let me direct your attention to

7    page 77, and I'm going to have you read this into the record.

8              THE COURT:  Well, you don't have to read -- okay.

9    BY MR. MAHAFFEY:

10   Q    Okay.  I'll just direct your attention to it.  Do you see

11   --

12             THE COURT:  Okay.  Why don't you --

13   BY MR. MAHAFFEY:

14   Q    Do you see the sentence that says, "Do not think you

15   should base future actions on past ones, because the contract

16   and trust are not yet in place"?  Do you see that word, "not

17   yet in place"?

18             Just yes or no, do you see the words, "not yet in

19   place"?

20   A    I don't see them, because there's too many lines here.  If

21   you point me, that would be helpful.

22             THE COURT:  Okay.  So why don't we just start with

23   email from Gwyn Myers to you, February 8th, 2007, at 12:19 p.m.

24   It's the top email on page 77.

25             THE WITNESS:  Oh, I was on the wrong page.

Trial Transcript, Page 143

Milner - Cross/Mahaffey                    144

1          THE COURT:  Yeah.

2          THE WITNESS:  Okay.

3          THE COURT:  Yeah, okay.

4          THE WITNESS:  All right.  Thank you.

5          THE COURT:  Yeah.  It's confusing.

6          THE WITNESS:  It is.

7          THE COURT:  Right.  And so --

8          THE WITNESS:  There's so many words to read so

9  quickly.

10          THE COURT:  Yeah.  There's -- there's a lot.  You're

11  right.  And that's why I want to make sure that you're on the

12  same -- everybody is on the same page.

13          THE WITNESS:  Thank you.

14          THE COURT:  All right.  So the first page of this

15  exhibit, Exhibit 9, the first email, which is at the top, do

16  you see that?

17          THE WITNESS:  Yeah, from Gwyn.

18          THE COURT:  It has three paragraphs.  It says, "Hi,

19  Carol," from Gwyn, right?

20          THE WITNESS:  Yes, I see that.

21          THE COURT:  Right?

22          THE WITNESS:  Uh-huh.

23          THE COURT:  The third paragraph -- he wants you to

24  look at the third paragraph.

25          MS. MONTGOMERY:  Your Honor, he needs to read the

Milner - Cross/Mahaffey                    145

1  entire -- this entire email of only three paragraphs so that

2  it's all in context.  He's pulling out one.

3         MR. MAHAFFEY:  This is cross.  They can do that in

4  direct.

5         THE COURT:  Just hold on.  Just hold on.  All right.

6  You can -- you can read the whole email.  All right, Ms.

7  Milner?

8         THE WITNESS:  Oh, you want me to read it?

9         THE COURT:  Well, I was just --

10         THE WITNESS:  That's fine.

11         THE COURT:  He was asking a question about the third

12  paragraph, but --

13         THE WITNESS:  Would you like me to read --

14         THE COURT:  -- your counsel suggests that you read

15  the whole email --

16         THE WITNESS:  Okay.

17         THE COURT:  -- so that --

18         THE WITNESS:  Sure.

19         THE COURT:  Yeah.  Yeah, it's short.  Just read the

20  whole email.

21         THE WITNESS:  "Hi, Carol.  I do not think that" --

22         THE COURT:  Oh, you don't have to read it out loud.

23  Read it yourself.

24         THE WITNESS:  Oh, sorry.

25         THE COURT:  Yeah, because he's going to ask you

Milner - Cross/Mahaffey                146

1  questions about it.  If he wants to read the whole thing on the

2  record, you know, we can do that, or we can just receive

3  Exhibit 9.

4          Are you offering Exhibit 9?  Because you objected to

5  Exhibit 9.

6          MR. MAHAFFEY:  Yes, we would be offering Exhibit 9.

7          THE COURT:  Okay.  Exhibit 9 is received.

8              (Exhibit 9 Received in Evidence)

9          THE COURT:  Okay.  So -- and take your time, Ms.

10 Milner, to make sure that you read it, because he is going to

11 ask you questions apparently.  All right.

12                   (Pause.)

13         THE WITNESS:  Go ahead.

14 BY MR. MAHAFFEY:

15 Q   Okay.  So directing your attention to that same email that

16 we've been referring to, the first three paragraphs, did you

17 have an understanding that Gwyn Myers was telling you that

18 although she personally believed, as she said in the first

19 sentence, that the inventory, quote, as yours are just that, in

20 her third sentence, she was telling you, "However, the contract

21 and trust are not yet in place."

22 A   Where does it say "however"?

23         THE COURT:  Yeah, it doesn't say "however."

24         MS. MONTGOMERY:  It doesn't say that.

25 BY MR. MAHAFFEY:

Milner - Cross/Mahaffey                 147

1  Q    Did you have an understanding --

2         THE COURT:  You have to look at the third paragraph,

3  so --

4         MR. MAHAFFEY:  Let me try it this way.

5         THE COURT:  Yeah, just look at the --

6  BY MR. MAHAFFEY:

7  Q    What did you think the words "the contract and trust are

8  not yet in place" meant?

9  A    It meant that they wanted to fund the trust with a piece

10 of real estate property and they were trying to work out the

11 details of that real estate and putting collateral into the

12 trust.

13 Q    What did you think the word "contract" referred to, that

14 says, "the contract is not yet in place"?

15 A    I believed it referred to the trust agreement being funded

16 by collateral.

17 Q    So your understanding is that the word "contract and

18 trust" were cumulative in that sentence?

19 A    No, I never --

20         MS. MONTGOMERY:  Objection.

21 BY MR. MAHAFFEY:

22 A    -- even thought that it had to do with the contract, the

23 one you're referring to.

24 Q    Isn't it true the same email told you the contracts hadn't

25 been executed yet?

Milner - Cross/Mahaffey                148

1  A    The trust agreement that they wanted to put collateral

2  into had not been executed yet.

3  Q    No, the same email told you that all the contracts,

4  plural, had not yet been executed.

5  A    That is not the way I took it.

6  Q    That's what it said.

7  A    No, but at the very top it says --

8          MS. MONTGOMERY:  Objection.  It does not.

9  BY MR. MAHAFFEY:

10  A    -- that it's my stuff.

11  Q    My question is, yes or no, did this same email chain tell

12  you that the contracts, plural, have not been executed?

13  A    They did not tell me that.

14          MS. MONTGOMERY:  Where is that?

15  BY MR. MAHAFFEY:

16  Q    Okay.

17          MS. MONTGOMERY:  Excuse me.  Where does it say that?

18          THE COURT:  Well --

19          MR. MAHAFFEY:  I'm going to cross-examine the

20  witness, Your Honor, as best I can.

21          THE COURT:  Well --

22          MR. MAHAFFEY:  I'll point to it.

23          THE COURT:  -- I think at this point it's really a

24  matter of you're asking what Ms. Milner made out of Ms. Myers'

25  email.  And apparently the parties disagree.  You're asking her

Trial Transcript, Page 148

1  to agree on Ms. Myers' interpretation, whatever that is, but we

2  don't have Ms. Myers here, so --

3           MR. MAHAFFEY:  Well, my --

4           THE COURT:  So --

5           MR. MAHAFFEY:  My question was for a different

6  purpose.

7           THE COURT:  To see if it's relevant.  You know, are

8  you trying to show that it puts Ms. Milner on notice that it's

9  the position of the debtor that the contract is not in place?

10          MS. MONTGOMERY:  Your Honor, we don't even have

11 testimony about whether or not the contract referred to in the

12 --

13          THE COURT:  Yeah, I don't know.

14          MS. MONTGOMERY:  -- in the third paragraph --

15          THE COURT:  Yeah.  Well --

16          MS. MONTGOMERY:  -- is the same -- is the settlement.

17          THE COURT:  Yeah, that's why I was just -- yeah, we

18 -- I don't know.  I don't think anybody knows.

19          MS. MONTGOMERY:  So these questions -- well, I think

20 Ms. Milner may know.

21          THE WITNESS:  Yeah, no, if anything it was assuring

22 to me.  She was constantly reassuring me that my agreement was

23 in --

24          THE COURT:  Well, I think you're right about that,

25 Ms. Milner, if it says that, "You don't need to worry about it,

Milner - Cross/Mahaffey                    150

1  because the property is yours and the assets are yours." So,

2  you know, what's there to worry about?

3          But then, what counsel is asking is, you know, did

4  you feel that, you know, the last paragraph was to make sure

5  that you had something to worry about?  That's what I think

6  he's asking you about.

7          THE WITNESS:  No, because if I really felt that way,

8  I would have addressed it at the time.

9          THE COURT:  So are you worried about the third

10 paragraph --

11         THE WITNESS:  I wouldn't have just let it float out

12 there.

13         THE COURT:  -- that just says that the contract is

14 not in place?  Does that mean anything to you?

15         THE WITNESS:  It means -- if you go earlier in the

16 document, it's about this collateral trust.  They wanted to

17 spread the payments out over time, and I was doing all I could

18 to help them do that but still have security.

19         And so they were looking at different ways to secure

20 the funds.

21         THE COURT:  All right.

22         THE WITNESS:  It had nothing to do with the property.

23         THE COURT:  Okay.

24 BY MR. MAHAFFEY:

25 Q    Okay.  So look at -- look at the next page, then.  Is it

Milner - Cross/Mahaffey                    151

1  your testimony it had nothing to do with --

2            THE COURT:  I'm sorry.  Next page?

3            MR. MAHAFFEY:  Page 77A.

4            THE COURT:  Okay.

5  BY MR. MAHAFFEY:

6  Q    So you just told the Court --

7            THE COURT:  So I would ask that you refer to a

8  specific email, because the next page has a number of emails,

9  so...

10 BY MR. MAHAFFEY:

11 Q    So directing your attention to the 11/18 a.m. email, the

12 portion of that email that initiated it from Gwyn Myers, and

13 referring to the bottom portion where she's referring to a

14 conversation with the attorney and where she says that once the

15 contracts are executed, then you can proceed with whatever has

16 been agreed to in those documents.

17           So I want to direct your attention to those documents

18 and the plural contracts.  Are you following me?

19 A    No, I am not.

20 Q    Okay.  So let's go to --

21           THE COURT:  She's not following you.  So why don't we

22 isolate -- why don't we isolate what you're asking her to

23 follow.

24           MR. MAHAFFEY:  Okay.  So go to the second --

25           THE COURT:  You know, the next page, Ms. Milner --

Milner - Cross/Mahaffey                    152

1            THE WITNESS:  77A?

2            THE COURT:  -- there's an email that starts, "Hi,

3   Carol."

4            THE WITNESS:  Yes.

5            THE COURT:  "Just had a call with Reg and Fred."

6            THE WITNESS:  Yes.  That's helpful.  Thank you.

7            THE COURT:  Okay.  And he's referring to, I believe,

8   the last sentence of that particular email, before it says,

9   "Gwyn."  "Hi, Carol, Gwyn."  Before the "Gwyn," it says, "Once

10  the money is in there, all the contracts are executed, and you

11  can proceed on whatever has been agreed to in those documents."

12           Do you see that sentence?

13           THE WITNESS:  Yes, I see that.

14           THE COURT:  I think he's asking what does that mean

15  to you?

16  BY MR. MAHAFFEY:

17  Q    Well, a slightly different approach.  Isn't it true that

18  after you read that they were still a holdup, a condition,

19  before you could proceed on whatever was agreed to in those

20  documents, you disagreed with that, and that's why, six months

21  later, you hired the Fish & Richardson firm to threaten sue

22  them?

23  A    No, that's not true.

24  Q    So the fact that after this February 8th document, this

25  email told you that, quote, once the money is in there, quote,

Milner - Cross/Mahaffey                    153

1  all of the contracts are executed, quote, and you can proceed

2  on whatever has been agreed to in those documents, you didn't

3  dispute that?

4  A     Those documents -- in my mind, what she was talking about

5  was funding the trust with real property.  At the time they had

6  a piece of real estate that actually my parents had donated to

7  them, and they wanted to provide that as security.  And that's

8  what we were dealing with at that time.

9           And when I hired Fish & Richardson, it was because

10 they owed me some money.  And then they paid it.  We had no

11 problem.

12 Q    So you didn't lay out in the very same email chain that

13 you were concerned that the rodents might be eating the very

14 document -- the very items?

15 A     I wanted -- I do remember that.

16 Q     Okay.

17 A     And --

18 Q     Let me ask you a question about that.

19 A     Okay.  Sure.  Sure.

20 Q    So the truth is, if you'll admit this to the judge, we can

21 move on.  The truth is you were concerned about the fact that

22 they hadn't transferred ownership, you weren't given access,

23 and you wrote in this same document --

24 A     I never --

25 Q     -- the very same document -- let me finish -- the same

Milner - Cross/Mahaffey                    154

1  document --

2  A    Sure.

3  Q    -- you wrote that you want access because you're concerned

4  rodents are eating your items.  And she said no, because the

5  contract, plural, had not been funded, had not been executed,

6  and that after that occurred, then you can have access to see

7  if the rodents," wrote it, that was the whole purpose of the

8  exchange, true?

9           MS. MONTGOMERY:  Objection.

10          THE WITNESS:  That's not true.

11          MS. MONTGOMERY:  It misstates --

12          THE COURT:  Well --

13          THE WITNESS:  I'm sorry.

14          THE COURT:  Let's take a look.  I'm sorry.  The

15  rodents were --

16  BY MR. MAHAFFEY:

17  Q    So let's look at the bottom of page 77.  The email starts

18  with, "Thank you, Gwyn."  Do you see that?

19          THE COURT:  Oh, I see.  Okay.  Okay.  So --

20  BY MR. MAHAFFEY:

21  A    Yes.

22  Q    Do you see the "Thank you, Gwyn"?

23  A    Yes.

24          THE COURT:  Right.  Your email starting on page --

25  the first page of this exhibit.

Milner - Cross/Mahaffey                        155

1  BY MR. MAHAFFEY:

2  Q    You then set out what you say is the following very likely

3  scenario, right?

4  A    Yep.

5  Q    And in your sentence you say, "I want to check in on the

6  puppets" --

7  A    Yep.

8  Q    -- "to make sure rodents aren't getting at them."

9  A    Yes.

10  Q    "I called facilities.  No call back.  I called Sheriden.

11  No call back.  I wait.  I wait.  No reply.  I call Gwyn or

12  bother the senior Schullers," you wrote all that, right?

13  A    Yep.

14  Q    Because you were laying out the scenario a year later that

15  you weren't given access to this alleged property, and you were

16  concerned because you could call, and you would talk to people,

17  and they wouldn't get back, and that's what Ms. Myers was

18  responding to was saying, "Carol, I assure you that once the

19  money is in there," --

20  A    No.

21  Q    She was saying, "Once the money is in there, then -- then

22  all your contracts are executed, and you can proceed on

23  whatever has been agreed to, including inspecting the puppets."

24         That was the truth.

25  A    No, that's not the truth.

Milner - Cross/Mahaffey                    156

1  Q     Okay.  So --

2  A     Can I --

3  Q     So what you wrote -- let's keep reading.  You then wrote,

4  "Instead, if it were in a trust, which I'll pay for to be

5  drafted if we were all in agreement."  "If."  You put that in

6  capitals, right, "If"?  That's you, right?

7  A     Yeah.

8  Q     "If we were all in agreement, so the monies aren't wasted,

9  then a third party becomes the bad guy.  He simply calls Fred

10 or whoever and sets up the deal, 'based on the trust.'  If it

11 says 'based on the contract,' then I'm left with threatening

12 lawsuits and the like, which I hate.  It seems that based on

13 the contract, we can set up the trust to facilitate what's

14 already been legally agreed to.  Then it seems it is all truly

15 done and packaged in a functional way.  Granted, I'd have to

16 see how to do this, but I will do the legwork and take on the

17 expenses if I know this would be followed through with."

18        You wrote that, right?

19 A     I did write that.

20 Q     So at that time, which is why you then hired the Fish &

21 Richardson firm, is because you had read paragraph 5.2.

22 A     No, that's incorrect.  I'm sorry, Mr. Mahaffey.

23 Q     Had you read paragraph 5.2 by the time you hired the Fish&

24 Richardson firm?

25 A     Mr. Mahaffey, that's incorrect in what you're saying.

Milner - Cross/Mahaffey                          157

1  Q    Yes or no, had you read paragraph 5.2?

2            MS. MONTGOMERY:  You're being argumentative.

3            THE COURT:  Well -- yeah, you are being

4  argumentative.  But you're entitled to ask your question

5  politely and --

6            MR. MAHAFFEY:  Okay.  I'll try not to be

7  argumentative.

8            THE COURT:  -- or less --

9            THE WITNESS:  Would you like me to address that?

10           THE COURT:  No.  He's just --

11           THE WITNESS:  Okay.

12           THE COURT:  What his question was -- and I'm going to

13 try to state it more neutrally -- is that you were concerned

14 about section 5.2 of the contract and that's what was basically

15 what you were thinking about when you wrote this email.

16           THE WITNESS:  No.  That's not true.

17           THE COURT:  All right.  That's fine.  I just want --

18 we just want your answer.  Thank you.

19           THE WITNESS:  Yeah.

20           THE COURT:  All right.

21 BY MR. MAHAFFEY:

22 Q    In the same email chain, now going to 7:22 a.m., where you

23 say, "Hey, Gwyn."

24 A    I'm sorry.  Can you say where that is again?

25 Q    In the same email chain.

Milner - Cross/Mahaffey                    158

1              THE COURT:  Yeah.  Which -- which email?

2              MR. MAHAFFEY:  Page 77A.

3              THE COURT:  Page 77A.

4              THE WITNESS:  Okay.

5              THE COURT:  Which is the second page.

6              MR. MAHAFFEY:  7:22 a.m.

7              THE COURT:  I mean, third page of this document,

8  right?

9              MR. MAHAFFEY:  Page 77 -- yeah, 77A is the third

10 page.

11             THE COURT:  Right.  77A.

12             THE WITNESS:  Okay.

13 BY MR. MAHAFFEY:

14 Q    Do you see the 7:22 email?

15 A    7:22 in the morning?

16 Q    Yes.

17 A    From me to Gwyn?

18 Q    Yes.

19 A    Yes.

20 Q    You wrote that, true?

21 A    Yes.

22 Q    And in that email you said, "It's gone silent"?

23 A    Yes.

24 Q    Those are your words, right?

25 A    Yes.

Milner - Cross/Mahaffey                    159

1  Q    Because you were frustrated because the board had gone

2  silent on you about --

3  A    No, that's not true.

4  Q    When had the board, prior to this, approved this alleged

5  Exhibit 7?  When prior to this had the board approved this?

6              MS. MONTGOMERY:  Objection.  Misstates the --

7              THE WITNESS:  I'm sorry.  They agreed --

8              THE COURT:  Okay.  Just --

9              THE WITNESS:  -- to it by way of the executive

10 committee.  It was done.

11 BY MR. MAHAFFEY:

12 Q    Yeah.  When did that get put in writing to you that the

13 board had modified --

14 A    I was told the executive committee had authority from the

15 board.

16 Q    I understand.  I understand you were told.

17 A    So I relied on their --

18 Q    Right.  I understand.  You --

19             THE COURT:  Okay.  Just hold on.  Just hold on.  You

20 have to listen to his question.  All right.

21 BY MR. MAHAFFEY:

22 Q    When were you given a written document that the bylaws had

23 been modified -- when were you given a written document that

24 the bylaws of Crystal Cathedral Ministry had been modified for

25 Carol Milner only and as to Carol Milner, she could receive $8

Milner - Cross/Mahaffey                    160

1 million in personal property as an insider for no

2 consideration, as an insider, without board approval?

3           When were you given a copy, Ms. Milner, that CCM --

4           MS. MONTGOMERY:  Objection.

5           THE COURT:  Okay.  Okay.  Just hold on.  Okay.  I'm

6 sorry.  What is the ground for the objection?

7           MS. MONTGOMERY:  She's already stated that she was

8 not familiar with the bylaws, she's not an attorney, she

9 doesn't have any understanding --

10          THE WITNESS:  I wasn't on the board.

11          THE COURT:  Well, just hold -- okay.  Your attorney

12 is arguing.

13          THE WITNESS:  Sorry.

14          MS. MONTGOMERY:  She was not on the board.  This

15 question is totally -- is totally improper and irrelevant.

16          THE COURT:  Well, it's argumentative.

17          MS. MONTGOMERY:  Well, it's argumentative --

18          THE COURT:  And assumes facts not --

19          MS. MONTGOMERY:  -- and it assumes --

20          THE COURT:  -- in evidence.  All right.  Sustained.

21 All right.

22          So it's 12:01 now.  So we're going to take a one-hour

23 lunch recess and resume at 1:01.  All right.  You can leave

24 your materials here if you don't want to take them with you.

25 The recorder is going to lock up the courtroom.

Milner - Cross/Mahaffey                    161

1          Ms. Milner, you can step down for now.  All right.

2          THE WITNESS:  Would you like this binder back, or do

3  you want me to leave it here?

4          THE COURT:  No, just leave it on the -- on the

5  witness stand.  Thank you, Ms. Milner, for asking.

6          THE WITNESS:  Thank you so much.

7          THE COURT:  All right.  And you can step down.  And

8  you and your counsel are going to take a lunch hour break,

9  along with counsel for the movant.

10          All right.  You can leave your materials here.  It's

11  going to be locked up.  And we'll reopen about 1:00 o'clock or

12  so.

13          All right?

14          MR. MAHAFFEY:  Thank you, Your Honor.

15          MS. MONTGOMERY:  Thank you.

16          THE COURT:  That's fine with you?  All right.  1:01.

17             (Recess 12:01 p.m./Reconvene 1:03 p.m.)

18          THE CLERK:  Please remain seated and come to order.

19  This United States Bankruptcy Court is again in session.

20          THE COURT:  All right.  The Court will --

21          MR. MAHAFFEY:  Your Honor, I'm sorry, but counsel is

22  indisposed for a moment.  Just --

23          THE COURT:  Well, I'm going to recall the -- yeah, I

24  understand.  All right.

25          So the Court will recall the matter of Crystal

Milner - Cross/Mahaffey                    162

1  Cathedral.  This is the resumption of the evidentiary hearing.

2  And I think we have all counsel present, and Ms. Milner is on

3  the stand.

4          I was thinking over lunch, it seemed like the

5  examination was getting a little repetitive.  And my

6  observation is that I think, Mr. Mahaffey, I think you're

7  arguing is that there are conditions precedent to, you know,

8  formation of contract, and that's really what you're getting

9  at.

10         MR. MAHAFFEY:  That was certainly part of it, and

11  then --

12         THE COURT:  Well, what's the other part of it is an

13  offer of proof, because you're not going to get her to admit

14  there wasn't a contract and it wasn't formed.  So --

15         MR. MAHAFFEY:  No, I know.

16         THE COURT:  I know you're trying to do that, but

17  that's pointless.

18         MR. MAHAFFEY:  No, I -- we've established --

19         THE COURT:  Well, what else are you trying to show

20  offer of proof?

21         MR. MAHAFFEY:  There was a dispute as to possession,

22  delivery, and access to the items at the point of the

23  bankruptcy petition.  So I think we can --

24         THE COURT:  What's the relevance of that?

25         MR. MAHAFFEY:  It's executory.  It's the essence of

Milner - Cross/Mahaffey                    163

1 the executory definition.  There was a claim that they had to

2 deliver these millions of dollars of property, make access to

3 it.

4        THE COURT:  Well, I don't even -- okay.  We don't

5 even know what the property is worth, millions of dollars, we

6 don't know.  We know money was spent, but that doesn't mean the

7 property is worth millions of dollars.

8        The church apparently, undisputed, spent millions of

9 dollars fabricating stuff.  We're not -- we don't know if it

10 was worth millions after the production.  We don't know that.

11 We just know the church spent a lot of money.  Maybe it was

12 worthless afterwards.

13        But, you know, we know the church spent a lot of

14 money.  There is no -- there is no valuation testimony what the

15 property is worth when it was allegedly the subject of these

16 transfer negotiations.

17        MR. MAHAFFEY:  Well, I think there's a bit of a

18 misunderstanding there, Your Honor.  The items that we are

19 debating in this hearing --

20        THE COURT:  Yeah, we don't know -- we don't have any

21 evidence of valuation, how much this stuff was worth.  We just

22 know what was spent.  That doesn't mean it's worth anything.

23        MR. MAHAFFEY:  We have at the time of the alleged

24 transfer the book value.  So whether --

25        THE COURT:  What's your offer of proof of valuation?

Milner - Cross/Mahaffey                164

1          MR. MAHAFFEY:  The actual books themselves that we

2 referred to in --

3          THE COURT:  Well, that -- books themselves?  What

4 exhibit are we referring to that shows the value of these?

5          MR. MAHAFFEY:  The Gwyn Myer declaration refers to

6 the Glory of Creation books that booked the $8.9 million by

7 schedules.  There were dozens and dozens of pages of schedules.

8          THE COURT:  They're just saying that the property --

9 okay.  So her declaration talked about -- okay.  Well, the

10 money was spent, but it doesn't say -- all right.  So where

11 does it say the property is worth something in here?  It just

12 talks about million dollars were spent.  It doesn't say what it

13 was worth.

14          MR. MAHAFFEY:  At paragraph 3 it says that CCM had

15 recorded in the Glory of Creation --

16          THE COURT:  Yeah, but that doesn't mean -- that

17 doesn't mean it's worth anything.  It doesn't say what it's

18 worth.  It just says that it was spent.

19          MR. MAHAFFEY:  Well, I don't mean to parse it,

20 because the Court's point is the Court's point.

21          THE COURT:  But that's not evidence of valuation.  It

22 just says money was spent.

23          MR. MAHAFFEY:  It says it was booked.

24          THE COURT:  You know, I could spent a million dollars

25 on a lottery ticket, and then once the numbers are drawn, it

Milner - Cross/Mahaffey                                165

 1  doesn't come in, it's worth zero.

 2          MR. MAHAFFEY:  The difference in that hypothetical is

 3  that this was a nonprofit set of books under the Glory of

 4  Creation --

 5          THE COURT:  That's not valuation.  The fact that

 6  something is booked doesn't mean it's worth that.  It just --

 7  and it talks about expenditures.  It doesn't say what it's

 8  worth.

 9          MR. MAHAFFEY:  Well, sure.  The projection equipment

10  that was --

11          THE COURT:  No, it's -- it says expenditures.  It

12  says they spent money.  Money wasn't --

13          MR. MAHAFFEY:  They spent a million --

14          THE COURT:  You're listing nine million -- almost $10

15  million of expenditures, and then you talked about millions of

16  dollars that were incurred.  That means expenses incurred.  It

17  doesn't say it's worth.

18          MR. MAHAFFEY:  Right.  So the projection equipment

19  that they bought --

20          THE COURT:  So don't keep referring to it as millions

21  of dollars of assets were transferred.  It was -- you know,

22  these assets were transferred.  What the value is, nobody

23  knows.  At least on this record.

24          MR. MAHAFFEY:  Okay.

25          THE COURT:  All right.  Got that?

Milner - Cross/Mahaffey                166

1          MR. MAHAFFEY:  got that.

2          THE COURT:  Okay.  So you're -- so you're saying

3    there are conditions precedent to the formation of the

4    contract.  All right.

5          But we don't need to ask Ms. Milner, because her

6    position is that there was a contract, and you're saying, well,

7    there are conditions precedent.  And getting her to admit that

8    it wasn't a contract or that Gwyn Myers says, I don't know what

9    that proves.

10         All right.  So what else are you trying to show?

11         MR. MAHAFFEY:  The elements of the executory nature

12   of the contract.

13         THE COURT:  All right.  So -- as far as this witness

14   is concerned, what are you going to ask her about?

15         MR. MAHAFFEY:  Her declaration where she establishes

16   what I think are the prima facie elements of executory

17   contract.

18         THE COURT:  All right.  That --

19         MR. MAHAFFEY:  I don't believe that the declaration

20   does that.  I think that was a matter of law.

21         THE COURT:  Well, all right.  So what -- what are you

22   going to ask her about?  I don't know if she testified what is

23   executory, so...

24         MR. MAHAFFEY:  Well, she testified --

25         THE COURT:  Okay.  So why don't we turn to that.  So

Milner - Cross/Mahaffey                         167

1  what were you going to ask her about where she testifies about

2  -- in her direct about what is executory?

3          MR. MAHAFFEY:  Well, there is a number of exhibits

4  that she attaches that are partial exhibits that conform to the

5  definition of executory, showing that there were ongoing

6  disputes regarding the contract's performance by both sides at

7  the time of the petition.

8          And if the Court finds that --

9          THE COURT:  I'm sorry.  Which one?

10          MR. MAHAFFEY:  I was going to start with the next in

11 order that I was moving up to which was, I think, Exhibit 15.

12          THE COURT:  15?  1-5?

13          MR. MAHAFFEY:  I mean, there are a series of them.

14 And we did contact Ms. Myers, Your Honor.  She is available

15 tomorrow.

16          THE COURT:  Well, we're not here tomorrow, so --

17          MR. MAHAFFEY:  She can be here Monday.

18          MS. MONTGOMERY:  Your Honor, Exhibit --

19          THE COURT:  Well, we're not going to be here tomorrow

20 or Monday.  We can talk about a future date if need be, but

21 we're really talking about what's executory.  All right.

22          So you're going to ask her about Exhibit 15?

23          MR. MAHAFFEY:  Well, that was the first set of

24 questions, and then all the rest of the exhibits.

25          MS. MONTGOMERY:  That's post confirmation, Your

Milner - Cross/Mahaffey                 168

1  Honor.

2          THE COURT:  Post confirmation.  Well, is this --

3  Exhibit 15 is post confirmation?  Okay.  Confirmation -- what

4  was the date of the confirmation order?

5          MS. MONTGOMERY:  December 11th, 2011.

6          THE COURT:  December 11th, 2011?

7          MS. MONTGOMERY:  2011.

8          THE COURT:  All right.  So this is post petition.

9  Well --

10          MR. MAHAFFEY:  I was going to start, actually, with

11  Exhibit 11 --

12          THE COURT:  Well, when is -- when is the -- what's

13  the operative date for determining whether or not a contract is

14  executory?  Isn't it the petition date?

15          MS. MONTGOMERY:  Yes.

16          THE COURT:  So this is post petition.

17          MR. MAHAFFEY:  Well, there's -- there's

18  circumstantial evidence both post and pre-petition that support

19  this.  I was going to actually go into pre-petition exhibits

20  first and then her declaration as to post petition exhibits to

21  prove that same disputes -- Your Honor, the same disputes --

22          THE COURT:  Well, why don't you ask her about what --

23  what her duties were to perform under the contract that are

24  still executory?  So why don't you ask her that.

25          MR. MAHAFFEY:  I'm going to go into that entire

Milner - Cross/Mahaffey                    169

 1  question.

 2          THE COURT:  All right.  So what else are you going to

 3  ask her?

 4          MR. MAHAFFEY:  The various subparts of that that are

 5  supported by her declaration.

 6          THE COURT:  All right.  All right.  So why don't we

 7  -- all right.  So I'm going to let you ask about the executory

 8  nature of the contract as to her side.

 9              CAROL MILNER RESUMED THE STAND

10              CROSS-EXAMINATION (CONTINUED)

11  BY MR. MAHAFFEY:

12  Q    So, Ms. Milner, directing your --

13  A    Hold on.  I just wanted to make sure that was on.  Sorry.

14  Q    Directing your attention back to Exhibit 7, and directing

15  your attention to the Schedule 1 of Exhibit 7 that contains the

16  four initials but not yours, correct?  You didn't initial this?

17  A    I'm sorry?

18  Q    You did not initial this, page 63?

19  A    No, I did not initial.

20          THE COURT:  Well, I think that's been asked and

21  answered.

22          MS. MONTGOMERY:  Yes.

23          THE COURT:  So let's move on.

24  BY MR. MAHAFFEY:

25  Q    Looking at the first sentence, it says, "The following

Milner - Cross/Mahaffey                    170

1  list is not inclusive."

2        Was that true, it was not inclusive?

3  A    That's true.

4  Q    And how many items were left off?

5  A    It would take binders of information.

6  Q    Okay.  So did you ever calculate the total number of items

7  that were left off?

8  A    No.

9  Q    Do you have any document that you could show Judge Kwan to

10 describe what those are, what their value might be, what their

11 description is?

12 A    I have the binders of information.  They existed at the

13 time.  This is referring to binders that had already -- were in

14 existence at the time.

15 Q    Okay.  So at the time of this document, the list was not

16 all inclusive because the binders were something that had to be

17 done in the future?

18 A    No.

19 Q    It was not inclusive because of why?

20 A    Because nobody thought it was necessary to put together

21 hundreds of pages listing all the things, so we categorized

22 them out and defined them and summarized and show exclusive and

23 non-show exclusive, plus some certain practical elements that

24 were needed for me to remount the play.

25 Q    And did you later request an inventory in multiple emails

Milner - Cross/Mahaffey                     171

1  before the petition?

2  A    No, never needed them.

3  Q    On July 31, 2007, did you advise Bruce Hollenbeck that you

4  were in the process of doing your own Creation inventory

5  because CCM had refused to?

6  A    You'll have to show me the -- I'll have to see the context

7  of that email if you can show me the email.

8  Q    Do you remember working on an inventory in 2007?

9  A    No.  I had -- I had all the documents.

10         THE COURT:  No, you answered his question.

11         THE WITNESS:  Yeah, sorry.

12         THE COURT:  Okay.  No --

13         THE WITNESS:  Yeah.

14         THE COURT:  Okay.  Don't volunteer.  All right?

15         THE WITNESS:  Sorry.

16         THE COURT:  What happens if you volunteer, it just

17  prolongs the hearing.

18  BY MR. MAHAFFEY:

19  Q    Did Mr. Hollenbeck write you at 1:52 p.m. on July 31st,

20  2007, and saying in response to your request that he could pull

21  a sample, that they didn't have an industry, and you responded,

22  "I'm in the process next three weeks of doing my own Creation

23  inventory," and that once done, you can tell him what items are

24  in the trailers?

25  A    Again, I would have to see the email to have context.

Milner - Cross/Mahaffey                172

1  Q    Did you ever do that, though?  Did you ever tell anybody

2  from CCM that because they hadn't prepared an inventory you

3  were working on your own?

4  A    It would not have been applicable to this inventory.

5  Q    Did anyone from CCM ever prepare an inventory?

6  A    No.

7  Q    At the time of the bankruptcy petition, isn't it true you

8  were still asking for the inventory?

9  A    No.

10  Q    So you didn't have a discussion with Sheriden Stolarz on

11  May 12th, 2009, where you were asking her for an inventory, and

12  she was saying that she was not going to do that, and then you

13  wrote that the trust and the documents were two inseparable

14  agreements?

15  A    You'd have to read the email to me or I'd have to see it.

16  Q    So your testimony is you do not remember having

17  conversations about inventories?

18  A    Not in what you're -- this was the inventory.  I had all

19  of the documentation.

20  Q    So at the time, did you prepare this Schedule 1 as, quote,

21  examples?

22  A    They were categories.

23  Q    So who chose the word that it serves as examples?  Your

24  counsel?

25  A    No.  I wrote that down.

Milner - Cross/Mahaffey                    173

1  Q    Oh, so you wrote Schedule 1?

2  A    Yes, I did.

3  Q    Okay.  So let's go back to the beginning.  So Schedule 1

4  is all your writing?

5  A    Correct, based on what we had discussed.

6  Q    Okay.  So no attorney from CCM participated in drafting

7  Schedule 1?

8  A    They discussed Schedule 1.  They did not draft Schedule 1.

9  Q    Which attorney are you saying discussed Schedule 1?

10 A    Mr. Gibson.

11 Q    At what time?

12 A    As far as I know, prior to, during, and after.

13 Q    It continued to be an item of discussion with Mr. Gibson?

14 A    Yes.

15 Q    Do you have any documents from Mr. Gibson where he

16 confirmed that he agreed with Schedule 1's description?

17 A    If I did, I would have turned them over to you, because I

18 gave you 2,000 emails or something like that.

19        THE COURT:  Well, let me ask you this.  Okay.  If

20 it's not on this list, right, if there are assets that are not

21 on the list, don't they belong to the church that's not on this

22 list?

23        THE WITNESS:  It was -- there was specific things

24 that were just to put the play on that the church didn't need

25 for anything else.

Milner - Cross/Mahaffey                    174

1          THE COURT:  Right.  No, what I'm just saying is that

2    the agreement is in the schedule, right?  The agreement between

3    the parties, between the church and you and the church, it's on

4    this list, right?  That's the agreement?

5          THE WITNESS:  In --

6          THE COURT:  If it's not on the schedule, then who

7    owns the property?

8          THE WITNESS:  If it's show specific, it would be

9    mine.  If it's not show specific, it would be CCM's.

10          THE COURT:  Well, if it's not on the list, and it

11    just says -- what I'm trying to find out is does it require

12    future definition of what's show specific or not?  That's what

13    I'm asking.

14          THE WITNESS:  No, it's pretty clear, and it's all in

15    the seven trailers that have the name on there.

16          THE COURT:  It's all in seven trailers?  Okay.

17          THE WITNESS:  And --

18          THE COURT:  But if it's not one of these categories

19    on here, so --

20          THE WITNESS:  Pretty much -- I think this pretty well

21    captures --

22          THE COURT:  Well, that's what I'm asking.  Does it

23    require the parties to figure out in the future what's on --

24    what's show specific or not?

25          THE WITNESS:  I would just refer back to my binders,

Milner - Cross/Mahaffey                              175

1  because that was what the intent was, that the binders

2  contained all the information.

3          THE COURT:  What binder are we talking about?

4          THE WITNESS:  I have binders.

5          THE COURT:  It says, "require a binder."  Who --

6          THE WITNESS:  It would require binders, meaning that

7  our show --

8          THE COURT:  Well, I was going to say, who --

9          THE WITNESS:  -- is in all these binders.

10         THE COURT:  It says it requires a binder of

11 information.

12         THE WITNESS:  Yeah.

13         THE COURT:  So was that to be done in the future?

14         THE WITNESS:  No.

15         MS. MONTGOMERY:  It says would -- it says, "This is

16 not all inclusive because" --

17         THE COURT:  Well --

18         MS. MONTGOMERY:  -- "it would require."

19         THE COURT:  Well, I realize that, but I'm just saying

20 that did it require sharing of a binder with the debtor to

21 figure out which was your property and which was the --

22         THE WITNESS:  No.  It was very clear.  We knew.  We

23 worked closely together on this show.  Everybody knew what was

24 mine and what wasn't.

25         THE COURT:  Well, how was that worked out after the

Milner - Cross/Mahaffey                    176

1  agreement -- after, you know, the agreement was signed?  How

2  did you work that out?

3          THE WITNESS:  Well, pretty much this captured it.

4  But because there was somebody involved that knew about

5  production, and they knew what --

6          THE COURT:  Well --

7          THE WITNESS:  You've kind of got to understand

8  production.

9          THE COURT:  Okay.  So before the debtor filed

10 bankruptcy, the debtor was holding onto the assets in its

11 custody?

12         THE WITNESS:  They were storing some in the

13 warehouse.

14         THE COURT:  Right.  Okay.  Did the debtor give you

15 any of the assets -- any of these assets before the bankruptcy

16 was filed?

17         THE WITNESS:  Yes.

18         THE COURT:  All right.  Some?

19         THE WITNESS:  Yes.

20         THE COURT:  All right.  Okay.  So the debtor had

21 given you some assets before the bankruptcy?

22         THE WITNESS:  Yes.

23         THE COURT:  And then some assets were given to you

24 after the bankruptcy?

25         THE WITNESS:  Yes.

Milner - Cross/Mahaffey                 177

1            THE COURT:  Okay.

2            THE WITNESS:  Anytime I --

3            THE COURT:  Right.  And now we're talking about

4  assets that were not given, right, that --

5            THE WITNESS:  Yeah, that I was just assured they were

6  very safe, because when we unloaded the --

7            THE COURT:  No, I was just asking --

8            THE WITNESS:  Okay.

9            THE COURT:  -- is that there -- there are still

10 assets --

11           THE WITNESS:  Just the seven trailers.

12           THE COURT:  -- you say that are yours that haven't

13 been given back to you?

14           THE WITNESS:  But they're all stored in seven

15 trailers.  They were put in there right after the show.

16           THE COURT:  No, no.

17           THE WITNESS:  Yeah.

18           THE COURT:  But you have to listen to my question.

19           THE WITNESS:  Okay.

20           THE COURT:  You're saying there are still assets that

21 -- that under this agreement, you know, that should be

22 characterized as yours that haven't been given back to you yet?

23           THE WITNESS:  Correct.

24           THE COURT:  Okay.  And that needs to be sorted out?

25           THE WITNESS:  Sorted as in what's mine and what's not

Milner - Cross/Mahaffey                    178

1  mine?

2          THE COURT:  Yeah, which one is yours and which one is

3  theirs.

4          THE WITNESS:  No, because they were all -- went right

5  from the show into these trailers, and the trailers have just

6  sat there untouched.

7          THE COURT:  Right.  The trailers -- okay.  So the

8  property was stored in the trailers, and the trailers are

9  located in some storage site, right?

10          THE WITNESS:  Yeah.

11          THE COURT:  Okay.

12          THE WITNESS:  To the best of my knowledge.

13          THE COURT:  And does this require the parties to go

14  throngh the trailers to sort out which ones are yours and which

15  ones --

16          THE WITNESS:  It shouldn't, no.

17          THE COURT:  No?  They all belong to you?

18          THE WITNESS:  The trailers belong to CCM, but they

19  were taken --

20          THE COURT:  No, but I'm saying the contents of the

21  trailers.

22          THE WITNESS:  Yes.  Correct.

23          THE COURT:  Okay.  Are all the items in the trailers

24  belonging to you or that needs to be sorted out?

25          THE WITNESS:  No.  They all belong to me.

Milner - Cross/Mahaffey                             179

1          THE COURT:  All right.

2    BY MR. MAHAFFEY:

3    Q    I thought you said that earlier there were items in a

4    warehouse.

5    A    There were.

6    Q    Okay.  So let me stop right there.

7    A    Okay.

8    Q    So it's not true, the items weren't put all in the

9    trailers, some were put in a warehouse?

10   A    No, I did say that they were also put in the warehouse.

11   Q    Okay.

12   A    You missed that.

13   Q    Let's back up.  Let's focus on the two different

14   locations.

15   A    Sure.

16   Q    Let's first go to the warehouse.  All right?

17   A    Yeah.

18   Q    So some items were put in the warehouse?

19   A    Yeah.

20   Q    And so they weren't put in the trailers?

21   A    No.

22   Q    And those items that were in the warehouse, directing your

23   attention back to the agreement, it said that the non-show

24   specific items would go to CCM, correct?

25   A    Yeah.  Can you -- can you tell me where in the agreement

Milner - Cross/Mahaffey                    180

1  you're looking at?

2  Q    Yes.  On page 63 of Exhibit 7, Schedule 1.

3  A    Yep.

4  Q    Reading from the first sentence, it says, The following

5  list is not inclusive -- not inclusive -- I mean, not all

6  inclusive?

7  A    Yes.

8  Q    Do you see that sentence?

9  A    Yes.

10 Q    As that would require a binder of information?

11 A    Correct.

12 Q    Rather, it serves as examples --

13 A    Right.

14 Q    -- of what would be show specific to go to you, correct?

15 A    Yes.

16 Q    And non-show specific to go to CCM?

17 A    Yes.

18 Q    And it says, "Inventoried goods," right?  Do you see the

19 word "inventoried"?

20 A    Yeah, but I have to read it in context, if you'll give me

21 just a minute.

22         Okay.

23 Q    So only the inventoried goods were going to go to you and

24 CCM, depending upon whether they were show specific?

25 A    I'm sorry.  I really don't understand what you're trying

Milner - Cross/Mahaffey                    181

1  to ask me.

2  Q    Does that sentence -- when you wrote this sentence, you

3  wrote it that the inventoried goods, meaning after everything

4  is inventoried, then you would divide them up?

5  A    No, that's no what --

6  Q    What does the words "inventoried goods" mean?

7  A    It just means that what we had gathered in the show.  I

8  had -- this show was huge, so I had lots of information.  I had

9  lots of files.  I had lots of binders.  And it was to mean that

10 those things that were listed in -- as what I needed to build

11 this show.

12 Q    And some of the inventoried goods were not show specific?

13 A    You're -- you keep referring to this inventory of goods,

14 and I really don't know -- like, it's baffling me.

15 Q    Well, I'm just referring to the language you chose.  Let's

16 see if I understand what you're saying.

17 A    Yeah.  I'm sorry.  I just -- I can't give you any clarity

18 on that.

19 Q    Okay.  So it is true that some of the items on this list

20 were not show specific?

21 A    Some of the items were purchased specifically for the

22 show, needed for the show, and CCM did not use them for

23 anything else, and those were mine.

24        And some of the things that were specifically for the

25 show stayed with CCM, because I recognized that they could be

Milner - Cross/Mahaffey                    182

1 useful to them.

2 Q    So were some of the items on the list not show specific?

3 A    Underneath CCM.

4 Q    So those were not show specific?

5 A    Some of them were -- no, let me -- I have to read through

6 them.  Projectors were specific -- we had seven projectors, and

7 two of them they could use, but they didn't want any

8 projectors, except for those few.

9        The audio delivery system was -- was a --

10 Q    I'm going to move to strike, because I'm not asking you to

11 read the list.  I'm asking you, just in general, just as a

12 general introductory question --

13 A    We bought some of those things -- we bought those for the

14 show.  That's why they had to be on this list.

15 Q    I want to focus --

16        THE COURT:  I'm sorry.

17        THE WITNESS:  I'm confused.  Sorry.

18        THE COURT:  Okay.  The source of the funds came from

19 the debtor, right?

20        THE WITNESS:  Yes.

21        THE COURT:  All right.

22 BY MR. MAHAFFEY:

23 Q    Okay.  I'm focusing on the word "non-show specific."  Do

24 you see that word in the third sentence?

25 A    I'm sorry.  I just got glasses three days ago.  Yes, I see

1 it.

2 Q    Okay.  So were some of the goods non-show specific and

3 some were show specific?

4 A    Yes.

5 Q    Okay.  And as I understand the way you wrote this, the

6 concept was is that what CCM keeps, which is the show specific

7 items --

8          THE COURT:  Non-show specific.

9 BY MR. MAHAFFEY:

10 Q    I mean the non-show specific items, they were going to

11 transfer those off the books to their books?

12          THE COURT:  Well, I don't know.

13          MS. MONTGOMERY:  Objection.  She's not an accountant.

14          THE COURT:  I was going to say, why is this relevant?

15 We're just reading off what it said.  So --

16          MR. MAHAFFEY:  Okay.

17          THE COURT:  You know, why don't we get to what's

18 really -- what was executory on behalf of Ms. Milner in this

19 agreement.

20 BY MR. MAHAFFEY:

21 Q    So, Ms. Milner, did you ever prepare an inventory at the

22 time of the agreement to divide up what was specific to the

23 show and not show specific?

24 A    No.  It wasn't necessary.

25 Q    Did the parties ever sit down to go through each of the

Milner - Cross/Mahaffey                    184

1  items to divide up what was show specific and specific to --

2  and not show specific?

3  A    I met Gwyn Myers after July 8 and before August 25.   We

4  met in the Crystal Cathedral to finalize what was in this list

5  and to go through and clarify.   The only one that they wanted

6  clarification on was the Martin MAX.

7  Q    Did you ever go to the warehouse to divide up what was

8  show specific and non-show specific?

9  A    Didn't need to.

10 Q    Okay.   I just -- I'm trying to ask --

11        THE COURT:   Well, now, it's a yes or no question.

12        THE WITNESS:   No.

13 BY MR. MAHAFFEY:

14 Q    Did you ever go to the trailers and meet to see what was

15 show specific and not show specific?

16 A    No.

17 Q    Did you ever communicate that you were concerned about the

18 warehouse not having climate control because of rodent

19 potential problems?

20 A    I wanted to double check and make sure that things were in

21 okay order.

22 Q    Okay.   And which of the --

23 A    At times.

24 Q    Which of the inventoried items -- do you have a list of

25 what was in the warehouse?

Milner - Cross/Mahaffey                185

1  A    I do somewhere, yes.

2  Q    When was that list prepared?

3  A    Probably when I picked them up.

4  Q    And were there -- was there a list ever created of what

5  was in the warehouse that was owned by CCM and what was owned

6  by you?

7  A    I'm sorry, I laugh.  They had a huge warehouse, and mine

8  took up --

9  Q    It's just a yes or no question.  Did anybody ever do an

10 inventory?

11 A    I have no idea.  I am not CCM.

12 Q    So when it says that -- when you say that you kept a

13 binder, did you ever convert that to an inventory of what was

14 in the warehouse and what was not in the warehouse?

15 A    No, there was not -- that wouldn't be in the binder.

16 Q    Did you ever create an inventory with CCM as to what was

17 in the warehouse that was show specific versus non-show

18 specific?

19 A    No, because I just picked it up.

20 Q    Do you know what -- do you know what's in the warehouse

21 today that's show specific versus non-show specific?

22 A    There wouldn't be anything in the warehouse that's related

23 to my show unless they got into the trailers.

24 Q    So you went sometime and emptied the warehouse?

25 Everything has been taken out?

Milner - Cross/Mahaffey                186

1  A    Yeah, they demanded that I take my stuff, so I took it.

2  Q    And when was this?

3        THE COURT:  Well, again, why don't we ask about what

4  is executory?

5        MR. MAHAFFEY:  Well, I'm trying to find the timing.

6  So the timing of this where they --

7        THE COURT:  Well, I don't think it really matters,

8  because I think the issue really is -- I think we discussed

9  this -- whether or not there is any part of the contract that

10  remains executory.  So --

11        MR. MAHAFFEY:  Right.  So was there --

12        THE COURT:  So -- so what does this have to do with

13  whether any of this is executory or not?

14        MR. MAHAFFEY:  It's still executory.  It was the

15  disputes -- the relevance, Your Honor, of the post petition

16  disputes can't be understated.

17        The post petition disputes, including the formal

18  rejection of the contract by the board --

19        THE COURT:  Well, I don't know.  I thought, like, in

20  the complaint, you wanted her to just, you know, pick up the

21  stuff, right, or --

22        MR. MAHAFFEY:  Well, now, post petition, the disputes

23  were that there was demands for turnover of assets that the

24  debtor resisted, and then there was settlement discussions to

25  say, "If you'll pick up the stuff in the trailers, we'll waive

Trial Transcript, Page 186

1  our rights" --

2          THE WITNESS:  That's not accurate.

3          THE COURT:  Well, that's settlement discussions, but

4  as of the petition date, what remained executory on Ms.

5  Milner's --

6          MR. MAHAFFEY:  All of the division of the assets.

7          THE COURT:  Well --

8          MR. MAHAFFEY:  Division --

9          THE COURT:  -- division of the assets --

10         MR. MAHAFFEY:  Yeah, the gravamen -- the entire

11 gravamen --

12         THE WITNESS:  That's not true.  I'm sorry.

13         THE COURT:  Well, no.  No, you --

14         MR. MAHAFFEY:  If I can --

15         THE WITNESS:  Okay.  Sorry.

16         THE COURT:  I'm not asking you, Ms. Milner, and you

17 better -- you better not say anything.

18         THE WITNESS:  Yeah.  Right.  Sorry.

19         THE COURT:  Because I'm arguing with counsel.  All

20 right.  I'm asking him questions.

21         MR. MAHAFFEY:  The debtor's position on this, Your

22 Honor, is that at the petition date, there were three critical

23 executory responsibilities that were in dispute that required

24 both parties to perform material conditions.

25         THE COURT:  Okay.  So why don't you ask her -- you

Milner - Cross/Mahaffey                          188

1  know, ask her if she agrees or not.

2              MR. MAHAFFEY:  I'm on the first.

3              THE COURT:  Okay.  So what's the first one?

4  BY MR. MAHAFFEY:

5  Q    The first one is, prior to the petition date, based on

6  your language that said some items fall in the gray area, that

7  there needed to be a division between show specific and non-

8  show specific, did you ever complete the task of dividing the

9  items in the trailer between those two categories?

10             Just yes or no?  Before the petition --

11 A    I need to understand your question.  I'm sorry, Mr.

12 Mahaffey.

13 Q    So before the petition --

14             THE COURT:  Okay.  So what he's asking, did you ever

15 -- did you ever -- you and the church ever divide up the items

16 that are show specific and non-show specific?

17             MS. MONTGOMERY:  But he said in the trailers, Your

18 Honor, and that's a misstatement of facts.

19             MR. MAHAFFEY:  Well, it's a disputed fact.  The

20 Ministry completely disagrees that the trailer has all show

21 items.  That's not true at all.  Everything is packed --

22             THE COURT:  Okay.  Well --

23             MR. MAHAFFEY:  Everything was packed --

24             THE COURT:  When were the -- when were the items

25 moved to the trailer?

Milner - Cross/Mahaffey                    189

1        THE WITNESS:  Immediately after the show came out of

2    the Cathedral, they went packed into crates and into the

3    trailers.

4    BY MR. MAHAFFEY:

5    Q    So then how did items get moved into the warehouse?

6    A    Those didn't fit in the trailers.  They didn't have space

7    for the trailers -- in the trailers.

8    Q    So that's the point.  So what happened here -- correct me

9    if I'm wrong -- what happened here is that the trailers aren't

10   the exclusive housing of items.  Some items went to a

11   warehouse.

12   A    Right.

13   Q    Some items went into a trailer.  So my questions are --

14   I'm starting with the trailers now, and then I'll move to the

15   warehouse.

16        Starting with the trailers, the items that went in

17   the trailers, when, prior to the petition, did you and CCM sit

18   down and inventory and divide those?

19   A    We did not need to.

20   Q    Okay.  So you did not is the answer?

21   A    They let --

22   Q    Whether you need to or not the Court will decide, but the

23   question I ask is did you ever sit down and divide what's in

24   the trailers, to go through them?

25   A    They were all show specific.

Milner - Cross/Mahaffey                    190

1            THE COURT:  Okay.  Well --

2   BY MR. MAHAFFEY:

3   Q    How do you know that?

4   A    So when we agreed here that the show specific items went

5   to me, that meant everything in the trailers, because

6   everything in the trailers was show specific.

7   Q    Where does it say that?

8            THE COURT:  So I guess he was asking you how do you

9   know that all the items in the trailers are show specific?

10           THE WITNESS:  Because when my show unloaded, it went

11  directly from the Cathedral, the trailers were probably 100

12  feet away, all my stuff was crated into custom crates --

13           THE COURT:  Okay.

14           THE WITNESS:  -- and put into the trailers.

15           THE COURT:  All right.  So -- okay.  So --

16  BY MR. MAHAFFEY:

17  Q    So your testimony is that you had pre-decided that

18  everything that was going to be show specific went to the

19  trailers, that was the agreement?

20  A    Trailers, yes.  All the show specific items were in that

21  particular trailer.

22  Q    Where -- where does the contract say that?  Where does the

23  contract --

24  A    That was before the contract.

25  Q    Okay.  So I'm going to focus on the contract and ask the

Milner - Cross/Mahaffey                              191

1  question again.

2        When you wrote this page --

3  A    Yeah.

4  Q    -- stepping back, did you have an understanding that if

5  CCM believed it needed some of the items that were used in the

6  show, that it believed that those items it would keep and those

7  items were going to be given to it, such as the projectors,

8  audio delivery, cushion, rigging hardware, microphone elements,

9  fascia, staging, ramp, stairs, et cetera?  Is that true?

10 A    I'm -- I don't understand your question.  I'm sorry.

11 Q    Okay.  So let's go through it.  Was the -- look at the

12 Schedule 1, go under the items that CCM was going to keep.

13 A    Okay.

14 Q    Okay.  Now, let's jump down to fascia, staging, ramps,

15 stairs, air conditioning, extras, take container.

16 A    Yes.

17 Q    Do you have any evidence that any of that went to the

18 warehouse?

19 A    No, I don't know what they -- I don't know where that is.

20 Q    Okay.  So let's just --

21 A    I think a lot of it was rented, actually.

22 Q    Okay.  I just want to focus on one thing at a time.

23 A    Yes.

24 Q    Let's make the assumption that right now, that if we went

25 to the trailers, opened them up and found what has been

Milner - Cross/Mahaffey                    192

1  described as fascia, staging, ramps, stairs, air conditioning,

2  extras, and tank container, you would concede to Judge Kwan,

3  those go to the Ministry, true?

4  A    True.

5  Q    Okay.  So there are some items in the trailers that go to

6  the Ministry?

7  A    No, that's not true.

8          THE COURT:  Well --

9  BY MR. MAHAFFEY:

10  Q    You don't know what's in the trailers, there might be --

11  A    I -- I have -- I don't -- I could --

12          THE COURT:  Well, all right.  Okay.

13  BY MR. MAHAFFEY:

14  Q    Let's go to the next item.  Generic lighting.  Did generic

15  lighting go --

16          THE COURT:  Yeah, let's not go to the next item.

17  Let's just ask.  Okay.  Again, let's go back and ask what's

18  executory.  Her position is that only the show specific items

19  were -- to her knowledge, only the show specific items were put

20  in the trailers; isn't that right?

21          THE WITNESS:  That's correct.

22          THE COURT:  That's your testimony?

23          THE WITNESS:  Yes.

24          THE COURT:  And so the division with respect to the

25  trailers didn't need to be done.

Milner - Cross/Mahaffey                    193

1            Now, you don't have any knowledge that non-show

2    specific items are in the trailers, do you?

3            THE WITNESS:  Not to my knowledge.

4            THE COURT:  Okay.  Not to her knowledge.  So she --

5    you can't ask her that, because she doesn't have any knowledge.

6            MR. MAHAFFEY:  Okay.

7    BY MR. MAHAFFEY:

8    Q    And so when you put the items in the trailers -- strike

9    that.

10           When you created this list, if everything from the

11   show was going into the trailers, wouldn't that include the

12   staging?

13   A    A lot of the staging was rented.

14   Q    But the staging --

15           THE COURT:  All right.  What makes any of this

16   executory?  So --

17           MR. MAHAFFEY:  Because the process -- it's a

18   fundamental concept, Your Honor.  If they haven't divided the

19   items at the time of the petition, and you don't know if the

20   trailers --

21           THE COURT:  Well, I don't know --

22           MR. MAHAFFEY:  The testimony --

23           THE COURT:  Her -- to her knowledge, it was divided

24   as to the items in the trailer.

25           MR. MAHAFFEY:  Well, can I cross-examine that a

Milner - Cross/Mahaffey                    194

1  little further?

2      THE COURT:  Well, I don't see why, unless she has --

3  unless she has personal knowledge, which she doesn't have, then

4  I don't see the point.

5  BY MR. MAHAFFEY:

6  Q    Well, the point is is when you made -- the question I have

7  is when you made Schedule 1 out, Ms. Milner --

8  A    Yes.

9  Q    -- when you wrote these examples, had you prepared your

10  binders yet?

11  A    The binders existed at the time the show was staged.

12  Q    And did you look at them for the examples?

13  A    I looked through them and them summarized them into these

14  categories.

15  Q    And this particular schedule you're saying was done

16  approximately a month and a half after the first one was done?

17  A    No.  This list was exactly the same.  The only thing that

18  changed between the July 8 list and this list was CCM's request

19  to have more of the Martin MAX, to which I said -- and they

20  wanted clarity so that we knew how many Martin MAX would go to

21  me and how many would go to them.

22      That's the only thing that changed, to my knowledge.

23  Q    And that clarity occurred approximately six weeks later --

24  A    Yes.

25  Q    -- and it was re-initialed, and you chose not to initial

Milner - Cross/Mahaffey                               195

 1  it?

 2  A    Yes, with Gwyn Myers.

 3  Q    Okay.  So when Gwyn Myers initialed it and you did not, is

 4  it your testimony that you were good with the list?  Even

 5  though you didn't initial it, is it your testimony that you

 6  approved it?

 7  A    This was our understanding.

 8  Q    And you just chose not to approve this page?

 9  A    I didn't need to.  It was mine.  It was going home --

10  because it was going home with me.  It wasn't something that

11  they needed my signature.

12          THE COURT:  Well, why don't we step back.

13          THE WITNESS:  Okay.

14          THE COURT:  Okay.  On Schedule 1, it doesn't have

15  your initials, and I think you're asking why your initials

16  aren't on Schedule 1, like in Exhibit 7.

17          THE WITNESS:  Yeah.

18          THE COURT:  So is there an explanation for that?

19          THE WITNESS:  Yes, because we had agreed already --

20          THE COURT:  No, what's the explanation why your

21  initials aren't on Schedule 1?

22          THE WITNESS:  Because this was my agreement, and so

23  --

24          THE COURT:  You mean your copy of the agreement?

25          THE WITNESS:  Yeah, my copy, so --

Milner - Cross/Mahaffey                    196

1              THE COURT:  Okay.

2              THE WITNESS:  -- I needed the assurance; they didn't.

3              THE COURT:  And it's your testimony that on other

4    copies you put your initials on it?

5              THE WITNESS:  The first -- the July 8 one.  I don't

6    know -- I think this was the other one.

7              THE COURT:  So when this was recirculated for -- you

8    know, because of -- of these -- of the final agreement with the

9    new Schedule 1, was that re-initialed by everybody else?

10             THE WITNESS:  Everybody else, because they --

11             THE COURT:  Well, why -- why didn't you initial it?

12   That's the question.

13             THE WITNESS:  Because I was the one who needed the

14   assurance that the property was -- because it was staying with

15   them.

16             THE COURT:  Well, but counsel's point was, well,

17   you're a contract party, so it had to be made sure that you

18   were a part to this.

19             THE WITNESS:  Because I relied on the July 8

20   agreement that actually talks about the properties coming to

21   me.

22             THE COURT:  Okay.  That's fine.  That's your

23   testimony.  All right, Mr. Mahaffey.

24   BY MR. MAHAFFEY:

25   Q    So at the time that the -- so what you're saying is that

Milner - Cross/Mahaffey                    197

1  before the contract was ever reached, the show was simply

2  loaded in the trailers, right?

3  A    Yes.   True.

4  Q    Okay.   And so at the time it was loaded in the trailers,

5  there was no agreement whatsoever that you were going to get

6  any of the property?

7  A    Correct.

8  Q    CCM had paid for it all, whatever it's value was, it is,

9  the show was canceled, it was loaded into the trailers,

10  correct?

11  A    It was loaded in the trailers.   The show was not canceled

12  at that point yet.

13  Q    But there was no -- there was no contract between you and

14  CCM to start dividing it up?

15  A    No.

16  Q    Okay.   And then you're saying -- were you present when the

17  trailers were loaded?

18  A    I might have been off and on present, but I had staff

19  primarily, and CCM had some employees involved.

20  Q    So you're saying that the stage management supplies

21  couldn't fit in a trailer, these supplies?

22  A    The trailers were packed full.

23  Q    So they were so packed that you couldn't put a few more

24  supplies in?

25  A    I'm sure not, because they were -- the supplies were

Milner - Cross/Mahaffey                    198

1  stored in what's called a gondola.

2  Q    So how do you know that?  Were you there?

3  A    No, I have pictures.

4  Q    Okay.  So were you there to take those pictures?

5  A    No, I had staff taking pictures.

6  Q    Okay.  So just to establish your personal knowledge, you

7  were not present and do not know what was put in the trailers

8  personally, you believe you know some of the things that were

9  --

10  A    I can't tell you when I was present and when I wasn't.  I

11  was working full time, so I was probably in and out.

12         THE COURT:  All right.

13  BY MR. MAHAFFEY:

14  A    I really can't answer you on that.

15  Q    Okay.  So you might have been present, but you don't

16  remember being there at all times it was being packed, right?

17  A    I cannot tell you how much of the time I was there.

18  Q    And when it was being packed, although you had binders of

19  stuff, nobody inventoried --

20         THE COURT:  Can I ask about what makes any of this

21  executory?  What makes this executory or goes to whether or not

22  the contract is executory?  Because if there's an agreement,

23  the stuff is the stuff, as to whether it was packed in the

24  trailers or not.  So the contract either effectuated a transfer

25  or it did not.  So --

Milner - Cross/Mahaffey                    199

1          MR. MAHAFFEY:  I think what the point of this --

2          THE COURT:  So what makes the contract -- what makes

3 all this executory?

4          MR. MAHAFFEY:  Because what happened, it's a pretty

5 simple analysis to what makes sense here.  Before this contract

6 was entered into, everything CC owned was packed into trailers

7 and then a warehouse.  It didn't go to just the trailers.  It

8 went to a warehouse.

9          THE COURT:  Well, I don't know.  But what makes this

10 executory though?

11          MR. MAHAFFEY:  Because the entire concept of dividing

12 personal properties -- look, the cases --

13          THE COURT:  All right.  That's an argument.  Okay.

14          MR. MAHAFFEY:  But the facts -- the facts that are on

15 --

16          THE COURT:  Well, that's an argument.  I think we're

17 kind of belaboring it.  I think there are other areas that

18 you're going to show us are executory.

19          MR. MAHAFFEY:  Well --

20          THE COURT:  Your argument is it still needs to be

21 done, right?  Isn't that your argument?

22          MR. MAHAFFEY:  Well, the argument is that the day of

23 the petition it was in dispute.  The witness --

24          THE COURT:  Well, I don't know what's in dispute.

25 You're --

1        MR. MAHAFFEY:  I was going to get to that.

2        THE COURT:  Okay.  I don't -- okay.  That's an

3  argument.  Okay.

4        MR. MAHAFFEY:  But let me --

5        THE COURT:  I don't think we're going to spend all

6  day.  It's cumulative.  And I'm going to ask you to move on to

7  some other area.

8  BY MR. MAHAFFEY:

9  Q    So go to Exhibit 12, Ms. Milner.

10  A    Okay.

11  Q    And this Exhibit 12 was part of an email chain that was

12  being exchanged at that time, true?

13  A    Well, it was one email, me to them.

14  Q    Well, the one --

15        THE COURT:  It's just one email, right.  In

16  isolation.  If you're saying there's a chain --

17        MR. MAHAFFEY:  I'm trying to establish that

18  foundation.

19  BY MR. MAHAFFEY:

20  Q    Would you agree that you wrote your part at 3:53, and you

21  responded to -- actually, you wrote additional emails

22  approximately an hour and ten minutes later that you didn't put

23  --

24  A    You'd have to point me to those.

25  Q    I have them, but I want to ask you if you would agree that

Milner - Cross/Mahaffey                          201

1  you selected just a part of this chain.

2  A    You'll have to show me the other -- the rest of the chain,

3  because I have too many to keep track of.

4         THE COURT:  All right.  Do you have any recollection

5  there are other emails relating to this email?

6         THE WITNESS:  I would -- there's too many emails.

7         THE COURT:  Okay.  The answer is no.  All right.

8  BY MR. MAHAFFEY:

9  Q    Do you remember in engaging in discussions with Mr. Penner

10 about whether or not there was a requirement for CCM to store

11 any of these items for you at the same time that this was being

12 written?

13 A    I remember having exchanges with Jim Penner.  I can't

14 remember off the top of my head what they regarded.

15 Q    But your part of what you've attached to the Court is

16 written to Jim Penner, right?

17 A    It's written to Jim Penner, Gwyn Myers, and Mark Winthrop,

18 who was bankruptcy counsel for CCM.

19 Q    Okay.  So this was right before the petition was filed or

20 right at the same time?

21 A    Approximately.

22 Q    And at the time that the petition was filed, you were

23 wanting to make sure that what was divided wasn't put on the

24 schedules?

25 A    Yes.

Milner - Cross/Mahaffey                    202

1  Q    Okay.  Did anybody ever show you the list of what was

2  divided?

3  A    No.  They just -- Jim Penner assured me that it wasn't a

4  problem, and nobody ever told me it was a problem.

5  Q    Okay.  But my question is different.  Did anybody ever

6  show you a list of what was going to be put on schedule and

7  what was not or what was considered by CCM to be their property

8  and what was not?

9  A    I had bankruptcy counsel that probably reviewed the

10  schedules.  I had no notification --

11  Q    So you are attaching, though -- at the bottom of this, you

12  reference a 7/06 document.

13  A    Yes.

14  Q    What document is that?

15  A    Settlement inventory.  It would be the same as this one

16  that we've been discussing.

17  Q    Okay.  I thought the one we were discussing was in August,

18  the 25th, when you made changes, four out of five initials were

19  put on it, and that's the schedule you're asking the judge now

20  to find --

21        THE COURT:  Well, I was going to say is the

22  settlement inventory, which is 7/6/06, is -- 7/06/06, is that a

23  date?

24        THE WITNESS:  Yes.

25        THE COURT:  All right.  So -- and the settlement

1  inventory, was that Schedule 1, or is that something else?

2          THE WITNESS:  That would be Schedule 1.

3          THE COURT:  Okay.

4          MR. MAHAFFEY:  Which version?

5          THE WITNESS:  It's probably the earlier version.

6  That was probably an accident on my part, attaching the wrong

7  version.

8          MR. MAHAFFEY:  Okay.  So let me --

9          THE COURT:  Okay.  So what you're saying is the

10 attachment to the settlement inventory that you attached to

11 this -- we don't have the attachment -- but that would have

12 been Schedule 1?

13         THE WITNESS:  To the best of my knowledge, yeah.

14         THE COURT:  Okay.

15 BY MR. MAHAFFEY:

16 Q    Okay.  So you sent the earlier outdated schedule with this

17 email; is that your testimony?

18 A    I'm sorry?

19 Q    You sent the earlier nonbinding --

20 A    I may have, on accident.

21 Q    Okay.  And when you did that, was that because you wanted

22 to be sure that the bankruptcy didn't include the items on the

23 inventory?

24 A    Probably, yeah.

25 Q    Okay.  What about the items that weren't on the inventory,

Milner - Cross/Mahaffey                                204

1 the ones that are in these binders that have not been produced

2 that list the thousands of items?

3 A    Again, because the -- because the Schedule 1 and the

4 inventory being categories, as the Judge stated earlier, if,

5 you know, you have a box of nails, I put a box of nails.  I

6 didn't identify every nail.

7 Q    Okay.  So why did you divide -- individually describe some

8 things specifically?

9 A    Such as?

10 Q    Well, what did --

11 A    Are you referring back to Schedule 1?

12 Q    Yeah.  So --

13 A    Okay.

14 Q    What are you saying on Schedule 1 is generic or some type

15 of a general description?

16         THE COURT:  Well, again, why don't we ask what's

17 executory or not?  So we have an email several years later.

18 "Don't put my" -- this is basically -- "Don't put my stuff on

19 the bankruptcy schedules."

20         MR. MAHAFFEY:  Correct.

21         THE WITNESS:  Yeah.

22         THE COURT:  Okay.

23         THE WITNESS:  You're storing my stuff, and don't

24 accidentally put it --

25         THE COURT:  Yeah, that's fine.  So -- so --

Milner - Cross/Mahaffey                    205

1  BY MR. MAHAFFEY:

2  Q    What steps did you take in the bankruptcy --

3          THE COURT:  So let's talk about what else is

4  executory.  So -- so offer of proof, why does any of this

5  pertain to whether or not the contract is still executory?

6          MR. MAHAFFEY:  Because the very division of assets

7  hadn't been completed yet.

8          THE COURT:  Well, why don't you just ask her that.

9  So --

10  BY MR. MAHAFFEY:

11  Q    Had the division of assets been completed yet?

12  A    Yes.

13  Q    Okay.  Where is that division?

14  A    In Schedule 1.

15  Q    Okay.  Other than Schedule 1 --

16  A    That's what it was.

17          THE COURT:  Oh, okay.  That's her position.  Okay.

18  BY MR. MAHAFFEY:

19  Q    Okay.  So your position is is that even though --

20          THE COURT:  Okay.  It's the debtor's position that

21  the assets need to be physically inspected and divided, right?

22  Isn't that your position?

23          MR. MAHAFFEY:  That's right.

24          THE COURT:  And that makes the contract executory?

25          MR. MAHAFFEY:  That's what the contract says.

Milner - Cross/Mahaffey                    206

1          THE COURT:  Okay.  All right.  I understand your

2   argument.  Okay.  That's really for argument.  Okay.

3          Do you have anything else to show that the contract

4   remained executory that you want to elicit testimony from the

5   witness?

6   BY MR. MAHAFFEY:

7   Q    Were you still having disputes at the time of the

8   bankruptcy over the division of the lights --

9   A    No.

10  Q    -- the mag lights and the robot lights?

11  A    No.

12  Q    Were you having -- why were you writing emails after the

13  bankruptcy was filed to divide the lights?

14  A    It wasn't about dividing the lights.  It was trying to

15  identify that some of the lights were mine.

16  Q    Okay.  A year after the bankruptcy was filed, you were

17  still going back and forth on trying to identify whose lights

18  were whose, true?

19  A    They would be on Schedule 1.  That's what got clarified.

20  Q    Okay.  So you were clarifying -- you wrote that there's

21  probably 25 or more robotic lights in the Cathedral, and you

22  were claiming that eight was yours.

23  A    No, that was Jim Penner that said that.

24  Q    Okay.  So you didn't agree with him?

25  A    No, I was not -- I was fine with Jim Penner.

1  Q    Okay.  So you -- you did agree that only eight of the 25

2  were yours?

3  A    Yeah.

4  Q    Where did you say that?

5  A    I don't know that I needed to.

6  Q    Where was your --

7  A    He said it to me.  He was -- he was verifying.

8  Q    What was the value of those lights, in your opinion?

9  A    When?

10 Q    At this point in time, when you were trying to --

11 A    In 2010?

12 Q    Let's start with 2010.  What was the value of the lights

13 that hadn't been divided yet?

14        MS. MONTGOMERY:  Objection.  Misstates her testimony.

15 BY MR. MAHAFFEY:

16 Q    Had the lights been divided in 2010?

17        THE COURT:  Well --

18 A    Yes.  We divided them with Gwyn Myers.

19        THE COURT:  Well, I guess there's -- the issue is if

20 -- if you look at Schedule 1 as six months after the original

21 execution date, it says the ones that were hanging in the

22 church were the church's.

23        THE WITNESS:  Yeah.

24        THE COURT:  The ones that were not hanging in the

25 church were not the church's, right?

Milner - Cross/Mahaffey                    208

1           THE WITNESS:  Right.

2           THE COURT:  That's what it said.  So, apparently,

3  there is an issue regarding which ones are hanging in the

4  church and which were not, right?

5           THE WITNESS:  Right.  And they --

6           THE COURT:  Because you wanted to make sure that the

7  ones that were not hanging in the church that you got, right?

8           THE WITNESS:  Right.  And I picked those up.

9           THE COURT:  Right.  So I don't know, why does that

10 make this executory?

11 BY MR. MAHAFFEY:

12 Q    Well, let me show you Exhibit 14, and maybe you can

13 explain to the Court why, two years later, you were still --

14          THE COURT:  Exhibit 14?  All right.

15          MR. MAHAFFEY:  Page 84.

16          THE COURT:  All right.  Exhibit -- 84.  Right.

17 BY MR. MAHAFFEY:

18 Q    Okay.  Is that your email back and forth to Mr. Penner?

19 A    Yes.

20 Q    And at the time of the January 13th, 2012, email, you

21 hadn't inventoried or divided up these lights?

22 A    As the Schedule 1 says, those hanging in the Cathedral

23 were the Cathedral, and those in the warehouse were in the

24 warehouse, and those being stored in the warehouse were

25 supposed to be mine, so --

Milner - Cross/Mahaffey                                    209

1  Q    Okay.  So Mr. Penner disagreed, true?

2  A    I don't know where -- you'd have to point me to where you

3  think he disagrees.

4  Q    Well, your position is if they're hanging in the inventory

5  -- I mean, if they're hanging in the Cathedral, none of them

6  are yours, right?  That's what the schedule says?

7  A    Would you let me read -- I'd like to read the email,

8  please.  Could I read the email, please?

9  Q    Yeah.

10  A    Thank you.

11         THE COURT:  Well, which emails -- are you going to

12  talk about all three pages?

13         MR. MAHAFFEY:  Well, no, I just --

14         THE COURT:  Are you going to be asking about all

15  three pages?

16         THE WITNESS:  Oh, I didn't realize it was three

17  pages.

18         THE COURT:  Are you going to read all three pages?

19         THE WITNESS:  I wasn't -- I don't know what they're

20  --

21         THE COURT:  Yeah, I don't know, either.

22         THE WITNESS:  If they can --

23         THE COURT:  So apparently, this -- this exhibit -- do

24  you remember this exhibit?  Well, okay.  Apparently it was

25  referring to -- apparently they bought some new lights, which

Milner - Cross/Mahaffey                    210

1  may or may not have been hanging in the theater.

2         So let me ask Ms. Milner, how many -- you're saying

3  that eight of these lights were yours?

4         THE WITNESS:  Yes.

5         THE COURT:  Okay.  And as long as you got your eight,

6  you're okay?

7         THE WITNESS:  Yeah.

8         THE COURT:  All right.  And what I think Mr. Penner

9  is explaining is that the church bought some new lights that

10 were not part of the eight but that were separate.  So you

11 didn't have any problem --

12        THE WITNESS:  Yeah.  They had actually got them at

13 the same time as the show.  So there was a whole bunch of new

14 lighting, and they were going to --

15        THE COURT:  Right.

16        THE WITNESS:  -- they got some of theirs --

17        THE COURT:  But those lights belonged to the church,

18 right?

19        THE WITNESS:  Yeah.

20        THE COURT:  Yeah, because as long as you got your

21 eight that were used in the show --

22        THE WITNESS:  Right.

23        THE COURT:  -- then -- right?

24        THE WITNESS:  Right.

25        THE COURT:  That met all your --

1          THE WITNESS:  Yeah.

2          THE COURT:  You got what you were entitled to?

3          THE WITNESS:  Correct.

4          THE COURT:  All right.  And so there is some issue

5   regarding whether or not the church made sure that you got your

6   lights, right?  You were worried about your eight lights,

7   apparently?

8          THE WITNESS:  Yeah, not -- not getting confused when

9   the new buyer came in.

10          THE COURT:  Right.  Right.  You wanted to make sure

11   that -- that your eight lights weren't being confused with the

12   debtor's property --

13          THE WITNESS:  Correct.

14          THE COURT:  -- and -- all right.  Okay.

15   BY MR. MAHAFFEY:

16   Q    Did you bring that into the bankruptcy court at all?

17          THE COURT:  Well, I was going to say, why does this

18   make this executory, again?

19          MR. MAHAFFEY:  It's textbook.  You've got a transfer

20   --

21          THE COURT:  I'm sorry.  It's what?

22          MR. MAHAFFEY:  It's a textbook example of an --

23          THE COURT:  It's not a textbook example of what's

24   executory.  This agreement was her -- she just wanted to make

25   sure her stuff didn't get mixed up.

Milner - Cross/Mahaffey                    212

1          MR. MAHAFFEY:  How does that -- Your Honor, how is

2    that not --

3          THE COURT:  How is not executory?  Because I don't

4    think it's executory -- make sit executory.  It just says,

5    okay, the agreement she got -- that she is supposed to get her

6    eight lights.  She wants to make sure she got her eight lights

7    and they're not mixed up with the other lights.

8          THE WITNESS:  And when they moved off campus, I

9    picked them up.  When they were moving off the campus, they

10   asked that I pick them up, and I did.

11         MR. MAHAFFEY:  So, did --

12         THE COURT:  Okay.  You got the eight lights already?

13         THE WITNESS:  Yeah.

14         THE COURT:  Okay.  She has the eight lights.  Okay.

15   And when did you pick them up?

16         THE WITNESS:  When they asked me to, because they

17   were leaving the campus.

18         THE COURT:  And was that after the bankruptcy?

19         THE WITNESS:  Yeah, that would have been 2013.

20         THE COURT:  Okay.  She already has the lights, so I

21   don't see why that makes it executory.

22         Ms. Montgomery, do you see why that makes this

23   executory?

24         MS. MONTGOMERY:  Absolutely not.

25         THE COURT:  All right.

Trial Transcript, Page 212

Milner - Cross/Mahaffey                                    213

1  BY MR. MAHAFFEY:

2  Q    On March 24, 2011, the board rejected formally your

3  contract, true?

4  A    No.

5           MS. MONTGOMERY:  No.

6           THE COURT:  I'm sorry.  Which contract are you

7  talking about?

8           MR. MAHAFFEY:  The subject -- disputed contracts.

9           THE COURT:  The board rejected her contract?

10          MR. MAHAFFEY:  Correct, with a board resolution made

11 March 24, 2011, correct?

12          MS. MONTGOMERY:  Objection.

13          THE COURT:  Well, what are we -- what are we -- okay.

14 So is there an exhibit we're talking about?

15          MR. MAHAFFEY:  Yes, the exhibit that Gwyn Myers took

16 off of her declaration based on her understanding the Court was

17 requesting it.

18          THE COURT:  Her -- which exhibit is that?  Because

19 you're referring to something that she may not know about.

20          MR. MAHAFFEY:  Well, I was going to lay the

21 foundation to see if she knew about it, then we were going to

22 offer the exhibit.

23          THE COURT:  All right.  So -- all right.

24 BY MR. MAHAFFEY:

25 Q    So, Ms. Milner, were you aware that on March 11, 2011,

Milner - Cross/Mahaffey                    214

1 based on the motion of Gwyn Myers, the Crystal Cathedral board

2 of directors specifically reached a resolution rejecting your

3 prior contract for the bankruptcy purpose?

4 A    No.  It would be helpful if you read that to me, maybe.

5 Q    Okay.  Let me show you --

6         MS. MONTGOMERY:  March --

7         THE COURT:  Well, all right.  Why don't --

8         MS. MONTGOMERY:  Excuse --

9         THE COURT:  Where are you going?

10        MR. MAHAFFEY:  I was going to --

11        THE COURT:  Well, you can't show her something

12 without -- All right.  What we're going to do -- we're going to

13 take a two-minute recess so that -- you're going to show it to

14 counsel, and counsel is going to look at it, because they're

15 entitled to look at it.

16        You can't just hand it to the witness without letting

17 counsel look at it.

18        All right.  All right.  So we're going to take two-

19 minute recess so counsel can confer and look at it.

20        And you can stay in the witness chair, Ms. Milner, or

21 you can step down for a few minutes.  Your choice.

22        THE WITNESS:  Thank you.

23        THE COURT:  Your counsel -- and they may want to ask

24 you about it, so you can step down and they can ask you about

25 it.  All right?

Milner - Cross/Mahaffey                    215

1            THE WITNESS:  Okay.

2            THE COURT:  Did you want to consult -- Ms.

3   Montgomery, did you want to consult your witness about this

4   document?

5            MS. MONTGOMERY:  Sure.

6            THE COURT:  All right.

7               (Recess 1:51 p.m./Reconvene 1:59 p.m.)

8            THE CLERK:  Please remain seated and come to order.

9   This United States Bankruptcy Court is again in session.

10           THE COURT:  All right.  The Court will recall its

11  calendar for today, Crystal Cathedral.

12           So, Ms. Montgomery, you've seen this document?

13           MS. MONTGOMERY:  We've seen this document.  It is

14  clear that Ms. Milner was not present at this board meeting to

15  testify as to the authenticity of what occurred.  The only

16  thing that she could testify to is the -- is the signatures

17  that are on the last page.  But it is important for the Court

18  to at least read this, because it doesn't say -- it is totally

19  inconsistent with all of the arguments.

20           This is the first time we've seen it today, that it's

21  been given, but it is totally inconsistent with everything that

22  Mr. Mahaffey is arguing, and, in particular, it notes in here

23  that all cash, property items in the settlement, that

24  everything has been fulfilled.

25           So it's indicating in here that there is no --

Milner - Cross/Mahaffey                216

1          THE COURT:  "It's noted that all cash and property

2    items in the settlement have all be fulfilled."

3          I don't know what that means.  It's not even

4    grammatical.

5          MS. MONTGOMERY:  Well, that's true.  But the only

6    thing that is in this --

7          THE COURT:  Yeah.  The only thing it talks about the

8    set items from Creation, right?

9          MS. MONTGOMERY:  It's stated that storage -- they're

10   only --

11         THE COURT:  Right.  The cash -- all the cash has been

12   paid and the property items, except for the set items from

13   Creation, that there was concern about the obligation of the

14   church to store the items.

15         And so apparently those items were still being held

16   in storage.

17         MS. MONTGOMERY:  True.  Correct.  They were still

18   being held in storage.

19         THE COURT:  So you don't object to the admissibility?

20         MS. MONTGOMERY:  Well, I don't think that -- I mean,

21   I don't know whether this occurred.  I don't think Ms. Milner

22   can testify that this is what occurred.

23         THE COURT:  Well, he can ask her if she has any

24   knowledge about it, lay a foundation.

25         That's what you were trying to do, right?  So why

Milner - Cross/Mahaffey                    217

 1 don't he ask her, see if she has any personal knowledge to

 2 testify about this.

 3 BY MR. MAHAFFEY:

 4 Q    Starting first, do you recognize the signature as your

 5 family members, your father, Mr. Penner?

 6 A    I recognize my father's.

 7 Q    You don't recognize Mr. Penner's?

 8 A    I didn't see his signature often enough.

 9 Q    But you have no dispute that the signature of your

10 father's is correct?

11 A    I don't think so.  It looks -- it looks like my father's

12 signature.

13 Q    At the time of this document, March 24th, 2011, was there

14 a dispute about storing the property?

15 A    Not that I was made aware of.

16 Q    And were you made aware that the CCM was disputing the

17 obligation to store it?

18 A    No, I was not.

19 Q    Do you know -- did they notify you of this immediately,

20 that they --

21 A    No, they did not.

22 Q    Sheriden Stolarz didn't immediately email you?

23 A    Not to my recollection, no.

24 Q    She may have, she may not; you just can't recall?

25 A    All I know is they continued to store it, and they were

Milner - Cross/Mahaffey                    218

1  fine with storing it.

2  Q    My question is very specific.  Do you have a recollection

3  one way or the other as to right after this, Sharon [sic]

4  Stolarz emailed you and advised you that the board had met and

5  the contract had been rejected?

6  A    No, not at all.

7  Q    So if you saw an email that was directed to you, would

8  that refresh your memory?

9  A    That said that the contract had been rejected?

10        THE COURT:  Well, how do you know it would refresh

11  your memory if she hasn't even seen it.

12        MR. MAHAFFEY:  Okay.  Okay.

13        THE COURT:  Do you want to show it to her or not?

14        MR. MAHAFFEY:  No.

15        THE COURT:  All right.  Then why ask her about it?

16  She doesn't have any recollection.

17        MR. MAHAFFEY:  Okay.

18        THE COURT:  Unless you want to try to refresh her

19  recollection.

20        MR. MAHAFFEY:  I'll move on.  Gwyn Myers is the

21  witness for this.

22        THE COURT:  Well, all right.

23        MR. MAHAFFEY:  So she is not here.

24        THE COURT:  Well, the contract wasn't formally

25  rejected, because there is no -- there -- you know, it wasn't

1  in the plan.  It wasn't --

2        MS. MONTGOMERY:  Gwyn Myers didn't -- by the way,

3  Gwyn Myers --

4        THE COURT:  Well, it wasn't in the plan, and there

5  was no -- no -- there is nothing before the Court about any

6  rejection, is there?

7        MS. MONTGOMERY:  There was a motion to reject a

8  number of contracts, and this was not --

9        THE COURT:  But not -- but there -- no, but I'm

10  asking -- I'm asking, was there any motion to reject this

11  contract specifically before the Court?

12        MS. MONTGOMERY:  No.

13        MR. MAHAFFEY:  No.  The debtor's position, it was a

14  catchall phrase with actual knowledge to the claimant that it

15  was being rejected, and she didn't file a timely claim.  She

16  did on other items, but not on this one.

17        THE COURT:  Well, yeah -- well, but that gets back to

18  whether or not it's executory or not.  All right.

19        It was executory, and then, arguably, it's rejected.

20  It was executory.  That's the big if.

21        MS. MONTGOMERY:  And it is as to particular

22  provisions.

23        THE COURT:  Yeah.  The fact that -- the fact that --

24  the fact that document is authentic, it doesn't mean that the

25  contract was rejected under the bankruptcy code.  It may -- you

Milner - Cross/Mahaffey                    220

1  know, the board thinks that it can reject something, but -- it

2  could, unless it were executory, but it's not.  But that's why

3  we're here.

4          MS. MONTGOMERY:  Well, and if the -- if they somehow

5  felt that the storage -- I don't think they could reject it.  I

6  think that they could breach it, and then she would have a

7  right to go ahead and file a claim for damages.

8          THE COURT:  Well, they can reject it as executory,

9  couldn't they?

10          MS. MONTGOMERY:  They were -- the had continued to

11  store it.

12          THE COURT:  It was executory -- it was executory at

13  the time of the -- it was executory at the time of the

14  petition.  They could reject it if it was executory.

15          MS. MONTGOMERY:  If it was executory.

16          THE COURT:  Isn't that the argument here, it's not

17  executory on her part?

18          MS. MONTGOMERY:  Yes.

19          THE COURT:  All right.  So, but if it was executory

20  on her part and on the church's part, it could be rejected?

21          MS. MONTGOMERY:  But, as this makes clear, everything

22  was already done and completed.

23          THE COURT:  Well, okay.  Well, I don't know.  I don't

24  know.  It's not before the Court, because --

25          MS. MONTGOMERY:  Well, I would move to admit it.

Milner - Cross/Mahaffey                    221

1  They've asked for it.  I will stipulate to admit it into

2  evidence.

3          THE COURT:  Well, he's not offering it.

4          You're not offering it, are you?

5          MR. MAHAFFEY:  Not at this time.  I have a witness,

6  Gwyn Myers, who couldn't be here today, but she'll be available

7  later.

8          MS. MONTGOMERY:  Your Honor, the declaration is --

9          THE COURT:  Well -- well, anyway -- well --

10         MS. MONTGOMERY:  It's silent.

11         MR. MAHAFFEY:  But the relevance is this witness.

12         THE COURT:  If we need to have a hearing about it --

13 so you're offering it?

14         MS. MONTGOMERY:  Well, this is the first I've seen

15 it, but I would offer it.  But --

16         THE COURT:  Well, all right.  They want to offer it.

17 Do you have any objection?

18         MR. MAHAFFEY:  The objection is until my witness is

19 here, I cannot explain -- their position is they're

20 interpreting it one way.  I have a witness who is --

21         THE COURT:  Well, now, it speaks for itself.

22         MS. MONTGOMERY:  Your witness doesn't --

23         MR. MAHAFFEY:  Okay.  We'll --

24         THE COURT:  It's --

25         MR. MAHAFFEY:  We'll accept it.

Milner - Cross/Mahaffey                222

1          THE COURT:  It's -- okay.  So they don't object and,

2   you know, they may bring a witness to testify about it.

3          MS. MONTGOMERY:  Well, Your Honor, I just want to

4   make it clear, though, the -- if Ms. Myers were to come in,

5   they are not entitled to add anything more to her declaration.

6   I'm simply entitled to cross-examine.

7          THE COURT:  Well, I don't know, if we have another

8   hearing about something else, you know -- this is just for this

9   particular issue.

10          MS. MONTGOMERY:  But she doesn't mention anything

11   about this in her declaration.

12          THE COURT:  Well, I don't know.  If we have a future

13   hearing, you know, and we have further testimony, you know,

14   probably you can ask her about it.  But that's not for today.

15   This is just for today's hearing.

16   BY MR. MAHAFFEY:

17   Q    Directing your attention to Exhibit --

18          THE COURT:  All right.  So why don't we mark this for

19   identification.

20          MS. MONTGOMERY:  Exhibit 39.

21          THE COURT:  39.  All right.  So this is Respondent's

22   39.  It's received.

23          (Exhibit 39 Marked for Identification)

24          (Exhibit 39 Received in Evidence)

25          THE COURT:  All right.  Okay.  Do you have other

Milner - Cross/Mahaffey                223

1  questions about the executory nature of this agreement?

2          MR. MAHAFFEY:  Yes.  I'd like to ask questions about

3  Exhibit 13.

4  BY MR. MAHAFFEY:

5  Q    Do you have Exhibit 13 in front of you?

6  A    Yes.

7  Q    And in this email exchange with Mr. Penner, you have

8  listed to him questions about what's going to be listed in the

9  bankruptcy estate?

10 A    Yes.

11 Q    Why were you concerned about that?

12 A    Because I didn't want it to accidentally get --

13         THE COURT:  Well, again, what makes any of this

14 executory?  I think we already talked about it.  Okay.  As long

15 as she got her eight lights, then, you know, that's fine.  She

16 just wanted -- she didn't want her property mixed up with the

17 church's property that might get liquidated in the bankruptcy.

18 So what -- you know, I think you've already covered this

19 particular subject.

20         So what else is -- do you need to show that the

21 contract is executory on her behalf?

22 BY MR. MAHAFFEY:

23 Q    Besides the lights, why were you asking what else was

24 going to be listed in the bankruptcy estate?

25         THE COURT:  Well, what -- okay.  Is there anything

Milner - Cross/Mahaffey                    224

1  else you were concerned about here about --

2          THE WITNESS:  I was just making sure that my property

3  didn't get mixed up.

4  BY MR. MAHAFFEY:

5  Q    Okay.  When you were making sure --

6  A    Because they were storing it.

7  Q    Were you represented by counsel at that time?

8  A    I don't think so, not yet.  I'm not sure when I

9  represented -- when I got counsel.

10 Q    But you knew the bankruptcy petition could impact your

11 property rights?

12 A    Well, I just figured all my stuff was setting on their

13 campus, and there was talk about them selling the campus, so...

14 Q    And you didn't have an inventory of what was yours and

15 what was theirs at that time?

16          THE COURT:  Well, okay.

17          MS. MONTGOMERY:  Asked and answered.

18          THE COURT:  Is there anything else that you're

19 concerned about, other than the lights, by this email?

20          THE WITNESS:  I'd like to read it, if I can.  Am i

21 reading the one or 82, or is it --

22 BY MR. MAHAFFEY:

23 Q    Yes, page 82.

24 A    I'll go to 83, right?

25 Q    Page 82, I think.  My question, Ms. Milner, is looking at

Milner - Cross/Mahaffey                225

1  your email where you say, "Do you know what's going to be

2  listed in the bankruptcy estate?  That's probably the easiest

3  way for me to understand what CCM is laying claim to.  That

4  will tell me if we're on the same page or need more

5  conversation on that matter."

6          Do you see that?

7  A    I think you'd have to go back to the original email I

8  sent, would probably clarify.  And it says I never -- I was

9  talking about the Martin MAX, which are the lights.

10         THE COURT:  Okay.  Anything else other than the

11 Martin MAX you were concerned about?

12         THE WITNESS:  Just what was still probably stored in

13 their warehouse.

14         THE COURT:  No.  Was there any other property other

15 than the Martin MAX that you were concerned about?

16         THE WITNESS:  Just what was stored in the warehouse.

17         THE COURT:  Just what was stored in the warehouse.

18 Okay.

19         All right.  So what makes all this executory?

20         MR. MAHAFFEY:  There was an uncertainty as to what

21 was owned by each side as to all this personal property.

22         THE COURT:  No, no.  It's not uncertainty as to what

23 was owned.  It was uncertainty whether or not it would be

24 physically mixed up and erroneously listed on the bankruptcy.

25         MR. MAHAFFEY:  No, there was a -- there was a

Milner - Cross/Mahaffey                           226

1  question -- with due respect, there is a question in the mind

2  as to who owns what.

3           THE WITNESS:  No, that's not true.

4           THE COURT:  No, I don't think that -- I agree with

5  her.

6           THE WITNESS:  Jim Penner knew very well what was

7  owned by them and what was -- yeah.

8           THE COURT:  Yeah.  It's what's in Schedule 1, which

9  was show specific or not.

10 BY MR. MAHAFFEY:

11 Q    So outside of this Schedule 1, what's listed?  Okay.  I'm

12 going to put that schedule aside and ask for the other

13 approximately one to 5,000 items.

14          How many other items besides what's listed on

15 Schedule 1 would you estimate exist?

16 A    I could not answer that.

17 Q    One to 5,000?

18 A    I could not answer that.

19 Q    Seven trailers full?

20 A    Seven -- yeah.

21 Q    Okay.  So of the items not on the list, do you have a

22 schedule that transferred to you ownership of those?

23 A    Schedule 1 transferred ownership to me.

24 Q    Okay.  The items not on the list.

25 A    They're in the list.

Milner - Cross/Mahaffey                227

1  Q    Okay.  So the items on the list are examples, true?

2  A    The items on the list are categories.

3  Q    They're not --

4  A    Showing -- yes, examples of all that is show specific.

5  Q    Okay.  So other than the --

6  A    And it was pretty -- it's puppets, scenic.  I mean, that's

7  what a show is made of.

8         THE COURT:  Well, I don't think you're going to get

9  her to agree to this.  And that's really for argument.

10  BY MR. MAHAFFEY:

11  Q    Okay.  So directing your attention to your Exhibit 18, you

12  wrote this to Sheriden Stolarz, true?

13  A    I -- give me a minute to read it, please.

14         THE COURT:  What's your question?

15         MR. MAHAFFEY:  If she wrote this -- or received this.

16  I guess it's from --

17         THE WITNESS:  I wrote any update on the trailer

18  challenge, and then she responded to me that it's going to have

19  to wait until they get moved off the campus and everything

20  settles down.

21  BY MR. MAHAFFEY:

22  Q    What was your understanding of the sentence that says,

23  "I've been given more items that appear to be Creation

24  related"?

25  A    Those were items that were kind of just here and there,

Milner - Cross/Mahaffey                    228

1  and she collected them for me and asked me to pick them up, and

2  I did.

3  Q    What did you understand what she meant by, "Since I do not

4  have a detailed inventory list"?

5  A    I think she was talking -- I was asking before this how

6  much they had for me that they had collected that they wanted

7  me to pick up so that I could plan what size truck to bring and

8  what kind of manpower I would need.

9  Q    Okay.  So did you give her an inventory list?

10  A    No.  She was asking me to pick things up.

11  Q    So you did not give her any inventory list in response?

12  A    Not so.

13        MS. MONTGOMERY:  Asked and answered.

14        THE WITNESS:  I was only picking up what she wanted

15  me to pick up.

16  BY MR. MAHAFFEY:

17  Q    Did you have an inventory list of what was in the

18  trailers?

19        MS. MONTGOMERY:  Asked and answered.

20  BY MR. MAHAFFEY:

21  Q    At this time, on June 17th --

22  A    They weren't asking me to pick up the trailers.

23  Q    But did you have an inventory at that time as to what was

24  in them?

25  A    It wasn't necessary.  She wanted me to pick things up, and

Milner - Cross/Mahaffey                          229

1  I was asking her what I needed to know so that I could prepare

2  manpower and space to move it.

3              THE COURT:  And, again, going back to what's

4  executory or not, okay, this regards -- this is regarding a

5  dispute the parties had had about arranging for pickup.

6              THE WITNESS:  They had to leave the campus, and they

7  couldn't store that stuff.  And I was trying to be helpful --

8              THE COURT:  Right.

9              THE WITNESS:  -- and pick it up and not make an

10 issue.

11             THE COURT:  Right.  Well, that's what I'm trying to

12 understand.  I'm trying to understand what counsel is trying to

13 show that this is executory or not.

14             MR. MAHAFFEY:  Because there is no division of

15 ownership, even three years later, and supposedly --

16             THE WITNESS:  Why would they ask me to pick it up?

17             MR. MAHAFFEY:  You've gone -- you've gone full

18 circle.

19             THE COURT:  No question.  No question.  No question.

20 We're discussing.

21             THE WITNESS:  I'm sorry.

22             THE COURT:  All right.  So --

23             MR. MAHAFFEY:  So there's three years later -- the

24 probative --

25             THE COURT:  Okay.  That's really for argument.  Okay.

Milner - Cross/Mahaffey                    230

 1 So there are disputes about what should be picked up or not.

 2 Okay.

 3          MR. MAHAFFEY:  There are disputes about --

 4          THE COURT:  And you're going to argue that this is

 5 executory?

 6          MR. MAHAFFEY:  The division of the assets is

 7 executory.

 8          THE COURT:  Well, all right.  Ask her another

 9 question.

10 BY MR. MAHAFFEY:

11 Q    Looking at Exhibit 17 --

12          MS. MONTGOMERY:  Your Honor, I would like to make

13 sure that these are entered into evidence as he asks her about

14 them.  She previously authenticated them.

15          THE COURT:  Well, he's asking -- he gets to ask his

16 questions.  If you want to move, you know, you can move them in

17 your direct.

18          MS. MONTGOMERY:  I'll move all of them.  That's fine.

19          THE COURT:  Well, not -- when it's your turn --

20          MS. MONTGOMERY:  Right.

21          THE COURT:  -- for redirect.

22          MS. MONTGOMERY:  Right.  What exhibit?

23          THE COURT:  All right.  Let him ask his questions,

24 because we don't want to run out of time today.

25          MS. MONTGOMERY:  I agree.

Milner - Cross/Mahaffey                231

1          THE COURT:  And I don't want to have to reschedule

2  another day and make Ms. Milner have to come back here.

3          MS. MONTGOMERY:  What exhibit is he referring to

4  right now?

5          MR. MAHAFFEY:  17.

6          THE COURT:  17.

7          MS. MONTGOMERY:  Okay.

8  BY MR. MAHAFFEY:

9  Q    Okay.  Directing your attention to Exhibit 17, do you see

10  your email at 9:28 a.m. in the middle of the page that starts

11  with, "We cannot go to Riverside"?

12  A    Yes.

13  Q    And do you see the part where you were saying that you

14  wanted to inspect, you said, "CCM will need to get them up here

15  and have a space where we have room to examine the contents."

16          Do you see that?

17  A    Yes.

18  Q    And did CCM ever provide you a room to examine the

19  contents?

20  A    No.

21  Q    The next sentence says, "For instance, the screens need to

22  be rolled out and looked at."

23          Do you see that?

24  A    Yes.

25  Q    Did CCM ever provide you access to go and look at the

Milner - Cross/Mahaffey                    232

1  screens?

2  A    No.

3  Q    But you claim that this was your property that you had

4  possession of?

5  A    Yes.  I didn't have possession.  It was my property in

6  their trailers.

7            THE COURT:  It's just yes or no.

8            THE WITNESS:  No.

9            THE COURT:  You don't need to explain anything.

10           THE WITNESS:  Okay.

11           THE COURT:  Just answer his question yes or no and

12  don't explain.

13           THE WITNESS:  Okay.

14           MS. MONTGOMERY:  And this is all post confirmation,

15  Your Honor.

16  BY MR. MAHAFFEY:

17  Q    And in March of 2013, you were trying to examine the

18  contents, but they were not allowing you to?

19  A    If they wanted me to pick them up, I needed to examine

20  them.

21  Q    Okay.  And for what reason?

22  A    To make sure that they were still in good -- good

23  condition.

24  Q    Didn't you have a key, since they were property?

25  A    I didn't have need of the property before.

Milner - Cross/Mahaffey                        233

1  Q    But, I mean, didn't you have a key so that you could look

2  at it anytime you want, your stuff?

3  A    No.

4  Q    They didn't give you a key?

5  A    No.

6  Q    Well, did you ask for a key, since it's your stuff?

7  A    I don't think trailers have keys.

8  Q    They don't have locks on them?

9  A    They do have locks on them.

10 Q    Those don't function with keys?

11 A    I guess they do, sure.

12 Q    Okay.  So did you ever get access to the trailers?

13 A    I never needed access.

14 Q    You didn't request access her to roll out te puppets?

15 A    Only if they wanted me to pick the stuff up.

16 Q    Well, when you say, "We cannot go to Riverside, we need to

17 get them up here," did they provide them up to you?

18 A    No, because they changed their mind and didn't want me to

19 pick them up after all.

20 Q    Okay.  So you were having a discussion about whether you

21 were going to go to Riverside, and they wanted you to go to

22 Riverside, and you said you wouldn't?

23 A    No.  I said -- yes.  I said, "You can't -- you've got to

24 bring them up here so I can get the stuff -- look at the

25 stuff."

Milner - Cross/Mahaffey                  234

1          THE COURT:  I'm sorry.  When you were saying, "We
2  need to get them up here," where were you at this time?
3          THE WITNESS:  It would be -- when they say "up here,"
4  they would mean the campus of the Crystal Cathedral.
5          THE COURT:  Oh, I see.
6          THE WITNESS:  Versus Riverside, where they were
7  stored.
8          THE COURT:  So when you were communicating with them,
9  it says, "We'll need to get them up here to Ms. Delinn
10 (phonetic)," and that meant the campus?
11         THE WITNESS:  Yes.
12         THE COURT:  All right.  Well, I thought the campus
13 was sold at that time.
14         THE WITNESS:  That was after this.  This was before
15 it was -- they had -- that may have been sold, but they hadn't
16 vacated.
17         THE COURT:  They hadn't vacated yet, but they were in
18 -- they were renting.  Okay.  Okay.  I got it.  Thank you.
19 BY MR. MAHAFFEY:
20 Q   Had you told them that you needed to access the trailers
21 and document the team -- I mean, document the items?
22 A   If they wanted me to pick them up.
23 Q   Had you never accessed them and documented these items?
24 A   No, because they changed their mind.
25 Q   Okay.  So from the time before the bankruptcy was filed,

Trial Transcript, Page 234

Milner - Cross/Mahaffey                          235

1  you didn't go in and access and document the items that you

2  were transferred?

3  A    To the best of my knowledge, the trailers have never been

4  opened since they were filled after the close of the show.

5  Q    And you were asking them to hunt for missing items at this

6  same time?  This is three years later?

7  A    There were some items that were supposedly stored in the

8  warehouse and Jimmy didn't know where they were.

9  Q    And so did you have any kind of list of those items that

10 were yours versus theirs at that time?

11 A    I think we talked about what was missing, but I ended up

12 picking them up when they found them.

13 Q    So did you have a list of what was yours or theirs?

14 A    No.  I think it was -- yeah, it was just -- it was

15 projectors, lights.  It was the stuff that was in the

16 warehouse.

17 Q    Okay.  You said that you then tried to -- at the end of

18 your email you say you've been trying to be patient with their

19 difficulties and because they weren't honoring the agreement to

20 store the items?

21 A    Where does it say that?  I'm sorry.

22 Q    Well, the bottom of page 90 on Exhibit 17, with your email

23 that starts with February 28, 2013, 3:56

24 A    It says, "So I've tried to comply with CCM's wishes,

25 assuming this meant that they were opting to continue to honor

Milner - Cross/Mahaffey                    236

1  the agreement to store the items.

2  Q    So did they opt to do that or not?

3  A    As far as I knew, yeah, because every time they did --

4  they would change their minds.  They would say, "Come pick this

5  up," and then they would say, "No, never mind," they would be

6  busy.

7  Q    That's my point.  So this back and forth with CCM was

8  involving their changing their mind as to whether they were

9  going to store or not to store?

10  A    No.  It was about them -- they wanted me to pick it up or

11  not.

12  Q    A year earlier, isn't it true that on June 25th, 2013,

13  their counsel, Palmieri, wrote your counsel and specifically

14  set forth that they disputed the contract formation, they

15  disputed your ownership, that there was no inventory, and this

16  was all going on between the attorneys at that time, right?

17  A    I can't tell you, because you haven't put the document in

18  front of me.

19        THE COURT:  Well, again, what makes any of this

20  executory?

21        MR. MAHAFFEY:  Because it was the same dispute prior

22  to the petition.

23        THE WITNESS:  It was never in dispute about the

24  ownership.

25        MR. MAHAFFEY:  Your Honor, I don't know how to

Milner - Cross/Mahaffey                    237

1 respond -- I apologize.  I don't know how to do this.  I know

2 you're directing the question to me, but the witness is

3 answering.

4          THE COURT:  Yeah, I know.  Don't -- right.  You're

5 not supposed to say anything when I'm talking to counsel.

6          All right.  Okay.  So that testimony is stricken.  It

7 was just totally unsolicited.

8          MR. MAHAFFEY:  Which testimony?

9          THE COURT:  All right.  So what makes all this

10 executory?  There remain ongoing disputes about -- about -- she

11 wants to pick up the items, but then when she goes to pick them

12 up, they're not made available to her.  That's her testimony.

13 That's her emails.

14          So what makes this executory or not?

15          MR. MAHAFFEY:  We briefed this with the cases.

16          THE COURT:  Well, it kind of looks like she's doing

17 her part to pick it up, and the church isn't making access to

18 her.

19          MR. MAHAFFEY:  That's right.

20          THE COURT:  So that's -- that means it's executory on

21 the church's part, but not on her part.

22          MR. MAHAFFEY:  Well, no.  It means both sides have

23 material responsibilities under the contract.

24          THE COURT:  Okay.  Well --

25          MR. MAHAFFEY:  And when the evidence --

Milner - Cross/Mahaffey                    238

1          THE COURT:  Okay.  That's an argument.

2          MR. MAHAFFEY:  It is.  I mean, that --

3          THE COURT:  Okay.  All right.  So what else are you

4    trying to show as executory?

5    BY MR. MAHAFFEY:

6    Q    At the time of this -- at the time of this ongoing

7    dispute, do you agree that the attorney -- you had hired an

8    attorney, Mr. Grumer, and Mr. Ghan of Palmieri and Tyler were

9    back and forth on all these issues, true?

10   A    No.  They were back and forth on me picking up the items.

11   Q    They weren't back and forth on ownership --

12   A    No.

13   Q    -- the duty to store, your rights -- the insider

14   relationship, that wasn't the entire content of all their

15   communications?

16   A    To the best of my knowledge, they always wanted me to pick

17   items up or they wanted to discard them.  They kept saying, "We

18   want to throw them away."

19          And we said, "You cannot throw them away."

20   Q    Okay.  Beyond that part of the dispute, are you denying

21   that your attorney was engaged with my client's attorney on the

22   whole basis that this was not a valid agreement, it was self

23   dealing, it wasn't ratified, all of that was in dispute?

24   A    No.

25   Q    You don't remember that?

Milner - Cross/Mahaffey                    239

1  A    No.  It was about me picking up the items.

2  Q    Okay.  So you do not have knowledge of communications back

3  and forth --

4             THE COURT:  Asked and answered.

5             MR. MAHAFFEY:  Okay.

6             THE COURT:  So what else is executory?

7             MR. MAHAFFEY:  Well, I guess I would like to mark

8  this June 25th letter as the next exhibit in order.

9             MS. MONTGOMERY:  What -- what year?

10             MR. MAHAFFEY:  2012.

11             THE COURT:  What exhibit number are we talking about?

12             MR. MAHAFFEY:  40.

13             THE COURT:  40?

14             MS. MONTGOMERY:  It's already in.  It's Grumer

15  Exhibit 28.

16             THE COURT:  Oh, it's Exhibit 28?  All right.  So

17  you're offering their 28?

18             MR. MAHAFFEY:  Yes.

19             THE COURT:  It's Mr. Grumer's letter, June 25, 2012?

20             MR. MAHAFFEY:  Yes.

21             MS. MONTGOMERY:  In Exhibit 28 --

22             THE COURT:  And that's Mr. -- it's -- it's the letter

23  to Mr. Grumer, right --

24             MR. MAHAFFEY:  Correct.

25             THE COURT:  -- that you're offering?

Milner - Cross/Mahaffey                    240

1              MS. MONTGOMERY:  And there -- but then there are

2 responses.

3              THE COURT:  From Mr. Ghan?

4              MR. MAHAFFEY:  Yes.

5              MS. MONTGOMERY:  Your Honor, but then Exhibit 29,

6 which Mr. Mahaffey chooses to ignore, is the response from Mr.

7 Grumer.

8              THE COURT:  Well, he's only offering 28.

9              MR. MAHAFFEY:  We can offer 28.  It's a valid point.

10 28 is from our side; 29 is from their side.

11             THE COURT:  Okay.  So you're offering both, 28 and

12 29?

13             MR. MAHAFFEY:  Yes.

14             THE COURT:  Okay.  So received.  28 and 29.

15             (Exhibits 28 and 29 Received in Evidence)

16             MS. MONTGOMERY:  And 30 is part of the same --

17             THE COURT:  Well, you can offer 30 when you get to

18 your point.  Okay.

19             So what else are we talking is executory?  Because I

20 want to give counsel for the respondents an opportunity to

21 examine.  And I don't think we're really making much progress

22 here.  It's kind of cumulative and repetitive.

23 BY MR. MAHAFFEY:

24 Q    At the time of the bankruptcy petition, was there ongoing

25 responsibilities to work with a Mr. Atmajian regarding some

Milner - Cross/Mahaffey                241

1  intellectual property rights arising out of the contract?

2  A    At the time of the petition, did you say?

3  Q    Right.

4  A    No.

5  Q    So you hadn't been discussing paragraph 1.5 as to what

6  your responsibilities were regarding a written agreement with

7  Jeff Atmajian, the composer?

8  A    Paragraph 1.5 of what?

9  Q    Of the subject Exhibit 7.

10  A    Of 7?

11  Q    Yes.

12         THE COURT:  No, Exhibit 7, which is the --

13         THE WITNESS:  The agreement.

14         THE COURT:  Right, the agreement with the revised

15  Schedule 1.

16         THE WITNESS:  And what point did you want me to look

17  at?

18         THE COURT:  He was asking were you working with a

19  composer, I believe.  Was it 1.5?

20         MR. MAHAFFEY:  Yes.  It was referenced in 1.5.

21         THE COURT:  Yeah, section 1.5.  Were you working with

22  Mr. Atmajian?

23         THE WITNESS:  To the best of my knowledge, Mr.

24  Atmajian kept all of his intellectual property; I kept all of

25  mine.

Milner - Cross/Mahaffey                    242

1  BY MR. MAHAFFEY:

2  Q    But isn't it true that there were multiple emails that you

3  sent regarding the agreements with Mr. Atmajian, including the

4  ones that we've already looked at where you were requesting

5  access to various items so that you could deal with Mr.

6  Atmajian, as set forth in paragraph 1.5?

7  A    I was asking for assurance that CCM had not contracted

8  with Mr. Atmajian in some way that may have affected my own

9  intellectual property rights.

10 Q    So what did you do going forward to fulfill your side of

11 this responsibility?

12 A    There wasn't responsibility for me.

13 Q    Why were you requesting information regarding Mr.

14 Atmajian?

15 A    Because I needed the Ministries to let me know if they had

16 somehow encumbered by intellectual property rights without my

17 knowledge.

18 Q    So did you deal with Mr. Atmajian at all?

19 A    Mr. Atmajian was satisfied and said that he had no

20 agreement with CCM, and I had no agreement with CCM, and that

21 we both retained all of our rights to our intellectual

22 property.

23        THE COURT:  So what makes this executory on Milner's

24 part, any of 1.5?

25        MR. MAHAFFEY:  There was disputes regarding this --

Milner - Cross/Mahaffey                243

1          THE COURT:  No, no, no.  I was going to say, what

2   makes this executory on her part?  What is she supposed to do

3   on her part?

4          MR. MAHAFFEY:  As set forth in A through E.

5          THE COURT:  A2E?

6          MR. MAHAFFEY:  Subsections A, B, C, D, and E have

7   bilateral responsibilities of both parties, as described in the

8   contract.

9          THE COURT:  As to her?

10         THE WITNESS:  It was basically saying if --

11         THE COURT:  No, no.

12         THE WITNESS:  Oh, sorry.  Sorry, sorry.

13         THE COURT:  I'm not --

14         THE WITNESS:  I thought I was --

15         THE COURT:  Again --

16         THE WITNESS:  I thought I was answering a question.

17         THE COURT:  Again, I'm asking him.

18         THE WITNESS:  Yeah.

19         THE COURT:  So what's executory as to her?

20         MR. MAHAFFEY:  After she forms the understanding that

21  they had breached these sections, then she had a --

22         THE COURT:  Well, yeah, so she was -- okay.  Well,

23  what's her obligation to do anything if --

24         MR. MAHAFFEY:  Filing a claim --

25         THE COURT:  If your client breached something, she

Milner - Cross/Mahaffey                    244

 1  has certain rights.  So that's not executory in her part.

 2  That's executory on the debtor's part.

 3          MR. MAHAFFEY:  No, it's executory on her part as to

 4  respond timely to that breach with the bankruptcy petition.

 5          THE COURT:  Well, but there's no breach, so there is

 6  nothing to respond to.

 7          MR. MAHAFFEY:  Well, but that's what I was

 8  developing, is there was --

 9          THE COURT:  Yeah, well --

10          MR. MAHAFFEY:  -- allegations of it.

11          THE COURT:  All right.  I would move on, because I

12  don't think there's anything executory about that.  And maybe

13  she was trying to find out whether there was a breach, but that

14  doesn't make it executory on her part.  You know, she wants to

15  know that her rights are being protected.

16  BY MR. MAHAFFEY:

17  Q    Is it true, Ms. Milner, that you did file a claim as to

18  one part of this contract and litigate it in the bankruptcy,

19  true?

20  A    I filed a claim regarding the amount of CD's that they had

21  produced.

22  Q    And that was a derivative of this contract, right?

23  A    I believe so.

24          THE COURT:  I'm sorry.  The claim was based on this

25  contract?

Milner - Cross/Mahaffey                245

1              MR. MAHAFFEY:  Correct.

2              THE WITNESS:  I believe so.

3    BY MR. MAHAFFEY:

4    Q    Yes?

5    A    I would have to go through the contract and find out

6    where.

7    Q    Well, let's stop a minute.

8              THE COURT:  Well --

9    BY MR. MAHAFFEY:

10   Q    Are you suggesting that other than this contract, there

11   was some other --

12             THE COURT:  Well, anyway, so what does -- what does

13   that make this executory?

14             MR. MAHAFFEY:  Well, it makes it executory in the

15   sense that she is litigating a portion of the contract in this

16   bankruptcy estate and not litigating another portion of the

17   contract in the same bankruptcy estate, and you're having the

18   debtor -- I mean, the position of Ms. Milner is --

19             THE COURT:  Well, I don't know.  I don't think it

20   really has anything -- whether or not she had --

21             MR. MAHAFFEY:  It's res judicata.

22             THE COURT:  -- she had a claim that she later

23   withdrew in the bankruptcy --

24             MR. MAHAFFEY:  And you issued a judgment in favor of

25   the debtor.

Milner - Cross/Mahaffey                246

1          MS. MONTGOMERY:  No, she -- no, he didn't.

2          THE COURT:  Well, but she withdrew the claim, so --

3          MR. MAHAFFEY:  I know, but you issued a judgment

4   based on the withdrawal.

5          THE COURT:  Yeah, but that has nothing to do with

6   whether or not the contract is executory.  So, all right.  So

7   the Court will sustain its own objection.

8          Move on to something else.

9          MR. MAHAFFEY:  One moment, Your Honor.  Could I have

10  just a five-minute recess?

11         THE COURT:  All right.  We'll take a five-minute

12  recess.

13              (Recess 2:29 p.m./Reconvene 2:40 p.m.)

14         THE CLERK:  Please remain seated and come to order.

15  This United States Bankruptcy Court is again in session.

16         THE COURT:  All right.  The Court will recall the

17  Crystal Cathedral matter.

18         MR. MAHAFFEY:  I'm almost finished.  Just one quick

19  line and I'm --

20         THE COURT:  All right.

21  BY MR. MAHAFFEY:

22  Q   Ms. Milner, can I direct your attention back to Exhibit 7,

23  to the Schedule 1?

24  A   Sure.  I'm there.  Am I on?

25  Q   Do you see the sentence that says, "CCM will keep all

Milner - Cross/Mahaffey                     247

 1 goods in the same condition as they were at the end of the '05

 2 season"?

 3 A    Yes.  Am I on?  I don't think I'm on, am I?

 4           THE CLERK:  It's just for recording purposes.

 5           THE WITNESS:  Oh, okay.

 6 BY MR. MAHAFFEY:

 7 Q    Do you see the sentence that says, "CCM will keep all

 8 goods in the same condition"?

 9 A    Yeah.

10 Q    Does the word "goods" refer to the phrase "inventory

11 goods" above?

12 A    It's all the goods of the show.

13 Q    So it doesn't refer to the inventory goods?

14 A    It refers to the show property.

15 Q    And how long was that obligation for CCM to last?

16 A    There was no -- it didn't define.

17 Q    For 100 years?

18 A    Possibly.

19 Q    For multiple generations in your lifetime?

20 A    It depended on what was going to happen in the future.

21 There was no -- we didn't talk about it.

22 Q    Did you have any obligation to -- well, strike that.

23           What did you mean, "in the same condition"?

24 A    Well, they would -- when the show was taken down, it was

25 immediately crated with custom crates and stored into the

Milner - Cross/Mahaffey                     248

1  trailers to be -- and so that they were very well preserved to

2  sustain long-term storage.

3  Q     And did you know what their condition was when they were

4  stored?

5  A     Oh, yeah.  They were taken right out of the show after

6  being in the show for 80 days.

7  Q     So how would you know if CCM was keeping them in the same

8  condition?

9  A     That's why I would have required looking at them before

10 picking them up.

11 Q     Okay.  So how many times did you request to go confirm on

12 your part -- so let's just talk about your side of the

13 responsibility.  How many times did you on your part go to

14 inspect?

15        MS. MONTGOMERY:  Objection, Your Honor.  This is --

16 goes -- does not go to executory nature.  It goes to any breach

17 of the contract.

18        MR. MAHAFFEY:  I was going to her side of the

19 equation, Your Honor, what her part was.

20        MS. MONTGOMERY:  She doesn't have an obligation.

21        THE COURT:  Well, just hold on for a second.  So the

22 -- what are you intending to show by the fact that how many

23 times she asked?

24        MR. MAHAFFEY:  Well, because the debtor's position is

25 is that the executory nature of the contract is that Ms.

Milner - Cross/Mahaffey                    249

1 Milner, by virtue of having the debtor have the responsibility

2 to keep the items in the same condition, had a reciprocal

3 obligation to inspect them, to inform the debtor that there was

4 any breach of that.  It can't be allowed to --

5          THE COURT:  Well, where is that in the -- is that

6 implied from --

7          MR. MAHAFFEY:  Correct.  It's implied from the

8 language.  I don't know what the witness will say.  I was going

9 to examine her and see what her testimony is.  She can deny it.

10          THE COURT:  Well, you can ask her, do you understand

11 that the agreement requires you to inspect your property?

12          THE WITNESS:  No.

13          THE COURT:  All right.  That's her answer.

14 BY MR. MAHAFFEY:

15 Q    How would you understand whether it was kept in the same

16 condition if you didn't inspect it?

17 A    Because I know the way it was stored.

18 Q    Well, how would you know if they varied from that by

19 letting rodents in?

20 A    Well, I just -- they were stored into a trailer that was

21 in good condition.  The crates were in good condition.  And if

22 they were abiding by the agreement, I trusted that they were,

23 they should be fine.

24 Q    I understand.  But on your part, did you have some

25 responsibility to request inspection to be sure that they were

Milner - Cross/Mahaffey                    250

1 kept in the same condition?

2 A    No.  I had the right.  I never had the need to inspect it.

3 Q    Okay.  But so your position is is that CCM has a lifetime

4 eternal duty to store --

5        THE COURT:  Asked and answered.  You already asked

6 100 years, generations.  Okay.  It's repetitive.

7 BY MR. MAHAFFEY:

8 Q    Inspection responsibilities, is that why you were asking

9 to see if their warehouse was climate controlled?

10 A    It wasn't a responsibility.  It was a right.  I had the

11 ability and the right to request and inspect if I wanted to.

12        THE COURT:  All right.  This is all about the

13 debtor's obligations.  It's not about her obligation, so --

14 BY MR. MAHAFFEY:

15 Q    So you position is is that the debtor had a one-sided

16 obligation to store and keep it in the same condition?

17 A    Absolutely.

18 Q    And you had no obligation at all?

19 A    Absolutely.

20 Q    And so this was an internal responsibility with you having

21 no --

22        THE COURT:  Okay.  Asked and answered.  Okay.  That's

23 argument.

24 BY MR. MAHAFFEY:

25 Q    The next sentence says that "The debtor will not use goods

Milner - Cross/Mahaffey                    251

1 without prior written approval of CCM" -- of yourself, right?

2 A    Correct.

3 Q    So what was your responsibility to see what goods were

4 being used by the debtor?

5        THE COURT:  Well, it doesn't say anything about her

6 executive --

7 BY MR. MAHAFFEY:

8 Q    So your position is --

9        THE COURT:  Right.  Right.

10        MR. MAHAFFEY:  Okay.

11        THE COURT:  Well, I think we're getting back.  The

12 document speaks for itself, and we're going to argue what it

13 means.

14 BY MR. MAHAFFEY:

15 Q    Did the debtor ever transfer items -- strike that.

16        Did you and the debtor meet to make a list so they

17 could fulfill this sentence that says, "What CCM keeps needs to

18 be transferred from the Glory of Creation books"?

19        So did you on your part meet with them to identify

20 what was going to be transferred?

21        THE COURT:  Well, it doesn't say anything for her.

22 Okay.

23        MR. MAHAFFEY:  It doesn't say anything --

24        THE COURT:  It speaks for itself.  It doesn't say

25 anything about her having to do anything.

Milner - Redirect/Montgomery                252

1          MR. MAHAFFEY:  It doesn't say either side.  I'm just

2  asking the question, did you --

3          THE COURT:  Well, all right.

4  BY MR. MAHAFFEY:

5  Q    Did you ever --

6          THE COURT:  It's -- it doesn't really -- okay.  There

7  is nothing executory on her part that's not spelled out in the

8  agreement, so --

9          MR. MAHAFFEY:  So there was no --

10         THE COURT:  And you're asking -- is there anything

11 executory that's not spelled out in the agreement that should

12 be implied?  I think we can argue that.

13 BY MR. MAHAFFEY:

14 Q    In fact, did you ever sit down with CCM to go through the

15 items so that you could transfer one by one the ones from their

16 books or the ones that were going to be kept by you?

17         THE COURT:  All right.  Sustained.  It's irrelevant.

18 All right.  Do you have any questions on redirect?

19         MS. MONTGOMERY:  Yes, Your Honor.

20                      REDIRECT EXAMINATION

21 BY MS. MONTGOMERY:

22 Q    Ms. Milner, at the beginning of the examination, you were

23 asked whether or not you knew of any non-family members on the

24 board.

25         Do you now recall any non-family members on the

Milner - Redirect/Montgomery                253

1 board?

2 A    I entirely forgot about Gwyn Myers.  Gwyn Myers was both

3 on the board and on the executive committee.

4 Q    And who was on -- to your knowledge, do you know who was

5 on the executive committee at the time?

6 A    To my knowledge, it was my parents, Robert and Arvella

7 Schuller, my brother, Robert Anthony Schuller, Fred Southard,

8 Gwyn Myers, and Holly Hagler.

9 Q    So at this point, four out of the six members of the

10 executive committee have signed the settlement agreement, which

11 is Exhibit 7, correct?

12 A    Correct.  And that's why I was always assured that it was

13 a valid agreement.

14 Q    Have you now received -- did you receive, prior to the

15 filing of bankruptcy in October 2010, all of the payments to

16 which you were entitled to?

17 A    Yes.

18        MR. MAHAFFEY:  Vague and ambiguous.  No foundation as

19 to where the payments came from.

20        MS. MONTGOMERY:  I --

21        THE COURT:  Well, it's the payments under the

22 agreement.

23        Did you receive all of the cash payments that --

24        THE WITNESS:  Yes.

25        THE COURT:  -- you were entitled to under the

Trial Transcript, Page 253

Milner - Redirect/Montgomery                254

1 agreement?  All right.  Overruled.

2 BY MS. MONTGOMERY:

3 Q    You were now owed any additional cash payments at the time

4 of bankruptcy; is that correct?

5 A    No, I was not.

6          MR. MAHAFFEY:  No foundation as to the amount of

7 payments that were owed and where they came from.

8          THE COURT:  All right.  Just hold on.  All right.

9 All right.  Overruled.  You may answer.

10          THE WITNESS:  No.  Say it again.

11          THE COURT:  You weren't owed anything else at the end

12 as far as cash?

13          THE WITNESS:  No, I was not owed anything else.  No.

14 BY MS. MONTGOMERY:

15 Q    You testified in answer to Mr. Mahaffey's questions

16 regarding the cost of fabrication, correct?

17 A    Yes.

18 Q    And you said it was somewhere in the neighborhood of $8

19 million, correct?

20 A    Yeah, that's -- that's --

21 Q    In the millions?

22 A    Yeah.  Yes.

23 Q    For fabrication?

24 A    Yes.

25 Q    At the time that you staged the play, did you own all of

Milner - Redirect/Montgomery                          255

1 the IP -- all of the copyright trademarks to the play itself?

2 A    Yes, I did.

3 Q    So when you talk about items that were created for the

4 play, such as puppets, or other items, could CCM have used

5 those?

6 A    No.

7 Q    Did they then have value to CCM?

8 A    No.

9 Q    If CCM had wanted to use them, would they have had to

10 negotiate with you and pay you for the use of your trademark or

11 copyrights?

12 A    Yes.

13          MR. MAHAFFEY:  Objection.  It's outside the scope.

14 It's what was litigated.  The Court issued a judgment on it.

15 That's our point is that this was the topic that the Court

16 granted a judgment in favor of CCM.

17          MS. MONTGOMERY:  No.

18          THE COURT:  All right.  Just -- okay.  So --

19          MS. MONTGOMERY:  I'm asking because he -- he got into

20 valuation.  I'm simply indicating that these did not have the

21 value, because they --

22          THE COURT:  Well --

23          MR. MAHAFFEY:  Your Honor, why don't we just ask the

24 witness what the value is in her opinion today, because if it's

25 worthless and there is no value, then we need to know a record

Trial Transcript, Page 255

Milner - Redirect/Montgomery                256

1  of that.  So maybe it's worthless.  Maybe the witness will

2  confirm that.

3          THE WITNESS:  To me, it's far from worthless.

4          THE COURT:  Well --

5          MR. MAHAFFEY:  Well, what's -- I think Your Honor --

6          THE COURT:  Well, there is no question pending, so

7  don't volunteer.

8          THE WITNESS:  Oh.

9          THE COURT:  Because you're extending the --

10         MS. MONTGOMERY:  Does the --

11         THE COURT:  Just hold on.

12         MS. MONTGOMERY:  Okay.

13         THE COURT:  Okay.

14         MR. MAHAFFEY:  Objection to the --

15         THE COURT:  I haven't made any ruling yet.

16         MR. MAHAFFEY:  Our objection to the line of

17  questioning is that it's probative what the witness's opinion

18  is of dollar value today.  It is probative.  But what they

19  spent, as the Court has commented, is not going to establish

20  the value today.

21         So I --

22         THE COURT:  Well --

23         MR. MAHAFFEY:  -- do think it's probative.

24         THE COURT:  Well, yeah, is the value of the property

25  really at issue here as to whether or not it's executory?

Milner - Redirect/Montgomery                    257

1          MR. MAHAFFEY:  Well, I think --

2          MS. MONTGOMERY:  No.

3          THE COURT:  That's why --

4          MS. MONTGOMERY:  No, it's not.

5          MR. MAHAFFEY:  It is.

6          THE COURT:  So why bother?

7          MR. MAHAFFEY:  Because it is value --

8          THE COURT:  Just hold on for a second.  Why bother

9  asking the question?

10          MS. MONTGOMERY:  That's fine.

11          THE COURT:  All right.

12          MS. MONTGOMERY:  I don't need to --

13          THE COURT:  There's no point in -- it really isn't

14  probative of whether or not -- the issue today is whether or

15  not it's executory or not.  It's not probative whether it's

16  executory or not.

17          MS. MONTGOMERY:  Correct.

18          THE COURT:  And I thought the idea of saying the

19  valuation is just to show how incensed the debtor is about this

20  particular contract, but, you know, that's -- it doesn't go to

21  whether it's executory or not.

22          MS. MONTGOMERY:  Yeah.

23          MR. MAHAFFEY:  The value -- the relevance --

24          THE COURT:  Okay.  I'm not asking -- entertaining

25  argument.  All right.  Because we're going to be here all

Milner - Redirect/Montgomery                    258

 1 night.  My recorder is here until 5:00 p.m., so --

 2              MS. MONTGOMERY:  Okay.

 3 BY MS. MONTGOMERY:

 4 Q    Ms. Milner, can you look at Exhibit 8, which was

 5 previously discussed?

 6 A    8?

 7 Q    Yes.  It's page 73.

 8 A    Yes.

 9 Q    At the time top is an email from Gwyn Myers to you,

10 correct?

11 A    Correct.

12 Q    The first line says, "Absolutely, go for it."

13              Do you recall what this is referring to?  What is

14 this a response to?

15 A    It's me wanting to get to the files and having documents

16 turned over to me, per the agreement.

17 Q    Additionally, did you have a discussion with Gwyn as to

18 whether or not they had to have a meeting of the executive

19 committee or anything else had to be done before this was

20 deemed a final agreement?

21              MR. MAHAFFEY:  Objection.  Leading.

22              MS. MONTGOMERY:  Did you have any discussions?

23 That's not leading.

24              THE COURT:  Well, it's foundational.  Overruled.

25 It's not asking her what those discussions were.  All right.

1          Did you have a discussion?

2          THE WITNESS:  Yes.  They had -- she had --

3          THE COURT:  Just yes or no.

4          THE WITNESS:  Yes.

5   BY MS. MONTGOMERY:

6   Q    Who was this discussion with?

7   A    Gwyn.

8   Q    Was -- was Gwyn the intermediary for you with regard to

9   the members of the executive committee?

10  A    Absolutely.

11  Q    Why as Gwyn -- or was she designated as the intermediary?

12  A    To the best of my knowledge.  That's what I was led to

13  believe.

14         THE COURT:  Yes or no?

15         THE WITNESS:  Yes.

16  BY MS. MONTGOMERY:

17  Q    Do you know why?

18  A    Because she was a non-family member, and she was on the

19  executive committee.

20  Q    And do you know what the meaning of this email is from

21  her, this -- at the -- the two paragraphs at the top?

22         MR. MAHAFFEY:  Objection.  Lack of foundation.  Calls

23  for speculation.

24         THE COURT:  Well, do you know -- she's asking do you

25  know what it refers to?  Well, overruled, because it's -- it's

Milner - Redirect/Montgomery                    260

1 in response to Ms. Milner's email, so she probably has some

2 idea what the subject matter is.

3           MS. MONTGOMERY:  Right.

4           THE COURT:  Overruled.

5 BY MS. MONTGOMERY:

6 A    There had been some question as to whether they were going

7 to have some sort of another meeting, and then this told me

8 that they didn't need to do that, per the bylaws, it was not

9 required, that she had gotten that information from Rick.

10 Q    Okay.

11 A    Mr. Gibson.

12          THE COURT:  Okay.  So what it says is that, "We have

13 decided just to inform the board rather than sending out a

14 ballot.  It turns out the bylaws support that.  Reg thought it

15 would be wise to have the board involved, but I'm not going

16 with wise on that."

17          Wise meaning counsel?

18          THE WITNESS:  Wise -- yeah.  He was -- he was telling

19 her he thought it was a good idea, but it wasn't required.

20          THE COURT:  Okay.  It's a good idea, but not

21 required, is that what --

22          THE WITNESS:  That's what I took it to mean as.

23 BY MS. MONTGOMERY:

24 Q    So was it your understanding that you were entitled to

25 rely on Exhibit 7 as being the final agreement?

1  A    Oh, absolutely.

2            THE COURT:  I'm sorry.  Exhibit --

3            MS. MONTGOMERY:  7.  Exhibit 7.

4            THE COURT:  Okay.

5            MR. MAHAFFEY:  Your Honor, this is -- this is

6  cumulative.  We went through all the emails that were six

7  months later that said that --

8            THE COURT:  Okay.  There is no -- okay.  You can

9  argue later.

10           MS. MONTGOMERY:  I think you already admitted Exhibit

11  7, correct?

12           THE COURT:  Yeah, 5 and 7 are in.

13           MS. MONTGOMERY:  Okay.  Then I would also please

14  admit Exhibit 8 that we just discussed.

15           THE COURT:  8?  All right.  Received.

16           MS. MONTGOMERY:  Received or admitted into evidence?

17  Is there a difference in your mind?

18           THE COURT:  What?  Exhibit 8?

19           MS. MONTGOMERY:  Yeah.

20           THE COURT:  Yeah, I just said received.

21           MS. MONTGOMERY:  Oh, okay.

22               (Exhibit 8 Received in Evidence)

23  BY MS. MONTGOMERY:

24  Q    Turning to Exhibit 9, which I think you were questioned

25  regarding by Mr. Mahaffey.

1 A    Yeah.  Hang on a second.

2         THE COURT:  Exhibit 9, right?

3         MS. MONTGOMERY:  It's starting on page 76.

4         THE WITNESS:  Yes.

5 BY MS. MONTGOMERY:

6 Q    And in the email on -- that's dated from you to Gwyn

7 January 17th, 2007, 6:20 p.m.

8 A    Yes.

9 Q    Okay.  Below that, it -- I don't see the date and time,

10 but Gwyn is writing to you on that same page, "Reg finally got

11 a copy of the preliminary title report on the condo."

12        Do you know what this was referring to?  Did you have

13 an understanding?

14 A    Yeah.  So the trust agreement -- the July 8th main body of

15 the agreement was our agreement.  And then it was more like the

16 how they were going to give me the money.

17        And instead of having them do it all in one lump

18 some, they wanted to spread it out over time.  But my attorney

19 and I wanted assurance that the money would come.  And so they

20 had considered putting in some real estate collateral into the

21 trust.

22 Q    Okay.  And when you -- continuing to look at Exhibit 9,

23 Mr. Mahaffey asked you about various contracts, I think, that

24 were referred to.

25        MR. MAHAFFEY:  Object.  It's vague and ambiguous.

Milner - Redirect/Montgomery                263

 1 Exhibit 9 has --

 2          MS. MONTGOMERY:  I'm looking at -- Sorry.

 3          THE COURT:  Yeah, yeah.

 4          MS. MONTGOMERY:  I'm looking.

 5          THE COURT:  Yeah, it referred contract and trust,

 6 right?  So overruled.  We were talking about what that contract

 7 meant, right?

 8          MS. MONTGOMERY:  Right.

 9          THE COURT:  Are you referring to that on page 2 of

10 this document at page 77?

11          MS. MONTGOMERY:  77, yes.  On 77.

12          THE COURT:  Right.

13          MR. MAHAFFEY:  77A?

14          MS. MONTGOMERY:  Well, 77.

15          THE COURT:  All right.  This is overruled.  All

16 right.  So you can answer the question.

17          You were talking about contracts and financing.

18 BY MS. MONTGOMERY:

19 Q    On 77A, it's talking about financing.  Do you see that?

20 On 77A, it's in the middle.

21          MR. MAHAFFEY:  Objection.  Leading.

22          THE COURT:  Refinancing?  You mean the decision was

23 made to refinance the condo and fund the trust with cash?

24          MS. MONTGOMERY:  Right.

25          THE COURT:  Is that what you're asking about?

Milner - Redirect/Montgomery                264

1          THE WITNESS:  Yes.

2  BY MS. MONTGOMERY:

3  Q    Is that -- is that referencing what you understood to be

4  the security or the collateral --

5  A    Yes.

6  Q    -- that was going to be put into the trust?

7  A    Yes.

8  Q    Your assets, your Creation assets and inventory, was that

9  ever intended to be included in the trust?

10  A    I asked Gwyn if they should be put into the trust.

11  Q    But under the settlement agreement, and as it was --

12  A    But she said no.

13  Q    Okay.

14  A    That the agreement -- that that would just encumber and

15  make everything messy and that the settlement agreement was --

16  the settlement agreement was done and to leave it alone.

17  Q    And it was finished?

18  A    Yes.

19  Q    And it was never -- and the inventory, the Creation

20  property was never put into the trust and never intended to be

21  put into the trust?

22  A    Correct.

23          MR. MAHAFFEY:  Objection.  Leading.

24          THE COURT:  Overruled.

25          MS. MONTGOMERY:  Your Honor, I would ask that we move

Milner - Redirect/Montgomery                265

1 Exhibit 9 into evidence.

2          THE COURT:  All right.  Exhibit 9 is received.

3 BY MS. MONTGOMERY:

4 Q    On the second page of Exhibit 9, at the very top, it says,

5 "I do not think that you need any other document since the

6 assets that were identified in the inventory as yours are just

7 that.  You have the right to look at the property that you own

8 or to do anything else with it that you desire."

9 A    Yeah.

10 Q    Do you see that?

11 A    Correct.

12 Q    And what was that in response to?

13 A    That was whether I needed to put them into the trust, to

14 protect -- you know, to make sure that everything went well,

15 and she said, "No, absolutely not.  They're yours."

16 Q    Okay.  So there was no question?

17 A    No question at all.

18 Q    Okay.  You were previously asked how you know that there's

19 nothing -- or that all of your Creation property was going into

20 these specific seven trailers.

21          Are the trailers marked?

22 A    Yes.

23 Q    How are they marked?

24 A    My trailers have a "C" on them for Creation.  Then they

25 have some trailers with an "X" on them, standing for Christmas,

Milner - Redirect/Montgomery                         266

1 their Christmas show.  And then our trailers have an "E" on

2 them for the Easter show.

3 Q    Were these trailers filled up to capacity at the time that

4 the show was dismantled in 2005?

5 A    Yes.

6 Q    Was there any room for any additional property to be

7 placed -- to be put into these trailers?

8 A    No, because they were enormous crates, and so the crates

9 were being stacked on top -- it was -- yeah.

10 Q    And you testified that to the best of your knowledge, they

11 had not been opened?

12 A    Yeah.

13 Q    So if they had been opened, it was not with your approval

14 or knowledge?

15 A    Absolutely correct.

16 Q    The items that were in the warehouse, were those items

17 that were either too big or could not fit into these trailers?

18 A    Yes.  They had some very large puppets.

19 Q    And everything that was yours that was in the warehouse

20 was already picked up with their approval?

21 A    Correct.

22 Q    And so to date, the only dispute that we have are as to

23 your entitlement to the -- to the contents of seven trailers?

24        MR. MAHAFFEY:  Counsel is testifying, Your Honor.

25 This isn't direct exam.  It's just leading.

1              THE COURT:  Well --

2              MS. MONTGOMERY:  This is just foundational, and I'm

3  just trying to clarify --

4              THE COURT:  Yeah.  Just trying to clarify, yeah, that

5  the dispute is over the items that haven't been picked up in

6  the trailers, so overruled.

7              THE CLERK:  Your Honor, counsel's objections are not

8  being picked up.  His microphone is not close enough.

9              MR. MAHAFFEY:  Sorry about that.

10             THE COURT:  Oh, right.  Right.  You don't -- right.

11 You don't want to -- you want to make sure it gets on the

12 record.  All right.

13 BY MS. MONTGOMERY:

14 Q    At this point in time, has everything -- all of the assets

15 for the play, for you to restage it, that were in the

16 warehouse, have all of those been picked up?

17 A    Yes.

18 Q    When your -- when your attorney, Carl Grumer, was having

19 discussion with Mr. -- is it Ghan -- in 2013 regarding a

20 dispute as to these -- as to the pickup of these items, do you

21 recall the letter that was being presented by Mr. Mahaffey?

22 A    I know there was a letter that came to Carl and a reply

23 from Carl, too, in response.

24 Q    Was the dispute regarding ownership of the trailers

25 themselves?

Milner - Redirect/Montgomery                    268

1 A    Oh, no.

2 Q    Was there ever a discussion about you simply picking up

3 the trailers and their contents?

4 A    Yeah, they did propose that.

5 Q    And do you know why that was not acceptable?

6        MR. MAHAFFEY:  Objection.  Lack of foundation.

7 BY MS. MONTGOMERY:

8 Q    If you know.

9        THE COURT:  Well, if she knows.  Yeah.  That's --

10        THE WITNESS:  Yeah, I know.

11        THE COURT:  The foundational question was if she

12 knows.  Do you know, yes or no?

13        THE WITNESS:  Yes, I know.

14        THE COURT:  All right.

15 BY MS. MONTGOMERY:

16 Q    Why -- can you tell me why the -- why that agreement did

17 not -- was not fulfilled?

18 A    Because in order to pick up the trailers, I needed to see

19 if it was cost effective for me, if it made sense.  And so I

20 had to look into where they stood on the titles, whether they

21 were registered, whether they were safe to be put on the road,

22 or if I was going to get cited if they went on the road.

23        I had to look at all the complications on that, and I

24 determined it wasn't --

25 Q    In 2013, when Mr. Grumer was assisting you in negotiating,

1 did you understand who actually owned the trailers?

2 A    The trailers themselves --

3 Q    The trailers themselves.

4 A    -- were owned by CCM.  And then they -- they originally

5 offered it, and then they came back and they said, "Oh, sorry,

6 we can't do that.  You can buy them for $1800 apiece.

7        And so then I was like, "Well, I've got to pay for

8 all the road worthiness and the trailer, that's a bit much.

9 I'll just pick up my stuff."

10 Q    So you refused their offer to purchase the trailers?

11 A    Correct.

12 Q    So some of the emails that are seen or letters that are

13 seen, when they're talking about the need for approval by the

14 plan -- plan administrator of the bankruptcy estate --

15 A    Oh, yeah.

16 Q    -- is that referring to the trailers?

17 A    Yeah, that's the trailers themselves.

18 Q    There was never a dispute that you owned everything inside

19 --

20 A    No.

21 Q    -- the trailers?

22 A    No.

23 Q    You were shown what was marked as Exhibit 39 regarding a

24 board meeting where they were discussing whether or not they

25 should be storing your property for an unlimited period of

Milner - Redirect/Montgomery                    270

1  time.

2          You were not present at that meeting, correct?

3  A    This is the first time I've ever heard of that.

4  Q    Did you ever receive any document from -- from the

5  bankruptcy counsel for the debtor saying, "We are rejecting the

6  storage portion of your -- of the settlement agreement"?

7  A    No, absolutely not.

8  Q    So you never had any notice that that was what they

9  intended to do?

10  A    No.  Not at all.

11  Q    Okay.  To the best of your knowledge, at the time that the

12  debtor filed bankruptcy in October 2010, was there anything

13  that you were obligated to do under the settlement agreement?

14  A    No, absolutely not.

15  Q    And what was the obligation, if any, of the debtor at the

16  time of bankruptcy?

17  A    Storing my goods and keeping them in the same condition.

18  Q    At the time that they put the goods into the -- into the

19  trailers, that was in -- when was that?  What time period?

20  A    When they put them into the trailers?

21  Q    Right.

22  A    As soon as the show closed.

23  Q    So that was September 2005?

24  A    Yeah, September 2005.

25  Q    Was there an anticipation that the show would be restaged

1 the following year?

2 A    Yes.

3 Q    So everything was being packed so that it could be

4 properly restaged the next year?

5 A    Yeah, and easily, because they would have had another show

6 coming up within just a few months.  So the reason for keeping

7 them all separate was so that they could just put up the

8 Christmas show, and they knew what was the Christmas stuff.

9         MS. MONTGOMERY:  Can I check my notes a second?

10                      (Pause.)

11        MS. MONTGOMERY:  Your Honor, I think as part of Ms.

12 Milner's declaration -- and there was no objection -- there was

13 no objection to the actual testimony or the exhibits, other

14 than Mr. Mahaffey doesn't think that exhibits were appropriate

15 -- Ms. Milner authenticated each of the exhibits that are

16 attached to her declaration, and I would ask that the Court

17 agree to admit all of those exhibits.  And that's 1 through --

18        THE COURT:  Well, we have -- I have already received

19 -- we already have 5, 7, 9, 28, and 29 and 8 all received.

20        MS. MONTGOMERY:  And I think 28 and 29 were --

21        THE COURT:  Yeah, they're already received, so --

22        MS. MONTGOMERY:  So the balance --

23        THE COURT:  So we have 1 -- no, I'm sorry.  We have

24 5, 7. 8, 9, and 28 and 29 of the exhibits that are attached

25 have been received already.

1        So you're asking that the remaining ones be received?

2        MS. MONTGOMERY:  Yes.

3        THE COURT:  All right.  So we have, let's see, 1 --

4        MS. MONTGOMERY:  I think 12 was -- 12 was previously

5  discussed and should be admitted.

6        THE COURT:  Yeah.  There are a number that were

7  discussed, but they weren't formally moved, so --

8        MS. MONTGOMERY:  You had indicated that I could move

9  for their admission at the time that I was doing the redirect,

10 so that's what I am doing.

11       MR. MAHAFFEY:  We have objections to these.  There's

12 a lack of foundation.

13       I have exhibits for the debtor, but because of the

14 Court's sentence, I interpreted it in good faith as not

15 requesting --

16       THE COURT:  Well, all right.  Why don't we just --

17       MS. MONTGOMERY:  He did not state any objections to

18 the individual documents or to any of her testimony.  I went

19 through his declaration and filed a specific evidentiary

20 objection.

21       THE COURT:  Well, why don't we -- okay.  Why don't we

22 look through -- all right.  So --

23       MR. MAHAFFEY:  And if we have the right to put on --

24       THE COURT:  Yeah.  Why don't we go through the

25 exhibits.  All right.

Milner - Redirect/Montgomery                    273

1          So Exhibit 1 --

2          MS. MONTGOMERY:  She has testified that's -- in her

3    declaration, that's a leadership team and executive committee

4    meeting that she was present at.

5          MR. MAHAFFEY:  Your Honor, if I may be heard.  May I

6    be heard briefly on this?

7          THE COURT:  Well, not yet.  Okay.  I'm just trying to

8    find out where it's discussed in the testimony.

9          MS. MONTGOMERY:  It should be pretty much in

10   chronological order.

11         THE COURT:  All right.  So --

12         MS. MONTGOMERY:  Paragraph 9.

13         THE COURT:  So it says -- so it talks about the

14   leadership team and --

15         MS. MONTGOMERY:  Most important, Mr. Gibson, their

16   attorney, says -- he reports at that meeting that Ms. Milner,

17   not CCM -- that she was not on the payroll and that the play

18   itself was -- was all her creative property.

19         THE COURT:  Well, that's really in her testimony

20   anyway.

21         MS. MONTGOMERY:  Well, it's in her testimony, but I

22   think it's --

23         THE COURT:  Yeah, her testimony is -- all right.

24   Okay.  Okay.  Sustained.  Not received.  You already have the

25   testimony that says what it says, so --

Milner - Redirect/Montgomery                274

1              MS. MONTGOMERY:  Okay.

2              THE COURT:  All right.  You don't really need the

3    notes.

4              MS. MONTGOMERY:  Well, a lot of this then I don't --

5    then we don't need.

6              THE COURT:  Yeah.  It seems to me you don't really

7    need all of these exhibits anyway.

8              Really the ones that are the important ones that I

9    think were already discussed or were discussed during the live

10   examination.  Well, I'm not sure you really -- really --

11             MS. MONTGOMERY:  We'd like exhibits -- we'd like --

12             THE COURT:  Do you want to offer 12, since that was

13   discussed?

14             MS. MONTGOMERY:  Yes, I'd like to offer 12.

15             THE COURT:  Okay.  12 is received.

16                  (Exhibit 12 Received in Evidence)

17             THE COURT:  It was part of cross-examination.

18             MS. MONTGOMERY:  And Exhibit 13, which was the

19   response to 12.

20             THE COURT:  Was that also discussed?

21             MS. MONTGOMERY:  Yes.

22             THE COURT:  That was also discussed during the

23   testimony.

24             MS. MONTGOMERY:  And Exhibit 14 was discussed

25   regarding the lights.

Milner - Redirect/Montgomery                275

1           THE COURT:  All right.  So since they were discussed

2    with her testimony, okay, received.

3               (Exhibits 13 and 14 Received in Evidence)

4           MS. MONTGOMERY:  Okay.

5           THE COURT:  It's all about the lights.

6           MS. MONTGOMERY:  Mr. Mahaffey brought up Exhibit 15.

7    Now, I don't know if you consider it, but 15 and 16 is the --

8    is the response to it.  So --

9           THE COURT:  15 and 16 --

10          MS. MONTGOMERY:  I think he brought up Exhibit 15.

11          THE COURT:  And 16.

12          MS. MONTGOMERY:  But, again, this is post

13   confirmation.

14          MR. MAHAFFEY:  I don't remember any reference to

15   Exhibit 15.

16          MS. MONTGOMERY:  Okay.  That's fine.

17          THE COURT:  All right.  You made a reference to 15,

18   right --

19          MS. MONTGOMERY:  Okay.

20          THE COURT:  -- Mr. Mahaffey?

21          MS. MONTGOMERY:  Yeah, I thought he did.

22          THE COURT:  I thought you asked her about it.  I

23   don't remember 16.

24          MS. MONTGOMERY:  I know, but 16 is the response.  So

25   if 15 is coming in, she's testified --

Milner - Redirect/Montgomery                    276

1            THE COURT:  Okay.  You're offering 15?  I don't

2    remember any discussion about 16 and the response.

3            MS. MONTGOMERY:  No, it wasn't, but 16 is the

4    response to --

5            THE COURT:  Yeah, well, but it wasn't really

6    discussed.  All right.  So they're offering 15 and 16, Mr.

7    Mahaffey.

8            MR. MAHAFFEY:  Well, the same position I took before.

9            THE COURT:  All right.  Sustained.  Not in.

10           MS. MONTGOMERY:  Okay.

11           THE COURT:  It seems to me that the documents -- you

12   already have the discussion of the testimony that kind of

13   summarize these documents anyway, so I don't think you really

14   need them.

15           MS. MONTGOMERY:  Well, they do summarize them, but I

16   would probably --

17           THE COURT:  You don't really need them.

18           MS. MONTGOMERY:  I would argue best evidence to some

19   extent.

20           THE COURT:  I'm sorry?

21           MS. MONTGOMERY:  I would have argued best evidence to

22   the extent that her testimony was citing to or quoting some of

23   these particular documents, but since she --

24           THE COURT:  I'm going to sustain the objection.

25           MS. MONTGOMERY:  Okay.

1           THE COURT:  All right.  Do you have any other

2   questions of the witness?

3           MS. MONTGOMERY:  No, Your Honor.

4           THE COURT:  All right.  Any recross?

5           MR. MAHAFFEY:  Briefly.

6           THE COURT:  All right.

7                      RECROSS-EXAMINATION

8   BY MR. MAHAFFEY:

9   Q    Ms. Milner, when this document that you drafted --

10          THE COURT:  I'm sorry.  Which document are we

11  referring to?

12  BY MR. MAHAFFEY:

13  Q    Schedule 1 of Exhibit 7 was drafted, did you have an

14  understanding that you were going to restage this play at some

15  point?

16  A    It certainly was my hope.

17  Q    So your -- so there was a good faith understanding between

18  you and the Ministry that if you were going to restage the

19  play, then the items that you would need that were created

20  uniquely or bought uniquely for the play would go to you,

21  correct?

22  A    They were to go to me no matter what.  I was allowed to

23  restage it or not restage it.  I could do anything I wanted to

24  with them.

25  Q    Okay.  So but the reason you entered into the agreement is

Milner - Recross/Mahaffey                    278

1 because you wanted to receive ownership of certain items so

2 that you could restage the play?

3 A     I wanted ownership of the items to settle the agreement

4 and the dispute, and that way I had the right to restage the

5 play if I wanted to.

6 Q     So the purpose was so that you could in good faith restage

7 the play sometime?

8 A     It was to do anything I wanted to with the property.

9 Q     Okay.  But they were show specific.  Or there is some use

10 of them besides the play?

11 A     Possibly.

12 Q     Well, do you have a value today of the ones that are

13 available besides the play?

14        MS. MONTGOMERY:  Objection, Your Honor, because this

15 goes to the value -- to Ms. Milner's valuation, not to what

16 they would be worth to CCM.

17        MR. MAHAFFEY:  No, it goes to the executory --

18        THE COURT:  Yeah, I was going to say, are you asking

19 about her value?  Right.  Well, it depends on, you know, she

20 says, you know, for her it's priceless because it's relating to

21 her creative acts.

22        And I'm not sure that -- you're asking her to value

23 it as far as her market value objectively or --

24        MR. MAHAFFEY:  The cases that have looked at this,

25 the reviewing courts of appeal, the Ninth Circuit, have looked

1 at this topic.  And this topic --

2          THE COURT:  I'm sorry.  What topic?

3          MR. MAHAFFEY:  The topic of executory obligations for

4 a party who claims the other side is storing their documents.

5          THE COURT:  Right.  Right.  So what does this have to

6 do with --

7          MR. MAHAFFEY:  If it's -- if it's worthless, then

8 thee may not be.

9          THE COURT:  Well, she's not -- I don't think she's

10 going to testify --

11          MR. MAHAFFEY:  Well, if it's --

12          THE COURT:  She's not going to testify it's

13 worthless.  She's going say it's priceless.

14          MR. MAHAFFEY:  Well, let her testify to that, because

15 if it's priceless, the Ninth Circuit compels it to be

16 executory.  So that's the law.

17          If you've got a priceless item -- let's say you've

18 got a priceless, rare automobile in my possession that you own

19 that's priceless, this thing is so valuable it's priceless, you

20 have a duty to inspect it if you think rodents are eating it.

21          So this is probative to the Ninth Circuit test that

22 if you have an executory responsibility -- there is no question

23 that if you claim it's priceless, you have an executory future

24 duty if you don't.  If you don't exercise your part of the

25 contract to exercise reasonable inspection on a regular basis,

Milner - Recross/Mahaffey                    280

1 you have waived your right to say that this is a priceless item

2 the other side has to store, so the contract is terminated and

3 rejected.

4          If it's worthless, if these are such unique -- I

5 mean, these are non-valuable items.  They have no market value.

6 Then you could suggest, "Hey, there's no reason for me to have

7 any responsibility on my side of the equation to go inspect

8 them.  They're worthless."

9          So you need a record for the Ninth Circuit to review

10 this to see why it is that this position of this witness is is

11 that she doesn't have any executory responsibilities --

12          THE COURT:  Well, but --

13          MR. MAHAFFEY:  -- to inspect her priceless items.

14          THE COURT:  But I don't know if she's qualified as an

15 expert, so --

16          MR. MAHAFFEY:  Well, she's the owner.  You don't have

17 to qualify.  The state --

18          THE COURT:  Well, if she's the owner then --

19          MR. MAHAFFEY:  She can have an opinion.

20          THE COURT:  If she's the owner of the property, then

21 -- okay, because you're arguing that she's not the owner

22 because there is no contract.

23          MR. MAHAFFEY:  Well, we are arguing that, but if she

24 -- the Court hasn't ruled.

25          THE COURT:  Okay.  She may be qualified to give an

1 opinion of value if she's the owner, but I don't know if you

2 concede --

3          MR. MAHAFFEY:  We're not conceding that she's the

4 owner.  Of course we're not.

5          THE COURT:  Well, then --

6          MR. MAHAFFEY:  But if we can't --

7          THE COURT:  Then I'm not going to ask her --

8          MR. MAHAFFEY:  We'd have to bifur --

9          THE COURT:  -- to give testimony, because she -- you

10 have to qualify her as an expert.  She's not an expert to value

11 this property.

12 BY MR. MAHAFFEY:

13 Q    Well, is there anybody more qualified than you, Ms.

14 Milner, as to the value?

15          THE COURT:  Okay.

16 BY MR. MAHAFFEY:

17 Q    Of every human being on the face of the earth besides you?

18          THE COURT:  It doesn't matter, because, you know --

19          MR. MAHAFFEY:  Well, experts --

20          THE COURT:  -- she has to be qualified as an expert

21 under scientifically validated principles, and you haven't done

22 that.

23          And, you know, you don't concede that she's the

24 owner.  If you concede she's the owner, then she can give an

25 opinion.  But as an exception to 702, valuation is normally a

1 subject of expert testimony; isn't that right?

2          MS. MONTGOMERY:  Yes.

3          THE COURT:  So you have to qualify her as an expert.

4 I don't think she qualifies as an expert, because you haven't

5 shown that she has conducted the scientifically valid method of

6 valuating personal property, which is usually, you know,

7 someone who has an understanding of the market and has

8 experience in valuing these things.

9          She doesn't have any training, as far as I know.

10          MR. MAHAFFEY:  Your Honor, I think --

11          THE COURT:  Unless you concede she's the owner, and

12 then she can give a lay opinion under 701.

13          MR. MAHAFFEY:  Could we have a conditional receipt of

14 the testimony?

15          THE COURT:  No.  No.  You're not -- you can't offer

16 opinion unless you concede she is the owner.  Otherwise it's

17 inadmissible.

18          MR. MAHAFFEY:  Well, I think the Court would have to

19 -- you know, in fairness, the Court would have to bifurcate the

20 issue of ownership and issue a finding.

21          THE COURT:  No, I don't think so.

22          MR. MAHAFFEY:  And then if you found that -- then we

23 could talk about --

24          THE COURT:  No, I'm not going to bifurcate it.

25          MR. MAHAFFEY:  It's unfair --

1          THE COURT:  If I find that she's the owner, then you
2  say it's priceless.

3          MR. MAHAFFEY:  I don't know what her testimony would
4  be.  I'm just trying to --

5          THE COURT:  Okay.  You're saying that she has a duty
6  to inspect the property if it's priceless?  Well, I don't know.
7  I'm not sure if I agree with that.  I don't know if there's
8  authority that supports that.  Where is that -- is that cited
9  in your briefing?

10         MR. MAHAFFEY:  Yes.

11         THE COURT:  Okay.  Where is that cited in your
12 briefing?

13         MR. MAHAFFEY:  I think I cited the Ninth Circuit
14 cases on executory contracts involving --

15         THE COURT:  Okay.  Which -- which pleading is this?

16         MR. MAHAFFEY:  You know, I'm not certain.

17         THE COURT:  Well, which pleading are we talking about
18 that you say that she has a duty to inspect her property if
19 it's priceless?  So where is that?

20         And you're saying it's a Ninth Circuit opinion.
21 Well, it should be easy to track down.

22         MS. MONTGOMERY:  Except there is no table of
23 authorities.  That makes it a little more difficult.

24         THE COURT:  I've never heard of such a thing, but,
25 you know, I could be wrong about that.

Milner - Recross/Mahaffey                284

1          MR. MAHAFFEY:  I've got the case cite somewhere that

2    I found, and I know it's a Ninth Circuit case that looked at

3    this issue.

4          THE COURT:  Yeah, well, you know, I'm looking at your

5    brief.  So tell me, which one are we talking about?

6          MR. MAHAFFEY:  I'm not finding it in this brief

7    unless it's --

8          THE COURT:  Okay.  You can file a post-trial brief,

9    but I'm not going to let her testify about valuation unless --

10          MR. MAHAFFEY:  I'll move on.

11          THE COURT:  -- unless she's qualified.

12          MR. MAHAFFEY:  I would accept that.  The offer of

13    proof is that the probative opinion of Ms. Milner to what it is

14    we're debating is probative to the executory --

15          THE COURT:  Well, yeah, if she's the owner.

16          MR. MAHAFFEY:  I understand, but there is no way to

17    try the sufficiency without bringing both issues together.  We

18    could have -- it's not efficient, so the Court --

19          THE COURT:  Well, I guess we might have to have a

20    retrial then.  All right.

21          She's not the owner.  You're not conceding she's the

22    owner.

23          MR. MAHAFFEY:  We're not conceding the contract was

24    formed for the very reasons we've articulated.

25          THE COURT:  Right.  Right.  That's right.  So --

1              MR. MAHAFFEY:  Any attorney might -- I mean --

2              THE COURT:  So ask her a different question, then.

3              MR. MAHAFFEY:  Okay.

4  BY MR. MAHAFFEY:

5  Q    So, Ms. Milner, looking at Exhibit 28 --

6              MS. MONTGOMERY:  And that's not her exhibit.

7              MR. MAHAFFEY:  I understand, but counsel on -- on

8  redirect, counsel asked you --

9              THE COURT:  I'm sorry.  On Exhibit A -- okay, 28.

10 Okay.  So --

11 BY MR. MAHAFFEY:

12 Q    You were aware that CCM's counsel was articulating the

13 clear position that it does not believe the settlement

14 agreement is valid because it was a self dealing transaction

15 that was not reviewed or ratified by the CCM's board of

16 directors.  That was key to the dispute over this alleged duty

17 to store, correct?

18             MS. MONTGOMERY:  Objection, Your Honor, particularly

19 since Exhibit 29, which you sustained an objection to and

20 didn't allow in, is the response to it.

21             THE COURT:  No, 29 and -- 28 and 29 are in.

22             MS. MONTGOMERY:  They are in?  Okay.

23             THE COURT:  Yeah, they're in.  They're both in.

24             MS. MONTGOMERY:  Okay.  Well --

25             THE COURT:  Yeah, they're both in, because you, I

1 think you --

2              MS. MONTGOMERY:  I said --

3              THE COURT:  Yeah, that --

4              MS. MONTGOMERY:  Okay.

5              THE COURT:  That he offered them, he offered your

6 exhibits, and you didn't object, as I recall.

7              MS. MONTGOMERY:  Okay.

8              THE COURT:  Yeah, they're in.

9 BY MR. MAHAFFEY:

10 Q    So, Ms. Milner, when your counsel asked you and directed

11 you on redirect that the only dispute was picking up the items,

12 in correct testimony, the dispute, as articulated by the

13 Ministry's counsel, is they said the settlement agreement is

14 not valid because it was a self dealing transaction.

15              Do you have that exhibit in front of you?

16 A    Uh-huh.

17 Q    Do you see that sentence?

18 A    Yeah, I do.

19 Q    Okay.  So backing up, where it says, "Ms. Milner has

20 contended that CCM has failed to provide her an inventory of

21 the Creation items and that various Creation items are missing

22 or have been damaged," that's your position today, right, that

23 CCM may have damaged your items by letting them deteriorate,

24 true?  Or are you not saying that?

25 A    No, that I picked up all the items from the warehouse and

1 from the campus.

2 Q    Okay.  So you're not making any claim that CCM has damaged

3 any of the items that are -- that you quote on?

4 A    Well, the only items that I'm worried about that still

5 exist are in the trailers, and, to the best of my knowledge --

6        THE COURT:  Well, she doesn't -- I think her argument

7 is she doesn't know.  She wants to see, but isn't allowed

8 access, as I understand.

9        THE WITNESS:  Yeah.  I wouldn't expect them to be.

10        THE COURT:  But --

11        THE WITNESS:  Yeah.

12        THE COURT:  You know, but, you know --

13 BY MR. MAHAFFEY:

14 Q    You've not been allowed --

15        THE COURT:  But I think you're right that the -- you

16 know, she testified the only dispute is regarding the trailer

17 ride.  I'm saying what you're pointing out is that the debtor

18 also disputes whether or not it was a arms length -- you know,

19 the contract is valid, so --

20        MS. MONTGOMERY:  Your Honor, they can't make that

21 argument, because this letter --

22        THE COURT:  Well, I don't know.  They're making it

23 now.  And, you know, I guess the Court will consider it for

24 what it's worth.

25        But I think that's really more a state court matter.

Milner - Recross/Mahaffey                288

1          MS. MONTGOMERY:  But it's a 2012 letter.  It's post

2  confirmation.

3          THE COURT:  Yeah, I know, but it may be -- you know,

4  I was going to say, that's probably a state law matter, but I

5  don't know.

6          MS. MONTGOMERY:  Well, the statute of limitations.

7          MR. MAHAFFEY:  Pre -- pre-confirma --

8          THE COURT:  So why don't you -- okay.  So do you have

9  a follow-up question?

10 BY MR. MAHAFFEY:

11 Q    So would you agree that for more than the last ten years

12 -- let's break it down in five years.  For at least five years,

13 you have known that CCM claims that this contract is not valid,

14 true?

15 A    No, I don't believe that.

16 Q    Well, this is a 2012 letter, and your counsel directly

17 asked you --

18          THE COURT:  Well --

19 BY MR. MAHAFFEY:

20 Q    You said you had read it.

21 A    My counsel replied to it.

22          THE COURT:  Yeah, but what does that have to do with

23 whether or not the contract is executory or not?

24 BY MR. MAHAFFEY:

25 Q    Because why, if you knew that CCM in 2012 and earlier took

Milner - Recross/Mahaffey                     289

1 the position that you not only didn't own it but obviously then

2 wouldn't have a right to possess it, what was your side of the

3 coin to go and inspect the items to make sure --

4 A    My attorney responded to them.

5 Q    Right.

6 A    And then they continued to discuss it, and they just

7 basically said, "Look, just pick it up."

8         And we kept saying, "Sure, I'll pick it up.  I don't

9 mind.  I don't mind picking up the stuff.  Just make it

10 accessible to me, and I'll make the specific arrangements."

11 Q    So where is it in the contract that CCM has to make it

12 accessible?

13 A    Well, practically, I just could not pick up something that

14 wasn't accessible.

15 Q    No, no.  The trailers are accessible just as to you as to

16 them, right?  We can both drive there today and get to the

17 trailers.

18 A    We didn't even know where they were.

19 Q    You're saying before the bankruptcy petition you didn't

20 know where the items were?  I thought you said you got some of

21 them.

22 A    From the warehouse on the campus, not the trailers.

23 Q    Well, where were all the items that you claim you own?

24         MS. MONTGOMERY:  Asked and answered, Your Honor.

25         THE WITNESS:  I'm sorry.  I'm not following.

1      THE COURT:  Well, they're in trailers, but it's a

2 question who had control of the trailers.

3      Who had control of the trailers?  You know, the

4 debtor did.

5      MR. MAHAFFEY:  So the debtor --

6      THE COURT:  You know, because the trailers are the

7 debtor's property.  So unless the debtor gave, you know, Ms.

8 Milner access, she can't go, you know, inspect the trailers on

9 her own.

10      MS. MONTGOMERY:  She can't move the trailers.

11      THE WITNESS:  I can't even touch them.

12      THE COURT:  Well, I was going to say, yeah, I don't

13 know -- because that's not -- you know, apparently the trailers

14 were put on some storage site that the -- that the debtor

15 leased, and apparently was having problems making available to

16 her.

17      So the trailers aren't hers, so why --

18      MR. MAHAFFEY:  So you've -- under storage law, Your

19 Honor -- so under all storage law -- so this is the Ninth

20 Circuit opinion that I'd like to file a supplemental brief on

21 -- under basic storage laws, the responsibility that's

22 executory is established.

23      If you own items and you're storing it, somebody else

24 is storing from you, you have an affirmative duty to make sure

25 you have access, inspection, and control.

1         So it is executory, because particularly if they're

2  priceless.

3         THE COURT:  Well, I guess -- is that in your brief?

4         MS. MONTGOMERY:  No.

5         MR. MAHAFFEY:  It's -- it's part of the executory

6  argument, but I found some additional authority that I didn't

7  see in this brief.

8         THE COURT:  All right.  So then --

9         MR. MAHAFFEY:  I'll provide that.

10        THE COURT:  All right.  So you want to file a

11 supplemental brief?

12        MR. MAHAFFEY:  Yes.

13        THE COURT:  All right.

14        MS. MONTGOMERY:  I think that's a brand new issue,

15 Your Honor, that he's --

16        THE COURT:  Well, he's going to -- you know, if it's

17 in evidence then, you know, I suppose he can make an argument

18 based on what's in evidence.

19        So you can conform the pleadings to what evidence

20 comes in.

21        MR. MAHAFFEY:  Thank you.

22 BY MR. MAHAFFEY:

23 Q   Was there some responsibility, Ms. Milner, for a mutual

24 good faith relationship that at some point your duty was to

25 come retrieve these items so that CCM did not have to store

Milner - Recross/Mahaffey                292

1 them for time immortal?

2 A    I continually did all I could.  If they asked me to

3 cooperate, I said, "Let's just work it out and how I can do

4 that."  And --

5 Q    So what efforts --

6 A    And then they would get busy and they would go away and go

7 quiet and --

8 Q    Okay.  So it's been 10 years now.  We're going on 11

9 years.

10 A    Uh-huh.

11 Q    So tell the Court what efforts you made, based on this

12 implied covenant of good faith, that you would at some time

13 come get your items.  Tell the Court what --

14        MS. MONTGOMERY:  Objection.  There is no -- that asks

15 for a legal conclusion, suggesting that it's of good faith.

16        THE COURT:  Yeah.  Sustained.

17 BY MR. MAHAFFEY:

18 Q    Okay.  So let's back up.  So your position to this court

19 on this record is that there was never any responsibility for

20 you in good faith to come get these items that you say may be

21 priceless?

22 A    Absolutely not.

23 Q    Okay.  That's your testimony.  So --

24 A    I could have -- I could --

25        THE COURT:  No, no.

Milner - Recross/Mahaffey                    293

1          THE WITNESS:  Okay.  Sorry.

2          THE COURT:  Okay.  Just wait until his next question.

3          THE WITNESS:  Yep.

4          THE COURT:  All right.  You're not supposed to argue

5  with the --

6          THE WITNESS:  Yeah, sorry.

7          THE COURT:  -- examiner.  Just answer the question.

8  BY MR. MAHAFFEY:

9  Q    So it's your understanding that you had no responsibility

10 to -- when you drafted this, the understanding between the

11 parties, the meeting of the minds were they were going to store

12 these for decades and decades and decades and you never had to

13 come get them?

14 A    Possibly.

15 Q    Possibly.

16 A    I could come get them if I wanted.

17 Q    Okay.  So it was -- basically, what the Ministry said is

18 that we will store them forever, and if you choose at any time

19 in the next -- in your lifetime to come get them, or anybody's

20 lifetime after yours, you may do so, or you may make us pay for

21 --

22         MS. MONTGOMERY:  Asked and answered and calls for

23 speculation.

24         THE COURT:  Well, let me ask, who drafted this

25 contract?

Milner - Recross/Mahaffey                294

1          MR. MAHAFFEY:  Mrs. Milner.

2          THE WITNESS:  No, I didn't.

3          THE COURT:  No.

4          MR. MAHAFFEY:  No, no, that document is --

5          THE COURT:  Well, I was going to say, who drafted the

6  contract?

7          MR. MAHAFFEY:  Mrs. Milner drafted this page.

8          MS. MONTGOMERY:  No, it's counsel, Mr. Gibson and Mr.

9  Margolis.

10          MR. MAHAFFEY:  Well, wait a second.  Wait a second.

11          THE COURT:  Well, I was going to -- I was going to --

12          MR. MAHAFFEY:  That's not what she testified to.  I

13  asked her --

14          THE COURT:  Well, she drafted -- she only drafted --

15  her testimony was only --

16          MS. MONTGOMERY:  One page.

17          THE COURT:  -- a schedule, not --

18          MR. MAHAFFEY:  Right.  So Schedule 1 is what we're

19  talking about.

20          So that ambiguity, construed against the drafter --

21          THE COURT:  Well, I don't know who the drafter was.

22  She only drafted the schedule.  So if you're arguing the

23  schedules, that's one thing.  But if you're arguing --

24          MR. MAHAFFEY:  Well, that's what we're talking about.

25          THE COURT:  -- the agreement itself, that's a

Milner - Recross/Mahaffey                    295

1  different thing.

2          MR. MAHAFFEY:  Okay.  Let me rephrase then, so maybe

3  I'll make my question clear.

4          THE COURT:  Right.

5  BY MR. MAHAFFEY:

6  Q    I'm looking at your position as to this clause on the

7  schedule that you drafted.

8          THE COURT:  Well, I'm not even sure it's ambiguous.

9  You know, apparently --

10 BY MR. MAHAFFEY:

11 Q    So it's clear from your per --

12         THE COURT:  Well, it would seem to me that at this

13 point that the church agreed to hold the stuff until a

14 particular time.  So I don't know why the church didn't come

15 after her earlier to ask her to pick up the stuff if it didn't

16 want to store the stuff.

17         MS. MONTGOMERY:  We've identified and produced

18 documentation --

19         THE COURT:  Yeah, so -- yeah.  I don't know.  When

20 they rejected the contract, why didn't they ask her to pick up

21 the stuff in 2011?  I don't know.

22         MR. MAHAFFEY:  They did.

23         MS. MONTGOMERY:  They did not.

24         MR. MAHAFFEY:  Okay.  Well, let's look at Exhibit 29

25 and see what the demand of our counsel is.

1          THE COURT:  29?  All right.  So, well, that's really

2  argument.  Okay.

3          So do you have any further questions of the witness

4  before I ask her to step down?

5          MS. MONTGOMERY:  It's 2012, by the way.  It's after

6  confirmation.

7          THE COURT:  It's 2012.  That's a year afterwards.

8  That's a year afterwards.  That's post-confirmation.

9          MR. MAHAFFEY:  We have -- we have exhibits going all

10 the way back --

11          THE COURT:  Okay.  Well, let me ask you this.  Do you

12 have any further questions of the witness?  Why don't you ask

13 them?

14 BY MR. MAHAFFEY:

15 Q    Okay.  Ms. Milner, what was the time frame that you

16 understood at some point that there would be no longer a duty

17 to store?

18 A    There was no time frame, because --

19          THE COURT:  Right.

20          THE WITNESS:  -- multiple years.

21          THE COURT:  That's the answer.  Don't explain.

22 There's -- was there any time frame?

23          THE WITNESS:  There was no time frame.

24          THE COURT:  No.

25 BY MR. MAHAFFEY:

1 Q    So when you drafted this contract, there was no deadline

2 at all for you to ever --

3        MS. MONTGOMERY:  Objection.  She did not -- there is

4 no testimony that she drafted this contract.

5        THE COURT:  All right.  Sustained.  She drafted the

6 schedule and the language about, you know, storing the stuff in

7 good condition.  All right.  Next question.

8 BY MR. MAHAFFEY:

9 Q    When you drafted the language that CCM will keep all goods

10 in the same condition as they were at the end of the '05

11 season, was there any end date to that?

12 A    Not to my knowledge.

13 Q    Did you discuss it with anybody --

14 A    No.

15 Q    -- from CCM?

16 A    No.

17 Q    So what was CCM's understanding of that sentence?

18 A    I think they planned on keeping it for as long as

19 necessary.

20 Q    Well, how do you know that?  What was the mutual

21 agreement?

22        THE COURT:  Well, it speaks for itself.  All right.

23 All right.  So --

24        MS. MONTGOMERY:  Let me ask -- can I --

25        THE COURT:  No.

1          MS. MONTGOMERY:  -- ask just one --

2          THE COURT:  That's it.  Recross is it.  All right.

3  All right.  Ms. Milner, you may step down.

4          (Witness excused.)

5          THE COURT:  So any other witnesses on behalf of the

6  respondents?

7          Mr. Light's testimony has already been received as

8  his direct, and there is no cross-examination.  So any other

9  witnesses?

10         You may step down, Ms. Milner.  You can leave it on

11  the -- thank you.

12         Yes?

13         MS. MONTGOMERY:  I was unaware that Mr. Grumer needed

14  to be here, but to the extent -- for a cross-examination, but

15  --

16         THE COURT:  Well -- well, what I was going to say is

17  that, you know, I can do it this way.  We can let in the

18  declarations of both sides, and then --

19         MS. MONTGOMERY:  But I have -- I have specific

20  objections to her declaration.  I don't mind if you want to

21  take her --

22         THE COURT:  Okay.  Okay.  So she's not available for

23  cross-examination, but --

24         MS. MONTGOMERY:  But that's separate and apart from

25  what --

1          THE COURT:  Okay.  So should I just let in all the

2   declarations and we can just rule on objections?  Is that

3   agreeable?

4          MS. MONTGOMERY:  Yes.  Let's rule on -- yes, let's

5   rule on the objections.

6          MR. MAHAFFEY:  I mean, with fairness to my client, we

7   would like to cal Ms. Myers.  She's --

8          THE COURT:  Well, you have her direct in, so whatever

9   you want to put in, it's in her direct.  You have her direct.

10  So, basically, I'll allow her direct in, and then I'll just

11  rule on the objections.

12          Is that all right with both sides?

13          MS. MONTGOMERY:  Yes.

14          MR. MAHAFFEY:  We would like her to be here, because

15  --

16          THE COURT:  No.

17          MR. MAHAFFEY:  -- the objections --

18          THE COURT:  Well -- all I -- you know, you want me to

19  consider her declaration.  You know, her direct is her direct.

20          MR. MAHAFFEY:  I am -- I'm trying to be reasonable.

21  The objections are lack of foundation.

22          THE COURT:  Well, yeah.  Yeah.

23          MR. MAHAFFEY:  They're lack of foundation.  They're

24  lack of foundation.  So if I don't have a witness --

25          THE COURT:  Well, what I was going to say is that you

1 have her -- you have Ms. Myers' declaration.  That's her

2 direct.

3       MR. MAHAFFEY:  I understand.  My offer of proof on

4 how we would respond to the lack of foundation is she would be

5 here to lay it.

6       Now, for --

7       MS. MONTGOMERY:  No, I'm sorry.  That doesn't work.

8       THE COURT:  No, she can't do that.  A lack of

9 foundation of what?

10       MR. MAHAFFEY:  The objections.  Their objections to

11 her -- as I understand it -- and I want to back up to be sure I

12 understand.

13       THE COURT:  Yeah.  I said I'll just rule on the

14 objections and I'll just let -- I'll otherwise receive, which

15 the Court overrules the objections.

16       MR. MAHAFFEY:  I understand.  The ruling on the

17 objections for lack of foundation ordinarily is addressed by

18 the witness laying the foundation.

19       THE COURT:  Yeah, but she's not here, though.

20       MR. MAHAFFEY:  I understand.

21       THE COURT:  Well, anyway, but the thing is that the

22 lack of foundation, you know, you should have provided a

23 foundation in the --

24       MR. MAHAFFEY:  Well, we're not conceding we didn't,

25 but normally what would have happened, just --

1          THE COURT:  Yeah, normally, you would have her here,

2 and then if you need to fix it, you can fix it with her being

3 here, but she's not here.

4          MR. MAHAFFEY:  Well, she's simply unavailable.

5          THE COURT:  Well, yeah, but --

6          MR. MAHAFFEY:  I'm an attorney.  I can't control --

7          THE COURT:  -- whose problem is that?  So do you want

8 me -- do you want --

9          MS. MONTGOMERY:  Yes.

10          THE COURT:  Okay.  I was going to say for both sides,

11 you know, I'll consider the direct testimony, even though the

12 witness is not here, but I'll rule on the objections.

13          MR. MAHAFFEY:  Could we have one hour to bring her

14 sometime next week?

15          THE COURT:  No.

16          MS. MONTGOMERY:  No.

17          THE COURT:  No.  This is supposed to be a limited

18 hearing.  I didn't think it was going to last all day.  It was

19 only to be whether the contract is executory or not, which

20 usually you look at the face of the document.

21          MR. MAHAFFEY:  But the Court had made a ruling to

22 begin with that there were two pivotal issues today and that if

23 the Court found ambiguity into the formation of the agreement

24 --

25          THE COURT:  Yeah, if there's -- if a document is --

1 is ambiguous, then, you know, we might consider a factual

2 finding on parol -- and receive parol evidence, but --

3          MR. MAHAFFEY:  The document says it's got a condition

4 precedent that absolutely is admitted.

5          THE COURT:  Well, that's an argument.  You may win on

6 that argument.  I don't know at this point.

7          So do you want the Court to consider the declarations

8 of these witnesses --

9          MR. MAHAFFEY:  Yes.

10          THE COURT:  -- without cross-examination?

11          MR. MAHAFFEY:  We would like the Court to consider

12 Ms. Myers' declaration.

13          THE COURT:  All right.  Well, then, the Court will

14 rule on the objections, then.  Okay.

15          So and the same is true of Mr. Grumer?

16          MS. MONTGOMERY:  Yes.

17          THE COURT:  Okay.

18          MS. MONTGOMERY:  I don't believe there are any

19 objections, though.

20          THE COURT:  Let's rule on the objections.  So as to

21 -- let's go through Ms. Myers' -- the objections to Ms. Myers'

22 declaration.

23          MS. MONTGOMERY:  This is document 2072.

24          THE COURT:  All right.  So the objections are --

25 let's see.  The lack of signature was cured.  All right.

1    MS. MONTGOMERY:  But, again, it was -- it's dated --
2 it says it was executed on the 7th, and she didn't -- and he
3 didn't even file it until last -- until yesterday.  So there is
4 nothing that suggests it was -- that it's necessarily a real
5 signature.  It wasn't served or anything until yesterday.

6    MR. MAHAFFEY:  No, it's her real signature.  She --

7    THE COURT:  Well, I -- you know --

8    MS. MONTGOMERY:  That's fine.

9    THE COURT:  I'm assuming -- okay.  So it had a --
10 there was a -- what you call it -- electronic signature without
11 the declaration of, you know, I guess the electronic filing
12 declaration.  Okay.  That's what it is.

13    But then there is a -- there is a -- a subsequently
14 filed one that's the same in all respects, except it has a
15 signed signature page, Mr. Mahaffey?

16    MR. MAHAFFEY:  Correct.

17    THE COURT:  All right.  So that's the only
18 difference.  All right.  So I'm going to -- I'm going to
19 overrule the objection on that ground, that there's lacking
20 signature, because they provided that.

21    That's what happens sometimes.  You know, it's hard
22 to get the witness to sign something.

23    So, all right.  So let's look at the substantive
24 objections.

25    MS. MONTGOMERY:  The first one is to paragraph 3.

1           THE COURT:  Paragraph 3.

2           MS. MONTGOMERY:  It's lines 2 through 9.  And the

3 objection is both lack of foundation --

4           THE COURT:  Lack of -- all right.  So best evidence

5 and lack of foundation.

6           Okay.  So do you want to address the objection?

7           MR. MAHAFFEY:  Well, she lays the foundation.  She's

8 a board member.  She received -- there was financial

9 information kept on a daily basis, and she had actual knowledge

10 of the events.

11           And, of course, we had the exhibit that backed this

12 originally part of it, but it was pulled off based on --

13           THE COURT:  All right.  I'm going to overrule the

14 objections because, one, you know, Ms. Milner testified that

15 the church spent this kind of money, pretty close, on these

16 items.  So you think it's particularly relevant, so it goes as

17 to weight.

18           MS. MONTGOMERY:  Okay.

19           THE COURT:  So it's overruled.

20           Now, the next one, the Glory of Christmas Lost $13

21 million.  Do you want address lack of foundation?

22           MS. MONTGOMERY:  I want to address --

23           MR. MAHAFFEY:  It's the same --

24           MS. MONTGOMERY:  There's --

25           THE COURT:  No, I'm asking Mr. Mahaffey.

1          MS. MONTGOMERY:  Oh.

2          MR. MAHAFFEY:  I mean, the foundation is undisputed.

3  It was conceded by Ms. Milner that this was the liaison on this

4  Creation issue.

5          THE COURT:  Yeah.  So what's the relevance of this

6  point?

7          MR. MAHAFFEY:  Because of the authority that if you

8  have this valuable of equipment, you have an affirmative duty

9  to maintain you rights of possession and ownership.

10         THE COURT:  Well, all right.  Well, I'm not sure how

11 Ms. -- you know, there's no foundation as to how they came up

12 with this number, so it's sustained.

13         MS. MONTGOMERY:  Next one, we don't have a problem

14 with 5 and 6.

15         THE COURT:  Okay.  Paragraph 7 -- I mean, paragraph

16 7, it says -- well, isn't that -- that's just foundational, so

17 that's overruled.

18         MS. MONTGOMERY:  There's hearsay.  "I learned with

19 other board members."

20         Who did she learn -- who did she learn from?

21         THE COURT:  Yeah.  That's corroborated by the

22 other -- she was part of these discussions, and so she learned,

23 and, you know, apparently she is just referring to, yeah, it's

24 best evidence, but we have the best evidence, so --

25         MS. MONTGOMERY:  And the best evidence is --

1  contradicts this.

2      THE COURT:  Yes, it's foundational.

3      MS. MONTGOMERY:  But it contradicts this.

4      THE COURT:  What contradicts --

5      MS. MONTGOMERY:  Well, the $190,000 a year for five

6  years is not a correct statement.

7      THE COURT:  Yes.  I thought it was 120.

8      MS. MONTGOMERY:  Well, it's 120, plus there is

9  $70,000 for her -- as a -- for her IP, basically.

10      THE COURT:  That's 190.

11      MS. MONTGOMERY:  It is 190, but it's for four -- but

12  it's for four years.  And it just shows that she doesn't have

13  any personal knowledge.  And she's just referring to --

14      THE COURT:  Yeah, it's just foundational.  So she was

15  involved in it.  Overruled.  I don't think it really -- it's

16  really not going to be that material, in my view.

17      The board agreed with his advice.

18      MS. MONTGOMERY:  We don't know what the advice is.

19      THE COURT:  Yeah, I don't know what his advice is.

20  Do we have Mr. Gibson's advice?

21      MR. MAHAFFEY:  Sure.  We have -- again, we have all

22  these emails.

23      MS. MONTGOMERY:  No.

24      THE COURT:  No, what documents that refer to his

25  advice?

1           MR. MAHAFFEY:  Yes.  I've got them right in front of

2 me.

3           MS. MONTGOMERY:  You don't have any declaration from

4 Mr. Gibson.  There's no authentication of any documents.

5           MR. MAHAFFEY:  But this is just --

6           THE COURT:  Yeah, I don't -- yeah --

7           MR. MAHAFFEY:  This is a matter I can't --

8           THE COURT:  We have -- we have evidence that's

9 contrary to that, including from Ms. -- we have an email from

10 Ms. Myers saying that board approval wasn't necessary.

11           MS. MONTGOMERY:  Right.

12           MR. MAHAFFEY:  And then we have an email afterwards,

13 six months later, that says the board has not approved it and

14 the contracts aren't set.

15           THE COURT:  Yeah, but you didn't need to have the

16 board.

17           MS. MONTGOMERY:  It's not --

18           THE COURT:  And she recommended that, you know, the

19 board -- well --

20           MR. MAHAFFEY:  Before.  Before she did.  And then

21 afterwards, when Mr. Gibson met with the board, they changed

22 that and made it clear, and then she communicated six months

23 later that this contract was not valid.

24           The evidence is in on that.

25           MS. MONTGOMERY:  No, it's not.

1          MR. MAHAFFEY:  It is.  Let's go through it.  It's

2 directly out of the Exhibit 14 email chain that we went through

3 in detail.

4          THE COURT:  Well, I don't --

5          MR. MAHAFFEY:  It's the very part of --

6          THE COURT:  Okay.  Yeah, sustained.  Best evidence.

7 I don't see what his advice was.

8          MR. MAHAFFEY:  His advice, Your Honor, is in the

9 exhibits that --

10          THE COURT:  Sustained.

11          MR. MAHAFFEY:  They didn't object to paragraph 8.

12          MS. MONTGOMERY:  Well, we did.

13          THE COURT:  Well, we're talking about paragraph 9.

14          MS. MONTGOMERY:  We objected to 8, which is what you

15 just sustained.

16          THE COURT:  Oh, yeah.  That's what we just discussed.

17          MS. MONTGOMERY:  Right.

18          MR. MAHAFFEY:  8 is not even objected to.  They

19 waived that objection.

20          MS. MONTGOMERY:  What?

21          THE COURT:  No, that was -- the objection as to

22 paragraph 8, the last one.  All right.

23          Paragraph 9.

24          MS. MONTGOMERY:  It lacks foundation, because there

25 is -- she doesn't describe when discussions took place.  It's

1  --

2          THE COURT:  Well, I was going to say, you know, I

3  don't know --

4          MS. MONTGOMERY:  How she knows --

5          THE COURT:  Yeah.  It lacks foundation.  Sustained.

6          MR. MAHAFFEY:  It does not lack foundation.  She says

7  that despite the numerous discussions --

8          THE COURT:  Well, I was going to say, you can just

9  argue it.  You can just argue.  There is no proof of a

10 quitclaim.  There is no proof of bill of sale.  There is no

11 proof of any -- any document like that.

12         MR. MAHAFFEY:  But she has a specific statement that

13 -- I guess the first sentence I understand.

14         THE COURT:  Yeah.

15         MR. MAHAFFEY:  But the second sentence --

16         THE COURT:  And then she said, "I understood that the

17 plan administrator would have to approve."

18         Well --

19         MS. MONTGOMERY:  How does she know --

20         THE COURT:  -- her understanding is really

21 irrelevant.

22         MS. MONTGOMERY:  Irrelevant.

23         THE COURT:  And --

24         MR. MAHAFFEY:  No.  She's a board member, and that's

25 why there was --

1            THE COURT:  Well, it's irrelevant.  Sustained.  Okay.

2  And then no trust agreement was ever signed.

3            MS. MONTGOMERY:  Well, we've put it -- you have it in

4  front of you.

5            THE COURT:  Yeah, when we have that, it's

6  contradicted by -- you know, we have a trust agreement that she

7  signed.

8            MR. MAHAFFEY:  Had she been available today, she

9  would have clarified that she meant funded.  It's not disputed

10 about the signature.  It's funding.

11           THE COURT:  Okay.  Well, we already have testimony

12 the trust wasn't funded anyway.

13           MR. MAHAFFEY:  Correct.

14           THE COURT:  So you don't need it.  Sustained.  You

15 already have -- you already have admission from Ms. Milner that

16 the trust was never funded.

17           MR. MAHAFFEY:  That's the relevance under 5.2.

18           THE COURT:  Right.  You already -- you already have

19 an admission from, you know, your adverse party that it's never

20 funded.

21           All right.  Paragraph 11.

22           MR. MAHAFFEY:  Goes to the formation issues.  She's

23 involved personally.  She has personal knowledge.  She was a

24 board member.  Her foundation is laid by virtue of the fact

25 that there's an admission she's the liaison and she's

1 communicating clear evidence that the board considered this to

2 be a preliminary document, not formed.

3          THE COURT:  I'm sorry.  What -- who referred -- which

4 board member?

5          MR. MAHAFFEY:  At least one of them is what she

6 states.

7          THE COURT:  Well --

8          MS. MONTGOMERY:  We don't know whether it's a board

9 --

10          THE COURT:  Well --

11          MR. MAHAFFEY:  The disadvantage is --

12          THE COURT:  -- that's kind of like real -- that's

13 kind of like big hearsay.

14          MR. MAHAFFEY:  Well, but --

15          MS. MONTGOMERY:  It's hearsay, which we've argued,

16 and --

17          THE COURT:  Yeah.  It's hearsay, and, you know, this

18 is really, really argument.

19          MR. MAHAFFEY:  Then grant relief for me, Your Honor,

20 for not --

21          THE COURT:  Yeah, I was going to say -- yeah, it's

22 really argument.

23          MR. MAHAFFEY:  Then can you please grant relief for

24 me to offer my exhibits?  I have them with me.  I have this

25 document.  I have the board resolutions.  I have the

312

1  communication.

2          MS. MONTGOMERY:  August 3rd, two thousand and --

3          MR. MAHAFFEY:  How is it fair to my client that I

4  have these exhibits in the courtroom.  You said, "You don't

5  need exhibits."

6          THE COURT:  No, I didn't say --

7          MR. MAHAFFEY:  So I pulled them off the declaration.

8          THE COURT:  I didn't say you don't need exhibits.

9          MR. MAHAFFEY:  You --

10          THE COURT:  I said that I had enough exhibits.

11          MR. MAHAFFEY:  Correct.

12          THE COURT:  But I didn't say you didn't have to --

13  you couldn't submit any.

14          MR. MAHAFFEY:  Well, how does -- how does a

15  reasonable attorney, when a court says, "I have enough

16  exhibits, you don't need them" --

17          MS. MONTGOMERY:  A reasonable attorney understands.

18          THE COURT:  Well, because --

19          MR. MAHAFFEY:  The Court could have issued a minute

20  order when we filed a motion to strike to say, look --

21          THE COURT:  Well, all right.

22          MR. MAHAFFEY:  -- you misunderstood it.  Bring your

23  exhibits.  You're going to need them.

24          I can solve these in hearsay.  I've got the exhibits

25  that back these up.

1          THE COURT:  Well, as I said, what we're talking about

2  is whether or not the contract is executory is really on the

3  face of the contracts.

4          MR. MAHAFFEY:  That's a secondary issue.

5          THE COURT:  Well --

6          MR. MAHAFFEY:  We're talking about whether or not --

7          THE COURT:  -- it's the primary issue, because if the

8  contract is not executory, it wasn't rejected.

9          MR. MAHAFFEY:  I understand.  But if it wasn't

10 formed, there's not a contract to reject.

11         THE COURT:  Well, I think that's a state law issue,

12 in the state court.

13         MR. MAHAFFEY:  Well, it's not a state law issue,

14 because we were positioned in this hearing to present that

15 evidence today, and we --

16         THE COURT:  Well, no, but the claims that you raised

17 were that this is a rejected contract.  You didn't -- in your

18 original motion, you didn't say anything the contract was

19 invalid.  All you said was the contract was rejected and

20 they're trying to -- you know, the respondents are trying to

21 enforce a rejected contract, so they're in violation of the

22 discharge injunction.

23         There was nothing about the contract being, you know,

24 invalid.  And I think that's also true in the state court

25 complaint.  I didn't see anything in the state court complaint

314

1 saying the contract was invalid.

2        You know, maybe it was invalid, but that's not pled

3 anywhere.  So, all right.  Sustained.

4        All right.  So paragraph 13 is -- well, all right.

5 That's -- she just said -- okay.  That's overruled.  That's her

6 testimony of what she said she did.

7        And the same is true with --

8        MS. MONTGOMERY:  These are best -- these are best

9 evidence objections.

10        MR. MAHAFFEY:  That should not be sustained.  We've

11 got --

12        THE COURT:  No, no.  I haven't -- okay.  Paragraph

13 14.  So her email of --

14        MR. MAHAFFEY:  It's her personal knowledge that she

15 wrote the email, which I have with me that communicated.

16 That's not best evidence.

17        THE COURT:  The contract -- I wrote her and stated

18 that the contract is a certain amount, need to approve it.

19        MS. MONTGOMERY:  Yeah.  It doesn't give you the full

20 context.  It doesn't give you response.

21        THE COURT:  Well, all right.  It goes as to -- it

22 goes as to weight.  All right.  You know, it's -- it's --

23        MS. MONTGOMERY:  But they are responsive documents.

24        THE COURT:  Okay.  It goes to weight, but I don't

25 think I can give very much weight for it, because the contract

1  speaks for itself.  And she -- you know, it goes as to weight.

2  All right.  Overruled.

3          You know, by the fact that Ms. -- Ms. Myers signed

4  the contract, you know, it seems to be inconsistent with what

5  -- you know.

6          MR. MAHAFFEY:  She's not the -- she's not the board.

7          THE COURT:  If she had these -- if she had these

8  qualms, why -- why sign the contract?

9          MR. MAHAFFEY:  Because she's on the executive

10 committee.  Look, I want to make sure the record is clear here.

11 There's two groups.

12         THE COURT:  All right.

13         MR. MAHAFFEY:  There is the executive committee --

14         THE COURT:  Overruled.

15         MR. MAHAFFEY:  -- and the board.  The board didn't

16 approve it.  The executive committee did.  There was

17 communication that the board had to approve it separately.

18 It's an insider agreement.  It's self dealing.  And the board

19 didn't approve it.  It's critical.

20         THE COURT:  All right.  Okay.  And that letter --

21 okay.  Is this one of the letters in evidence?

22         MS. MONTGOMERY:  Yes.

23         THE COURT:  Yeah.

24         MS. MONTGOMERY:  I believe so.

25         THE COURT:  You know, the Fish Richardson letter?

316

1           MR. MAHAFFEY:  Yes.

2           MS. MONTGOMERY:  Did we actually put it into

3  evidence?

4           THE COURT:  All right.  So we have --

5           MS. MONTGOMERY:  No, it was not -- it was not put

6  into evidence.  They said no.  They objected.

7           THE COURT:  All right.  Overruled.

8           MS. MONTGOMERY:  Well, then you need the -- then you

9  need the exhibit.

10          THE COURT:  Yeah, they have the exhibit in evidence.

11          MS. MONTGOMERY:  No, they said --

12          THE COURT:  Yeah, I thought the exhibits were in

13  evidence.

14          MR. MAHAFFEY:  We have no objection to the exhibit

15  coming in.  I don't think, Your Honor, that you -- that you

16  admitted that exhibit yet.

17          THE COURT:  I'm sorry.  20 -- Right.  20 -- wasn't it

18  20?

19          MR. MAHAFFEY:  Exhibit 10 is the Fish Richardson

20  letter.

21          THE COURT:  And so Exhibit 10 --

22          MR. MAHAFFEY:  We have no identification to that

23  being received for this purpose.

24          MS. MONTGOMERY:  Yeah, Exhibit 10.

25          THE COURT:  Exhibit 10 is the Fish Richardson letter.

317

1 Well, that's the letter that they're referring to, right?

2          MS. MONTGOMERY:  Right.  But he didn't -- he objected

3 to having it come in.

4          THE COURT:  Okay.  He now -- now he withdraws it.

5          MS. MONTGOMERY:  Okay.

6          THE COURT:  Okay.  So it's in.  10 is in.

7               (Exhibit 10 Received in Evidence)

8          THE COURT:  All right.  10 is in.  All right.  All

9 right.  So paragraph 17.

10          MS. MONTGOMERY:  Lack of foundation entirely on 17.

11          MR. MAHAFFEY:  She's laid that foundation.  She has

12 personal knowledge that this ongoing dispute of Ms. Milner's

13 duty to inspect and pick up continued.

14          THE COURT:  I'm sorry.  What -- where does it talk

15 about a duty to inspect?  A duty to store property and --

16          MS. MONTGOMERY:  There is no duty to inspect.  There

17 is --

18          THE COURT:  Well, this doesn't say anything about a

19 duty to inspect, but it goes to, yeah, there are continuing

20 disputes and -- all right.

21          MS. MONTGOMERY:  There weren't any continuing --

22          THE COURT:  It's just foundational.  Overruled.  You

23 know, the duty to inspect is just argument of counsel.

24          MS. MONTGOMERY:  Although Ms. Milner's declaration

25 specifically states there were no disputes after that letter in

1  2007.

2          THE COURT:  Well, it goes as to weight.  Okay.  Okay.

3  It's argument.  It goes to the weight.

4          So paragraph 19 --

5          MS. MONTGOMERY:  Wait.  18.

6          THE COURT:  You're right.  Excuse me.  My mistake.

7  18.  So is this some email too -- is this email in the record

8  or --

9          MS. MONTGOMERY:  It's not in the record.

10          MR. MAHAFFEY:  It's not in the record.  We didn't

11  attach it based on our understanding of the Court's direction.

12  I have it in the courtroom.  We have it and can offer it

13  through Ms. Myers or now.

14          THE COURT:  I understood.  Well, it's hearsay or best

15  evidence.

16          MR. MAHAFFEY:  No, it's a party admission.  Ms.

17  Milner is put into position to say that there are no --

18          MS. MONTGOMERY:  That's best evidence.

19          MR. MAHAFFEY:  Can I finish?  The position of the

20  debtor is that this is direct evidence, direct evidence, that

21  if she continues to say to the Court, "I did not have any" --

22          THE COURT:  Well, do we have what she said that it's

23  too ambiguous?

24          MR. MAHAFFEY:  Yes.  I've got this whole chain of

25  communications.  She's got -- part of it is --

1            THE COURT:  Well, is it in one of the exhibits?

2            MR. MAHAFFEY:  One half of it is.  Her portion, I

3 believe, is in her declaration.

4            THE COURT:  No, is her -- is her portion in one of

5 the exhibits that we're referring to, even one of her exhibits?

6            MS. MONTGOMERY:  I don't --

7            MR. MAHAFFEY:  I'm looking, Your Honor.  I know I've

8 seen it.

9            THE COURT:  Right.  Is it attached to one of their

10 declarations?

11           MR. MAHAFFEY:  Let me look.  I think it's part of her

12 declaration.  I have to go back and look at it.

13           THE COURT:  Regarding Sheriden Stolarz?

14           MR. MAHAFFEY:  Isn't it in the declaration of Ms.

15 Milner?

16           MS. MONTGOMERY:  No.  Exhibit -- there's an Exhibit

17 11 that seems to relate, but it's a month earlier, and it --

18           THE COURT:  Exhibit 11 has --

19           MR. MAHAFFEY:  Okay.  So that has -- okay.  So that's

20 it.  So Exhibit 11 is the --

21           THE COURT:  So you agree with Exhibit 11?

22           MR. MAHAFFEY:  Well, if the Court wants the context

23 for a foundation, Exhibit 11 --

24           THE COURT:  All right.  So it says Ms. Stolarz sent

25 an email.  I thought I read something about that before.

1          MR. MAHAFFEY:  It's at the time of the petition.

2 It's a direct sentence.  It says, "It's my understanding that

3 there are no other agreements or binding obligations that the

4 Ministry is not fulfilling on your behalf."

5          And then this --

6          MS. MONTGOMERY:  It's before the petition.  It's a

7 year before.

8          THE COURT:  I'm sorry.  Which email is this?

9          MR. MAHAFFEY:  This is Exhibit 11.

10          THE COURT:  Yeah, where does it say that there is no

11 obligation?

12          MR. MAHAFFEY:  One, two, three, four five -- the

13 fifth paragraph.  And then Ms. Milner disputes that and says

14 that she won't agree to that, which is probative to the fact

15 that there was executory disputes on both sides.

16          THE COURT:  Yeah, all right.  All right.  Overruled.

17          MS. MONTGOMERY:  We haven't even seen the document.

18          THE COURT:  And Exhibit 11 is --

19          MS. MONTGOMERY:  But we'd like the document that he's

20 talking about, because we haven't seen it, and it's not in

21 here.

22          THE COURT:  Well, it just says that this is what Ms.

23 Stolarz -- it's just -- it's just the parties disagree.  And it

24 sounds like your client --

25          MS. MONTGOMERY:  But --

1          THE COURT:  -- doesn't agree.

2          MS. MONTGOMERY:  -- would you please order him, Mr.

3  Mahaffey, to produce these documents to us that he's withheld?

4          THE COURT:  Well --

5          MR. MAHAFFEY:  Yeah, discovery on both sides.  The

6  reason we didn't produce documents in this litigation --

7          THE COURT:  Well, you want to -- you want to produce

8  the email where she says that it's too ambiguous for her to

9  confirm?  But it just indicates she doesn't agree with what Ms.

10 Stolarz says.

11         MR. MAHAFFEY:  That's right.  We contend that --

12         MS. MONTGOMERY:  But it may --

13         THE COURT:  That's why I don't think it -- why does

14 this hurt you where she doesn't agree?

15         MS. MONTGOMERY:  We don't even know -- because we

16 don't know what it says.  We don't know what it's talking

17 about.  We don't know what agreement it's talking about.

18         MR. MAHAFFEY:  It's probative to the case law from

19 the debtor's perspective that the definition of an executory

20 contract is and whether or not there's an affirmative duty to

21 file a claim as whether there's a dispute on performance on

22 both sides.

23         MS. MONTGOMERY:  We need to see the document now if

24 he's going to ask --

25         MR. MAHAFFEY:  So this is direct.  I'm going to find

1 it.

2          THE COURT:  You have -- right.  You have the email?

3          MR. MAHAFFEY:  I'm looking.

4          THE COURT:  Which -- all right.  Paragraph 19 --

5 while you're looking, paragraph 19 and 20, I'm going to

6 overrule the objections.  It just says that the parties have

7 disputes, which apparently they did, and we've had testimony

8 about that.

9          So the only one we're looking at is paragraph 18.

10          MR. MAHAFFEY:  I'm sorry, Your Honor.

11          THE COURT:  Otherwise, Ms. Myers' declaration is

12 received.

13          MS. MONTGOMERY:  Well, wait.  On 19, there is nothing

14 -- she -- I mean, Ms. Milner doesn't have any -- doesn't have

15 foundation.  She doesn't have personal knowledge about what was

16 being said and done.

17          And then Ms. Milner specifically -- I'm sorry.  No,

18 Ms. Milner specifically testified that the purpose of her

19 inquiry to Mr. Penner, Mr. Winthrop, and so forth, was not a

20 dispute.  It was simply to make sure that when they were

21 preparing schedules that her items that were -- that were being

22 held in trust were not -- were not included in the schedules.

23          So the idea that they say it was disputing is

24 contradicted by the testimony, and she doesn't have personal

25 knowledge.

1          THE COURT:  So this is -- okay.  Let me ask Mr.

2 Mahaffey.  So this quotation, you know, disputing transferred

3 ownership to her, where does that come from?

4          MR. MAHAFFEY:  It comes from the simultaneously

5 exchanged communications that were occurring at that time.

6          THE COURT:  Yeah.  Okay.  So which -- which emails

7 are those?  Were those some sort of emails?

8          MR. MAHAFFEY:  Yes.

9          THE COURT:  Okay.  So where -- where are those?  What

10 are they -- what are they quoting?

11          MR. MAHAFFEY:  They are quoting Mrs. Milner's

12 admissions that there is --

13          THE COURT:  No, no.

14          MS. MONTGOMERY:  No.

15          THE COURT:  What are they quoting exactly so we can

16 look at it?

17          MS. MONTGOMERY:  Yeah.  It's Exhibit 12, and it

18 doesn't say what he says.

19          THE COURT:  Exhibit 12, is that what you're referring

20 to?

21          MR. MAHAFFEY:  I'm still on the first request, Your

22 Honor, to find the email that was filed with 12, and I'm trying

23 to find that.

24          THE COURT:  Right.

25          MR. MAHAFFEY:  I must have pulled it out.  That's

324

1  what I did.  Hang on a second.

2          THE COURT:  Oh, you're right.  Right.  It's --

3          MR. MAHAFFEY:  Okay.  So here is --

4          MS. MONTGOMERY:  12 is not in.  We moved for it, and

5  it was not allowed in.

6          THE COURT:  What?  12?  12 is -- 12 is received.

7          MS. MONTGOMERY:  Oh, okay.

8          THE COURT:  Yeah, 12 is received.

9          MS. MONTGOMERY:  But this -- but this statement,

10  which lacks foundation, is totally --

11          THE COURT:  Well, all right.  It goes as to weight.

12  All right.  It's based on 12.  And I understand that it's based

13  on 12.  And, you know, if I -- you know, tentatively, I would

14  agree with respondents.  I think it was only what should be on

15  the schedules.  But that's Ms. Myers' take on it.

16          And then afterwards, maybe apparently CCM had some

17  disputes about the validity of the contract in some letters

18  after the fact.

19          MS. MONTGOMERY:  But those were all --

20          THE COURT:  After the fact.  After the fact.

21          MS. MONTGOMERY:  And there was no --

22          THE COURT:  Well, you know, you have to wonder, why

23  are they paying out all this money, and why are they

24  transferring all the assets.

25          MS. MONTGOMERY:  Well, all the money was paid out

325

1  before bankruptcy.

2          THE COURT:  You look at the conduct, it looks like

3  they were enforcing -- they thought the contract was valid.

4  Otherwise they wouldn't be paying the money or transferring the

5  assets.

6          MS. MONTGOMERY:  Right.

7          THE COURT:  So this is just Ms. Myers' view.  All

8  right.  Overruled.

9          All right.  So you have the email about what Ms.

10 Milner said?

11         MR. MAHAFFEY:  I am not finding it quickly.  I've got

12 it --

13         THE COURT:  All right.  So I'm going to conditionally

14 overrule it, but you're going to have to file a copy of that

15 email.

16         MR. MAHAFFEY:  I will do so.

17         THE COURT:  Okay.  Within let's say a week.

18         MR. MAHAFFEY:  Okay.

19         THE COURT:  All right.  So Ms. Myers' declaration is

20 otherwise received.

21         MS. MONTGOMERY:  Wait.  And 20.

22         THE COURT:  Oh, it's overruled.  You know, we have

23 testimony about their continuing --

24         MS. MONTGOMERY:  Through two thousand --

25         THE COURT:  It's her take on it.  It goes as to

1 weight.

2          MS. MONTGOMERY:  We don't even know if Ms. Myers is

3 still --

4          THE COURT:  Well, I know.  I know.

5          MS. MONTGOMERY:  -- a drifter.

6          THE COURT:  But, you know --

7          MS. MONTGOMERY:  We don't even know that --

8          THE COURT:  The import -- the import of Ms. Myers'

9 testimony is contradictory.  Here she is signing this and then

10 she says it's not valid.  She's signing the contract.

11          And now she says it's not valid.  So I'm not sure

12 what to think.  I'm going to have to figure this out.

13          MS. MONTGOMERY:  But you don't have any --

14          THE COURT:  It goes as to weight.

15          MS. MONTGOMERY:  You don't have any evidence as to --

16          THE COURT:  It goes as to weight.

17          MS. MONTGOMERY:  Okay.  But you don't know --

18          THE COURT:  Yes, there is evidence about a dispute.

19 And, you know, and I heard from the witness, Ms. Milner's

20 testimony --

21          MR. MAHAFFEY:  Ms. Myers' position is she signed the

22 contract, but --

23          THE COURT:  All right.  All right.

24          MR. MAHAFFEY:  -- the board didn't approve it, the

25 contract.

1           THE COURT:  All right.  It goes as to weight.

2           MR. MAHAFFEY:  It's because there wasn't a majority

3 --

4           THE COURT:  Now, let's talk about Mr. Grumer.

5           MS. MONTGOMERY:  There is no objections filed.

6           THE COURT:  All right.  Mr. Grumer's declaration,

7 you're objecting to Mr. Grumer's declaration.  So why are we

8 objecting to Mr. Grumer's declaration?

9           MR. MAHAFFEY:  Well, it was based on the Court's

10 directive that this was to be a streamlined matter without

11 extra exhibits and a declaration from one side and then no

12 witnesses.

13          So that part, we actually agree with counsel.  It's

14 evolved to where both of us were supposed to bring all

15 witnesses and attach as many exhibits as we want and have a

16 full hearing today, an evidentiary matter, so --

17          THE COURT:  Well, you know, I really -- we were

18 really going to talk about whether or not this contract was

19 executory.

20          MR. MAHAFFEY:  That's what you had ruled, and that's

21 why we --

22          THE COURT:  Well, all right.

23          MR. MAHAFFEY:  -- didn't subpoena Ms. Myers.  We

24 didn't go --

25          THE COURT:  Let's talk a look at Mr. Milner -- Mr.

1 Grumer's declaration.  All right.  His declaration is in

2 document number 2066.

3         MS. MONTGOMERY:  It begins at page 24.

4         THE COURT:  24.

5         MR. MAHAFFEY:  We show it starting at page 25.

6         MS. MONTGOMERY:  24.

7         MR. MAHAFFEY:  The filing page, Your Honor, just so

8 we're all looking at the same document, the filing page is doc.

9 2066, page 25.

10         THE COURT:  Well, yeah, and the internal document --

11 internal pagination is 24 through --

12         MS. MONTGOMERY:  32.

13         THE COURT:  -- 32.  All right.  So you have specific

14 objections to Mr. Grumer's declaration?

15         MR. MAHAFFEY:  Yes.

16         THE COURT:  Okay.  So where are they in your

17 objections?

18         MR. MAHAFFEY:  Well, we filed a motion to strike in

19 its entirety, based on the Court's directives.

20         THE COURT:  I have this thing called objection and

21 request to strike.  So you had said that the Court only allowed

22 one declaration.  I don't remember saying that.

23         MS. MONTGOMERY:  No.

24         MR. MAHAFFEY:  I quoted the Court's language.  I

25 didn't --

1          THE COURT:  Well, I don't remember saying that.

2          MR. MAHAFFEY:  We have an actual tape where that was

3 the directive of the Court.

4          MS. MONTGOMERY:  You would never say a single

5 declaration.

6          THE COURT:  Yeah, I would never say something like

7 that, so -- my law clerk listened to it, and he said he

8 couldn't -- heard anything like that.

9          So if you want to order the transcript and then show

10 me, you can do that.

11          MR. MAHAFFEY:  Well, I don't -- I don't want to argue

12 with the Court, but this is a quote from the transcript, and

13 this is where it came from.

14          THE COURT:  Well, a purported quote.  My law clerk

15 listened to it and said there wasn't any such thing.

16          MR. MAHAFFEY:  You said -- your law clerk said that

17 we misquoted paragraph 4?  I have --

18          THE COURT:  Yes.

19          MR. MAHAFFEY:  I can play the audio right now.  I've

20 got the audio with me.

21          THE COURT:  You've got the audio?  Okay.  Why don't

22 you play it.

23          MR. MAHAFFEY:  It will take me a moment to queue it

24 up.  Actually, a CD -- counsel has a CD, so why don't we play

25 the one that she was given a CD of?

 1          MS. MONTGOMERY:  I don't have any way of playing it.

 2 Go ahead.

 3          THE COURT:  You have the CD?

 4          MS. MONTGOMERY:  Well, your clerk just gave me a CD,

 5 because they --

 6          THE COURT:  Yeah, they have a digital file, but, you

 7 know, it would be helpful if you knew exactly where it was,

 8 because I don't want to listen to the entire hearing again.

 9          MS. MONTGOMERY:  We just got it from your clerk,

10 because they -- because your clerk looked at the papers and

11 recognized that Mr. Mahaffey never paid for it, never ordered

12 it, and took the copy that I paid for and ordered.

13          MR. MAHAFFEY:  Your Honor --

14          MS. MONTGOMERY:  So I just got it today, and I

15 haven't listened to it.

16          THE COURT:  Oh, I see.  Oh, I was going to say, you

17 know --

18          MR. MAHAFFEY:  We did.  We paid for it.

19          THE COURT:  Mr. Mahaffey, you got --

20          MS. MONTGOMERY:  You did not pay for it.

21          THE COURT:  Did you order -- is she right that she

22 ordered the CD and you got it?

23          MR. MAHAFFEY:  She's wrong.  We have a receipt.  We

24 paid for it, ordered it, and picked it up.

25          MS. MONTGOMERY:  You do not.  It wouldn't -- it was

1 not on the docket and your clerk just asked me for the -- for

2 the request back.  There is nothing that your --

3          MR. MAHAFFEY:  I don't know --

4          THE COURT:  All right.

5          MR. MAHAFFEY:  -- how else to --

6          THE COURT:  All right.

7          MR. MAHAFFEY:  There is no way we got -- maybe I can

8 do this, Your Honor.  I know it's late in the day.

9          Would the Court kindly give me leave, since

10 apparently when I heard the Court's directive regarding only

11 filing party declarations that formed the contract I

12 misunderstood it, so that was the reason that --

13          MS. MONTGOMERY:  He didn't even --

14          MR. MAHAFFEY:  -- we objected, because Mr. Grumer did

15 not form the contract, Mr. Margolis did, and the Court had said

16 that you can file declarations between the parties who formed

17 the contract.

18          I took that literally.  I apologize.  That's what it

19 said.  I listened to it many times.

20          THE COURT:  Okay.  All right.

21          MR. MAHAFFEY:  So I made a mistake, if that was a

22 mistake.  I would like to file declarations --

23          THE COURT:  Again -- all right.  All right.

24          MR. MAHAFFEY:  -- objections.

25          THE COURT:  All right.

1          MR. MAHAFFEY:  So if I could file objections, I will

2 do so promptly.  I can have them here tomorrow morning.

3          THE COURT:  Okay.  Well, I was going to say, you

4 know, this whole thing was really about the interpretation of

5 the contract and -- and that's what I thought, and I guess it

6 kind of got blown up.  All right.

7          Well --

8          MS. MONTGOMERY:  I mean, all of this information is

9 only relevant to show course of conduct that establishes the --

10 Ms. Milner's ownership of this property, which they keep

11 attacking, which is ridiculous.

12         The executory nature is basically on the face of the

13 contract, as Your Honor --

14         THE COURT:  Yeah, that's what I was saying is that --

15 then what I'm going to do is I'm going to sustain the

16 objection.  I don't think I really need Mr. Grumer's

17 declaration about what -- how to interpret the contract.

18         MS. MONTGOMERY:  I don't think he's saying how to

19 interpret the contract.

20         THE COURT:  Yeah, I know.  I know.  What you're --

21 okay.  You know, I think there's enough that the Court doesn't

22 need Mr. Grumer's testimony.

23         MS. MONTGOMERY:  Well, only to the -- only if there

24 is any question as to Ms. Milner's ownership of this property,

25 because the exhibits and the declaration show that they are not

1  discussing --

2          THE COURT:  Well, I was going to say is that if the

3  debtor was so concerned about the ownership of the property,

4  why would it be handing it over to Ms. Milner?  So -- except

5  for what's in the trailer.

6          So I don't need Mr. Grumer's testimony for that.

7  Okay.  Sustained.

8          Okay.  Mr. Grumer's declaration is not in, but Ms.

9  Myers' declaration is received with the Court's rulings.

10         All right.  It's now 4:07.  Mr. Mahaffey, you were

11 saying you wanted to file post-trial briefing --

12         MR. MAHAFFEY:  Yes, Your Honor.

13         THE COURT:  -- about this duty that you were talking

14 about, the duty to inspect?

15         MR. MAHAFFEY:  Yes.

16         MS. MONTGOMERY:  And this is an implicit --

17         THE COURT:  All right.  How much time do you need for

18 that?

19         MR. MAHAFFEY:  Ten days.

20         THE COURT:  Ten days.  All right.

21         MS. MONTGOMERY:  He says he has the document right

22 now.  Why does it take ten days?

23         THE COURT:  Well, I was going to say it's late and --

24         MS. MONTGOMERY:  As we have expressed concern, Mr.

25 Light has surgery coming up, and my daughter is being married

1  in three weeks, so --

2          THE COURT:  Well, you don't have to -- okay.  Well,

3  we can extend the time out.  So you don't have to file

4  anything.  He wants to file something.  You don't have to file

5  anything.

6          MS. MONTGOMERY:  Well, I want to see it and reply.

7          THE COURT:  Yeah, you can.  So just -- okay.  So --

8          MS. MONTGOMERY:  When are we --

9          THE COURT:  -- I'll let Mr. Mahaffey -- okay.

10 Optional post-trial briefs due two weeks, and then two weeks

11 for response.  Isn't that enough time?

12         MS. MONTGOMERY:  It's too much.

13         THE COURT:  What's too much?

14         MS. MONTGOMERY:  Because you're putting -- when are

15 you -- because you're then pushing out any further hearing as

16 to a determination for -- I mean, do you need -- you want our

17 --

18         THE COURT:  Well, your schedule doesn't permit you to

19 do it earlier because, you know, you have other commitments.

20         MS. MONTGOMERY:  No.  We are prepared.  If he files

21 -- he says he's got his authority.  File it in three days, and

22 we'll file a response in another three days.

23         MR. MAHAFFEY:  I'm in a Superior Court trial right

24 now that I got leave to be here today.

25         THE COURT:  Yeah, there's always a trial, so --

1          MR. MAHAFFEY:  I cannot file it in three days.

2          MS. MONTGOMERY:  When is -- when does Your Honor want

3  to hear argument?

4          THE COURT:  Well, he says ten days.  Okay.  So ten

5  days.  And how much time after his ten days do you want?

6          MS. MONTGOMERY:  On executory nature?  We haven't had

7  an official argument.  Do you want -- are you expecting

8  argument?  Do you want argument of counsel with regard to the

9  executory nature, or have you already heard enough in these

10  objections and the testimony to decide?

11          THE COURT:  Well, I'm just asking is -- you know, I

12  would offer you time to argue, but I'm not sure how long you'll

13  need for that.

14          How long would you need for closing argument on this?

15          MS. MONTGOMERY:  An hour.

16          THE COURT:  An hour?

17          MS. MONTGOMERY:  Maybe less.  Maybe less than an

18  hour.

19          THE COURT:  Well, we don't have an hour, because, you

20  know, we took so long with this hearing that the recorder has

21  to go home.  And I don't think I can get anybody at this late

22  hour --

23          MS. MONTGOMERY:  I can make an argument --

24          THE COURT:  -- to stay --

25          MS. MONTGOMERY:  We could make a closing --

336

1          THE COURT:  -- here and --

2          MS. MONTGOMERY:  Yeah, we could make it in 15

3  minutes, a closing argument.

4          THE COURT:  15 minutes?  All right.

5          MR. MAHAFFEY:  Your Honor, you had invited briefing.

6  It's late in the day.  I would appreciate the opportunity to

7  brief the evidence under what I think is the binding authority

8  and then waive a verbal argument.

9          THE COURT:  Well, my feeling is I already have enough

10 written arguments, and I already heard what today, and I can

11 distill what the testimony is today.  So I don't really you

12 think need to summarize what the testimony is --

13         MS. MONTGOMERY:  Okay.

14         THE COURT:  -- because I already listened to the

15 entire thing.

16         MR. MAHAFFEY:  We'll have our brief in ten days.

17         THE COURT:  And I've already read all the

18 declarations.  And he just wants to bring something to the

19 Court's attention on briefing.  And you can respond to it or

20 not.

21         MS. MONTGOMERY:  How about the -- what about the

22 exhibit that he said that you conditionally --

23         THE COURT:  Yeah, he has to file his exhibit, you

24 know, showing on that one item, which goes back to about the --

25 your client's alleged response to what -- it's Ms. Sheriden had

1 said about -- do you have -- you know, the church has met all

2 its obligations to you, haven't it, and then, you know, your

3 client allegedly said, well, I can't confirm that at this

4 point.

5          That's -- and you're saying you don't think that's --

6          MS. MONTGOMERY:  I don't know, but there may be

7 something that goes beyond it.  He's put in documents in the

8 past --

9          THE COURT:  Yeah, well, then you can file something

10 that's responsive to that.  So if you want to file any other

11 email things, you can file something responsive to that when

12 you respond to his supplemental brief and supplemental

13 evidence.

14          MS. MONTGOMERY:  Can we do -- can we have him do it

15 within the next week?

16          MR. MAHAFFEY:  That was the Court's order.  I'm going

17 to go back and look for it tonight.

18          THE COURT:  Yeah, he's going to go get it --

19          MS. MONTGOMERY:  No, the brief and the email within

20 the next week.

21          THE COURT:  Well, he's in trial.  He needs ten days.

22          MS. MONTGOMERY:  So ten days is --

23          THE COURT:  He's in trial and needs ten days.

24          MR. MAHAFFEY:  We'll get it done.  If we can do it

25 faster than ten days, we will, but --

1          THE COURT:  Yeah, he'll -- yeah, but, you know --
2  which is not unreasonable.

3          MS. MONTGOMERY:  Then we'll respond -- we'll respond
4  within ten days.

5          THE COURT:  Or do you want to come back and you want
6  to argue, you want an hour and you want to argue, you can do
7  that, too, but I don't think it's necessary.

8          MS. MONTGOMERY:  If it's not necessary, then let's
9  just do it --

10          THE COURT:  It's not necessary.

11          MS. MONTGOMERY:  Then do it on the papers.  And if he
12  has ten days --

13          THE COURT:  You know, he wants to file something that
14  makes a specific argument or arguments on what was shown, and
15  he can make any argument he wants.

16          MS. MONTGOMERY:  Wait.  That's getting expansive.
17  Aren't you --

18          THE COURT:  And then you can have any counter
19  arguments you want.

20          MS. MONTGOMERY:  Aren't you -- didn't you direct him
21  to make his argument with the one Ninth Circuit case that
22  created some kind of an implied duty to inspect?

23          THE COURT:  Yeah, well, that's what he asked for the
24  supplemental briefing specifically.

25          MR. MAHAFFEY:  It is, but I want tie up --

1          THE COURT:  But I'm not going to limit the parties to

2  -- you can address whatever you feel you need to address to

3  represent the interests of your clients in your -- your

4  optional post-trial brief.

5          You can decide that you already said enough, or you

6  can decide to raise any arguments you thought the evidence can

7  support.

8          MS. MONTGOMERY:  All right.  We're not going to do a

9  post-trial brief.  We will only respond to his.

10         THE COURT:  Yeah, that's fine.  That's fine.  As I

11  said, it's optional.  You can just respond to what they're

12  filing.

13         MS. MONTGOMERY:  Okay.

14         THE COURT:  You know, I'm not inviting it.  You know,

15  he has asked for leave to be able to file something, and so I'm

16  willing to do that, you know, in lieu of, you know, oral

17  closing arguments.

18         MR. MAHAFFEY:  Thank you.

19         THE COURT:  Unless you want to come back, which I

20  don't think is necessary.

21         MS. MONTGOMERY:  I don't want to come back, but I

22  don't want to see a whole slew of brand new arguments.

23         THE COURT:  Well, you know, you have this issue that

24  you can raise claims that conform to the evidence.  So, you

25  know --

1          MS. MONTGOMERY:  But he -- but we have all the

2 evidence in.

3          MR. MAHAFFEY:  Your Honor, you've ruled.  This is not

4 unreasonable.

5          THE COURT:  Yeah.  Well, he's going to argue what the

6 evidence means, and my -- you know, my focus is really whether

7 the contract is executory or not.

8          And if it isn't, then there is no violation of

9 discharge injunction.  If it is, then it's a problem.

10          MS. MONTGOMERY:  Well, you also have the fact that he

11 -- that all we have done is filed an answer to a complaint that

12 he filed, so --

13          THE COURT:  Yeah.  That's another -- that's -- you

14 can respond to that and just say that's not a violation of any

15 -- that's not conduct that violates anything, because you just

16 filed it.

17          Well, that's a good point.  So other than filing an

18 answer asserting affirmative defense, is there anything that

19 the debtor has done to enforce the contract?

20          MS. MONTGOMERY:  No.

21          THE COURT:  Then that may --

22          MS. MONTGOMERY:  But we want to -- but we want to

23 make sure that your ruling should say whether or not this is

24 executory and whether there's anything there --

25          THE COURT:  Right.  Right.

1          MS. MONTGOMERY:   -- because when we see it --

2          THE COURT:  Right.  Right.  Right.  Well, that's one

3 of your defenses, but your other defense, it would seem to me,

4 is that all he did was file an answer raising an affirmative

5 defense and didn't do anything, you know, actively to collect

6 on the contract.

7          You know, that may be a defense to --

8          MS. MONTGOMERY:  That's a straight out defense to the

9 contempt.

10          THE COURT:  Right.

11          MS. MONTGOMERY:  But we don't want to be back here

12 again in front of you, because --

13          MR. MAHAFFEY:  We're way ahead of ourselves, Your

14 Honor.

15          THE COURT:  Well, you know, if the contract is

16 executory and you decide that you want to go ahead and enforce

17 the contract, and it is executory, you know, I can't give you a

18 blanket exemption at that point.

19          It's whether or not the record at this point supports

20 contempt.  But if you do something else, that might be

21 something else.

22          MS. MONTGOMERY:  Well, but --

23          THE COURT:  But if you get a declaration the contract

24 is not executory, then that would seem to me that whatever you

25 do is not going to be contempt.

1          MS. MONTGOMERY:  Correct.

2          THE COURT:  Right.  But if it is executory, and you

3  do something beyond, you know, you could get a result where the

4  Court determines it's executory -- I'm speaking hypothetically,

5  because I'm not making any -- I'm not making any ruling on the

6  merits today or any tentative ruling on the merits -- you could

7  get a determination, you know, and there are a number of

8  alternatives.

9          You could get a determination the contract is

10 executory, but filing an answer in affirmative defense isn't

11 contemptuous.

12         But, if you do something else that's active that may

13 be contemptuous, but that would be advisory opinion

14 prospective, but at least you know there's a hazard.  Or you

15 can get a determination that it's not executory and whatever

16 you do, it's not going to be contempt.

17         MS. MONTGOMERY:  Right.

18         THE COURT:  Okay.  I don't know how it's going to

19 turn -- I'm going to have to think it through.

20         But I can't tell you today how it's going to turn

21 out, because I need to look at what counsel is going to offer

22 in his post-trial, and he has to follow up on his commitment to

23 submit the email.  And then you get a chance to respond by

24 responding to the arguments and responding to the email that he

25 produces.

1              MS. MONTGOMERY:  In our -- in the opposition to the

2    contempt motion, we already made the arguments with regard to

3    whether or not filing a -- filing an answer --

4              THE COURT:  Yeah, so you don't need --

5              MS. MONTGOMERY:  So --

6              THE COURT:  So you need to rehash it.

7              MS. MONTGOMERY:  I'm not going to do that.

8              THE COURT:  Well, why would you have to rehash

9    something that you've already argued?  Because I'm already

10   reading your arguments anyway.

11             MS. MONTGOMERY:  Okay.  That's fine.

12             THE COURT:  That's the whole point.  That's why I

13   said it's optional.  If you already made your arguments --

14             MS. MONTGOMERY:  I made them --

15             THE COURT:  -- what good does it do to repeat them?

16             MS. MONTGOMERY:  I made them in the papers to the

17   opposition to the contempt, not with regard to a trial brief on

18   these issues.  But --

19             THE COURT:  Well, you know, if you feel you need to

20   say something, say something.  But if you already said it

21   before, why do you need to say it again?  All right.  Why do

22   you -- you know, it's just me, you know.  Right?  Maybe this

23   will save you repeating yourself.

24             MS. MONTGOMERY:  It would --

25             THE COURT:  But in the event you want to make sure

1 that you emphasize it, you can say it again if you want.

2         MS. MONTGOMERY:  Well, if Your Honor comes out and

3 says this is an executory contract, that it was an executory

4 contract that's been rejected, then we want to be -- you should

5 also be in a position, based on the original opposition to say,

6 and but there is -- there is no contempt, because --

7         THE COURT:  Yeah, that's a -- as I just said, that

8 could be the result.

9         MS. MONTGOMERY:  Okay.  But I didn't -- I didn't put

10 a section in our trial brief that said, by the way, because you

11 didn't ask for that section.

12         MR. MAHAFFEY:  We don't have an objection.  I mean,

13 we, obviously, respectfully disagree.

14         THE COURT:  Right.

15         MR. MAHAFFEY:  A definition of --

16         THE COURT:  Right.  Right.  Right.

17         MS. MONTGOMERY:  Okay.

18         THE COURT:  I think you argued it's not contempt.

19 Whatever -- whatever respondents did, it's not contempt,

20 because --

21         MR. MAHAFFEY:  Engaging affirmative defenses we

22 contend is a -- if it's executory, they disagree.

23         THE COURT:  Yeah, using -- filing -- filing and

24 serving an answer raising an affirmative defense, you're saying

25 that's not contemptuous?

1          MR. MAHAFFEY:  And we're saying --

2          THE COURT:  That's --

3          MR. MAHAFFEY:  -- it could be.

4          MS. MONTGOMERY:  No.

5          MR. MAHAFFEY:  And so it's an issue --

6          THE COURT:  Well, I don't know.  I'm going to

7  determine that, but --

8          MR. MAHAFFEY:  Right.

9          THE COURT:  I'm going to determine that, but that's

10  your argument, is that even --

11          MS. MONTGOMERY:  It was.

12          THE COURT:  -- even if it's executory, it still may

13  not be contempt, because it's not enough to cross the contempt

14  threshold.

15          MR. MAHAFFEY:  They --

16          THE COURT:  That's your argument.

17          MR. MAHAFFEY:  They've made their point.

18          THE COURT:  That's her argument.

19          MR. MAHAFFEY:  Right.

20          THE COURT:  That's their argument.

21          MR. MAHAFFEY:  I understand that.

22          THE COURT:  All right.  That's their argument.  And

23  the Court will address that argument.

24          MS. MONTGOMERY:  Can we ask -- can we get specific

25  dates?  Because we're getting into --

1          THE COURT:  Yeah, I know.  I was going to get to my

2  -- I'm looking for my calendar so I can give you dates.  So we

3  can fix the --

4          MS. MONTGOMERY:  So we request that they file by the

5  28th of September.

6          THE COURT:  Well, let's talk about ten days.  He

7  asked for ten days, and that's -- ten days from today is --

8  today is the --

9          MS. MONTGOMERY:  20th.  The 30th is a Sunday.

10          THE COURT:  Today is the 20th.  I was going to say,

11  we might --

12          MR. MAHAFFEY:  Is that October 1st?

13          MS. MONTGOMERY:  No.

14          THE COURT:  Okay.  All right.  So today is September

15  20th, and ten days from today would be September --

16          MR. MAHAFFEY:  I don't have staff on Sunday.  Can we

17  do it the 1st?  That would be the first Wednesday.

18          THE COURT:  Yeah, September -- that would be October

19  1.

20          MR. MAHAFFEY:  Correct.  So that's --

21          THE COURT:  Yeah, October 1, that's reasonable.

22  Yeah.  October 1.

23          Okay.  So, you know, I know, Ms. Montgomery, I think

24  you have a commitment on the 4th.

25          MS. MONTGOMERY:  He's got surgery on the 11th, on

1  that very day that it's due, he's in surgery.

2          MR. MAHAFFEY:  We don't have an objection to --

3          THE COURT:  No, no, no.  That's when his thing is

4  due.

5          MS. MONTGOMERY:  Yes, but our -- yes, but we have to

6  respond.

7          MR. MAHAFFEY:  They can have more time to respond.  I

8  am not objecting to them having time to respond.

9          THE COURT:  Yeah, yeah.  You have jury duty, but --

10  well, I was going to --

11          MS. MONTGOMERY:  No, it's not jury duty.

12          THE COURT:  That's when he's filing his thing, you

13  have jury duty.

14          MS. MONTGOMERY:  It's not jury duty.  He's in the

15  hospital.

16          MR. LIGHT:  No.  Yeah, the situation that I was

17  looking at is the 1st puts it -- ten days after the 1st puts us

18  at the 11th, which is my surgery day.

19          MS. MONTGOMERY:  For our response.

20          THE COURT:  Yeah.  Is that what you want?

21          MR. LIGHT:  I was hoping -- if they filed on the 28th

22  and we -- ours was due on the 8th --

23          THE COURT:  Well, I'm, giving him ten days.  Okay.

24  There's not going to be any -- I'm not going to short him the

25  ten days.  And the next business day is --

1          MR. LIGHT:  I'll just have to contribute, if I'm

2 going to contribute, on the 10th, prior to my going in.

3          THE COURT:  Right, right, right.

4          MS. MONTGOMERY:  And so then --

5          THE COURT:  So are you indisposed between the 1st and

6 the 10th?

7          MR. LIGHT:  No.  No, I should be okay between the 1st

8 and the 10th.

9          THE COURT:  Right.  And, you know, Ms. Montgomery

10 could -- you know, Ms. Montgomery has a trip, right?  You have

11 a trip on the 4th?

12          MS. MONTGOMERY:  No.  My daughter is getting married,

13 and I'm taking off the 11th, 12th, and wedding is the 14th.

14          THE COURT:  What about beforehand on the 10th?

15          MS. MONTGOMERY:  I'm working.  I'm -- but it's not

16 giving us the full time period, but --

17          THE COURT:  Well, what would be the full time period

18 that you want?

19          MS. MONTGOMERY:  Well, we wanted him to file on the

20 Friday -- on Friday.

21          THE COURT:  That's not going to happen.

22          MS. MONTGOMERY:  Then I guess we'll take until the --

23          THE COURT:  It's going to be October 1.

24          MS. MONTGOMERY:  We'll take to the -- we'll take to

25 the 11th, and we'll be filing early.  I won't have any --

1          THE COURT:  Okay.  Okay.

2          MS. MONTGOMERY:  I can assure you I won't have any

3 assistance.

4          THE COURT:  Okay.  October 11th is fine.

5          MS. MONTGOMERY:  My secretary who is getting married

6 will be gone that whole week, so --

7          THE COURT:  Do you want -- do you want the 15th?

8          MS. MONTGOMERY:  No.  She's getting married the 14th.

9 It doesn't do me any good.

10         You can give us to the 11th, and whatever it is,

11 we'll file.

12         THE COURT:  Or the 12th?  You want the 12th, Friday?

13 It doesn't matter.

14         MS. MONTGOMERY:  It doesn't matter.  There won't be

15 anybody there.  Nobody is home.

16         THE COURT:  Okay.  You want it done expeditiously,

17 but -- okay, I understand we have some scheduling issues.  All

18 right.

19         So optional post-trial briefs by either side, be

20 October 1.

21         MS. MONTGOMERY:  What date did you --

22         THE COURT:  Post-trial, October 1.

23         MS. MONTGOMERY:  And when does he have to file a

24 certain email?

25         THE COURT:  And along with the required email,

1 October 1.

2         MS. MONTGOMERY:  Didn't you say -- you said seven
3 days on the email.

4         THE COURT:  Yeah, I know, but I'm going to make them
5 the same day, and I'm exercising my discretion, plus the email.
6 And you still get the time to respond, okay, to link up the
7 representation in Ms. Myers' declaration.

8         And then any reply or response to that trial brief,
9 including a response to the email, will be due October 11th,
10 2018.

11        MS. MONTGOMERY:  Okay.

12        THE COURT:  All right?

13        MS. MONTGOMERY:  Yes.

14        THE COURT:  And then no further hearings, no further
15 briefing, that's it, under submission.

16        MS. MONTGOMERY:  No further declarations?

17        THE COURT:  Right.  Nothing further.  That's it.

18        MS. MONTGOMERY:  But even -- even on the 1st?  He's
19 got his -- his evidence is in.  He's got no further
20 declarations.

21        THE COURT:  Yeah.  There's going to be a declaration
22 authenticating the email.  This is a true and accurate copy of
23 the email represented in Ms. Myers' declaration.

24        MS. MONTGOMERY:  And that's it?

25        THE COURT:  That's it.  No further declarations.  You

1 know, they'll leave -- the evidence is closed, except for the

2 email and any response to the email.

3          MS. MONTGOMERY:  Okay.

4          THE COURT:  All right?  You got that, everyone?

5          MS. MONTGOMERY:  Yes.

6          MR. MAHAFFEY:  Understood.

7          THE COURT:  And then it's all argument and written

8 briefing.  All right.

9          Now, do we need an order for this, or we waive

10 notice?

11          MS. MONTGOMERY:  No.  Waive notice.

12          THE COURT:  Waive notice, Mr. Mahaffey?

13          MR. MAHAFFEY:  Notice waived.

14          THE COURT:  All right.  Anything further?

15          MR. MAHAFFEY:  No, Your Honor.

16          MS. MONTGOMERY:  No, Your Honor.

17          THE COURT:  All right.  Thank you very much for your

18 presentation, and --

19          MS. MONTGOMERY:  Did you need any order on the

20 evidentiary objections?

21          THE COURT:  No, I don't think so.

22          MS. MONTGOMERY:  Or do you want to wait until --

23          THE COURT:  Someone ordered the tape.

24          MR. MAHAFFEY:  Thank you, Your Honor.

25          THE COURT:  I don't want to put anybody to the bother

352

1 of -- I have my notes, and --

2        MS. MONTGOMERY:  Okay.  I have my notes, too.

3        THE COURT:  -- and we have the tape.  And that's what

4 it's for.  I don't want to have you do busywork, which that

5 would be.  I think that's enough.

6        All right.  Anything further, anyone?  All right.

7 Thank you.

8        MS. MONTGOMERY:  Thank you.

9        MR. MAHAFFEY:  Thank you, Your Honor.

10        (Proceedings concluded at 4:25 p.m.)

11                    * * * * *

12            **C E R T I F I C A T I O N**

13        I, LORI A. KNOLLMEYER, court approved transcriber,

14 certify that the foregoing is a correct transcript from the

15 official electronic sound recording of the proceedings in the

16 above-entitled matter, and to the best of my ability.

17

18 /s/ Lori A. Knollmeyer

19 LORI A. KNOLLMEYER

20 J&J COURT TRANSCRIBERS, INC.        DATE:  January 23, 2019

21

22

23

24

25

# Trial Exhibit 8

Trial Exhibit 8

10/23/12                                              Print

| | |
|---|---|
| **Subject:** | Re: Update on CCM obligations |
| **From:** | Gwyn Myers (gwmyers@attglobal.net) |
| **To:** | carol_csmilner@yahoo.com; |
| **Date:** | Friday, September 8, 2006 6:25 PM |

Absolutely...go for it!  We have decided to just "inform" the board rather than sending out a ballot.  Turns out the bylaws support that.  Reg just thought that it would be wise to have the board involved but I am not going with "wise" on this one.

So...we are done and Robert A has been told in a conference call with Reg and me.  He was upset at first but Reg backed up the contract as being very straight forward and that he would have changed maybe a couple of technical things.  RA calmed down by the end of the call and seemed as OK as he will get with it.

Your baby seems in no hurry to face the world...not bad thinking!

Gwyn
------ Original Message ----- From: "carol milner" <carol_csmilner@yahoo.com>
To: "Gwyn Myers" <gwmyers@attglobal.net>
Sent: Friday, September 08, 2006 8:42 AM
Subject: Update on CCM obligations


> Hey Gwyn,
>
> I know you are most likely bound by Reg's schedule but
> I need to move forward to obtain those Atmajian
> agreements and also to get the files from my office.
> I would like to move forward on this next week if baby
> still has not arrived.  Even if baby arrives, I would
> like to delegate this to a rep on my behalf to deliver
> them to me at home.  May I proceed?
>
> _____
> Do You Yahoo!?
> Tired of spam?  Yahoo! Mail has the best spam protection around
> http://mail.yahoo.com

CSM01841

Trial Exhibit 8, Page 353

10/23/12                                    Print

| | |
|---|---|
| **Subject:** | RE: Jeff Atmajian negotiations and contracting |
| **From:** | Sheriden Stolarz (sheridens@crystalcathedral.org) |
| **To:** | carol_csmilner@yahoo.com; |
| **Date:** | Friday, September 15, 2006 3:32 PM |

Hi Carol -

I will start putting together what I have.  I shared your request with
Reg and he will have his files sent to Gerry Margolis.

Your baby must be due any minute now!
All my best, Sheriden


-----Original Message-----
From: carol milner [mailto:carol_csmilner@yahoo.com]
Sent: Tuesday, September 12, 2006 1:44 PM
To: Sheriden Stolarz
Subject: Jeff Atmajian negotiations and contracting

Hi Sheriden,

I need to acquire all Atmajian correspondence from
CCM.  Would you be the one to address this or should I
address this request to Holly or Reg?  I need the
following if they relate in any way to CD production
and Show composing/producing/directing any and all
other Creation related work Jeff did for CCM in any
and all formats including:

All notes on conversations w/ any and all CCM
management, etc.
All e-mail correspondence w/ any and all CCM
management, etc.
All deal points, agreement drafts, etc. between CCM
and Atmajian

In other words, a complete file - obviously this also
includes the same for like correspondence that took
place with Atmajian's council.

I will also need the same for all other Creation
vendors that were corresponded with by CCM management
such as:  Pat Millicano, Aerialistic, LA Pro Point (on
the tree), etc.  These latter vendors are less
priority (timewise) than Atmajian.  If possible I'd

out:blank                                                              1/2

CSM01861

10/25/12                                                Print

like the Atmajian documents within 3-4 weeks and the
other info within 6-8 weeks.

The above has been approved by the Board of Directors
with Gwyn Myers as the point person if you need to
check it out.  Any problems, don't hesitate to connect
with me at this e-mail address.

Thank you Sheriden for all that you do,

Carol

_____

Do You Yahoo!?
Tired of spam?  Yahoo! Mail has the best spam protection around
http://mail.yahoo.com

out:blank                                                   2/2

CSM01862

Trial Exhibit 8, Page 355

# Trial Exhibit 9

Trial Exhibit 9

10/25/12            Print

| Subject: | Re: Update |
|---|---|
| From: | Gwyn Myers (gwmyers@attglobal.net) |
| To: | carol_csmilner@yahoo.com; |
| Date: | Wednesday, January 17, 2007 8:01 PM |

All stipulations in the contract that was signed remain in place.

Gwyn
----- Original Message -----
From: "carol milner" <carol_csmilner@yahoo.com>
To: "Gwyn Myers" <gwmyers@attglobal.net>
Sent: Wednesday, January 17, 2007 6:20 PM
Subject: Re: Update


>I spoke with my parents about the other items I
> e-mailed you on last week and they seem to be in
> agreement.  Are these also being done by Friday?  (See
> my reply sent to you on Jan. 8 regarding assets into
> trust, third party trustee, etc.)
>
> (--- Gwyn Myers <gwmyers@attglobal.net> wrote:
>
>> Hi Carol--
>>
>> Reg finally got a copy of the Preliminary Title
>> Report on the condo from the title company and can
>> now recite all of the facts as they appear in the
>> public record.
>>
>> He is planning on having the necessary agreements
>> and the Executive Committee consent completed and
>> circulating by close of business this Friday.
>>
>> Gwyn
>
>
>
>
>

> Get your own web address.
> Have a HUGE year through Yahoo! Small Business.
> http://smallbusiness.yahoo.com/domains/?p=BESTDEAL

out:blank            1/1

CSM01869

10/23/12                                                Print

| Subject: | Re: Update... Please? |
|---|---|
| From: | Gwyn Myers (gwmyers@attglobal.net) |
| To: | carol_csmilner@yahoo.com; |
| Date: | Thursday, February 8, 2007 12:19 PM |

Hi Carol--

I do not think that you need any other document since the assets that were identified in the inventory as yours are just that! You have the right to look at property that you own or to do anything else with it that you desire.

Changing any part of that agreement or tying anything else to it would not be a top choice of mine. Let's get this completed. Then, if you have any problems accessing property that is yours, I would think that it could be handled in another way.

That is the way that I would see it but maybe I am missing something. Do not think that you should base future actions on past ones because the contract and trust are not yet in place and do not dictate the actions of the CCM bunch.

Gwyn

----- Original Message -----
From: "carol milner" <carol_csmilner@yahoo.com>
To: "Gwyn Myers" <gwmyers@attglobal.net>
Sent: Thursday, February 08, 2007 11:18 AM
Subject: Re: Update... Please?


> Thank you, Gwyn. This is in reply to both of your
> e-mails - I hear you on the "second career" - it has
> been crazy. Thank you for your continued patience.
> The only question that remains then is the assets
> trust. This was not part of the original contract
> though the asset distribution was. The only reason I
> am suggesting this is that it would put you (who has
> better things to do) and Reg (who costs $$ AND has
> better things to do) and my parents (who could really
> use doing something else) from having to get involved
> in the future if the right people at CCM don't
> respond. For instance, think of the following very
> likely scenario:
>
> I want to check in on the puppets to make sure rodents
> aren't getting at them. I call facilities. No call

out:blank                                               1/3

CSM01870

Trial Exhibit 9, Page 357

10/25/12                                  Print

> back. I call Sheriden. No call back. I wait and I
> wait. No reply. I call Gwyn or I bother the Senior
> Schullers? Instead, if it were in a trust (which I'll
> pay for to be drafted IF we are all in agreement so
> the $$ aren't wasted) then a third party becomes the
> "bad guy". He simply calls Fred or whoever and sets
> up the deal "based on the trust". If it stays "based
> on the contract" then I'm left with threatening law
> suits and the like which I HATE. It seems that based
> on the contract we can set up the trust to facilitate
> what's already been legally agreed to. Then, it
> seems, it is all truly done and packaged in a
> functional way. Granted, I'd have to see how to do
> this - but I will do the leg work and take on the
> expenses if I know this would be followed through
> with.
>
> --- Gwyn Myers <gwmyers@attglobal.net> wrote:
>
>> Hi Carol--
>>
>> Just had a call yesterday with Reg and Fred. The
>> decision was made to
>> refinance the condo and fund the trust with that
>> cash. It will be a lot
>> easier than trying to figure out how to satisfy your
>> concerns with a trust
>> deed. Fred started on the financing yesterday and
>> will complete it as soon
>> as possible. Once the money is in there, all of the
>> contracts are executed
>> and you can proceed on whatever has been agreed to
>> in those documents.
>>
>> Gwyn
>> ----- Original Message -----
>> From: "carol milner" <carol_csmilner@yahoo.com>
>> To: "GWyn Myers" <gwmyers@attglobal.net>
>> Sent: Thursday, February 08, 2007 7:22 AM
>> Subject: Update... Please?
>>
>>
>> > Hey Gwyn,
>> >
>> > It's gone silent on how we are proceeding forward.
>> I
>> > need an update ASAP on the following:
>> >
>> > - $70,000 royalty was due the first of the year
>> > - Status of compensation or property deed into
>> trust

out:blank                                                   2/3

CSM01871

Trial Exhibit 9, Page 358

10/25/12                                    Print

```
>> > - Assets into trust?
>> > - Atmajian and other legal documents that are way
>> > overdue
>> > - Point person at CCM who will be diligent in
>> ongoing
>> > communication with me on assets, misc. docs, etc.
>> (So
>> > that we can move into cooperative dialogue and get
>> it
>> > off of your plate and the Schuller's plate).
>> >
>> > I would like to reiterate that I would really like
>> to
>> > see this move into a more positive place in case
>> the
>> > future unveils a desire for future alliance
>> between
>> > Creation and CCM.
>> >
>> > Continued thanks,
>> >
>> > Carol
>> >
>> >
>> >
>> >
>> >
>> >
>>
>
```
_____

```
>> > Need Mail bonding?
>> > Go to the Yahoo! Mail Q&A for great tips from
>> Yahoo! Answers users.
>> >
>>
> http://answers.yahoo.com/dir/?link=list&sid=396546091
>>
>>
>>
>
>
>
>
>
```
_____

```
> Get your own web address.
> Have a HUGE year through Yahoo! Small Business.
> http://smallbusiness.yahoo.com/domains/?p=BESTDEAL
```

CSM01872

# Trial Exhibit 39

Trial Exhibit 39

**Crystal Cathedral Ministries Inc**
**Meeting of the Board of Directors**
**March 24, 2011**

Dr. Schuller called the meeting of the Crystal Cathedral Ministries, Inc. ("CCM")

to order and began with a Devotional and Prayer.


Dr. Schuller called the roll call: Arvella Schuller, Gwyn Myers, Rick Mysse, and

Jim Penner were all present.  Also attending; were Dr. Sheila Schuller Coleman the

CEO of CCM, Council for CCM Marc Winthrop and Richard Salus, and Council for

Dr. and Mrs. Schuller Carl Grumer.


<u>**Report on Chapter 11:**</u>

As part of developing a repayment plan Jim Penner informed the Board that CCM

management has completed work on the budget for 2011. The budget reflected a

surplus of just over 1 million. The surplus is a necessary factor in developing a

repayment plan for the vendors. The full budget will be brought to the next Board

meeting and the Board will discuss the budget then.

Marc Winthrop council for CCM, reported on the bankruptcy:

a) The Court approved the extension of the exclusivity period until <u>April 18</u>.  Mr.

Winthrop will file a request to the Court to extend the exclusivity period.

b) Noted time factors to completing a repayment plan are the completion of

reviewing all claims made by creditors to CCM, a risk analysis from FTI on the

property to determine valuations of the property and including expected

commercially standard levels of amortization, and finalizing all sources of cash

available to CCM for repayment.


X. 39

c) Gwyn Myers will develop a "timeline" of all tasks that need to be completed to

file a plan. That timeline will be distributed to Marc Winthrop, Jim Penner and

Sheila Coleman for review and input, and present the timeline at the next

scheduled Board meeting.

Gwyn Myers noted several items requiring Board action with regard to the

Chapter 11 process:

a) A demand letter calling the loan has been given to CCM on the Laguna Condo.

Said condo was a gracious gift to the ministry by Dr. and Mrs. Schuller.

Subsequent to the gift CCM's Board approved a loan to be placed against condo

to provide working capital to CCM. As a result of the lack of cash flow needed to

service the loan, a motion was made to list the condo for sale. After discussion the

Board passed the following resolution, with Gwyn Myers making the motion.

Rick Mysse seconding and all voting in favor, with Dr. Robert Schuller

abstaining, and Arvella Schuller voting in opposition.

**RESOLVED, the CCM shall list the condominium property located at 31423
Coast Highway, #33, Laguna Beach, CA 92677, Laguna Beach CA for sale
with Clarence Yoshikane, Sales Executive -- Bankruptcy Specialist,
Prudential California Realty, at fair market value. All showings shall be done
by appointment only.**

**RESOLVED FURTER, that the officers of CCM are hereby instructed to
take all appropriate action to list the condominium property, including
execution and delivery for the listing agreement and necessary disclosure
forms. Final sale is subject to Board approval.**

b) The contract with Tim Milner was discussed noting that Mr. Milner is

functioning in different areas of ministry than called for in his current contract.

CCM Council Richard Salus will review the current contract and bring a revised version to the next meeting.

c) The settlement contract with Carol Milner was discussed. It was noted that all cash and property items in the settlement contract have all be fulfilled, but that there is a clause in the contract that requires CCM to store set items from Creation owned by Carol Milner and maintain and preserve these items in "like condition". The agreement between CCM and Carol Milner is silent on the term for CCM's obligation to store said items. Noting that it was an extremely difficult task to store physical items in an unchanged state, and with no end date given, Gwyn Myers recommended that the contract be rejected, and that Carol Milner should be given reasonable notice to retrieve her physical items from ministry storage. After discussion the Board passed the following resolution, with Gwyn Myers making the motion. Rick Mysse seconding and all voting in favor, with Dr. Robert Schuller abstaining, and Arvella Schuller voting in opposition.

**RESOLVED, the contract between CCM and Carol Milner dated July 8, 2006 be rejected.**

**RESOLVED FURTHER, that Carol Milner shall be given thirty (30) days to remove her items from CCM's custody and control, at her expense.**

Richard Salus, CCM General Council reported that the trustee of the Garvey Estate has decided to remain neutral on a request to remove the restrictions on the Estate. After discussion the Board passed the following resolution, with Jim Penner making the motion. Rick Mysse seconding and all voting in favor.

**RESOLVED, Richard Salus, Council for CCM is hereby requested to petition the California Probate Court requesting, on CCM's behalf as the beneficiary of the Garvey Trust, that all restrictions on the use of the funds as set forth in the Garvey Trust be removed.**

### New Business:

Jim Penner recommended that Board meetings not be audio recorded in their entirety, but only audio record the motions and votes on motions. Written minutes were being taken and were sufficient for documenting the meetings. Richard Salus, council for CCM concurred that complete audio recordings were not necessary. After discussion the Board passed the following resolution, with Jim Penner making the motion. Rick Mysse seconding the motion and all voting in favor with Dr. Robert Schuller abstaining, and Arvella Schuller voting in opposition.

**RESOLVED, Audio recordings of CCM Board meetings shall only extend to motions and votes on motions.**

### Intellectual Properties and Transition Contract:

CCM Corporate Council Richard Salus reported that a meeting was convened with council to Dr. Robert H. Schuller and Arvella Schuller on regarding agreements impacting transition and intellectual property matters. Mr. Salus will continue work on this area along with intellectual property counsel for CCM and report to the Board on his progress at the next meeting.

### Presentation of Feb 15 and March 8 Minutes:

Jim Penner, Board Secretary presented the minutes for March 8, 2011 Board meeting. After discussion the Board unanimously accepted the March 8 minutes. Mr. Penner then presented the February 15 Minutes. After a brief discussion the February 15 minutes were accepted with Jim Penner making the motion. Rick Mysse seconding and all voting in favor, with Arvella Schuller abstaining.

The next scheduled meeting of the Board is Tuesday April 5 at 9:30am. There being no further business for the Board, the meeting was adjourned.

Jim Penner
Secretary

Approved by The Board of Directors on March 11, 2011

Dr. Robert Schuller,
Chairman of the Board of Directors

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1925 Century Park East, Suite 2000, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): **APPENDIX OF EXHIBITS IN SUPPORT OF SUPPLEMENTAL BRIEF**  will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (*date*) **October 25, 2019**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Allison R Axenrod    allison@claimsrecoveryllc.com
- James C Bastian    jbastian@shbllp.com
- Carla M Blanc    carla.margolis.blanc@sce.com, carla.margolis.blanc@sce.com
- Jeffrey W Broker    jbroker@brokerlaw.biz
- George S Burns    george@gsburnslaw.com, angela@gsburnslaw.com
- Frank Cadigan    frank.cadigan@usdoj.gov                ☒ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (*date*) **October 25, 2019**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

The Honorable Robert N. Kwan
United States Bankruptcy Court
255 E. Temple Street, Suite 1682
Los Angeles, CA 90012

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (*date*) **October 25, 2019**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐                                    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| October 25, 2019 | Jennifer A. Montgomery | /s/ Jennifer A. Montgomery |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                **F 9013-3.1.PROOF.SERVICE**

# CONTINUED SERVICE

## NEF

- Mark R Campbell    mcampbell@markcampbelllaw.com
- Patricia A Cirucci    patricia.cirucci@sce.com
- Jeff Cohen    JC@SouthpawAsset.com
- Jeff Cohen    JC@SouthpawAsset.com
- Chukwudum N Emenike - DISBARRED -    chuckeme@yahoo.com
- Don Fisher    dfisher@ptwww.com, tblack@ptwww.com
- Roger F Friedman    rfriedman@rutan.com
- Bernard R Given    bgiven@loeb.com, mortiz@loeb.com;ladocket@loeb.com;bgiven@ecf.courtdrive.com
- Marshall F Goldberg    mgoldberg@glassgoldberg.com, jbailey@glassgoldberg.com
- Carl Grumer    cgrumer@manatt.com, mchung@manatt.com;fstephenson@manatt.com
- Kavita Gupta    kgupta@guptaferrer.com
- Joan Huh    joan.huh@cdtfa.ca.gov
- Rika Kido    rkido@shulmanbastian.com, avernon@shulmanbastian.com
- Edward S Kim    ekim@hemar-rousso.com
- Jeannie Kim    jkim@buchalter.com
- Steven B Lever    sblever@leverlaw.com, assistant@leverlaw.com;r58483@notify.bestcase.com;6121219420@filings.docketbird.com
- Peter W Lianides    plianides@wcghlaw.com, pj@wcghlaw.com;jmartinez@wcghlaw.com;Meir@virtualparalegalservices.com
- Craig A Loren    aloren@debtacquisitiongroup.com, bschwab@debtacquisitiongroup.com;jsarachek@debtacquisitiongroup.com
- Douglas L Mahaffey    dougm@mahaffeylaw.com, michelle@mahaffeylaw.com
- Alvin Mar    alvin.mar@usdoj.gov, dare.law@usdoj.gov
- Lawrence C Meyerson    lcm@lcmplc.com
- Christopher Minier    becky@ringstadlaw.com, arlene@ringstadlaw.com
- Michael S Mitchell    mike@demarcomitchell.com
- John D Monte    johnmontelaw@gmail.com
- Susan I Montgomery    susan@simontgomerylaw.com, assistant@simontgomerylaw.com; simontgomerylawecf@gmail.com; montgomerysr71631@notify.bestcase.com
- Karen S. Naylor    knaylor@burd-naylor.com, Karen@ringstadlaw.com;jaimee@ringstadlaw.com
- Karen S. Naylor    knaylor@burd-naylor.com, Karen@ringstadlaw.com;jaimee@ringstadlaw.com
- Brian R Nelson    becky@ringstadlaw.com, brian@ringstadlaw.com;arlene@ringstadlaw.com
- Vahak Papasian    vahak@vaplaw.com, hawkp@ecf.courtdrive.com;test@ecf.courtdrive.net
- Sue Y Park    sparkcallahan@gmail.com
- Thomas J Polis    tom@polis-law.com, paralegal@polis-law.com;r59042@notify.bestcase.com
- Richard J Reynolds    rreynolds@bwslaw.com, psoeffner@bwslaw.com;tmims@bwslaw.com;rjr-nef@bwslaw.com;fcabezas@bwslaw.com
- James S Riley    tgarza@sierrafunds.com
- Todd C. Ringstad    becky@ringstadlaw.com, arlene@ringstadlaw.com
- Christopher O Rivas    crivas@reedsmith.com, chris-rivas-8658@ecf.pacerpro.com
- Nanette D Sanders    becky@ringstadlaw.com, arlene@ringstadlaw.com
- Ramesh Singh    claims@recoverycorp.com
- Robert Tannor    rtannor@creditorliquidity.com
- Edward J Tredinnick    etredinnick@greeneradovsky.com
- United States Trustee (SA)    ustpregion16.sa.ecf@usdoj.gov
- Andrew F Whatnall    awhatnall@daca4.com
- Marc J Winthrop    mwinthrop@wcghlaw.com, pj@wcghlaw.com;jmartinez@wcghlaw.com
- Arnold H. Wuhrman    Arnold@WuhrmanLaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*    **F 9013-3.1.PROOF.SERVICE**