FILED & ENTERED

MAR 31 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY bakchell  DEPUTY CLERK

## NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>CRYSTAL CATHEDRAL MINISTRIES,<br><br>Debtor. | Case No. 2:12-bk-15665-RK<br><br>Chapter 11<br><br>**MEMORANDUM DECISION AND ORDER ON MOTION OF RESPONDENT CAROL MILNER FOR SANCTIONS UNDER FEDERAL RULE OF BANKRUPTCY PROCEDURE 9011 OR THE COURT'S INHERENT AUTHORITY AGAINST DEBTOR, CRYSTAL CATHEDRAL MINISTRIES, AND DEBTOR'S COUNSEL** |

Pending before the court is the Motion of Carol Milner for Sanctions against Debtor Crystal Cathedral Ministries and Debtor's Counsel pursuant to Federal Rule of Bankruptcy Procedure 9011 ("Bankruptcy Rule 9011")[1] or the court's inherent authority, filed on July 2, 2019 (the "Sanctions Motion" or "Motion for Sanctions"), Electronic Case Filing ("ECF") 2100.  In this memorandum decision, the court refers to Carol Milner as "Milner," her counsel as "Movant's Counsel," Crystal Cathedral Ministries as "CCM," and CCM's counsel as "Debtor's Counsel."

---

[1]    Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101 – 1532.  References to the Federal Rules of Bankruptcy Procedure appear as "Bankruptcy Rule _," and references to the Federal Rules of Civil Procedure appear as "Civil Rule _."

1    In her Motion for Sanctions, Milner asserts that CCM and Debtor's Counsel filed a

2    frivolous Motion for an Order to Show Cause RE Contempt, ECF 2043 (the "Contempt

3    Motion"), seeking to hold her and her attorney, Harold J. Light ("Light"), in contempt for

4    allegedly violating the discharge injunction in this bankruptcy case, without making a

5    reasonable inquiry or having a legal or factual basis for the filing of the Contempt Motion.

6    Specifically, Milner contends that her written objection to the issuance of an order to show

7    cause requested in the Contempt Motion, filed on June 12, 2018 (ECF 2050 and 2051)

8    and the July 11, 2018 e-mail from Movant's Counsel to Debtor's Counsel, attaching a

9    warning letter (the "Bankruptcy Rule 9011 Warning Letter"), put CCM and Debtor's

10   Counsel on notice that the facts and law established that a 2006 settlement agreement

11   between Milner and CCM (the "Settlement Agreement") was an enforceable contract,

12   which was no longer executory, and was thus never rejected in CCM's bankruptcy case,

13   which arguments showed that the Contempt Motion lacked merit.  *Sanctions Motion,* ECF

14   2100 at 14 (citing *inter alia, In re Parkwood Realty Corp.,* 157 B.R. 687 (Bankr. W.D.

15   Wash. 1993) and *In re Continental Country Club, Inc.,* 114 B.R. 763 (Bankr. M.D. Fla.

16   1990)).  According to Milner, a reasonable review of the Settlement Agreement indicated

17   that it was not an executory contract which could be rejected by CCM in its bankruptcy

18   case.  *Id.* at 13-14 (citing *In re Robert L. Helms Construction & Development Company,*

19   *Inc.,* 139 F.3d 702, 705 and n. 7 (9th Cir. 1998)).  Milner also asserts that Debtor's

20   Counsel, on behalf of CCM, erroneously claimed that the relevant date for rejection or

21   breach under 11 U.S.C. § 1141(b) was the date the final decree was entered in the case,

22   not the "effective date of the plan."  *Id.* at 14.  Milner further asserts that CCM ignored the

23   Ninth Circuit's decisions in *In re Ybarra,* 424 F.3d 1018 (9th Cir. 2005) and *In re Taggart,*

24   888 F.3d 438 (9th Cir. 2018)[2], and wrongfully contended that she violated the discharge

25   injunction by filing an answer in a state court action commenced by CCM against her in

26   November 2017 (the "State Court Action").  *Id.* at 14-15.

27   _____

28   [2]    The Ninth Circuit's decision in *In re Taggart* was later vacated and remanded, 587 U.S. __, 139 S.
Ct. 1795, 204 L.Ed. 2d 129 (2019).

**MEMORANDUM DECISION**

Milner contends that Debtor's Counsel and CCM filed a trial brief in support of the Contempt Motion that advanced false factual arguments and misstated the law, ECF 2071 (the "CCM Trial Brief").  *Sanctions Motion*, ECF 2100 at 15.  Milner contends that CCM's position in its Trial Brief filed by Debtor's Counsel, arguing in the alternative that CCM never transferred ownership of the subject property to Milner and that she must present evidence of her ownership of the property at trial, was false and contradictory to its litigating position taken in the State Court Action that she owned the subject property.  *Id.* Milner also asserts that CCM through Debtor's Counsel falsely recited California law as requiring a bill of sale to transfer property, misreading *Hull v. Ray*, 80 Cal.App. 284 (1926), and wrongfully argued that there was no consideration for the transfer of the subject property to Milner, which CCM contended defeated her claims.  *Id.*

Milner further argues that the post-trial brief filed by CCM through Debtor's Counsel presented additional frivolous arguments not warranted by fact or law, ECF 2077 (the "CCM Post-Trial Brief").  *Sanctions Motion*, ECF 2100 at 16.  Milner contends that Debtor's Counsel's claim at trial that Ninth Circuit authority supported the proposition that Milner had an implied duty to inspect or "timely" retrieve the subject property, and his subsequent failure to produce such authority in the CCM Post-Trial Brief or retract the claim in the same brief, amounted to a frivolous legal argument.  *Id.*

Milner thus argues in the Sanctions Motion that the court may impose sanctions against Debtor's Counsel and CCM pursuant to Bankruptcy Rule 9011 or the court's inherent authority because the Contempt Motion, CCM Trial Brief, and CCM Post-Trial Brief included arguments not warranted by fact or law, and the Contempt Motion was filed by CCM to "harass Ms. Milner in an . . . attempt . . . to persuade her to release CCM from any and all damage claims that she may have against CCM and Crystal Cathedral for their failure to properly store her property."  *Id.* at 17.

On August 28, 2019, CCM filed its opposition to the Sanctions Motion, arguing that the Sanctions Motion was untimely and failed to demonstrate sanctionable conduct by CCM under Bankruptcy Rule 9011.  *CCM Opposition to Sanctions Motion*, ECF 2114.

**MEMORANDUM DECISION**

1    CCM argued that Milner failed to trigger the 21-day "safe harbor" under Bankruptcy Rule

2    9011(c)(1)(A), and, citing *Islamic Shura Council of Southern California v. F.B.I.,* 757 F.3d

3    870 (9th Cir. 2014), that the Sanctions Motion was untimely because the court already

4    adjudicated the Contempt Motion.  *CCM Opposition to Sanctions Motion*, ECF 2114 at 10-

5    12.  CCM also argued that because it was represented by legal counsel, Debtor's

6    Counsel, monetary sanctions pursuant to Bankruptcy Rule 9011(b)(2)—those related to

7    claims allegedly not warranted by law—cannot be imposed against CCM.[3]  *Id.* at 15-17.

8    Alternatively, CCM asserted that Milner did not present evidence of specific conduct

9    indicating an "improper purpose" behind the filing of the Contempt Motion.  *Id.* at 19.  CCM

10   asserted that any of Milner's contentions that might be construed as evidencing its specific

11   conduct were based on claims under Bankruptcy Rule 9011(b)(2), which provision does

12   not apply to represented parties in their individual capacities.  *Id.* at 20-23.  CCM also

13   argued that sanctions under the court's inherent authority are without merit because

14   Milner failed to demonstrate bad faith on its part because it relied on counsel in filing the

15   Contempt Motion, which was a pleading supported by law.  *Id.* at 24.

16          Debtor's Counsel filed a separate opposition to the Sanctions Motion on August 28,

17   2019, arguing that the requested relief in the Sanctions Motion should be denied on

18   numerous grounds.  *Debtor's Counsel Opposition to Sanctions Motion*, ECF 2120.  First,

19   Debtor's Counsel argued that because no motion to reopen the bankruptcy case was filed

20   by Milner, the Sanctions Motion should be denied in its entirety.  *Id.* at 6.  Debtor's

21   Counsel also made the same arguments as CCM: that the Sanctions Motion was untimely

22   under *Islamic Shura Council of Southern California v. F.B.I.,* 757 F.3d 870 (9th Cir. 2014),

23   and that Bankruptcy Rule 9011 sanctions are precluded because Milner failed to satisfy

24   the "safe harbor" requirement of Bankruptcy Rule 9011(c)(1)(A).  *Id.* at 7-8.  Additionally,

25   Debtor's Counsel asserted that the court could not exercise its inherent authority to

26

27

28   [3]     Bankruptcy Rule 9011(c)(2)(A) states: "Monetary sanctions may not be awarded against a
represented party for a violation of subdivision (b)(2)."

**MEMORANDUM DECISION**

1  sanction because Bankruptcy Rule 9011 expressly covered all of the alleged misconduct

2  and that his conduct did not reach the threshold for a finding of bad faith.  *Id.* at 9-10, 12.

3  CCM and Debtor's Counsel each made a counter-request for sanctions against

4  Milner for filing the Sanctions Motion.  *CCM Opposition to Sanctions Motion,* ECF 2114 at

5  27-28; *Debtor's Counsel Opposition to Sanctions Motion,* ECF 2120 at 14.

6  On September 11, 2019, Milner filed a reply addressing these oppositions of CCM

7  and Debtor's Counsel.  *Milner Reply to CCM and Debtor's Counsel Oppositions*, ECF

8  2121.  Milner argued that the Sanctions Motion was timely pursuant to Bankruptcy Rule

9  9011 because CCM and Debtor's Counsel had allegedly waived any objections to the 21-

10  day "safe harbor" under Bankruptcy Rule 9011 by signing a stipulation dated July 15,

11  2019, the Bankruptcy Rule 9011 Warning Letter from Movant's Counsel to Debtor's

12  Counsel satisfied the safe harbor of Bankruptcy Rule 9011, alternatively, the Contempt

13  Motion was essentially the filing of a bad faith petition not requiring compliance with the

14  Bankruptcy Rule 9011 safe harbor, the Sanctions Motion was filed "as soon as

15  practicable," and the court's inherent authority to sanction is not limited by a procedural

16  safe harbor or similar considerations.  *Milner Reply to CCM and Debtor's Counsel*

17  *Oppositions*, ECF 2121 at 5-6.  Milner also made the further arguments that CCM and

18  Debtor's Counsel acted in bad faith, asserting that he failed to independently investigate

19  the facts or law before filing the Contempt Motion and that CCM pursued the Contempt

20  Motion for the improper purpose of intimidating and harassing Milner. *Id.* at 7, 11.

21  The court conducted a hearing on the Sanctions Motion on September 18, 2019.

22  At the hearing, Milner requested leave of court to file supplemental briefing and evidence

23  in support of the Sanctions Motion.[4]  Debtor's Counsel and CCM orally objected to this

24  request, and the court, after hearing argument on the objections, overruled the objections

25  and granted the request of Milner for supplemental briefing and evidence.  On September

26  24, 2019, CCM filed and served a formal written objection to the "order" (i.e., the court's

27  _____

28  [4]    *Audio Recording, September 18, 2019, Sanctions Motion Hearing* at 12:59–1:01 p.m. ("We thought
this was sufficient, but obviously it isn't. . . . Can we have a briefing schedule so we can go ahead . . .")
(Movant's Counsel); *see also id.* at 1:04–1:09 p.m.

**MEMORANDUM DECISION**

1  oral ruling of September 18, 2019) allowing Milner to file "amended" or further briefing or

2  evidence.  *CCM Objection to Order Allowing Milner to File "Amended" or Further Briefing*

3  *or Evidence in Support of the Motion for Sanctions*, ECF 2124.  On September 27, 2019,

4  Milner filed and served a reply to CCM's renewed objection.  *Milner Response to*

5  *Objection of CCM to Supplemental Briefing*, ECF 2125.  On October 10, 2019, Debtor's

6  Counsel filed a joinder in CCM's renewed objection.  *Joinder to CCM Objection to Order*

7  *Allowing Supplemental Briefing*, ECF 2126.  The court overruled the renewed objections

8  to supplemental briefing filed by CCM and Debtor's Counsel by order entered on

9  November 12, 2019.  ECF 2129.

10        Pursuant to the court's oral ruling of September 18, 2019, which permitted

11  supplemental briefing and evidence, Milner filed a Supplemental Memorandum in support

12  of the Sanctions Motion on October 25, 2019 (the "Supplemental Memorandum").  *Milner*

13  *Supplemental Memorandum re Bad Faith,* ECF 2127.  In her Supplemental Memorandum,

14  Milner argues that the court's inherent sanctioning power is not displaced by Bankruptcy

15  Rule 9011, *id.* at 5-6, and the bad faith conduct of Debtor's Counsel and CCM merits the

16  imposition of sanctions under the court's inherent authority, *id.* at 14 and 19.  Milner

17  contends that Debtor's Counsel should be sanctioned based on his purported

18
19        (i) frivolous filing of the OSC Motion for the improper purpose of
      pressuring her to sign a release of claims before she could inspect
      her property, (ii) knowing submission of his false declaration in
20        support of a motion for a continuance, (iii) knowing submission of
      the false and contradictory testimony of Gwen Myers at trial, and
21        (iv) presentation of false and misleading legal arguments at trial, all
      of which were intended to mislead the Court[.]

22  *Id.* at 14.  As to CCM, Milner argues that the court should impose sanctions under its

23  inherent authority because "CCM supported the introduction of the perjurious declaration

24  of Ms. Myers and the making of frivolous factual and legal arguments to the Court."  *Id.* at

25  19.  According to Milner, CCM's choosing to sue both her and her state court attorney,

26  Light, for contempt can only be viewed as a blatant attempt to intimidate and coerce her

27  into signing a release of all claims against CCM before she could inspect her property.  *Id.*

28  at 19.

**MEMORANDUM DECISION**

1        On December 2, 2019, CCM filed its Response to Milner's Supplemental

2  Memorandum, which argued that its conduct did not rise to the level of bad faith—there

3  was no evidence of recklessness and improper purpose or harassment—and that Milner

4  conceded that her Bankruptcy Rule 9011 claim was futile.  *CCM Response to*

5  *Supplemental Memorandum,* ECF 2131 at 16-18.  Debtor's Counsel filed a separate Brief

6  in Opposition to Milner's Supplemental Memorandum.  *Debtor's Counsel Opposition to*

7  *Supplemental Memorandum,* ECF 2133.  In Debtor's Counsel's opposition, he argued, as

8  CCM did, that Bankruptcy Rule 9011 should not be displaced by the court's inherent

9  authority to sanction and asserted that he made legal arguments regarding the executory

10  nature of the Settlement Agreement, claim preclusion, waiver, and the purported non-

11  transfer of the subject property in good faith.  *Id.* at 5-16.

12        On December 16, 2019, Milner filed replies to CCM's supplemental briefing, ECF

13  2135, and Debtor's Counsel's supplemental briefing, ECF 2136.  In her reply to CCM's

14  opposition, Milner argued that CCM has engaged in litigation for the purpose of harassing

15  her into releasing her claims related to the subject property, and CCM allowed Debtor's

16  Counsel to file the allegedly fraudulent declaration of Gwen Myers.  *Reply to CCM*

17  *Supplemental Opposition,* ECF 2135 at 3-6.  In her reply to Debtor's Counsel's opposition,

18  Milner argued that the authority in *Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991) allows

19  the federal courts to use their inherent authority to sanction even when other federal rules

20  may allow sanctions for similar conduct.  *Reply to Debtor's Counsel Supplemental*

21  *Opposition,*  ECF 2136 at 5.  Milner also contended that the filing of the Contempt Motion

22  was in bad faith because, among others, Debtor's Counsel ignored controlling Ninth

23  Circuit authority.  *Id.* at 7.[5]  Additionally, Milner argued that Debtor's Counsel's significant

24  reliance on the statements and positions of CCM's prior attorneys was objectively

25  unreasonable, the exhibits Debtor's Counsel included with his supplemental brief were

26

27  ——————————

28  [5]    Milner again cited to *In re Taggart*, 888 F.3d 438 (9th Cir. 2018), *vacated and remanded,* 587 U.S.
    __, 139 S. Ct. 1795, 204 L.Ed. 2d 129 (2019) and *In re Ybarra*, 424 F.3d 1018 (9th Cir. 2005).

**MEMORANDUM DECISION**

1    either unauthenticated or already filed, and his submission of the allegedly fraudulent

2    declaration of Gwyn Myers all demonstrate bad faith. *Id.* at 7-13.

3          Regarding resolution of this Motion for Sanctions, the court may and does take

4    judicial notice of its files and records under Federal Rule of Evidence 201. *In re Clark*,

5    525 B.R. 442, 449 n.8 (Bankr. D. Idaho 2015), *aff'd*, 2016 WL 1377807 (9th Cir. BAP

6    2016) (taking judicial notice of papers filed on its docket and noting, "papers filed in a

7    bankruptcy case by a debtor under penalty of perjury also have evidentiary significance

8    under Fed. R. Evid. 801(d)"); *see also,* Barry Russell, *Bankruptcy Evidence Manual,* §

9    201.05 (online ed., October 2019 update). In particular, the court finds that its

10   Memorandum Decision on Debtor's Motion for Issuance of Order Directing Carol Milner

11   and Harold J. Light, Esq. to Show Cause Why They Should Not Be Held In Contempt

12   (FRBP 9020); And For Damages and Attorneys' Fees For Intentionally Violating the

13   Permanent Injunction, filed and entered on November 2, 2018, ECF 2079 (the

14   "Memorandum Decision"), along with the papers and evidence underlying that decision,

15   are integral to adjudication of the Sanctions Motion. Accordingly, the court discusses the

16   Memorandum Decision and the record in that proceeding below.

17          Having considered all the oral and written arguments of the parties and the other

18   papers and pleadings filed relating to this matter, the court rules as follows.

19                   **I.**      **JURISDICTION**

20          This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§

21   1334(b) and 157(b)(2)(A).

22                  **II.**      **BACKGROUND**

23   **A.**     **Milner's Play, the 2006 Settlement Agreement, and the CCM's Bankruptcy**

24          The background of the Sanctions Motion originates in the 1990s when Milner wrote

25   a play entitled "Glory of Creation" (the "Play"). *Memorandum Decision*, ECF 2079 at 4. In

26   2003, CCM and Milner began negotiations regarding staging the Play on CCM's church

27   campus beginning in the summer of 2005. *Id*. According to CCM, it incurred almost $10

28   million in expenses by purchasing the subject property for the Play (the "property," the

1   "subject property," or the "Play Property").[6]  *CCM Trial Brief*, ECF 2071 at 3.  Thereafter, a

2   dispute arose between CCM and Milner after CCM notified Milner that it would not be

3   staging the Play in 2006 or beyond.  *Memorandum Decision*, ECF 2079 at 4.  CCM and

4   Milner began negotiations of an agreement to resolve their disputes related to the Play,

5   and on or about July 8, 2006, CCM and Milner entered into the Settlement Agreement to

6   resolve their disputes.  *Id.*  The Settlement Agreement recited that "various disputes and

7   controversies have broken out between [CCM] and [Milner], all of which disputes and

8   controversies the parties intend to and do hereby agree to fully and finally settle and

9   resolve the same in accordance with the terms and conditions set out" in the Settlement

10  Agreement.  *Id.* at 4-5.  The Settlement Agreement provided for a release of claims by

11  CCM against Milner and Milner against CCM, settlement payments from CCM to Milner,

12  and the storage by CCM of various physical property assets belonging to Milner.  *Id.* at 4-

13  5.  Much of this property is still being stored by CCM for Milner.  *Jacobson Declaration,*

14  *Contempt Motion,* ECF 2043 at 23-25.

15         On October 18, 2010, CCM initiated this bankruptcy case by filing a voluntary

16  petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C.  ECF 1.  Milner filed

17  four proofs of claim in CCM's bankruptcy case: (1) Claim No. 243-1, amended by Claim

18  No. 243-2, asserting a claim of $10,615 for "housing allowance and copyright

19  infringement"; (2) Claim No. 336-1 asserting an administrative claim for an unknown

20  amount based on alleged copyright infringement relating to the Play; (3) Claim No. 337-1

21  asserting an administrative claim of $83,608.92 for breach of an oral pre-petition

22  employment contract for post-petition services as CCM's "Director of Brand Development

23  and Intellectual Property"; and (4) Claim No. 342-1 asserting an administrative claim for

24

25  [6]     In making this assertion, CCM relied upon the Declaration of Gwyn Myers, who was a board
    member of CCM in 2006 and later chief restructuring officer during CCM's bankruptcy case.  *Declaration of
    Gwyn Myers,* ECF 2068 at 2 (¶¶ 3-4). However, at trial the court sustained Milner's objection to testimony as
26  to the asserted $13 million loss that CCM incurred in putting on the Play.  *Evidentiary Hearing Transcript,
    September 20, 2018,* ECF 2095 at 304-305.  The statements regarding the financing of the Play provide
27  information as to what the parties contend was involved in the dispute between CCM and Milner, resulting in
    the Settlement Agreement, and are relevant to the defense of CCM and its attorney, Debtor's Counsel, that
28  they did not act in bad faith. Milner in her trial testimony acknowledged that CCM spent $9 million in
    expenses in acquiring property for the Play.  *Id.* at 304.

**MEMORANDUM DECISION**

1   an unknown amount based on other alleged copyright infringement relating to the Play.

2   Milner withdrew Claim Number 243-2 as it related to the copyright infringement claim and

3   Claim Numbers 336-1 and 342-1 in their entirety.  *Notice of Withdrawal of Proofs of Claim*

4   *and Administrative Expense Claims,* ECF 1262.  The court allowed in part Milner's Claim

5   Number 243-2 for a housing allowance based on a concession of the plan agent and

6   disallowed the remainder of the claim and the entirety of her Claim Number 337-1 based

7   on breach of the oral pre-petition employment contract with CCM, which is not related to

8   the Settlement Agreement.  *Memorandum Decision on Motion of Plan Agent and*

9   *Reorganized Debtor for Judgment on Partial Findings re: Objections to Claims*, ECF 1386

10  at 47-53.

11          On December 12, 2011, the court entered its order confirming the Second

12  Amended Chapter 11 Plan Filed by the Official Committee of Creditors Holding Unsecured

13  Claims as Modified at Confirmation Hearing (the "Plan").  *Plan Confirmation Order*, ECF

14  841; *see also Second Amended Chapter 11 Plan*, ECF 812.  On April 27, 2012, the court

15  entered an order establishing an Effective Date of the Plan of May 1, 2012 (the "Effective

16  Date").  *Order Establishing Plan Effective Date,* ECF 1105; *see also Notice of Plan*

17  *Effective Date*, ECF 1108.  On May 20, 2016, upon CCM's motion, and having determined

18  that the Plan was fully implemented, the court entered a Final Decree Closing Case, ECF

19  2028.

20  **B.    CCM's State Court Action and Motion for Contempt**

21          On November 7, 2017, CCM and its affiliate, The Crystal Cathedral, represented by

22  Debtor's Counsel, filed the State Court Action: a *Complaint for: (1) Declaratory Relief; and*

23  *(2) Injunctive Relief* (the "State Court Complaint") against Milner in the Superior Court of

24  California for the County of Orange, Case Number 30-2017-00954144-CU-MC-CJC.

25  *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 4-

26  115.  CCM's State Court Complaint[7] alleged two claims for relief, one for declaratory relief

27  _____

28  [7]      Although CCM's affiliate, The Crystal Cathedral, was a plaintiff with CCM in the State Court Action,
it was not a party to this contested matter, and the court refers to the State Court Complaint as CCM's.

1   and one for injunctive relief.  CCM's declaratory relief claim sought a judicial determination

2   that the relationship of a gratuitous bailment was created between CCM and Milner, that

3   this gratuitous bailment relationship terminated and that CCM has no continuing obligation

4   to store and maintain Milner's personal property items.  *State Court Complaint, Exhibit A*

5   *to Debtor's Request for Judicial Notice,* ECF 2044 at 8-9 (¶¶ 24-29).  CCM in its

6   declaratory relief claim alternatively requested that if the state court determined that the

7   Settlement Agreement between CCM and Milner, referred to by CCM as "the subject

8   rejected executory contract," still created "any rights and obligations between the parties,"

9   the state court determine that the contract did "not include any obligation for CCM to store

10  [Milner's property] indefinitely," interpreting the language of the Settlement Agreement that

11  "CCM will keep all goods in the same condition as they were at the end of the '05 Season"

12  to allow it to declare the termination of any storage arrangement.  *Id.* at 9 (¶ 30).  CCM's

13  injunctive relief claim sought a mandatory injunction compelling Milner to remove her

14  items from its premises, or, alternatively, allowing CCM to dispose of Milner's items with

15  reasonable costs of storage and disposal to be reimbursed by Milner to CCM.  *Id.* at 9 (¶¶

16  31-34).

17         In support of its two claims for relief in the State Court Complaint, CCM alleged that

18  it had entered into the Settlement Agreement to resolve the parties' differences regarding

19  the production of the Play, that it stored various physical properties belonging to Milner,

20  that the remaining stored property occupied several large box trailers owned by CCM, that

21  CCM had submitted the Plan in its bankruptcy case on or about November 23, 2011,

22  which plan of reorganization included a provision specifically addressing

23  "Assumption/Rejection of Executory Contracts and Unexpired Leases" that stated: "Any

24  contracts not designated for assumption or rejection at or before the Confirmation

25  Hearing, shall be deemed rejected as of the Effective Date," that this plan provision

26  applied to the Settlement Agreement of July 8, 2006 between CCM and Milner as the

27  Settlement Agreement "was not Accepted specifically in the Plan," that the bankruptcy

28  court entered its order confirming the Plan, that the bankruptcy court's plan confirmation

11

**MEMORANDUM DECISION**

1  order resulted in a rejection and discharge of the Settlement Agreement between CCM

2  and Milner, which order terminated CCM's duty to comply with the agreement and relieved

3  it of any and all obligations to any future performance under the Settlement Agreement "to

4  store any of the equipment of" Milner, "if such an obligation ever existed," that after the

5  Settlement Agreement was rejected and discharged in the bankruptcy case, the

6  relationship between CCM and Milner "became one of a gratuitous bailment" as codified

7  by California Code of Civil Procedure §1847(b) in that Milner "deposited her personal

8  property with CCM without CCM ever receiving consideration for storing the property

9  beyond the mere possession of [Milner's] deposit," and that the bailment terminated when

10  CCM gave notice of its termination to Milner by a letter sent by CCM's out of state counsel

11  in Oklahoma on April 19, 2017.  *State Court Complaint, Exhibit A to Debtor's Request for*

12  *Judicial Notice,* ECF 2044 at 5-8 (¶¶ 7-23).

13         Thus, in its State Court Complaint, CCM's theory for declaratory and injunctive

14  relief terminating its contractual obligations to store Milner's property under the Settlement

15  Agreement was that such obligations were terminated as a result of the entry of the

16  bankruptcy court's order confirming the Plan that included a plan provision which rejected

17  executory contracts not specifically designated for assumption or rejection at or before the

18  plan confirmation hearing, and that the Settlement Agreement was not so designated.

19  CCM in its allegations in the State Court Complaint admitted that it entered into the

20  Settlement Agreement and did not dispute its execution, that it had contractual obligations

21  under the Settlement Agreement to store Milner's property from the Play, and that it did

22  not dispute Milner's ownership of the property.[8]  CCM's theory of relief in the State Court

23  Complaint was premised on the assumption that the Settlement Agreement between it

24  and Milner was an executory contract, as the allegations of paragraphs 14-16 and 30 refer

25  to executory contracts.  Paragraphs 14-16 refer to CCM's plan of reorganization,

26

27  [8]      Although CCM in the State Court Complaint in paragraphs 25 and 29 referred to the "CCM items,"
CCM otherwise referred to the property as property belonging to Milner, i.e., "various physical properties
belonging to Defendant [Milner]," "her personal property," "her property" and "her items," and none of CCM's
28  allegations in the State Court Complaint made a claim of ownership of this property.

**MEMORANDUM DECISION**

specifically addressing the assumption and rejection of executory contracts and unexpired leases and alleging that the Settlement Agreement was "not Accepted [i.e., assumed]." *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice,* ECF 2044 at 6 (¶¶ 14-16).  Paragraph 30 refers to the Settlement Agreement as "the subject rejected executory contract," but no allegation of the complaint specifically alleges that the Settlement Agreement was an executory contract or how it was executory.  *Id.* at 9 (¶ 30).

On February 15, 2018, Debtor's Counsel sent a letter by email to Milner's counsel in the State Court Action, Light, setting forth a settlement proposal on behalf of CCM.  By the proposed settlement, CCM would offer Milner "actual ownership of the storage trailers themselves" to resolve the State Court Action with "a mutually acceptable general release and settlement agreement[,]" but that she would have to "accept the trailers as is, where is, and she would take possession of them in their entirety with all the contents." *Exhibit 3 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 44.  By offering Milner ownership of the storage trailers themselves, the implicit assumption in CCM's settlement offer was that the contents of those trailers, namely, the property stored inside, already belonged to Milner, which was consistent with CCM's allegations in the State Court Complaint that it was storing Milner's property.

On February 28, 2018, Milner, represented by Light, filed an answer to the State Court Complaint (the "Answer").  *Answer, Exhibit B to Debtor's Request for Judicial Notice*, ECF 2044 at 117-125.  In the Answer, Milner denied the allegations of the State Court Complaint and asserted twenty-one affirmative defenses.  *Id*.  The twenty-one Affirmative Defenses included: (1) Failure to State a Claim, (2) Detrimental Reliance, (3) Intentional and/or Negligent Misrepresentation and Concealment, (4) Plaintiff's Acts and Omissions, (5) Intentional or Negligent Misconduct of Third Parties, (6) Contractual Obligations Not Extinguished, (7) Obligation to Maintain Defendant's Property, (8) Failure to Allow Reasonable Access to Property, (9) Acts and Omissions of a Party's Agents, (10) Acts and Omissions of Plaintiffs' Principals, (11) Laches, (12) Estoppel, (13) Waiver, (14) Unclean Hands, (15) In Pari Delicto, (16) Offset, (17) Failure to Mitigate, (18) Plaintiffs Not

13

1  Real Parties In Interest, (19) Plaintiffs Lack Capacity to Maintain Action, (20) Breach of

2  Duty to Redeliver Defendant's Property, and (21) Failure to Comply with

3  Statutory/Common Law Duties of Bailee.  In Milner's Sixth Affirmative Defense –

4  "Contractual Obligations Not Extinguished," she directly contravened CCM's theory of

5  relief in alleging that "Plaintiffs' contractual obligations were not extinguished in

6  bankruptcy proceedings."  *Id.* at 119.

7          On Monday March 19, 2018, Debtor's Counsel sent an email message to Milner's

8  counsel, Light, stating that he (Debtor's Counsel) was working on an "ex-parte" to be

9  noticed for "this Thursday" to have the state court rule that "by filing an answer that claims

10  that [Milner] has ownership rights, notwithstanding the bankruptcy plan confirmation order,

11  she is violating the permanent injunction.  The law on concept that a plan confirmation

12  order is resjudicata [sic] as to any creditor claim, filed or unfiled, is very compelling.  [See

13  e.g. *Trulis v. Barton* (9th Cir. 1995) 107 F3d 685, 691; *In re Chattanooga Wholesale*

14  *Antiques, Inc.* (6th Cir. 1991) 930 F2d 458, 463; *In re Maxwell Communication Corp.* (2nd

15  Cir. 1996) 93 F3d 1036, 1044.]."  *Exhibit 5 to Debtor's Counsel Declaration attached to*

16  *Contempt Motion*, ECF 2043 at 56.   Debtor's Counsel further stated in this email

17  message:

18          Once she understands this, or if necessary is educated by the
          Court, even though my clients could dispose of the property under
19          the protection of the permanent injunction, they are still willing to
          circulate a release.  After your client signs it, she can then come
20          and retrieve the property.  The major issue in logic between us, is
          your use of the phrase 'her property'.  The permanent injunction
21          terminated her ownership.  Is she ready to sign a release?  If not, I
          will look forward to your opposition.
22
   *Id.*
23
          Apparently, what Debtor's Counsel meant by working on an "ex-parte" was an
24
   application for a temporary restraining order to be heard on an ex parte basis relating to
25
   CCM's injunctive relief claim in the State Court Complaint, which would be considered and
26
   ruled upon by the state court.  The case law cited by Debtor's Counsel in the email stands
27
   for the general proposition that a plan confirmation order has res judicata effect as to
28

**MEMORANDUM DECISION**

1  prepetition claims of creditors, whether filed in the bankruptcy case or not, but does not

2  specifically address the situation here of a claim of post-confirmation breach of a

3  prepetition contract that is no longer executory and could not be rejected in the bankruptcy

4  case, as discussed herein.  The implicit assumption in the statement in Debtor's Counsel's

5  email regarding Milner's property, that "[t]he permanent injunction terminated her

6  ownership," was that Milner previously owned the property which was transferred to her

7  by the Settlement Agreement.  *Exhibit 5 to Debtor's Counsel Declaration attached to*

8  *Contempt Motion*, ECF 2043 at 56.  Thus, CCM's position asserted by Debtor's Counsel

9  in this email was not that Milner never owned the property because there was no valid

10  transfer from the Settlement Agreement, but that Milner owned the property, and her

11  ownership was somehow terminated by the plan confirmation order.  There is nothing in

12  Debtor's Counsel's email that sets forth the legal authority that terminated the transfer of

13  property to Milner under the Settlement Agreement, and his proposition is simply

14  unfounded as he never provided any valid legal authority for such a proposition in this

15  matter.

16  On March 30, 2018, Milner's counsel, Light, sent a letter to Debtor's Counsel by

17  email and regular mail in response to Debtor's Counsel's email message of March 19,

18  2018 and a telephone conversation that Light and Debtor's Counsel had on March 29,

19  2018.  *Exhibit 6 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043

20  at 58-59.  As recited in this letter, Light stated that Debtor's Counsel said in this telephone

21  conversation that he (Debtor's Counsel) intended to file a motion to strike Milner's answer

22  to the State Court Complaint on grounds that the affirmative defenses purportedly violate

23  the discharge injunction in CCM's bankruptcy case and that he (Debtor's Counsel) had

24  reserved a May 20, 2018 hearing date for this motion, but wanted to seek by way of an ex

25  parte application an earlier hearing date.  *Id.* at 58.  Light further stated that he was

26  extremely busy dealing with many motions in limine and otherwise preparing for a two

27  week jury trial beginning on April 30, 2018, and had requested Debtor's Counsel to give

28  him an accommodation to set the hearing date in June on account of Light's trial

15

**MEMORANDUM DECISION**

1  schedule, but that Debtor's Counsel not only refused such request, but would seek to set

2  the hearing in April. *Id.*

3      Light wrote:

> Your refusal to extend any courtesy in this regard is disappointing, especially in light of the utter baselessness of the position you are taking in connection with your proposed motion [for contempt].  As I have pointed out before, the suggestion that because the settlement agreement between our clients was purportedly 'deemed rejected' Ms. Milner lost her ownership interest in her property is specious.  In this regard, you have utterly ignored the fact that the settlement agreement was not even an executory contract subject to the provision of the plan of reorganization on which you rely.  As you are presumably aware, an executory contract is one which both sides still have duties to perform before it becomes fully executed.  My client had completed all of her obligations under the settlement agreement long before the bankruptcy proceeding was filed by your clients, thus making the contract not executory.  Moreover, there is nothing in the operative injunction which would purport to preclude my client from defending herself against your clients' complaint and the baseless attempt to convert her personal property apparently included in that pleading.

14  *Exhibit 6 to Debtor's Counsel Declaration attached to the Contempt Motion*, ECF 2043 at

15  58-59.  Thus, Light's letter put CCM and Debtor's Counsel on notice as of March 30, 2018

16  of Milner's meritorious defenses to CCM's claims that she violated the discharge

17  injunction from its bankruptcy case, namely, that the Settlement Agreement could not

18  have been rejected in the bankruptcy case since it was not executory, that Milner owned

19  the property, and that she could defend herself in the State Court Action since CCM was

20  initiating post-confirmation litigation.

21      Although CCM alleged in its State Court Action that it no longer had a contractual

22  obligation to store Milner's property under the Settlement Agreement because the

23  agreement was terminated by the Plan in CCM's bankruptcy case, which claim for

24  declaratory and injunctive relief was therefore pending and already at issue before the

25  state court, CCM decided to commence new litigation against Milner in another court—this

26  court—by filing the Contempt Motion against Milner and Light for pleading in the pending

27  State Court Action.  On June 8, 2018, CCM, by its counsel, filed the Contempt Motion,

28  ECF 2043, requesting that the court issue an order to show cause why it should not hold

1 | Milner and Light in civil contempt and issue sanctions for violating the discharge

2 | injunction.[9]  The gravamen of the Contempt Motion was stated as follows:

> The violation is currently taking place in *Crystal Cathedral Ministries v. Carol Schuller Milner,* Orange County Superior Court Case No. 30-2017-00954144, where, among other things, the Contemnors filed an Answer on February 28, 2019 that include affirmative defenses claiming this Court never extinguished the pre-petition, and post-petition contractual obligations between CCM and Milner that arose out of a rejected 2006 contract.  That contract was part of the claims asserted by Milner in the bankruptcy and was the subject matter of litigation during the proceedings.  That contract was not accepted and not part of the final approved plan of reorganization, yet the Contemnors continue to insist Milner has continuing rights arising out of it.

10 | *Contempt Motion*, ECF 2043 at 2.  CCM specifically contended in the Contempt Motion

11 | that "Milner and Light are in contempt in these proceedings by virtue of filing Affirmative

12 | Defense Nos. 1-3; 6-8; 11;13-15; 18-21 [in their Answer to the State Court Complaint]."

13 | *Id.* at 19.  CCM explicitly referenced Milner's Affirmative Defense No. 6, which stated:

14 | "Plaintiff's contractual obligations to maintain defendant's property were not extinguished

15 | in bankruptcy proceeding [sic]."  *Id.*

16 | CCM's legal theory in support of the Contempt Motion was that, citing *inter alia,* 11

17 | U.S.C. §§524 and 1141, the order confirming the Plan discharged it from all

18 | preconfirmation claims, including CCM's contractual obligations as to property claims

19 |

---

[9]    At the time of filing the Contempt Motion, which instituted new litigation in this bankruptcy case, the bankruptcy case was closed, and CCM did not move to have the bankruptcy case reopened for the court to adjudicate the Contempt Motion.  A debtor seeking to enforce the discharge injunction through contempt proceedings is not required to move to reopen a bankruptcy case for such proceeding.  *In re Menk,* 241 B.R. 896, 910 (9th Cir. BAP 1999).  This is because closing a case generally does not terminate the bankruptcy court's jurisdiction and reopening the case does not affect this jurisdiction.  *Id.* at 911.  "[T]he reopening of a closed bankruptcy case is a ministerial act that functions primarily to enable the file to be managed by the clerk as an active matter and that, by itself, lacks independent legal significance and determines nothing with respect to the merits of the case."  *Id.* at 913.  In his opposition to the Sanctions Motion, ECF 2120 at 5-6, Debtor's Counsel argues that the Sanctions Motion should be denied because Milner did not move to have this bankruptcy case reopened.  The cases cited by Debtor's Counsel in support of his opposition are inapposite; the holdings of *In re Ozenne,* 841 F.3d 810 (9th Cir. 2016) and *Trohimovich v. C.I.R.,* 776 F.2d 873 (9th Cir. 1985) involved failures to timely appeal.  The holding of *Beezley v. California Land Title Co.,* 994 F.2d 1433 (9th Cir. 1993), that a motion to reopen a bankruptcy case should be denied if there is no useful purpose for reopening, such as to amend a schedule of debts in a no asset, no bar date Chapter 7 case, is similarly inapposite.  Since reopening a case is administrative and not jurisdictional, and CCM represented by Debtor's Counsel was able to litigate the Contempt Motion without reopening, this court determines that if there was sanctionable behavior arising out of the Contempt Motion proceedings, the court should be able to exercise its inherent authority to consider the motion concerning such behavior without the formality of reopening the case. If the technicality of reopening the case was not a bar to adjudicating the Contempt Motion, it should not be a bar to considering sanctionable behavior arising out of such proceedings.  A contrary result would amount to exalting form over substance.

**MEMORANDUM DECISION**

1    arising from the Settlement Agreement, which CCM referred to as "the Rejected Contract,"

2    that Milner could have made, but failed to make, during CCM's Chapter 11 bankruptcy

3    case.  *Id.* at 21.  As in the State Court Complaint, CCM's theory of relief in the Contempt

4    Motion was premised on the assumption that the Settlement Agreement with Milner was

5    an executory contract.  CCM, by Debtor's Counsel, asserted that the Settlement

6    Agreement "was not accepted and part of the final approved plan of reorganization," *id.* at

7    2, and that "Milner and her attorney Light insist that personal property ownership rights still

8    exist arising out of a rejected prepetition 2006 contract," *id.* at 6.  Elaborating on this point,

9    CCM argued:

10                    The law is clear.  A rejection of an unexpired contract removes the
                     contract from the bankruptcy estate, and 'constitutes a breach of such
11                   contract or lease' that is effective immediately before the petition for
                     bankruptcy.  [11 U.S.C.] § 365(g).  '[R]ejection of an executory
12                   contract serves two purposes.  It relieves the debtor of burdensome
                     future obligations while he is trying to recover financially and it
13                   constitutes a breach of a contract which permits the other party to file
                     a creditor's claim.  *In re Onecast Media, Inc.* (9th Cir. 2006) 439 F.3d
14                   558, 563; *Sir Speedy Inc. v. Morse,* 256 B.R. 657, 659 (D. Mass.
                     2000).  The estate is relieved from rendering further performance
15                   under the contract, and the contract counterparty is given an
                     unsecured claim *for breach* that can be processed in bankruptcy with
16                   other creditors' claims.  See, e.g., *In re Rega Props., Ltd.,* 894 F.2d
                     1136, 1140 (9th Cir. 1990).
17
     *Id.* at 11-12 (italics in original).
18
             However, the court observes that as in the State Court Complaint, nowhere in the
19
     Contempt Motion does CCM specifically assert that the Settlement Agreement was an
20
     executory contract or how it was executory.  The court further observes that when CCM
21
     states that "the law is clear" and cites 11 U.S.C. § 365(g) that "[a] rejection of an
22
     unexpired contract removes the contract from the bankruptcy estate, and 'constitutes a
23
     breach of such contract or lease' that is effective immediately before the petition for
24
     bankruptcy," CCM substituted the word "unexpired" for "executory," before the word
25
     contract.  The word "unexpired" precedes "lease," not "contract," in 11 U.S.C. § 365(g).
26
     Moreover, "unexpired" is not the equivalent of "executory."  Thus, the court finds that
27
     CCM's substituted wording of "unexpired contract" for "executory contract" distorted the
28

18
**MEMORANDUM DECISION**

1  meaning of the statutory language in 11 U.S.C. § 365(g).  Notably, Milner raised as a

2  defense the argument that the Settlement Agreement was not an executory contract in her

3  Answer to the State Court Complaint and in her counsel's March 30, 2018 letter to

4  Debtor's Counsel.  *See Exhibits 4 and 6 to Debtor's Counsel Declaration attached to the*

5  *Contempt Motion,* ECF 2043 at 48-49, 58-59.  Accordingly, before CCM filed the

6  Contempt Motion on June 8, 2018, Debtor's Counsel and CCM had knowledge of the

7  issue of whether the contract was executory, but never addressed the issue in the

8  Contempt Motion, instead arguing based only on the assumption that the Settlement

9  Agreement was executory, ignoring Milner's defense specifically raised in Light's letter to

10  Debtor's Counsel on March 30, 2018.  As discussed in the court's Memorandum Decision,

11  ECF 2079, Milner's defense that the Settlement Agreement was not executory was

12  meritorious.

13         According to CCM in the Contempt Motion:

14                 The point of rejection was the point of breach which Milner was then
                responsible to assert her claims.  She knew of [the] contract and it
15              was an exhibit in claim litigation she had counsel on.  Any claims of
                bailment, or contract claims to preserve the obligation of CCM to
16              protect and upon demand, return Milner's personal property were
                waived by her failing to assert a timely claim.  *Robertson v. Isomedix,*
17              *Inc. (In re Intl. Nutronics)* (9th Cir. 1994) 28 F.3d 965, 969.  Milner
                never filed a proof of claim regarding the items for the Play which
18              resulted in a knowing waiver.  The Final Decree [in the bankruptcy
                case] bars any subsequent action by way of the subject Affirmative
19              Defenses in the superior court and represents an ongoing intentional
                violation.
20
    *Id.* at 21.[10]
21
22         CCM thus reasoned that the plan confirmation order discharged it as the

23  bankruptcy debtor from all pre-confirmation claims pursuant to 11 U.S.C. §§ 524(a)(2) and

24  1141(d)(1)(A), including claims that purportedly could have been brought by Milner.  *Id.* at

25  17 (citing *inter alia, F.C.C. v. NextWave Personal Communications Inc.,* 537 U.S. 293,

26  ――――――――――――――
    [10]      As evidence of the alleged contemptuous acts by Milner and Light, CCM attached copies of its State
    Court Complaint and Milner's Answer thereto, signed and filed on behalf of Milner by Light, to its Request for
27  Judicial Notice in support of the Contempt Motion.  *Exhibits A and B to Debtor's Request for Judicial Notice,*
    ECF 2044.  CCM also attached a copy of Milner's Answer to the Contempt Motion.  *See Exhibit 4 to*
    *Debtor's Counsel Declaration attached to the Contempt Motion,* ECF 2043 at 48-49.
28

1   303 (2003), *In re Marriage of Williams,* 157 Cal.App.3d 1215, 1224 (1984) and *In re*

2   *Marriage of Lynn,* 101 Cal.App.4th 120, 125-126 (2002)).

3          In arguing that Milner waived her rights to enforce the Settlement Agreement by

4   failing to file a claim in the bankruptcy case, CCM did not explicitly refer to the doctrines of

5   claim and issue preclusion (or res judicata and collateral estoppel) in the Contempt

6   Motion,[11] but that was apparently CCM's intention, as indicated by its citation to the Ninth

7   Circuit's decision in *In re Intl Nutronics*, which held that the res judicata effect of a

8   bankruptcy court sale order precluded certain antitrust claims that could have been

9   brought to challenge the sale, 28 F.3d at 969-971, and thus, based on this case law,

10  CCM's argument was that the final decree in the bankruptcy case "bars" any subsequent

11  action to enforce any contractual claims under the Settlement Agreement.   *Contempt*

12  *Motion,* ECF 2043 at 21.   Thus, according to CCM, the plan confirmation order, which

13  resulted in the rejection of "unexpired" contracts such as the Settlement Agreement

14  between it and Milner, had res judicata effect and precluded Milner from enforcing any

15  contractual claims against CCM based on the Settlement Agreement.   This res judicata

16  argument of CCM in support of the purported discharge violation is based on two essential

17  premises: (1) the Settlement Agreement was an executory contract susceptible to

18  rejection upon plan confirmation; and (2) the filing of an answer in post-confirmation

19  litigation initiated by the debtor, CCM, was, therefore, an enforcement action in violation of

20  the discharge injunction in effect upon plan confirmation.   As discussed herein, these

21  premises were fundamentally flawed because if the contract was not executory, it would

22  not have been rejected, no breach would have occurred, and thus Milner had no reason to

23

24  [11]      In response to Milner's supplemental briefing in support of the Sanctions Motion, Debtor's Counsel
    argues that his claim preclusion argument was the "center of the [Contempt] motion," *Debtor's Counsel*

25  *Reply to Milner Supplemental Memorandum re Bad Faith,* ECF 2133 at 7, even though the Contempt Motion
    and Debtor's Counsel's briefing in support thereof never mentioned the words "claim preclusion," "issue

26  preclusion," "res judicata," or "collateral estoppel," and he never set out the legal standards for application of
    those doctrines.   It is thus understandable that Milner in response asserts that his argument was "ridiculous,"
    commenting: "Nowhere in the Contempt Motion or in the brief filed by [Debtor's Counsel] did he argue that

27  claim preclusion or res judicata barred Ms. Milner from defending herself in the state court litigation."   *Reply*
    *to Debtor's Counsel Opposition,* ECF 2136 at 8. The court had to read and re-read Debtor's Counsel's

28  argument in the Contempt Motion, ECF 2043 at 21, a number of times to be able to construe it as arguing a
    claim preclusion theory.

**MEMORANDUM DECISION**

1  file a claim during the bankruptcy regarding the subject property, and Milner defending

2  herself in post-confirmation litigation initiated by CCM was not a violation of the discharge

3  injunction since the reorganized debtor "returned to the fray" by initiating litigation.

4  As in the State Court Complaint, CCM in the Contempt Motion affirmatively

5  asserted that it entered into the Settlement Agreement; it did not dispute the execution of

6  the Settlement Agreement, that it had contractual obligations under the Settlement

7  Agreement to store Milner's property from the Play, and that Milner owned the property.

8  *Contempt Motion,* ECF 2043 at 8-9.  The Contempt Motion stated:

9   On or about July 8, 2006, CCM and Milner entered into a certain
    written Agreement, (the "Agreement").  The agreement resolved their
10   differences concerning the production of the Play and replaced all
    prior agreements with the terms and provisions of the Agreement.
11   Exhibit "1"; Jacobson Dec., ¶ 10.  The agreement contained a
    "Schedule 1 'Distribution of Creation Assets' that stated *inter alia*:
12   'CCM will keep all goods in same conditions as they were in at the
    end of '05 season.  CCM will not use goods without prior, written
13   approval of CSM [Carol Schuller Milner]".  Ex. 1, p. 8.  Pursuant to
    that agreement, CCM stored 'Milner's goods' which were various play
14   related items belonging to Milner which currently include screens,
    screen frames and truss; props, puppets, scenic elements, and road
15   cases.  Jacobson Dec., ¶ 11.  Today the various stored items occupy
    seven (7) large (45' & 48') box trailers owed by CCM.  Jacobson Dec.,
16   ¶ 12.  The storage is offsite of CCM's campus, and it cost them
    thousands of dollars a year to continue to store the property
17   previously owned by Milner.  Jacobson Dec., ¶ 13.  Before the
    Bankruptcy discharge, Milner did retrieve some items, but failed to
18   retrieve 7 trailers full of other items.

19  *Id*.

20  Consistently throughout the Contempt Motion, CCM referred to the property that it

21  stored pursuant to the Settlement Agreement as Milner's "goods" or property.  In his

22  declaration filed in support of the Contempt Motion, Russell Jacobson ("Jacobson"),

23  CCM's chief operating officer, stated: "This matter concerns CCM's efforts to have Carol

24  Milner, ("Milner"), retrieve the remaining property she previously owned that CCM has

25  been storing for several years at CCM's expense.  The storage by CCM at CCM's

26  expense is pursuant to a 2006 contract to which Milner and CCM were parties."  *Jacobson*

27  *Declaration attached to Contempt Motion*, ECF 2043 at 23 (¶¶ 2-3).  This testimony of an

28  officer of CCM in a supporting declaration for the Contempt Motion indicates CCM's

21

1   acknowledgment that it entered into the contract with Milner with the obligation to store

2   her property at its expense and that it was still performing that obligation pursuant to the

3   contract, which was CCM's litigating position for the Contempt Motion.

4           In explaining why CCM decided to file the Contempt Motion and institute new

5   litigation in a different court when it already had the pending State Court Action, Debtor's

6   Counsel stated in his opposition to the Sanctions Motion: "The purpose of the motion was

7   to expedite a resolution of the parties' dispute by a single motion, as opposed to a drawn-

8   out State Court action."  *Debtor's Counsel Opposition to Sanctions Motion,* ECF 2120 at

9   10.  In elaborating on this rationale, Debtor's Counsel later stated that:

10                  the state case filed against Milner listed the discharge as a basis of
                    recovery.  It was a separate ground in the state litigation that the
11                  bankruptcy court may have adjudicated the subject contract by
                    rejecting it as executory or based on the claim preclusion document
12                  [sic] as argued herein.  However, presenting bankruptcy law and
                    argument to a state judge is not ideal when the actual bankruptcy
13                  case itself could be reopened and this issued [sic] decided by the
                    same bankruptcy court.  [Debtor's Counsel] believed in good faith
14                  that a single hearing with this court could end the dispute if the
                    outcome was favorable to CCM.  This was not an improper
15                  purpose, it was the intended purpose of streamlining the legal
                    disputes between the parties.
16

17  *Debtor's Counsel Opposition to Supplemental Memorandum,* ECF 2133 at 16-17.

18          On June 12, 2018, Milner filed a written opposition to the Contempt Motion in her

19  Objection to Issuance of an Order to Show Cause RE Contempt (the "Objection to

20  Contempt Motion"), ECF 2050, arguing that the Contempt Motion should be denied

21  because the Settlement Agreement was not an executory contract that could be rejected

22  by operation of the Plan and that the confirmed Plan could not alter her rights in the

23  property being stored by CCM.  *Objection to Contempt Motion,* ECF 2050 at 11.  In

24  support of her argument that the Settlement Agreement was not an executory contract

25  that could be rejected, Milner stated that in order for a contract to be rejected under 11

26  U.S.C. §365(a) the contract had to be executory, and the test to determine whether a

27  contract was executory was the so-called Countryman test formulated by Professor Vern

28  Countryman in the Minnesota Law Review, which test has been adopted by many courts,

22

**MEMORANDUM DECISION**

including the Ninth Circuit.  *Objection to Contempt Motion,* ECF 2050 at 6 (citing *In re Robert L. Helms Construction & Development Co., Inc.,* 139 F.3d 702, 705 (9th Cir. 1998) (citing Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. 439, 460 (1973))).  As set forth by the Ninth Circuit,

> An executory contract is one "on which performance remains due to some extent on both sides." *National Labor Relations Board v. Bildilsco and Bildilsco,* 465 U.S. 513, 522-23 n. 6, 104 S.Ct. 1188, 1194 n. 6, 79 L.Ed.2d 482 (quotation marks and citation omitted). More precisely, a contract is executory if "the obligations of both parties are so unperformed that the failure of either party to complete performance would constitute a material breach and thus excuse the performance of the other." *Griffel v. Murphy (In re Wegner),* 839 F.2d 533, 536 (9th Cir. 1988).

*In re Robert L. Helms Construction & Development Co., Inc.,* 139 F.3d at 705 and n.7 (citing Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L. Rev. at 460).  According to Milner, she had no unperformed obligations under the Settlement Agreement other than the duty not to disparage CCM and Crystal Cathedral, she granted CCM a release from its breach of contract, and CCM transferred ownership of the Play Property to her and paid her as required by the Settlement Agreement.  Accordingly, the only remaining obligations under the Settlement Agreement inured to CCM—storing and maintaining Milner's Play Property.  *Objection to Contempt Motion,* ECF 2050 at 9-10.  As Milner argued, based on the Countryman test, for a contract to be executory both contracting parties must have outstanding material obligations, so that a breach by one excuses the other, and Milner's sole obligation under the Settlement Agreement not to disparage CCM or Crystal Cathedral was not a material obligation that would cause the Settlement Agreement to be executory.  *Id.* at 10 (citing *In re Jarvis,* 2005 WL 7758805 (Bankr. D. N.H. 2005)).

In addressing CCM's argument that Milner's ownership rights were terminated by the order confirming its reorganization plan, Milner asserted that CCM's confirmed plan did not alter her ownership rights in the Play Property because ownership of the property was transferred to her from CCM under the Settlement Agreement, and there was no

23
**MEMORANDUM DECISION**

1   need to file a prepetition or administrative claim regarding the property because CCM did

2   not assert ownership to the property.  *Id.* at 10-11.

3         In responding to CCM's argument that her claims relating to the Play Property were

4   not discharged, Milner asserted that her claims arising post-confirmation were not covered

5   by the discharge injunction because these claims arose from CCM's post-confirmation

6   conduct after the entry of the final decree in, and the closing of, the bankruptcy case.  *Id.* at

7   11-13.  As the court determined, Milner's claims arose post-confirmation because CCM

8   continued to comply with its contractual obligations to store Milner's property post-petition

9   and post-confirmation.  *Memorandum Decision,* ECF 2079 at 19 ("Further, any breach by

10  Debtor occurred post-confirmation, so Milner could not have violated the discharge

11  injunction by asserting her affirmative defenses in the State Court Action.  At no time

12  before the Plan was confirmed did Debtor breach the Settlement Agreement . . . .").

13        Milner finally argued that she and Light could not be held in contempt because

14  under then existing Ninth Circuit law, they had a good faith belief that they did not violate

15  the discharge injunction on grounds that the Settlement Agreement was not an executory

16  contract that could be rejected in CCM's bankruptcy case, she never lost ownership of the

17  Play Property pursuant to the Settlement Agreement, and she was entitled to defend

18  herself in CCM's post-petition state court action because CCM "returned to the fray" by

19  instituting new litigation against her.  *Objection to Contempt Motion,* ECF 2050 at 13-14.

20        In this responsive pleading to the Contempt Motion, Milner requested that the court

21  "sanction CCM's attorney, on its own initiative," for filing the Contempt Motion, stating:

22  "Because the [Contempt Motion] will be granted or denied within seven days pursuant to

23  Local Rules, Ms. Milner and Mr. Light cannot give CCM the 21 days' notice to withdraw

24  the Motion as otherwise required by Fed.R.Bankr.P. 9011(c)(1)(A)."  *Id.* at 5.[12]

25
---
26  [12]     The court notes that contrary to this assertion on behalf of Milner, no local rule mandates that the
    court decide a Motion for Order to Show Cause re Contempt within seven days.  Local Rule 9020-1(b)
    requires the moving party to serve its motion on the responding party "which shall have 7 [seven] days to
27  object to the issuance of the order [to show cause why party should not be held in contempt]."  Milner, by
    her counsel, complied with Local Rule 9020-1, filing the Objection to Contempt Motion, ECF 2050, only four
28  days after Debtor's Counsel filed the Contempt Motion.  Thus, the assertion by Milner's counsel that

                                                                              (Continued...)

**MEMORANDUM DECISION**

1  On June 14, 2018, CCM by Debtor's Counsel filed its reply to Milner's Objection to

2  Contempt Motion, ECF 2053, and made three arguments in response to Milner's

3  objection.  First, CCM argued that Milner was barred from pursuing her personal property

4  claims under the Settlement Agreement because she had filed and litigated other claims

5  under the Settlement Agreement relating to her intellectual property rights in the

6  bankruptcy case, and CCM had never agreed to her ownership of the Play Property,

7  putting her on notice that CCM disputed her ownership and its obligation to store the Play

8  Property, such that she should have filed a proof of claim in the bankruptcy case to avoid

9  the bar from the discharge injunction, asserting: "The duties of storage and protection of

10  the show specific equipment was a liability of the Debtor and it was subject to discharge

11  *unless Milner timely objected."  CCM Reply to Objection to Contempt Motion,* ECF 2053 at

12  5 (italics in original).  Apparently CCM's reference to Milner having to timely object to

13  discharge meant that Milner needed, but failed, to file a timely proof of claim to preserve

14  her contractual claims under the Settlement Agreement.  In any event, CCM did not

15  provide any specific legal authority to support this argument, other than citing *Walls v.*

16  *Wells Fargo Bank, N.A.,* 276 F.3d 502, 507 (9th Cir. 2002) for the general proposition that

17  disputing the discharge in post-petition litigation was contempt, and 11 U.S.C. § 502(b)(9),

18  which provides that creditors of the estate have to file timely proofs of claim.  *Id.* at 4-6.

19  CCM in making this argument did not expressly refer to the doctrines of claim and issue

20  preclusion (i.e., res judicata and collateral estoppel), but couched its argument in terms of

21  the consequence of Milner's alleged failure to file a personal property claim in the

22  bankruptcy case as a "waiver."  This argument was simply a reiteration of CCM's waiver

23  argument in the Contempt Motion, ECF 2043 at 21.

24  Second, in response to Milner's argument that she could not be held in contempt

25  for having a subjective good faith belief that the discharge injunction did not apply to her,

26  CCM argued that Milner was not entitled to this defense because she was actively

27  compliance with the Bankruptcy Rule 9011 "safe harbor" was rendered impracticable or impossible under
the Local Rules was incorrect.

28

**MEMORANDUM DECISION**

1  involved in its bankruptcy case by pursuing her copyright infringement claims based on

2  other parts of the Settlement Agreement, objecting to CCM's reorganization plan, and

3  objecting to the sale of CCM's main assets in the bankruptcy case.  CCM also argued that

4  Milner "knowingly waived other claims, including this one."  *CCM Reply to Objection to*

5  *Contempt Motion,* ECF 2053 at 6-7.  However, as indicated above, CCM's Contempt

6  Motion and the Jacobson Declaration acknowledged that CCM was still performing the

7  storage obligation under the Settlement Agreement after plan confirmation, and Milner

8  would needed to have had a claim for breach of that obligation at the time of plan

9  confirmation to "knowingly" waive such a claim.  She had no such claim for breach as to

10  the Play Property before the Plan was confirmed.  *Memorandum Decision,* ECF 2079 at

11  19.

12       Third, in response to Milner's argument that the Settlement Agreement was not an

13  executory contract which could be rejected in the bankruptcy case, CCM argued that

14  Milner had a duty under the contract to act in good faith and perform indemnity

15  obligations, defense obligations, and obligations to protect CCM from infringement claims,

16  thereby rendering the Settlement Agreement executory.  *Id.* at 8-10.  Citing Sections 1.2,

17  1.3 and 1.4 of the Settlement Agreement, CCM argued that the Settlement Agreement

18  was executory because Milner had obligations to act in good faith when resolving whether

19  to grant or reject permission for CCM to produce the Play or present any of its creative

20  elements, or for CCM to use show related equipment, or for CCM to duplicate DVD and/or

21  videotape audiovisual versions of the Play.  *Id.* at 8-9.  CCM cited *Carma Developers*

22  *(California), Inc. v. Marathon Development California, Inc.* 2 Cal.4[th] 342, 372 (1992), and

23  argued that a breach of the implied covenant of good faith and fair dealing is a material

24  breach excusing a counterparty's performance under an agreement.  *Id.* at 9.  CCM

25  explained: "As affirmed in the *Marathon* case, a breach of this good faith covenant 'would

26  constitute a material breach and thus excuse the performance of the other.'"  *Id.*  CCM

27  also argued that Milner had future indemnity and defense obligations owing to CCM,

28  which purportedly made the contract executory in that Milner had agreed to indemnify and

26

**MEMORANDUM DECISION**

1  defend CCM with respect to any claims asserted by or on behalf of Jeff Atmajian, a music

2  composer, for copyright infringement if he made such claims before CCM's reorganization

3  plan was approved.  *Id.*

4  　　CCM's reply was the first time that it articulated an argument that the Settlement

5  Agreement was still an executory contract at the time that it filed its bankruptcy case and

6  that it identified what Milner's purported unperformed material contractual obligations

7  were.  However, as the court determined in its Memorandum Decision, CCM's executory

8  contract argument was legally unfounded.  *Memorandum Decision,* ECF 2079 at 11-18.

9  As explained in the Memorandum Decision, the three distinct provisions of the Settlement

10  Agreement in Sections 1.2, 1.3 and 1.4 requiring CCM to obtain Milner's consent before

11  using, disposing of, or producing certain materials related to the Play, did not impose

12  some ongoing duty on Milner to act in good faith to perform an affirmative obligation, but

13  rather were independent conditions imposed on CCM before it could take these certain

14  actions.  *Id.* at 13-14.   Moreover, as further explained in the Memorandum Decision,

15  Milner had substantially performed her material obligations under the Settlement

16  Agreement as soon as it was executed by her releasing her claims against CCM arising

17  out of their dispute regarding the staging of the play.  *Id.*  The Settlement Agreement gave

18  Milner the sole discretion to withhold her consent and did not impose on her any ongoing

19  contractual duty to perform because these provisions related to CCM's requirements to

20  undertake certain acts, and if Milner had in the future withheld her consent, which had not

21  been alleged, let alone proven, it would not have been a material breach of her affirmative

22  obligation to perform under the contract so that CCM would be excused from its obligation

23  to grant a reversion of rights in the play and to make royalty payments to her.  *Id.*

24  　　Regarding the indemnity provision identified by CCM, as further explained in the

25  Memorandum Decision, it was not material such that the contract was executory because

26  Milner did not agree to a general, ongoing duty to indemnify CCM for loss or damage, but

27  rather set limitations on her right to use the music in the play.  If Milner used any part of

28  the music, she agreed to indemnify CCM regarding any claim asserted by the music

**MEMORANDUM DECISION**

1  composer, Atmajian, which claim was completely hypothetical based on the record. *Id.* at

2  15.  Moreover, since CCM got Milner's substantial performance by her release of claims

3  against it, any breach of this duty to indemnify it for a hypothetical breach of the music

4  composer's rights did not have the importance or seriousness to be material to terminate

5  the contract. *Id.* at 15-16.  Additionally, the non-disparagement provision in the

6  Settlement Agreement was not a material obligation to show the agreement was

7  executory because a breach would not deprive either party of the benefits reasonably

8  expected under the contract. *Id.* at 16.  CCM's arguments in its reply to Milner's objection

9  to the Contempt Motion that the Settlement Agreement was an executory contract at the

10 time of its bankruptcy case were simply unfounded.

11      On June 19, 2018, the court vacated the July 11, 2018 hearing, which CCM had

12 improperly noticed for hearing on its Contempt Motion contrary to Local Bankruptcy Rule

13 9020-1(d), which provides that no hearing be set on a contempt motion unless ordered by

14 the court. *Order Vacating Hearing on Contempt Motion,* ECF 2054.

15      On June 21, 2018, having determined that the Contempt Motion should be treated

16 as a contested matter, the court set it for a status conference for July 31, 2018, and

17 required that a joint status report be filed on or before July 24, 2018.  *Order Treating*

18 *Contempt Motion as a Contested Matter,* ECF 2055.  The court set the status conference

19 because the court was not satisfied that CCM had established a prima facie case

20 requiring Milner to show cause.  Accordingly, the court treated the Contempt Motion as a

21 contested matter and asked the parties whether there were disputed issues of fact

22 requiring an evidentiary hearing.

23      On or about July 11, 2018, Milner, through her counsel, sent the Bankruptcy Rule

24 9011 Warning Letter: a letter by e-mail, "Re: Notice of Claim to Rule 9011 Sanctions," to

25 Debtor's Counsel, requesting that Debtor's Counsel reconsider and withdraw the

26 Contempt Motion, or otherwise, Milner would continue to defend the "frivolous claims" that

27 he brought on behalf of CCM and file a formal motion for sanctions under Bankruptcy Rule

28 9011. *Letter from Movant's Counsel to Debtor's Counsel, dated July 11, 2018, Exhibit 1*

28

**MEMORANDUM DECISION**

1   *to Movant's Counsel Declaration attached to Sanctions Motion,* ECF 2100 at 19 and 2100-

2   1 at 1-5 (citing *inter alia, In re Ybarra*, 424 F.3d 1018, 1027 (9th Cir. 2005) and *In re*

3   *Taggart*, 888 F.3d 438 (9th Cir. 2018)).   In this warning letter, Movant's Counsel stated

4   that the purpose of the letter was to put Debtor's Counsel on notice that the claims in the

5   Contempt Motion were not supported by the law and had clearly been asserted to harass

6   Milner.  Movant's Counsel asserted that Debtor's Counsel was misstating the law

7   regarding the plan confirmation order, misunderstanding the concept of the closing of

8   CCM's bankruptcy case and misidentifying the Settlement Agreement as an executory

9   contract.  ECF 2100-1 at 1-5.

10          In support of Milner's demand for withdrawal of the Contempt Motion, her counsel's

11  Bankruptcy Rule 9011 Warning Letter set forth seven arguments: (1) the Settlement

12  Agreement was not executory for the reasons stated in Milner's objection responding to

13  the Contempt Motion; (2) the Settlement Agreement was never identified as an executory

14  contract in CCM's bankruptcy schedules or amended schedules, and CCM's motion to

15  reject executory contracts did not list the Settlement Agreement as a contract to be

16  rejected; (3) case law demonstrated that where a debtor never identifies a contract on its

17  bankruptcy schedules or plan as executory and never seeks to reject it, using boilerplate

18  language in a debtor's reorganization plan is insufficient to put creditors on notice of the

19  executory nature of the contract so as to require a creditor to file a proof of claim, citing *In*

20  *re Parkwood Realty Corp.,* 157 B.R. 687 (Bankr. W.D. Wash. 1993) and *In re Continental*

21  *Country Club, Inc.,* 114 B.R. 763 (Bankr. M.D. Fla. 1990); (4) contrary to Debtor's

22  Counsel's claims, the effective date of the plan is the appropriate date for determining

23  whether a breach of contract occurs post-confirmation, and therefore, whether a claim of

24  breach can be asserted against the reorganized debtor without violating the discharge

25  injunction, because 11 U.S.C. § 1141 sets forth the effects of plan confirmation, not the

26  subsequent order closing the case, and 11 U.S.C. §1141(b) provides that "the

27  confirmation of a plan vests all of the property of the estate in the debtor"; (5) Debtor's

28  Counsel's submission of a June 25, 2012 letter from CCM's prior counsel to Milner's prior

1  counsel as purported evidence of abandonment of her property without including Milner's

2  responsive letter of June 27, 2012 was improper; (6) the discharge injunction does not

3  apply to prevent a creditor from defending itself post-petition where debtor continues or

4  initiates the litigation of prepetition claims and "returned to the fray," citing *In re Ybarra,*

5  424 F.3d 1018, 1027 (9th Cir. 2005); and, (7) the Ninth Circuit held in *In re Taggart,* 888

6  F.3d 438 (9th Cir. 2018) that based on debtor's "return to the fray" and continuance of

7  litigation post-petition, the creditors acted in good faith and could not be held in contempt

8  for seeking an award of post-petition attorneys' fees, even if the discharge injunction was

9  found to apply. *Letter from Movant's Counsel to Debtor's Counsel, dated July 11, 2018,*

10  *Exhibit 1 to Movant's Counsel Declaration attached to Sanctions Motion,* ECF 2100-1 at 3-

11  4.

12      On July 20, 2018, the parties filed a Joint Status Report in compliance with the

13  court's prior order. *Joint Status Report,* ECF 2059.  In the joint status report, CCM,

14  represented by Debtor's Counsel, requested authorization to take depositions of Milner

15  and her former counsel regarding her subjective good faith belief that she did not act in

16  violation of the discharge injunction in answering the State Court Complaint based on

17  correspondence between her and CCM's counsel in 2012 relating to CCM's demand that

18  she remove the Play Property from its facilities, which request Milner opposed because

19  such correspondence related to matters occurring after entry of the plan confirmation

20  order in 2011.  ECF 2059 at 5-7 and 45-46.

21      On July 31, 2018, the court held a status conference on the Contempt Motion.  At

22  the status conference, CCM, by Debtor's Counsel, raised new arguments that the

23  Settlement Agreement may not be an enforceable contract because factual disputes

24  existed as to whether an inventory of the subject property was ever done, whether the

25  property was actually transferred to Milner, whether there was ever a meeting of the

26  minds sufficient to render the agreement enforceable, and whether a bill of sale evidenced

27  any purported transfer of the property. *Audio Recording, July 31, 2018 Status Conference*

28  at 2:00–2:42 p.m.  As a result of CCM's new arguments, the court stated that it was

30

**MEMORANDUM DECISION**

1  inclined to set an evidentiary hearing.  The court first indicated that it would schedule the

2  evidentiary hearing only to resolve the executory contract issue, which determination, the

3  court noted, might be dispositive of the entire dispute.  *Id.* at 2:33–2:35 p.m. ("What has to

4  be determined is whether the contract is executory or not.") (statements of the court).

5  CCM by Debtor's Counsel argued that it would be "most efficient" if both questions: (i)

6  whether the subject property was transferred to Milner, and (ii) whether the Settlement

7  Agreement was executory, be litigated at the evidentiary hearing.  *Id.* at 2:35–2:37 p.m. ("I

8  would like to do them both [the transfer of ownership issue and the executory contract

9  issue].  What I would suggest is that we present this in one hearing. It would be most

10  efficient.") (statements of Debtor's Counsel).

11       On September 7, 2018, Milner filed trial declarations of her three witnesses for the

12  September 20, 2018 evidentiary hearing.  *Declarations of Carol Milner, Carl Grumer, and*

13  *Harold Light in Connection with the Sept. 20, 2018 Evidentiary Hearing,* ECF 2066.  CCM

14  by Debtor's Counsel filed one declaration on its behalf, the declaration of Gwyn Myers,

15  ECF 2068, which was refiled with a wet signature on September 19, 2018, ECF 2075.  On

16  September 10, 2018, CCM by Debtor's Counsel filed objections to the declarations of

17  Milner's witnesses.  ECF 2070.  On September 13, 2018, Milner filed objections to the

18  declaration of Gwyn Myers, a reply to Debtor's Counsel's evidentiary objections, along

19  with a trial brief (the "Milner Trial Brief").  *Evidentiary Objections to Myers Declaration,*

20  ECF 2072; *Reply to Objections to Declarations of Carl Grumer and Harold Light,* ECF

21  2073; *Milner Trial Brief,* ECF 2074.

22       On September 13, 2018, CCM by Debtor's Counsel filed a trial brief entitled

23  Reorganized Debtor's Brief in Support of Finding that the July 8, 2006 Document [sic] Did

24  Not Transfer Ownership to Carol Milner of the Debtor's Property and Is An Executory

25  Contract for Purposes of Bankruptcy Code § 365(g) ("CCM Trial Brief"), ECF 2071.  In its

26  trial brief, CCM made three arguments.  First, CCM argued that the Settlement Agreement

27  did not legally transfer ownership of the Play Property to Milner; second, the Settlement

28  Agreement was not a valid contract for lack of consideration; and third, if the court did not

**MEMORANDUM DECISION**

1   agree with its argument that the Settlement Agreement did not transfer ownership, the

2   Settlement Agreement was an executory contract.  *CCM Trial Brief,* ECF 2071 at 1.

3          In support of the first argument in its trial brief, CCM asserted that Milner and Light

4   were in contempt of the discharge injunction because Milner could not insist on ownership

5   of the Play Property while demanding that CCM store the Play Property based on the

6   Settlement Agreement where there was no specific list of items that were legally

7   transferred to Milner in Schedule 1 to the Settlement Agreement, nor was there an

8   accompanying bill of sale for the transferred property, citing, *Hull v. Ray,* 80 Cal.App. 284,

9   289-290 (1926), and there were three different versions of the Settlement Agreement in

10  the record, thereby indicating "uncertainty" that there was sufficient mutual intent to

11  transfer all of the property from CCM to Milner.  *CCM Trial Brief,* ECF 2071 at 2-7.

12  According to CCM, the list of transferred property on Schedule 1 to the Settlement

13  Agreement referred to a list of certain categories of "show specific" property, but included

14  that the "list [ ] is not all-inclusive" and also refers to a "binder of information," which CCM

15  asserted was to be created in the future,[13] and thus, the language in Schedule 1 to the

16  Settlement Agreement was insufficient to meet the standard of a valid bill of sale contract.

17  *Id.* at 3.  CCM did not cite any legal authority for this assertion that the list of transferred

18  property in Schedule 1 to the Settlement Agreement did not meet "the standard of a valid

19  bill of sale contract," *id.*, and it was not clear what that standard was from its brief.

20  Moreover, this argument was inconsistent with CCM's litigation positions taken in the

21  State Court Complaint and the Contempt Motion, which the court determined were judicial

22  admissions, that CCM and Milner executed and had a contractual agreement settling their

23  disputes, the Settlement Agreement, that Milner owned the Play Property transferred to

24  her under the Settlement Agreement, and that CCM was storing Milner's property at its

25  expense under the Settlement Agreement.  In any event, the court rejected this argument

---

26  [13]  As stated in the CCM Reply to Milner's Objection to the Contempt Motion, ECF 2053 at 2, "The contract
    states Milner participated in creating this list [see section 1.4] and Milner agreed to the following:

27  'Distribution of Creation Assets: The following list in [sic] not all inclusive, as that would require a binder of
    information, rather *it serves as examples* of what would be show specific (to go to CSM) and not show

28  specific (to go to CCM) inventoried goods.  Some of the items fall in a gray area and were distributed below
    based on practicality for both parties.'"  *Id.* (emphasis added).

1  because a bill of sale is not required under California statutory law to transfer property,

2  and the Settlement Agreement as a contract was specific and definite enough to provide

3  for the transfer of ownership of the "show specific" property, with specifically enumerated

4  categories of property, to Milner.  *Memorandum Decision*, ECF 2079 at 21-22 (citing

5  California Civil Code, §§1000 and 1039).  CCM's argument that the terms of the

6  Settlement Agreement were too uncertain to be a binding contract transferring the

7  property to Milner because three versions of the Settlement Agreement were in the record

8  before the court lacked merit.  The different copies of the Settlement Agreement were not

9  materially different as to the transfer of the property to Milner.  Moreover, this new

10  argument of CCM contradicted the judicial admissions made in its affirmative allegations

11  in the State Court Complaint, which factual allegations served as the basis of the

12  Contempt Motion.  Those allegations principally were that CCM and Milner executed the

13  Settlement Agreement, and CCM stored the various physical properties belonging to

14  Milner as set forth in the Settlement Agreement.

15        The plain language of the Settlement Agreement in Section 1.3 and Schedule 1

16  indicated a clear intent to transfer property as between CCM and Milner.  Section 1.3

17  states:

18              In connection with production of the Play on the Ministries campus
              in 2005 the Ministries [i.e., CCM] commissioned and caused to be
19              created various physical properties more particularly described on
              Schedule 1 attached hereto and by this reference and made a part
20              hereof.  Such exhibit was prepared jointly by CSM [i.e., Carol
              Schuller Milner] and an authorized representative of the Ministries
21              and provides for the disposition of such physical properties and the
              respective party's right to use and to possess any of such materials
22              are as set out on Schedule 1, which shall be binding on the parties
              unless they shall hereafter specifically agree in writing to an
23              alteration set forth on Schedule 1.

24  *Settlement Agreement*, *Exhibit 1 to Russell Jacobson Declaration attached to Contempt*

25  *Motion*, ECF 2043 at 28.  Schedule 1 bore the heading "DISTRIBUTION OF CREATION

26  ASSETS" and stated:

27              The following list is not all-inclusive, as that would require a binder
              of information; rather it serves as examples of what would be show
28              specific (to go to CSM) and non-show specific (to go to CCM)

1
2
3
4

inventoried goods.  Some items fall in a gray area and were distributed below based on practicality for both parties.  What CCM keeps needs to be transferred from their 'Glory of Creation' books to the CCM's capital expenses or other departmental expenses and needs to be adjusted throughout all CCM documentation regarding Creation.  CCM will keep all goods in same condition as they were in at the end of the '05 season.  CCM will not use goods without prior, written approval of CCM.

5   *Id.* at 33.  Schedule 1 then listed categories of personal property distributed between

6   Milner and CCM.  *Id.*  CCM in the Contempt Motion represented that Exhibit 1 to the

7   declaration of Russell Jacobson was the duly executed Settlement Agreement, which was

8   signed and initialed by its board members, including Gwyn Myers.  ECF 2043 at 5 and 27-

9   33.  This plain language of the Settlement Agreement set forth a clear intent to "distribute"

10  or transfer the personal property described and listed in Schedule 1 as between CCM and

11  Milner.

12          CCM's second argument in its trial brief was that Milner had no ownership rights in

13  the Play Property because the Settlement Agreement was not a valid contract for lack of

14  consideration.  CCM argued that the contract was unconscionable in compensating Milner

15  five years of future salary and royalties, in addition to transferring the Play Property,

16  costing $9 million, for a failed play that was purportedly a $13 million loss for CCM.  *CCM*

17  *Trial Brief,* ECF 2071 at 7.  This argument is also inconsistent with CCM's judicial

18  admissions in the State Court Complaint and in the Contempt Motion that CCM and Milner

19  executed and had a contractual agreement settling their disputes, and the agreement was

20  an executory contract that could have been rejected in its bankruptcy case.

21          CCM's third argument in its trial brief was that the Settlement Agreement was an

22  executory contract that was rejected upon confirmation of the Plan and that Milner waived

23  any claims to the subject property by not filing a claim regarding the property in the

24  bankruptcy case.  *Id.* at 8-9.  While CCM made this argument previously in its reply to

25  Milner's objection to the Contempt Motion, its theories explaining what made the

26  Settlement Agreement an executory contract were new; that is, CCM asserted that the

27  Settlement Agreement was executory because: (1) Milner had not performed her part of

28  the agreement to resolve the "gray area" referred to in Schedule 1 to the Settlement

34

**MEMORANDUM DECISION**

1    Agreement, which states that "[s]ome of the items fall in a gray area and were distributed

2    below based on practicality for both parties," ECF 2043 at 33; and (2) CCM had an

3    unperformed obligation to comply with paragraph 5.2 of the Settlement Agreement to

4    create and fund a trust instrument in a form satisfactory to Milner and her attorneys to pay

5    the settlement amounts to Milner pursuant to the Settlement Agreement.  *CCM Trial Brief,*

6    ECF 2071 at 8-11.  CCM's first claim, that the Settlement Agreement was executory

7    based on Milner's failure to resolve the "gray area" referred to in Schedule 1, is baseless

8    because the plain language of Schedule 1 indicates that while arguably there was a "gray

9    area" between show specific and non-show specific property, the distribution of the

10   subject property, whether show specific, non-show specific, or somewhere in the "gray

11   area," was being made as set forth on the list of property in Schedule 1.  Thus, there was

12   no failure of Milner to perform by not separately resolving the "gray area" property

13   because the purpose of Schedule 1 was exactly that.  CCM's second claim that the

14   Settlement Agreement was executory based on CCM's unperformed obligation to create

15   and fund a trust instrument to pay Milner under the Settlement Agreement does not make

16   the agreement executory because this obligation does not demonstrate that Milner has

17   unperformed obligations.  An executory contract has unperformed material obligations on

18   both sides of the contract.  *In re Robert L. Helms Construction & Development Co.,* 139

19   F.3d at 705 and n. 7.  Moreover, this second claim of CCM was based on the declaration

20   of Gwyn Myers and her assertion that CCM did not approve such a trust instrument, ECF

21   2071 at 10.  This claim was meritless because the trust instrument was created and

22   authorized on behalf of CCM by its representatives, Robert Schuller, Arvella Schuller and

23   Myers herself as the non-insider executive committee member.  *Settlement Agreement,*

24   *Trial Exhibit 7*, ECF 2066-1 at 28-44.  Further, the funding of the trust was immaterial

25   because CCM made all of the settlement payments to Milner without funding the trust.

26   *Milner Trial Testimony, Evidentiary Hearing Transcript, September 20, 2018,* ECF 2095 at

27   98-99, 253-254.  CCM's new alternative theories addressing why the Settlement

28   Agreement was executory were not formulated when CCM filed the Contempt Motion.  If

35

1  they had been, they would have been asserted with the other purported reasons that the

2  contract was executory stated in CCM's reply to Milner's objection to the Contempt

3  Motion, the initial response to Milner's opposing arguments.  Thus, the court infers under

4  the circumstances that the new arguments were devised much later in the litigation

5  process, in fact, right before trial.

6        On September 20, 2018, the court conducted an evidentiary hearing on the

7  Contempt Motion.  *Evidentiary Hearing Transcript, September 20, 2018,* ECF 2095.

8  During the evidentiary hearing, Debtor's Counsel on behalf of CCM cross-examined

9  Milner, the only witness who testified live, and both parties set forth more fully the

10 arguments discussed above.  During the evidentiary hearing, Debtor's Counsel reiterated

11 his arguments that the Settlement Agreement was not an enforceable contract, and

12 Milner's claims were precluded by collateral estoppel.  *See e.g.,* ECF 2095 at 19 (arguing

13 claim preclusion and no meeting of the minds); *id.* at 85 (arguing no transfer of property);

14 *id.* at 98-100 (cross-examining Milner regarding section 5.2 of the Settlement Agreement

15 and a trust never being funded); *id.* at 205-206 (arguing there was no inventory of the

16 property); *id.* at 283-291 (arguing that a Ninth Circuit authority exists supporting the

17 proposition that Milner had an unperformed material duty to inspect the property, thereby

18 showing that the Settlement Agreement was executory).  With leave of court, the parties

19 made their closing arguments on the Contempt Motion in the form of post-trial briefing.

20 *See CCM Post-Trial Brief,* ECF 2077, filed on October 1, 2018, and *Milner Post-Trial Brief,*

21 ECF 2078, filed on October 10, 2018.

22       On October 1, 2018, CCM by Debtor's Counsel filed its post-trial brief entitled

23 Reorganized Debtor's Closing Brief (the "CCM Post-Trial Brief"), ECF 2077.  In its Post-

24 Trial Brief, CCM made two arguments.  First, CCM argued that the plan confirmation order

25 barred Milner's claims against CCM pursuant to the doctrine of claim preclusion, which

26 purportedly barred her breach of contract claims because they were "further claims arising

27 out of the disputed, pre-petition July 8, 2006 agreement," and Milner had litigated other

28 contract claims arising out of the Settlement Agreement (relating to her intellectual

36

1    property rights) during the bankruptcy.  *CCM Post-Trial Brief,* ECF 2077 at 1.  According

2    to CCM, Milner's current contract claims involved the same cause of action that she filed

3    and litigated during the bankruptcy case, that is, as argued by CCM,

> 4    this Court should deem all claims arising from the alleged July 8,
>      2006 documents consumed by the Court's final order rejecting
> 5    Milner's contract claims. [Doc. 1411, December 4, 2012 order].  It is
>      well established that a judgment in an action for a breach of contract
> 6    bars a subsequent action for additional relief based on the same
>      breach.  *Holmes v. David H. Bricker, Inc.* (1969) 70 Cal.2d 786.
> 7    There were sufficient disputes at the time of the petition to compel
>      Milner to file a separate claim [for breach of CCM's storage
> 8    obligations].  The claims bar date and final order [in the bankruptcy
>      case] prevent Milner from now pursuing any new claims related to the
> 9    July 8, 2006 disputed agreement.

10    *Id.* at 5.

11        Second, CCM argued that if the court was to assume that the Settlement

12    Agreement was a valid contract, the contract was a "gratuitous bailment contract" for CCM

13    to store goods for no consideration, which was executory because "[b]ased on the history

14    of uncertainties and disputes over the contract terms, Milner had a duty to take

15    reasonable steps as an owner to make sure that CCM was preserving the property to

16    keep it show ready" and "[h]er duty to inspect, at lease [sic] annually, makes the subject

17    storage provision executory."  *CCM Post-Trial Brief,* ECF 2077 at 6-7.  However, CCM

18    cited no legal authority to support its argument that Milner had a duty to inspect her

19    property in storage with CCM.

20        On October 10, 2018, Milner filed her post-trial brief, ECF 2078 ("Milner Post-Trial

21    Brief").  First, Milner reminded the court and the parties that Debtor's Counsel had

22    requested that he be allowed to file an additional exhibit, which he could not locate at trial,

23    and include a citation to a Ninth Circuit case in his post-trial brief, which he claimed

24    established an implied duty by Milner to inspect or timely retrieve the subject property.

25    *September 20, 2018, Evidentiary Hearing Transcript*, ECF 2095 at 290-291; *see also*

26    *CCM Post-Trial Brief*, ECF 2077 at 5-7 (arguing that Milner had a duty to inspect, which

27    made the Settlement Agreement an executory contract).  Debtor's Counsel argued on

28    behalf of CCM at trial that such a purported duty was impliedly a part of the Settlement

**MEMORANDUM DECISION**

1  Agreement and resulted in the Settlement Agreement being deemed an executory

2  contract that was rejected upon confirmation of the Plan.  Milner pointed out that Debtor's

3  Counsel, however, failed to cite any authority—Ninth Circuit or other—supporting the

4  proposition in the CCM Post-Trial Brief that an implied duty to inspect or retrieve one's

5  property exists when such property is being stored by another.  *Milner Post-Trial Brief,*

6  ECF 2078 at 5.

7          Milner argued that: (i) the Settlement Agreement was enforceable and not a

8  rejected executory contract because the evidence showed that Milner had no

9  unperformed obligations, and there was no legal authority to support CCM's argument that

10  she had a duty to inspect her property in storage; (ii) the plan confirmation order was not

11  res judicata because the evidence showed that CCM's breach of the storage obligations

12  occurred post-confirmation and not before or during CCM's bankruptcy case, or before

13  confirmation of the Plan; (iii) Milner was the owner of the subject property as shown by

14  CCM's judicial admissions in its prior pleadings, notably, the State Court Complaint; (iv)

15  claims against CCM concerning the Settlement Agreement could be brought and decided

16  in state court; and, (v) Milner and Light could not be held in contempt of the discharge

17  injunction based on her filings in the state court proceeding because the Settlement

18  Agreement was not executory and the property belonged to Milner.  *Milner Post-Trial*

19  *Brief,* ECF 2078 at 6-12.

20          Milner argued that Debtor's Counsel's reliance on allegations asserted by the

21  bankruptcy plan administrator in her objection to Milner's intellectual property claim as

22  support for Debtor's Counsel's claim preclusion argument was evidence of bad faith.  *Id.*

23  at 7.  Milner also argued that any "suggestion that there was any breach of CCM's storage

24  obligation before and/or during the bankruptcy is not supported by the evidence."  *Id.* at 8.

25  Further, Milner argued that Debtor's Counsel's argument that the subject property was

26  never transferred to Milner demonstrated bad faith because CCM's State Court Complaint

27  "repeatedly refer[red] to the [subject property] as Ms. Milner's property."  *Id.* at 11 (citing

28

**MEMORANDUM DECISION**

1  *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at ¶¶

2  18, 20, 21, 23).

3      In its Memorandum Decision, filed and entered on November 2, 2018, the court

4  held that CCM failed to prove by clear and convincing evidence that Milner and her

5  counsel knowingly and willfully violated the discharge injunction.  *Memorandum Decision*,

6  ECF 2079 at 10.  The court held that the Settlement Agreement was not an executory

7  contract, *id.* at 17; the Plan Confirmation Order had no res judicata effect on Milner's right

8  to enforce the Settlement Agreement, *id.* at 21; and additional arguments in CCM's trial

9  brief were without merit, *id.* at 21-22.  Specifically, the court rejected "the notion advanced

10  by Debtor that *any* violation of the implied covenant of good faith and fair dealing

11  necessarily constitutes a material breach."  *Id.* at 13.  The court further commented that it

12  was unable to find the language that CCM quoted as purportedly from the opinion in

13  *Carma Developers (California), Inc. v. Marathon Development California, Inc.,* 2 Cal.4th

14  342, 372 (1992), and the proposition attributed to the purported quote was "in direct

15  conflict" with California law.  *Id.* at 13-14.  The court also determined that the three

16  provisions of the Settlement Agreement that CCM contended established an ongoing duty

17  of good faith upon Milner, thereby rendering the contract executory, imposed conditions

18  upon CCM—not Milner—and that "Milner substantially performed her obligations under

19  the Settlement Agreement as soon as it was executed[.]"  *Id.* at 14.  The court further

20  rejected CCM's arguments that Milner's indemnification or non-disparagement obligations

21  could give rise to material breaches to show that the Settlement Agreement was

22  executory.  *Id.* at 15-16.

23      In the Memorandum Decision, the court also discussed CCM's argument, which

24  Debtor's Counsel raised at the evidentiary hearing on the Contempt Motion and in the

25  *CCM Post-Trial Brief*, ECF 2077 at 5-7, that Milner "had some ongoing duty under state

26  law to periodically inspect" the subject property, and that this duty gave rise to a material

27  obligation that rendered the Settlement Agreement executory.  *Memorandum Decision,*

28  ECF 2079 at 16-17; *see also, September 20, 2018, Evidentiary Hearing Transcript*, ECF

2095 at 290-291.  After proposing this theory at the evidentiary hearing with no supporting

case law, the court directed CCM and Debtor's Counsel to include the argument and

authority in CCM's post-trial brief, which they failed to do.  Ultimately, CCM and Debtor's

Counsel cited no legal authority for the proposition, and the court determined that there is

no such legal authority.

The court also rejected CCM's alternative argument that, even if the Settlement

Agreement was not an executory contract that was rejected in its bankruptcy case, Milner

was barred by the Plan Confirmation Order from continuing to pursue claims arising from

the Settlement Agreement, because either CCM breached the Settlement Agreement pre-

confirmation—it did not—or Milner waived her claims when she litigated unrelated claims

under the Settlement Agreement during the bankruptcy case.  *Memorandum Decision,*

ECF 2079 at 19-20.  Debtor's Counsel, in connection with the Motion for Sanctions, later

argued in his Brief in Opposition to Milner's Supplemental Memorandum, ECF 2133, that

his waiver and claim preclusion arguments were not ruled upon, but this is demonstrably

false.  The court in its Memorandum Decision specifically ruled upon CCM's claim

preclusion (or res judicata) argument, stating:

> Here, the proofs of claim filed by Milner in this case had nothing to do with storage of the Play Property. [. . .] At no time before the Plan was confirmed did Debtor breach the Settlement Agreement or notify Milner that it would no longer store the Play Property. [. . .] Debtor presented no evidence that it refused to perform under the Settlement Agreement or that it engaged in conduct that made it impossible to perform its obligations under the Settlement Agreement before entry of the Plan Confirmation Order, which would give rise to a claim for preconfirmation breach by Milner.

*Memorandum Decision,* ECF 2079 at 19-20.  The court also found entirely meritless

Debtor's additional arguments that Milner could not have obtained ownership of the

subject property because the Settlement Agreement was not accompanied by a bill of

sale, or that there was no meeting of the minds as to the Settlement Agreement so it was

never enforceable, because, among other reasons, the judicial admissions made by CCM

in its State Court Complaint and Contempt Motion that CCM and Milner entered into the

1    contract referred hereto as the Settlement Agreement, and the undisputed evidence

2    showed that the parties had performed under the contract.  *Id.* at 21-22.

3        After the court filed and entered its Memorandum Decision, ECF 2079, and Order

4    Denying Debtor's Motion for Issuance of Order Directing Carol Milner and Harold J. Light,

5    Esq. to Show Cause Why They Should Not Be Held In Contempt, ECF 2080, CCM filed a

6    notice of appeal with the Ninth Circuit Bankruptcy Appellate Panel, ECF 2084, which it

7    later voluntarily dismissed on April 15, 2019, ECF 2098.

8        On July 2, 2019, Milner filed this Sanctions Motion requesting imposition of

9    sanctions against Debtor's Counsel and CCM pursuant to Bankruptcy Rule 9011 and the

10   court's inherent authority.

11                     **III.    ANALYSIS**

12       Having considered all the briefing and evidence put forth by the parties, the court

13   grants the motion in part and denies it in part.  Specifically, the court grants the motion as

14   to Debtor's Counsel because he acted recklessly, asserted frivolous legal arguments, and

15   brought the Contempt Motion for the improper purpose of coercing Milner into signing a

16   release of any purported claims she might have under the Settlement Agreement, which

17   conduct is tantamount to bad faith and is sanctionable under the court's inherent authority.

18   The court denies the motion as to CCM because the record does not demonstrate either

19   by clear and convincing evidence or by a preponderance of the evidence that it engaged

20   in conduct tantamount to bad faith since it relied on legal counsel to represent its interests

21   in its dispute with Milner from its inception, and there is insufficient evidence in the record

22   showing that it directed the frivolous litigation strategy undertaken by Debtor's Counsel or

23   otherwise committed a fraud upon the court.

24   **A.    Bankruptcy Rule 9011**

25       Under Bankruptcy Rule 9011, bankruptcy courts have the authority to sanction

26   parties, attorneys, and law firms who present papers to the court that are either frivolous

27

28

1  or presented for an improper purpose.[14]  "In determining if sanctions are warranted under

2  [Bankruptcy] Rule 9011, the bankruptcy court must consider both frivolousness and

3  improper purpose 'on a sliding scale, where the more compelling the showing as to one

4  element, the less decisive need be the showing as to the other.'"  *Winterton v. Humitech*

5  *of Northern California, LLC (In re Blue Pine Group, Inc.)*, 457 B.R. 64, 75 (9th Cir. BAP

6  2011) (vacated in part for other reasons by *In re Blue Pine Group*, 526 Fed. Appx. 768

7  (9th Cir. 2013)) (internal citation omitted).  When evaluating liability under Bankruptcy

8  Rule 9011, courts must examine the matter under an objective standard of

9  reasonableness measured by the actions of "a competent attorney admitted to practice

10  before the involved court."  *Id*.

11      An award of sanctions for a violation of Bankruptcy Rule 9011 is "an exceptionally

12  serious matter, and is reserved for those rare situations in which a claim or defense is

13  asserted without any evidentiary support or legal basis, or for improper purposes, such as

14  to harass or delay an opponent, or cause undue expense."  *Board of Trustees v.*

15  *Quinones (In re Quinones)*, 543 B.R. 638, 646 (Bankr. N.D. Cal. 2015) (citing *inter alia*

16  *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990)).  A party seeking sanctions

17  therefore must strictly comply with all of Bankruptcy Rule 9011's procedural requirements

18  for an award.  *Radcliffe v. Rainbow Construction Co.*, 254 F.3d 772, 789 (9th Cir. 2001);

19  *Barber v. Miller*, 146 F.3d 707, 710-711 (9th Cir. 1998).

20      The language of Bankruptcy Rule 9011 mirrors that of Civil Rule 11, so courts

21  analyzing sanctions under Bankruptcy Rule 9011 commonly rely on cases interpreting

---

22  [14]    Bankruptcy Rule 9011 provides, in relevant part:

23      (b) Representations to the Court.  By presenting to the court (whether by signing, filing, submitting,
    or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented

24      party is certifying that to the best of the person's knowledge, information, and belief, formed after an
    inquiry reasonable under the circumstances,—

25          (1) it is not being presented for any improper purpose, such as to harass or to cause
        unnecessary delay or needless increase in the cost of litigation;

26          (2) the claims, defenses, and other legal contentions therein are warranted by existing law
        or by a nonfrivolous argument for the extension, modification, or reversal of existing law or
        the establishment of new law;

27          (3) the allegations and other factual contentions have evidentiary support or, if specifically
        so identified, are likely to have evidentiary support after a reasonable opportunity for further
        investigation or discovery; . . ..

28  Federal Rule of Bankruptcy Procedure 9011(b).

**MEMORANDUM DECISION**

1   Civil Rule 11.  *Miller v. Cardinale (In re DeVille)*, 361 F.3d 539, 550 and n. 5 (9th Cir.

2   2004) (citation omitted).  Further, when Bankruptcy Rule 9011 was adopted in its present

3   form in 1997, the drafters of the amended bankruptcy rules referred readers to the notes

4   accompanying the 1993 amendments of Civil Rule 11 for guidance.  *Id.* at 552 and n. 8.

5   When interpreting Bankruptcy Rule 9011, the Ninth Circuit continues "to adhere to the

6   practice that precedents interpreting [Civil] Rule 11 may prove a helpful guide" and "look[s]

7   to the Advisory Committee Notes to the 1993 Amendments to Rule 11" to inform

8   judgments about the procedures required in imposing sanctions under Bankruptcy Rule

9   9011.  *Id.* at 552.[15]

10         In *Barber v. Miller,* 146 F.3d 707 (9th Cir. 1998), the Ninth Circuit discussed

11  sanctions under Civil Rule 11, analyzing the 1993 amendments of Civil Rule 11 and the

12  accompanying Advisory Committee Notes.  *Barber v. Miller,* 146 F.3d at 710-711.  In

13  *Barber v. Miller,* Imageware, the party seeking sanctions*,* had warned the offending party,

14  Carlsen, in two separate letters that his claims were baseless, putting him on notice that it

15  would seek Civil Rule 11 sanctions if the purportedly frivolous complaint was not

16  withdrawn.  146 F.3d at 709.  Imageware later filed a motion to dismiss, and the court

17  granted the motion with prejudice.  *Id.*  Around two months after the dismissal,

18  "Imageware informed Carlsen by letter that it would seek sanctions."  *Id.*  One month later

19  (and three months after the dismissal), Imageware "both moved for sanctions and served

20  Carlsen with the motion."  *Id.*  The district court awarded Imageware sanctions against

21  Carlsen.  *Id.*  The Ninth Circuit reversed the judgment awarding sanctions, holding that

22  compliance with the "safe harbor" under Civil Rule 11 is binary: (i) the "safe harbor"

23  expressly requires service of a motion in compliance with Civil Rule 11(c)(2),[16] and (ii) the

24  "safe harbor" implicitly requires that service of the motion occur before the court has

25  ─────────────
    [15]      The current wording of Federal Rule of Bankruptcy Procedure 9011(c) dates from 1997, and the
    essentially identical language in Federal Rule of Civil Procedure 11(c) dates from 1993.  The Advisory
26  Committee Notes on the 1997 Amendments to Rule 9011 state: "For an explanation of these amendments,
    see the advisory committee note to the 1993 amendments to Fed. R. Civ. P. 11."  Fed. R. Bankr. P. 9011;
27  Advisory Committee Notes, 1997 Amendment (accessed on March 8, 2020, and available at
    https://uscode.house.gov/view.xhtml?path=/prelim@title11/title11a/node2&edition=prelim).

    [16]      The bankruptcy equivalent of Federal Rule of Civil Procedure 11(c)(2) is Federal Rule of Bankruptcy
28  Procedure 9011(c)(1)(A).

**MEMORANDUM DECISION**

1  decided the merits of the underlying dispute.  *Id.* at 710-711; *see also Islamic Shura*

2  *Council of Southern California v. F.B.I.,* 757 F.3d 870, 872-873 (9th Cir. 2014).

3      As discussed below, the court finds that Milner has not satisfied either procedural

4  requirement of the "safe harbor" under Bankruptcy Rule 9011.  Milner did not serve a

5  "motion" in compliance with Bankruptcy Rule 9011, nor did she serve such a motion

6  before the court decided the merits of the underlying dispute, here, CCM's Contempt

7  Motion.  The court therefore denies the Sanctions Motion to the extent Milner sought

8  sanctions pursuant to Bankruptcy Rule 9011.

9      **i.   Milner's Failure to Serve the Sanctions Motion on CCM and Debtor's**

10      **Counsel as Required by the Bankruptcy Rule 9011(c)(1)(A) "Safe**

11      **Harbor" Warrants Denial of Relief under That Rule.**

12      Bankruptcy Rule 9011(c)(1)(A) [17] requires that before a motion for sanctions is filed

13  with the court, the motion must have been served on the party whose conduct is alleged

14  to violate the rule, and the alleged violating party must be allowed at least twenty-one

15  days to correct or withdraw the offending pleading, allegation, or denial (the "safe harbor").

16  Fed. R. Bankr. P. 9011(c)(1)(A).  To comply with Bankruptcy Rule 9011, a moving party

17  therefore must serve its sanctions motion "on the plaintiffs with a demand for retraction of

18  the allegedly offending allegations," and then allow the plaintiffs at least twenty-one days

19  to retract the pleading before filing the motion with the court.  *Radcliffe v. Rainbow*

20  *Construction Co.*, 254 F.3d at 788-789.

21

22

---

23  [17]    Federal Rule of Bankruptcy Procedure 9011(c)(1)(A) provides:

24      A motion for sanctions under this rule shall be made separately from other motions or requests
        and shall describe the specific conduct alleged to violate subdivision (b). It shall be served as
25      provided in Rule 7004. The motion for sanctions may not be filed with or presented to the court
        unless, within 21 days after service of the motion (or such other period as the court may
        prescribe), the challenged paper, claim, defense, contention, allegation, or denial is not
26      withdrawn or appropriately corrected, except that this limitation shall not apply if the conduct
        alleged is the filing of a petition in violation of subdivision (b). If warranted, the court may award
27      to the party prevailing on the motion the reasonable expenses and attorney's fees incurred in
        presenting or opposing the motion. Absent exceptional circumstances, a law firm shall be held
28      jointly responsible for violations committed by its partners, associates, and employees.

---

44

**MEMORANDUM DECISION**

1    In *Barber v. Miller,* the Ninth Circuit held that the procedural requirements of the

2   safe harbor in Bankruptcy Rule 9011 are mandatory.  146 F.3d at 710-711.  The Ninth

3   Circuit has emphasized that the Civil Rule 11 Advisory Committee Notes make

4   "abundantly clear" that the revised Bankruptcy Rule 9011(c)(1)(A), like Civil Rule

5   11(c)(1)(A), establishes a safe harbor in that "a party will not be subject to sanctions on

6   the basis of another party's motion unless, after receiving the motion, it refused to

7   withdraw that position or to acknowledge candidly that it does not currently have evidence

8   to support a specified allegation."  *Barber v. Miller,* 146 F.3d at 710 (citing Advisory

9   Committee Notes, 1993 Amendment).  The purpose of the safe harbor "is to give the

10  offending party the opportunity, within 21 days after service of the motion for sanctions, to

11  withdraw the offending pleading *and thereby escape sanctions*."  *Barber v. Miller,* 146

12  F.3d at 710.  The safe harbor was adopted to, among other reasons, encourage the

13  withdrawal of papers that violate Bankruptcy Rule 9011 without involving the court,

14  thereby avoiding sanction proceedings whenever possible and streamlining the litigation

15  process.   *See* 5A Charles Alan Wright and Arthur R. Miller, *Federal Practice and*

16  *Procedure* § 1337.2 (4th ed., online ed., August 2019 update); *see also Truesdell v.*

17  *Southern California Permanente Medical Group*, 293 F.3d 1146, 1151 (9th Cir. 2002)

18  (safe harbor is meant to give an opportunity to remedy any alleged misconduct); *Ellis v.*

19  *Devig*, No. 3:08-cv-19, 2008 U.S. Dist. LEXIS 29893, 2008 WL 1735389 at *1 (D. N.D.

20  2008) (purpose of safe harbor is to encourage withdrawal).

21    In *Radcliffe v. Rainbow Construction Co.*, the Ninth Circuit discussed its holding in

22  *Barber* and the exacting procedures that Bankruptcy Rule 9011 requires:

23    In *Barber*, we held that the procedural requirements of Rule
     11(c)(1)(A)'s 'safe harbor' are mandatory.  [146 F.3d] at 710-11.  Thus,
24    in *Barber*, we concluded that, although a defendant had given informal
     warnings to the plaintiffs threatening to seek Rule 11 sanctions, these
25    warnings did not satisfy the strict requirement that a motion be *served*
     on the opposing party twenty-one days prior to filing. *Id.* at 710.  It is
26    the service of the motion that gives notice to a party and its attorneys
     that they must retract or risk sanctions.  In light of our holding in
27    *Barber*, the fact that the plaintiffs had advance warning that Rainbow
     objected to their conspiracy allegation did not cure Rainbow's failure to

28

**MEMORANDUM DECISION**

comply with the strict procedural requirement of Rule 11(c)(1)(A). The
district court abused its discretion when it concluded otherwise.

*Radcliffe v. Rainbow Construction Co.,* 254 F.3d at 789.[18]  Thus, as noted by the Ninth

Circuit Bankruptcy Appellate Panel, "The Ninth Circuit strictly enforces the safe harbor

provision."  *Philips v. Gilman (In re Gilman),* 2019 WL 3096872, at *14 (9th Cir. BAP 2019)

(citing *Islamic Shura Council of Southern California v. F.B.I.,* 757 F.3d 870, 872 (9th Cir.

2014)).

Because Milner did not comply with the "safe harbor" procedures of Bankruptcy

Rule 9011(c)(1)(A) the court determines that neither Debtor's Counsel nor CCM may be

properly sanctioned under Bankruptcy Rule 9011.  The court also finds that CCM and

Debtor's Counsel did not and could not have waived any defenses related to the safe

harbor under Bankruptcy Rule 9011(c)(1)(A) based on paragraph four of the parties'

stipulation to continue the hearing on the Sanctions Motion.  *See Stipulation to Continue

Hearing on Sanctions Motion,* ECF 2107 at 3 (¶ 4) ("CCM and Debtor's Counsel waive

their objections, if any, that Milner failed to comply with Bankruptcy Rule 9011(c)(1)(A) by

not serving her Motion for Rule 9011 Sanctions on CCM and Debtor's Counsel at least 21

days before filing it.").  Because CCM and Debtor's Counsel had no paper that could be

withdrawn at the time Milner filed the Sanctions Motion, as the court had already

adjudicated the Contempt Motion, they had no right to relinquish by waiving "their

objections" to Milner's failure to comply with the safe harbor.  The court does not read

paragraph 4 of the stipulation, ECF 2107, as constituting a waiver of any or all defenses

under Bankruptcy Rule 9011(c)(1)(A).

---

[18]    *See also Ellis v. Devig*, No. 3:08-cv-19, 2008 U.S. Dist. LEXIS 29893, 2008 WL 1735389 at *1
(D.N.D. 2008) ("The language of Rule 11, along with the Advisory Committee Notes, clearly sets forth the
procedure which parties must follow when they believe sanctions may be appropriate. First, the other party
should be informally notified of the potential violation before service of the Rule 11 motion. If the issue is not
resolved after informal notification, the party seeking sanctions must serve a separate motion for sanctions
upon the other party. After the motion has been served, the other party has the 21-day safe harbor period to
withdraw or correct the challenged paper. The district court should not be involved in the matter prior to the
expiration of the safe harbor period. If the safe harbor period runs without appropriate action by the other
party, only then should the motion for sanctions be filed with the district court.").

46

**MEMORANDUM DECISION**

1    Milner was aware of the need to comply with the "safe harbor" provision in

2  Bankruptcy Rule 9011; she addressed the "safe harbor" in her Objection to Contempt

3  Motion, her initial pleading in this contested matter.  *Milner Objection to Contempt Motion*,

4  filed June 12, 2018, ECF 2050 at 5 ("Because the [Contempt Motion] will be granted or

5  denied within seven days pursuant to Local Rules, Ms. Milner and Mr. Light cannot give

6  CCM the 21 days' notice to withdraw the Motion as otherwise required by Fed.R.Bankr.P.

7  9011(c)(1)(A).").  As discussed in footnote 11 above, Milner's contention that the local

8  rules somehow precluded strict compliance with Bankruptcy Rule 9011 is incorrect.

9    The court declines to consider the conversion of the Contempt Motion to a

10  contested matter as the equivalent of the filing of a bad faith bankruptcy petition, which the

11  Bankruptcy Rule 9011(c)(1)(A) safe harbor would not apply to, because the Contempt

12  Motion is not a petition, which is a term of art to commence a case under the Bankruptcy

13  Code under Bankruptcy Rule 1002.  *See Milner Reply to CCM and Debtor's Counsel*

14  *Oppositions*, ECF 2121 at 5-6.  The Contempt Motion is a request for an order as defined

15  by Bankruptcy Rule 9013.  Milner's contention that she filed the Sanctions Motion as soon

16  as practicable under the circumstances is unavailing because as CCM and Debtor's

17  Counsel argue, she could have served the motion any time after the Contempt Motion

18  was filed and before the court entered its decision on the merits on the Contempt Motion.

19  Moreover, as discussed herein, controlling Ninth Circuit authority mandates that this court

20  enforce the Bankruptcy Rule 9011(c)(1)(A) "safe harbor" strictly.

21    In *Barber v. Miller,* the Ninth Circuit held that multiple warning letters to an attorney

22  about the defects of his claim did not satisfy Bankruptcy Rule 9011 because a motion was

23  required to be served.  146 F.3d at 710 ("Those warnings were not motions, however, and

24  the Rule requires service of a motion.").  Like the moving party in *Barber v. Miller,* here,

25  Milner only sent a warning letter, and not a motion, to CCM and Debtor's Counsel, to put

26  them on notice that Bankruptcy Rule 9011 sanctions were likely to be sought if the

27  Contempt Motion was not withdrawn when her counsel e-mailed her Bankruptcy Rule

28  9011 Warning Letter to Debtor's Counsel.  *July 11, 2018 Letter from Movant's Counsel to*

1    *Debtor's Counsel, Exhibit 1 to Sanctions Motion,* ECF 2100-1 at 4-5.  The Bankruptcy

2    Rule 9011 Warning Letter, however, suffers from the same fatal procedural flaw—not

3    being a motion—as the warning letters in *Barber v. Miller*.  As discussed above, the

4    evidentiary hearing on the Contempt Motion was conducted on September 20, 2018.

5    Milner's arguments supporting her request for CCM and Debtor's Counsel to withdraw the

6    Contempt Motion, or otherwise face possible sanctions, were put forward in the

7    Bankruptcy Rule 9011 Warning Letter delivered by e-mail to Debtor's Counsel on July 11,

8    2018.  *Id*.  Milner could have reconstituted her Bankruptcy Rule 9011 Warning Letter into

9    a motion and served Debtor's Counsel and CCM at least as early as July 11, 2018, but

10   never did so.  At the Status Conference on July 31, 2018, the court set the evidentiary

11   hearing for September 20, 2018, and other deadlines related to the evidentiary hearing fell

12   before September 20, 2018, which was approximately seven weeks after the status

13   conference.  Milner could have served CCM and Debtor's Counsel with a "safe harbor"

14   sanctions motion at least as late as Tuesday, August 28, 2018 to give 21-day notice

15   before trial started but did not.  Moreover, Milner could have served a "safe harbor" motion

16   after trial because the court did not issue its Memorandum Decision adjudicating the

17   Contempt Motion until November 2, 2018.  Even though this all may be in hindsight, the

18   court finds that Milner had a sufficient opportunity to satisfy the Bankruptcy Rule

19   9011(c)(1)(A) "safe harbor" before trial in the time period at least from July 11, 2018 to

20   August 28, 2018 (and she had the opportunity ever since she was served with the

21   Contempt Motion on or about June 8, 2018)..

22        Accordingly, because Milner did not satisfy the "safe harbor" requirement that she

23   serve a motion pursuant to Bankruptcy Rule 9011(c)(1)(A), this failure alone warrants

24   denial of her Sanctions Motion as to the relief requested under Bankruptcy Rule 9011.

25        ///

26

27

28

**MEMORANDUM DECISION**

1

          **ii.**    **Milner's Failure to Timely File the Sanctions Motion Before**

2

                **Adjudication of the Contempt Motion as Required by the Ninth**

3

                **Circuit Warrants Denial of Relief Under That Rule.**

4

        In *Truesdell v. Southern California Permanente Medical Group*, 293 F.3d 1146 (9th

5

Cir. 2002), the Ninth Circuit reaffirmed its rulings in *Barber v. Miller* and *Radcliffe v.*

6

*Rainbow Construction Co.,* that require strict procedural compliance under Bankruptcy

7

Rule 9011.  293 F.3d at 1151-1152.  The Ninth Circuit explained that in *Barber v. Miller,* it

8

9

10

11

12

13

> held that a party may not wait to serve its motion for sanctions until the court has ruled on the offending filing. [citing *Barber,* 146 F.3d at 710-711.]; *see also* Fed. R. Civ. P. 11 advisory committee's notes to 1993 amends. (stating that, "[g]iven the 'safe harbor' provisions . . ., a party cannot delay serving its Rule 11 motion until conclusion of the case (or judicial rejection of the offending contention)").  Once the court has dismissed the action with prejudice, counsel cannot withdraw the pleading.  Allowing a party to wait until judgment is entered before serving a Rule 11 motion would effectively eliminate the safe harbor altogether.

*Truesdell v, Southern California Permanente Medical Group,* 293 F.3d at 1152.

14

        Similarly, in *Islamic Shura Council of Southern California v. F.B.I.,* 757 F.3d 870

15

(9th Cir. 2014), the Ninth Circuit held that:

16

17

18

19

> Motions for Rule 11 attorney's fees cannot be served after the district court has decided the merits of the underlying dispute giving rise to the questionable filing.  This is because once the court has decided the underlying dispute, the motion for fees cannot serve Rule 11's purpose of judicial economy.

20

757 F.3d at 873; *see also, In re Quinones,* 543 B.R. at 648-649 (same).

21

        Milner filed the Sanctions Motion, ECF 2100, on July 2, 2019, which was eight

22

months after the court issued its Memorandum Decision on the Contempt Motion, ECF

23

2079, entered on November 2, 2018.  By filing the Sanctions Motion long after the court

24

ruled on the Contempt Motion, Milner negated the very purpose of the Bankruptcy Rule

25

9011 "safe harbor"—allowing the parties an opportunity to avoid litigation about litigation

26

before involving the court.  The goal of judicial economy is not served by allowing parties

27

to bypass the "safe harbor" requirement and file motions under Bankruptcy Rule 9011

28

after the underlying dispute has been adjudicated.  Thus, Milner's failure to file the

1  Sanctions Motion until after the underlying dispute had been resolved also warrants denial

2  of the motion as to the relief sought under Bankruptcy Rule 9011.

3  **B.      The Bankruptcy Court's Inherent Authority to Sanction Bad Faith Conduct**

4          In *Roadway Express, Inc. v. Piper,* 447 U.S. 752 (1980), the Supreme Court

5  described the bases on which a federal court may impose sanctions under its inherent

6  authority.  The Supreme Court stated that there are "ample grounds for recognizing[] . . .

7  that in narrowly defined circumstances federal courts have inherent power to assess

8  attorney's fees against counsel[,]" observing that the general rule that a litigant cannot

9  recover his attorney fees "does not apply when the opposing party has acted in bad

10  faith[,]" and federal courts have the inherent power to levy sanctions, including attorney

11  fees, for "willful disobedience of a court order . . . or when the losing party has acted in

12  bad faith, vexatiously, wantonly, or for oppressive reasons. . . ."  *Id.* at 765-766 (internal

13  quotation marks and citations omitted).  The Supreme Court emphatically added that "[i]f a

14  court may tax counsel fees against a party who has litigated in bad faith, it certainly may

15  assess [attorney fee sanctions] against counsel who willfully abuse judicial processes."

16  *Id.* at 766*; see also Chambers v. NASCO, Inc.,* 501 U.S. 32 (1991) (reaffirming the

17  principles set forth in *Roadway*).

18          A federal court's inherent authority to sanction, however, "ought to be exercised

19  with great caution[.]"  *Chambers v. NASCO, Inc.,* 501 U.S. at 43 (internal quotations

20  omitted) (quoting *Ex parte Burr,* 22 U.S. 529, 9 Wheat. 529, 531, 6 L. Ed. 152 (1824)).

21  "Because of their very potency, inherent powers must be exercised with restraint and

22  discretion."  *Id.* at 44 (citation omitted).

23          In a similar vein, the Ninth Circuit has stated with respect to Civil Rule 11 sanctions:

24  "Rule 11 is an extraordinary remedy, one to be exercised with extreme caution."

25  *Operating Engineers Pension Trust v. A-C Co.,* 859 F.2d 1336, 1345 (9th Cir. 1988).  In

26  explaining the policy rationale for exercising extreme caution when deciding whether to

27  impose sanctions under Civil Rule 11, the Ninth Circuit stated in *Operating Engineers*

28  *Pension Trust v. A-C Co.*:

The [Advisory] Committee [on the Federal Rules]'s note to amended Rule 11 emphasizes that the Rule 'is not intended to chill an attorney's enthusiasm or creativity in pursuing factual or legal theories.'  Fed.R.Civ.P. 11, Notes of Advisory Committee on Rules, Federal Civil Judicial Procedure and Rules 34 (West 1987). Furthermore, as Justice Stevens has stated:  "Freedom of access of the courts is a cherished value in our democratic society. Incremental changes in settled rules of law often result from litigation.  The courts provide the mechanism for the peaceful resolution of disputes that might otherwise rise to attempts at self-help.  There is, and should be, the strongest presumption of open access to all levels of the judicial system.  Creating a risk that the invocation of the judicial process may give rise to punitive sanctions simply because the litigant's claim is unmeritorious could only deter the legitimate exercise of the right to seek a peaceful redress of grievances through judicial means . . . . [T]he strong presumption is against the imposition of sanctions for invoking the processes of the law."  *Talamini v. All-State Insurance Co.,* 470 U.S. 1067, 105 S.Ct. 1824, 1827-28, 85 L.Ed.2d 125 (1985) (Stevens, J., joined by Brennan, Marshall and Blackmun, concurring).  We agree with Justice Stevens that judges must not, by imposing sanctions unnecessarily, discourage the filing of good faith actions.  It is essential that free access to the judicial system be maintained; Rule 11 was not intended to impede such access.

859 F.2d at 1344.

The Ninth Circuit in *Operating Engineers Pension Trust v. A-C Co.,* further commented on the potential of Rule 11 sanctions to interfere with a lawyer's ethical duty to zealously represent a client:

Rule 11 must not be construed as to conflict with the primary duty of an attorney to represent his or her client zealously.  Forceful representation often requires that an attorney attempt to read a case or an agreement in an innovative though sensible way.  Our law is constantly evolving, and effective representation sometimes compels attorneys to take the lead in that evolution.  Rule 11 must not be turned into a bar to legal progress.  *See, e.g., Hudson v. Moore Business Forms, Inc.,* 827 F.2d 450, 453-55 (9th Cir. 1987) ("attempt to seek tort damages under a *Seaman's*-type action is not frivolous, but rather an attempt to expand a developing area of the law").  Courts must also "avoid using the wisdom of hindsight and should test the signer's conduct by inquiring into what was reasonable to believe at the time the pleading . . . was submitted." *Id.*  The simple fact that an attorney's legal theory failed to persuade the district court "does not demonstrate that [counsel] lacked the requisite good faith in attempting to advance the law." *Hurd v. Ralphs Grocery Co.,* 824 F.2d 806, 811 (9th Cir. 1987). Rather, we reserve sanctions for the rare and exceptional case where the action is clearly frivolous, legally unreasonable or without legal foundation, or brought for an improper purpose.

859 F.2d at 1344.

**MEMORANDUM DECISION**

1    As the Ninth Circuit further observed in *Conn v. Borjorquez,* 967 F.2d 1418 (9th Cir.

2  1992), this is so because "[s]uch sanctions can have an unintended detrimental impact on

3  an attorney's career and personal well-being."  967 F.2d at 1421 (citing *Brown v.*

4  *Federation of State Medical Boards of the U.S.,* 830 F.2d 1429, 1437 (7th Cir. 1987)).

5  Mindful of these policy concerns, the court approaches the task of determining Milner's

6  Motion for Sanctions against CCM and Debtor's Counsel with "great caution," in the words

7  of the Supreme Court in *Chambers v. NASCO, Inc.* regarding sanctions under the court's

8  inherent authority, and with "extreme caution," in the words of the Ninth Circuit in

9  *Operating Engineers Pension Trust v. A-C Co.* regarding sanctions under Civil Rule 11.  In

10  the court's mind, the difference between "great caution" and "extreme caution" is probably

11  semantical, and the court has reviewed Milner's sanction motion with great and extreme

12  caution, mindful of the impact on the attorney's career and well-being if sanctions are

13  imposed for bad faith under the court's inherent authority in light of the negative

14  reputational and financial impact of such imposition, considering Milner's current demand

15  of over $150,000 for attorneys' fees she contends that she incurred in defending the

16  Contempt Motion.  In determining the sanctions motion, the court has provided this

17  detailed explanation that its ruling is not to punish the attorney's enthusiasm or creativity

18  in pursuing factual or legal theories or his carrying out his primary duty as an attorney to

19  represent his client zealously, but that this case is the rare and exceptional situation

20  where the action is clearly frivolous, legally unreasonable or without legal foundation, or

21  brought for an improper purpose.

22    Regarding the inherent authority of bankruptcy courts specifically to impose

23  sanctions, the Ninth Circuit has stated: "The inherent sanction authority allows a

24  bankruptcy court to deter and provide compensation for a broad range of improper

25  litigation tactics."  *Knupfer v. Lindblade (In re Dyer)*, 322 F.3d 1178, 1196 (9th Cir.

26  2003)(citing *Fink v. Gomez*, 239 F.3d 989, 992-993 (9th Cir. 2001)).  However, before the

27  bankruptcy court imposes sanctions under its inherent authority, it must find either bad

28  faith, conduct tantamount to bad faith, or recklessness with an "additional factor such as

1   frivolousness, harassment, or an improper purpose." *Fink v. Gomez*, 239 F.3d at 994; *see*

2   *also* Black's Law Dictionary (11th ed. 2019) (defining "bad faith" as "Dishonesty of belief,

3   purpose, or motive").   Regarding the imposition of sanctions for bad faith pursuant to a

4   bankruptcy court's inherent authority, the Bankruptcy Appellate Panel of the Ninth Circuit

5   has stated that bad faith "consists of something more egregious than mere negligence or

6   recklessness." *Cunningham v. Jacobson (In re Jacobson)*, 2009 WL 7751428, at *15 (9th

7   Cir. BAP 2009) (internal citation and quotation marks omitted).   The bankruptcy court

8   therefore "must make an explicit finding" of bad faith or similarly egregious conduct to

9   support the imposition of sanctions pursuant to its inherent authority.   *In re Dyer,* 322 F.3d

10  at 1196 (citing *Fink v. Gomez,* 239 F.3d at 992-993); *see also, Primus Automotive*

11  *Financial Services, Inc. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997); *United States v.*

12  *Stoneberger,* 805 F.2d 1391, 1393 (9th Cir. 1986).   This explicit finding is "especially

13  critical when the court uses its inherent powers to engage in fee-shifting[.]" *Primus*

14  *Automotive Financial Services, Inc. v. Batarse*, 115 F.3d at 648.   As further stated by the

15  Ninth Circuit in *Primus Automotive Financial Services, Inc. v. Batarse,* "[w]e insist on the

16  finding of bad faith because it ensures that 'restraint is properly exercised,' and it

17  preserves a balance between protecting the court's integrity and encouraging meritorious

18  arguments." *Id.* at 649 (citing *Roadway Express, Inc. v. Piper,* 447 U.S. at 764 (noting

19  that because "inherent powers are shielded from direct democratic controls, they must be

20  exercised with restraint and discretion") and *Zambrano v. City of Tustin,* 885 F.2d 1473,

21  1478 (9th Cir. 1989)).

22      The Ninth Circuit's opinion in *Fink v. Gomez* is particularly instructive here, and

23  thus, the court summarizes the opinion in some detail below.   In *Fink v. Gomez*, the Ninth

24  Circuit determined that a district court has authority under its inherent power to impose

25  sanctions when an attorney has made reckless misstatements of law and fact and has

26  done so for an improper purpose.   239 F.3d at 990.   *Fink v. Gomez* involved an inmate at

27  the California Institute for Men, a man named Fink, who was left permanently and

28  severely disabled after an altercation with several guards whom he later sued for

**MEMORANDUM DECISION**

1   violations of his civil rights.  *Id.*  Fink also filed a related petition for a writ of habeas

2   corpus.  *Id.*  An attorney representing the guard defendants in Fink's civil rights case

3   made "various misrepresentations" of the facts and California law to the district court

4   during an off-the-record telephonic conference related to the habeas corpus case and

5   subsequent hearings before the district court.  *Id.* at 990-991.  Specifically, the guards'

6   attorney claimed that California law required that the California Department of Corrections

7   hold another disciplinary hearing regarding the altercation involving Fink and the guards,

8   notwithstanding the district court's conditional judgment precluding a new hearing.  *Id.* at

9   990.  In reliance on the attorney's representations, the district court did not enjoin the new

10  disciplinary hearing, stating that Fink should suffer no adverse consequences as a result

11  of the new hearing.  However, the new disciplinary hearing resulted in substantial adverse

12  consequences to Fink.  *Id.*  Two months later, the same attorney for the guards appeared

13  before the district court and further misled the court as to the consequences of Fink's new

14  disciplinary hearing.  *Id.* at 990-991.  The attorney had also falsely claimed that "the

15  matter of the . . . altercation had been referred to the district attorney for prosecution, [and]

16  that the district court's denial of the petition for writ of habeas corpus 'wasn't exactly

17  reversed[.]'"  *Id.*  As a result of the attorney's misbehavior, the district court *sua sponte*

18  issued an order to show cause why the attorney should not be sanctioned for misstating

19  California law, the state of the record and other facts in the case.  *Id.* at 991.  The district

20  court found that the attorney advanced meritless claims under California law because a

21  new disciplinary hearing was not required, and the attorney had in fact orchestrated the

22  new disciplinary hearing "in bad faith with a view to gaining an advantage in [her] case."

23  *Id.* (internal quotations omitted).  However, the district court decided not to impose

24  sanctions due to uncertainty in the case law that some opinions of the Ninth Circuit

25  indicated that only subjective bad faith was sanctionable, while other opinions implied that

26  recklessness or objective bad faith would suffice.  Fink appealed on grounds that the

27  district court abused its discretion when it declined to impose sanctions after finding that

28  the attorney had acted in a reckless manner rising to the level of bad faith.  *Id.*

**MEMORANDUM DECISION**

1    On appeal, the Ninth Circuit reversed, stating that the district court abused its

2  discretion in misapprehending the scope of its inherent authority to impose sanctions.  *Id.*

3  at 994.  In analyzing the imposition of sanctions under a court's inherent power, the Ninth

4  Circuit discussed the Supreme Court's decision in *Chambers v. NASCO, Inc.*, observing

5  that it "left no question that a court may levy fee-based sanctions when a party has acted

6  in bad faith, vexatiously, wantonly, or for oppressive reasons, delaying or disrupting

7  litigation, or has taken actions in the litigation for an improper purpose."  *Id.* at 992 (citing

8  *Chambers v. NASCO, Inc.,* 501 U.S. at 45-46 and n.10).  The Ninth Circuit's description of

9  the Supreme Court's holding in *Chambers v. NASCO, Inc.,* quoted above, is in the

10  disjunctive; that is, a bad faith finding therefore may be proper where a party acts with

11  improper purpose alone.  *Id.*  Even before the Supreme Court had decided *Chambers v.*

12  *NASCO, Inc.*, the Ninth Circuit observed that it had recognized that 'improper purpose' is

13  an independent ground for sanctioning a litigant under a court's inherent authority.  *Fink v.*

14  *Gomez,* 239 F.3d at 992 ("[*In re Itel Securities Litigation,* 791 F.2d 672 (9th Cir. 1986)]

15  teaches that sanctions are justified when a party acts for an *improper purpose* — even if

16  the act consists of making a truthful statement or a non-frivolous argument or objection.").

17  Thus, the Ninth Circuit concluded in *Fink v. Gomez* that 'improper purpose' is alone

18  sufficient to support a finding of bad faith.  *Id.* at 992.  However, the Ninth Circuit held that

19  mere recklessness is not sufficient for a court to sanction under its inherent authority, but,

20  however, "[s]anctions are available for a variety of types of willful actions, including

21  recklessness when combined with an additional factor such as frivolousness, harassment,

22  or an improper purpose."  *Id.* at 993-994.

23              **i.    Frivolousness Standard**

24    In the Sanctions Motion, citing *Fink v. Gomez,* Milner contends that Debtor's

25  Counsel should be sanctioned for bringing the Contempt Motion on behalf of CCM against

26  her and her state court counsel, Light, for an improper purpose and for making frivolous

27  and reckless arguments in support of that motion.

28

**MEMORANDUM DECISION**

1    Although it may be said, as the Sixth Circuit has observed, that "[f]rivolity, like

2  obscenity, is often difficult to define[,]" *WSM, Inc. v. Tennessee Sales Co.,* 709 F.2d 1084,

3  1088 (6th Cir. 1983), there is a consistent body of law in the Ninth Circuit defining

4  frivolousness in the similar context of imposing sanctions under Civil Rule 11.  For

5  example, in *Moore v. Keegan Management Company (In re Keegan Management*

6  *Company Securities Litigation)*, 78 F.3d 431 (9th Cir. 1996), the Ninth Circuit stated: "[t]he

7  word 'frivolous' does not appear anywhere in the text of [] Rule [11]; rather, it is a

8  shorthand that this court has used to denote a filing that is *both* baseless *and* made

9  without a reasonable and competent inquiry."  *Id.* at 434.  *See also Christian v. Mattel,*

10  *Inc.,* 286 F.3d 1118, 1127 (9th Cir. 2002); *accord, Thompson v. Massarweh,* 2017 WL

11  6316816, at *1 (N.D. Cal. 2017) (citing *inter alia*, *Christian v. Mattel, Inc.,* 286 F.3d at

12  1127).  As to defining frivolous generally, the Ninth Circuit has adopted an ordinary

13  meaning of frivolous, meaning "groundless . . . with little prospect of success; often

14  brought to embarrass or annoy the defendant."  *United States v. Braunstein,* 281 F.3d

15  982, 995 (9th Cir. 2002) (citing *United States v. Gilbert,* 198 F.3d 1293, 1299 (11th Cir.

16  1999) (adopting the Eleventh Circuit's approach to defining "frivolous" and "bad faith" on a

17  Hyde Amendment motion by looking to Black's Law Dictionary and Civil Rule 11) (citation

18  omitted).  As to what constitutes a reasonable inquiry, the Ninth Circuit has also stated

19  that a reasonable inquiry is "that amount of examination into the facts and legal research

20  which is reasonable under the circumstances of the case."  *Zaldivar v. City of Los*

21  *Angeles,* 780 F.2d 823, 831 (9th Cir. 1986).

22    Since the Ninth Circuit has stated its reliance upon legal authorities interpreting

23  Civil Rule 11 when considering the imposition of sanctions under Bankruptcy Rule 9011,

24  *see, In re DeVille*, 361 F.3d at 552, this court considers that it is appropriate to consider

25  authorities interpreting Civil Rule 11 in determining whether sanctions should be imposed

26  here for bad faith conduct involving frivolousness.

27

28

**MEMORANDUM DECISION**

ii.    **Recklessness Standard**

"The civil law generally calls a person reckless who acts . . . in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Farmer v. Brennan,* 511 U.S. 825, 836 (1994) (discussing the civil and criminal law standards for recklessness in connection with "deliberate indifference" under the Eighth Amendment) (citation omitted).  In the context of sanctions based upon misrepresentations to a court, the Ninth Circuit has defined recklessness as "a departure from ordinary standards of care that disregards a known or obvious risk of material misrepresentation."  *Thomas v. Girardi (In re Girardi),* 611 F.3d 1027, 1038 n. 4 (9th Cir. 2010).  Therefore, based on these standards, recklessness essentially involves an unreasonable departure from the ordinary standard of care where the actor had to have been aware of the risks in her behavior.  *See id.* (citing *Prescod v. AMR, Inc.*, 383 F.3d 861, 870 (9th Cir. 2004) (per curiam) (applying California tort law identifying recklessness where "the actor has intentionally done an act of an unreasonable character in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow"); *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-1569 (9th Cir. 1990) (en banc) (defining the "recklessness" that constitutes the scienter necessary for a securities law violation as behavior "involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it") (quotation omitted)).  In this case, any alleged recklessness may be identified based on the high risk of harm, namely, litigation costs, that was known by Debtor's Counsel and CCM before filing the Contempt Motion, and the ongoing harm to Milner that would occur if the conduct of Debtor's Counsel and CCM leading up to and during the prosecution of the Contempt Motion unreasonably departed from an ordinary level of care.

**MEMORANDUM DECISION**

### iii.   Improper Purpose Standard

Civil Rule 11 indicates that improper purposes that justify sanctions include harassment and causing "unnecessary delay," or "needlessly increase[ing] the cost of litigation," among others.  Federal Rule of Civil Procedure 11.  In *Bader v. Itel Corporation (In re Itel Securities Litigation),* 791 F.2d 672 (9th Cir. 1986)*,* the Ninth Circuit found that the improper purpose warranting sanctions was "the attempt to gain tactical advantage in another case."  *Fink v. Gomez,* 239 F.3d at 992 (citing *In re Itel Securities Litigation,* 791 F.2d at 675).  This court in a prior case has held that it constitutes bad faith for a debtor to file a bankruptcy petition to impede, delay, forum shop or obtain a tactical advantage regarding litigation ongoing in a nonbankruptcy forum, such as a state court or a federal district court.  *In re Silberkraus,* 253 B.R. 890, 905 (Bankr. C.D. Cal. 2000) (listing cases).  Other bankruptcy courts have also determined that bad faith is shown by pursuing litigation for an improper purpose such as a tactical advantage.  *Skies Unlimited, Inc. of Colorado v. King,* 72 B.R. 536, 539 (Bankr. D. Colo. 1987) (order to show cause re contempt was filed for the improper purposes of harassment and "placing unwarranted pressure" because debtors were "seeking to browbeat the Defendant with threats of potential contempt orders and thereby dissuade him from pursuing his claims in the state court."); *In re Collins,* 250 B.R. 645, 663 (Bankr. N.D. Ill. 2000) ("[Debtor] did not merely invoke the shield of the automatic stay; he converted it to a sword for the sole purpose of frustrating a single creditor . . . Such a purpose is improper  . . .").  Although the subject Contempt Motion does not involve a bankruptcy petition, the non-exhaustive list of improper purposes in *Silberkraus* and the other cases cited above are useful to the court's analysis here.

### iv.   Burden of Proof

The Ninth Circuit has held that the burden of showing bad faith is on the party claiming bad faith, but it has not decided the standard of proof that applies, i.e., whether a preponderance of the evidence or clear and convincing evidence is sufficient to support a finding of bad faith.  *Lahiri v. Universal Music & Video Distribution Corp.*, 606 F.3d 1216,

58

**MEMORANDUM DECISION**

1  1219 (9th Cir. 2010); *F.J. Hanshaw Enterprises, Inc. v. Emerald River Development, Inc.*,

2  244 F.3d 1128, 1143 and n. 11 (9th Cir. 2001); *see also, Nguyen v. Golden (In re Pham),*

3  2017 WL 5148452, at *8 n. 9 (9th Cir. BAP 2017).

4       As discussed below, the court determines that whether the standard of proof is

5  clear and convincing evidence or a preponderance of the evidence, Milner has met her

6  burden of proof as to Debtor's Counsel, but not as to CCM.

7  **C.    Discussion**

8            **i.    The Applicability of Bankruptcy Rule 9011 Does Not Preclude the**

9                 **Imposition of Sanctions Under the Court's Inherent Authority**

10      The court addresses the arguments of CCM and Debtor's Counsel whether

11 Bankruptcy Rule 9011 precludes the court from imposing sanctions under its inherent

12 authority before considering whether the conduct of Debtor's Counsel and CCM was so

13 egregious to constitute bad faith warranting the imposition of sanctions under the court's

14 inherent authority.  The "inherent power of a court can be invoked even if procedural rules

15 exist which sanction the same conduct."  *Chambers v. NASCO, Inc.,* 501 U.S. at 49.  In

16 *Miller v. Cardinale (In re DeVille)*, 361 F.3d 539, 551 (9th Cir. 2004), the Ninth Circuit

17 addressed the arguments now being made by CCM and Debtor's Counsel that if

18 Bankruptcy Rule 9011 applies, imposition of sanctions under the court's inherent authority

19 is precluded, stating that "the Supreme Court has emphatically rejected the notion that the

20 advent of . . . the sanctioning provisions in the Federal Rules of Civil Procedure displaced

21 the inherent power to impose sanctions for bad faith conduct."  *In re DeVille*, 361 F.3d at

22 551 (citing *Chambers v. NASCO, Inc.*, 501 U.S. at 49-50).  The Ninth Circuit further stated

23 in *DeVille* that: "We agree with the BAP's conclusion that, given the inadequacy of rules

24 and statutes to sanction [the Appellants'] misconduct, the bankruptcy court correctly relied

25 upon its inherent power as a sanctioning tool."  361 F.3d at 551.  In the BAP's underlying

26 decision, *Miller v. Cardinale (In re DeVille),* 280 B.R. 483, 486-487 (9th Cir. BAP 2002),

27 the BAP expressly concluded that "[t]his is a situation in which neither a statute nor the

28 rules of procedure are 'up to the task.'  [Bankruptcy Rule 9011] does not suffice because

1  the victim did not make the requisite motion following compliance with the mandatory

2  "safe harbor" and because the court may not shift attorneys' fees and costs on its own

3  motion." *In re DeVille,* 280 B.R. at 494.  Accordingly, the rule of decision as stated in the

4  Ninth Circuit's opinion in *In re DeVille,* based on the Supreme Court precedent in

5  *Chambers v. NASCO, Inc.*, is that a bankruptcy court may exercise its inherent authority

6  to sanction even when the disputed conduct may also be sanctionable pursuant to

7  Bankruptcy Rule 9011.

8       Like the party seeking sanctions based on bad faith conduct in *In re DeVille,* here,

9  Milner did not make a timely "safe harbor" motion as required to impose sanctions

10  pursuant to Bankruptcy Rule 9011.  As discussed above, Milner never served Debtor's

11  Counsel and CCM with a copy of her Sanctions Motion and a request to withdraw any

12  allegedly offending pleadings 21 days before filing the Sanctions Motion, nor before the

13  underlying matter of the Contempt Motion was finally adjudicated, but she was aware of

14  the need to comply with the "safe harbor" provision in Bankruptcy Rule 9011 as she

15  addressed the "safe harbor" in her initial Objection to Contempt Motion.  *Objection to*

16  *Contempt Motion*, filed June 12, 2018, ECF 2050 at 5 ("Because the [Contempt Motion]

17  will be granted or denied within seven days pursuant to Local Rules, Ms. Milner and Mr.

18  Light cannot give CCM the 21 days' notice to withdraw the Motion as otherwise required

19  by Fed.R.Bankr.P. 9011(c)(1)(A).").  As indicated by the example of *In re DeVille,*

20  however, Milner's oversight does not necessarily render this court incapable of imposing

21  sanctions against Debtor's Counsel or CCM for bad faith misconduct that might otherwise

22  be sanctionable under the court's inherent authority or Bankruptcy Rule 9011.  361 F.3d at

23  551.  The court thus determines that, as was the case in *In re DeVille,* Bankruptcy Rule

24  9011 is not "up to the task" in light of Milner's lack of compliance with the "safe harbor"

25  and timeliness requirements of Bankruptcy Rule 9011.  Accordingly, the court may

26  consider the exercise of its inherent authority to sanction Debtor's Counsel or CCM, even

27  though the court also could have considered the imposition of sanctions against Debtor's

28  Counsel or CCM under Bankruptcy Rule 9011.

**MEMORANDUM DECISION**

1
2

    **ii.**    **Debtor's Counsel May Be Sanctioned for Conduct Tantamount to Bad Faith**

3

    i.  <u>Frivolousness and Recklessness: Misstatements of Law and Fact</u>

4    The argument made by Debtor's Counsel on behalf of CCM in the Contempt

5 Motion was essentially that the effect of the order of this court confirming CCM's plan of

6 reorganization rejected the pre-petition Settlement Agreement between Milner and CCM,

7 and therefore, under the doctrine of claim preclusion, the plan confirmation order had

8 preclusive effect to bar any claim that Milner could raise under that contract.  According to

9 CCM and Debtor's Counsel, Milner and her attorney, Light, thus, violated the discharge

10 injunction from the bankruptcy case by filing their answer in CCM's State Court Action

11 asserting affirmative defenses based on contract rights under the purportedly rejected

12 Settlement Agreement.  The argument is baseless because there is no authority

13 supporting a discharge injunction violation for a creditor defending herself in post-

14 confirmation litigation initiated by a reorganized debtor who voluntarily "returned to the

15 fray."  Moreover, the Settlement Agreement was not executory and thus, not susceptible

16 to rejection through the bankruptcy case pursuant to 11 U.S.C. §365(g), and claim

17 preclusion based on the plan confirmation order was inapplicable because CCM's breach

18 of its contractual storage obligations were post-confirmation.

19    ***Debtor's Counsel's Argument that Milner Should Be Held in Civil Contempt***

20 ***for Violating the Discharge Injunction in CCM's Bankruptcy Case by Raising***

21 ***Affirmative Defenses in Her Answer in the State Court Action Was Frivolous and***

22 ***Reckless***.  CCM's Contempt Motion, drafted and filed by Debtor's Counsel as its counsel,

23 was premised on the theory that Milner and her state court counsel, Light, should be held

24 in civil contempt for violating the discharge injunction in CCM's bankruptcy case for the

25 assertion of affirmative defenses in Milner's answer, prepared and filed by Light, in CCM's

26 state court action against her.  As discussed in the Memorandum Decision, CCM in its

27 Contempt Motion, drafted and filed by Debtor's Counsel, failed to cite "any legal authority

28 in support of its proposition that the court has the authority to find a party in civil contempt

61

1   for filing an answer to a complaint *in a lawsuit initiated by the debtor."*  ECF 2079 at 10

2   (emphasis in original).  Neither party to this matter, nor the court, has identified any

3   authority that exists for the proposition that a creditor violates the discharge injunction by

4   filing an answer to a state court complaint—in other words, defending its rights—where

5   that complaint was filed post-confirmation by a reorganized debtor and relates to post-

6   confirmation claims that did not arise, and were not litigated, during the bankruptcy case.

7           As the Ninth Circuit has recognized in *Siegel v. Federal Home Loan Mortgage*

8   *Corp.*, 143 F.3d 525 (9th Cir. 1998), confirmation of a plan of reorganization discharges a

9   debtor of its pre-confirmation liabilities.  *Id.* at 533 (citing *Sure-Snap Corp. v. Vermont (In*

10  *re Sure-Snap)*, 983 F.2d 1015, 1019 (11th Cir. 1983)).  However, the Ninth Circuit in

11  *Siegel* also observed: "[n]o doubt the future is always contingent, but that does not mean

12  that a bankrupt is discharged regarding everything he might do in the future."  *Id.* at 532

13  (discussing contingent claims).  In *Siegel*, the debtor never objected to the creditor's

14  proofs of claim, but rather chose to file a separate action against the creditor even before

15  his bankruptcy case was closed, and the Ninth Circuit held that a debt from an award of

16  attorney fees incurred post-petition, based on a pre-petition cause of action, was not

17  discharged in bankruptcy.  *Id.* at 531-532.  In reaching its decision, the Ninth Circuit

18  emphasized the debtor's post-petition initiation of new litigation, commenting that "while

19  his bankruptcy did protect [the debtor] from the results of his past acts, . . . it did not give

20  him carte blanche to go out and commence new litigation about [a] contract without

21  consequences."  *Id.* at 534.

22          Similarly, in *Boeing North America, Inc. v. Ybarra (In re Ybarra),* 424 F.3d 1018 (9th

23  Cir. 2005), the Ninth Circuit, following its reasoning in *Siegel*, held that claims for

24  attorneys' fees and costs incurred post-petition are not discharged where, "post-petition,

25  the debtor voluntarily 'pursued a whole new course of litigation,' commenced litigation, or

26  'returned to the fray' voluntarily."  *Id.* at 1024 (citing *Siegel v. Federal Home Loan*

27  *Mortgage Corp.,* 143 F.3d at 533-534); *see also id.* at 1026 ("Even if a cause of action

28

**MEMORANDUM DECISION**

1   arose pre-petition, the discharge shield cannot be used as a sword that enables a debtor

2   to undertake risk-free litigation at others' expense." (citation omitted)).

3        More recently, in another bankruptcy court decision involving a debtor's "return to

4   the fray," in *In re Wiersma,* 2015 WL 5833878 (Bankr. D. Idaho 2015) (Pappas, J.), the

5   debtor received her discharge on January 23, 2013; she initiated a cause of action in state

6   court[19] on October 4, 2013; and, the state court entered a judgment against debtor on

7   September 5, 2014.  *In re Wiersma,* 2015 WL 5833878, at *1.  The attorney for the

8   prevailing party in the state court litigation later sought additional attorney fees he

9   allegedly incurred in collecting the state court judgment.  *Id.* at *2.  Debtor then sought

10  relief from the bankruptcy court, arguing under Idaho case law and an equitable doctrine

11  of "fairness" that the attorney was in contempt of the discharge order.  *Id.*  Judge Pappas,

12  like the Ninth Circuit in *Siegel v. Federal Home Loan Mortgage Corp.*, emphasized the

13  debtor's initiation of litigation, observing that: "at the time Debtor filed her bankruptcy

14  petition . . . [the creditor] had no knowledge that she would, post-discharge, 'return to the

15  fray' in state court, . . . ."  *Id.* at 3.  Citing *Siegel v. Federal Home Loan Mortgage Corp.*,

16  the bankruptcy court concluded that there was no discharge violation because "debtor . . .

17  made the decision to 'return to the fray' to prosecute the defamation action herself.

18  [citation].  In doing so, she assumed the risks inherent in that decision[. . .]."  *Id.* at 4.

19       These authorities indicate that where a debtor initiates post-petition a new round of

20  litigation regarding prepetition acts, the debtor has "returned to the fray," and other parties

21  may participate in such litigation and hold debtor liable without running afoul of the

22  discharge injunction.  Thus, there was no legal basis for Debtor's Counsel to assert on

23  behalf of CCM in the Contempt Motion that Milner and Light violated the discharge

24  injunction for participating in litigation initiated by CCM post-petition and post-confirmation.

25  Here, CCM "returned to the fray" by suing Milner in state court over a dispute regarding

26  their prepetition contract.  Accordingly, Debtor's Counsel's assertion of this claim was

27

28  [19]    In *Wiersma,* the Chapter 7 trustee had elected not to pursue the cause of action during the
bankruptcy.  *In re Wiersma,* 2015 WL 5833878, at *1.

1   frivolous because he has not shown that there was any legal basis for the claim, nor that

2   he made such a claim after a reasonable inquiry into the law or facts.  In his opposition to

3   the Sanctions Motion, as Milner points out, Debtor's Counsel does not address Milner's

4   arguments based on *In re Ybarra* that it is permissible to engage in litigation and not

5   violate the discharge injunction where the debtor "returned to the fray."  Debtor's

6   Counsel's lack of rebuttal indicates that he had no valid response to support his claim.

7   Under his view, Milner could not legally respond to CCM's state court complaint, even if

8   she had valid grounds to oppose the complaint as she did here, and Milner would be in

9   civil contempt in violation of the discharge injunction under any circumstances, unless she

10   conceded to CCM on the merits of its complaint, which view is inconsistent with the case

11   law relied upon by Milner and discussed herein.

12       The record indicates that Debtor's Counsel's assertion of this claim for CCM was

13   not only frivolous, but reckless, as shown by Movant's Counsel's Bankruptcy Rule 9011

14   Warning Letter, delivered by e-mail on July 11, 2018, on behalf of Milner, which put

15   Debtor's Counsel on notice that *In re Ybarra,* 424 F.3d 1018, 1027 (9th Cir. 2005), *In re*

16   *Wright,* 509 B.R. 250, 255-256 (Bankr. D. Ariz. 2014), and then-controlling authority in *In*

17   *re Taggart,* 888 F.3d 438 (9th Cir. 2018), would lead a reasonable attorney to conclude

18   that Milner was entitled to rely on the debtor's "return to the fray" as a basis for defending

19   herself in the state court litigation.  *July 11, 2018 Letter from Movant's Counsel to Debtor's*

20   *Counsel,* Exhibit 1 to *Sanctions Motion,* ECF 2100-1 at 4-5.  The Bankruptcy Rule 9011

21   Warning Letter explained how under the existing Ninth Circuit precedent in *Taggart*, even

22   if a court determined that Milner violated the discharge injunction, her apparent good faith,

23   even if unreasonable, would insulate her from a finding of contempt.  *July 11, 2018 Letter*

24   *from Movant's Counsel to Debtor's Counsel,* Exhibit 1 to *Sanctions Motion,* ECF 2100-1 at

25   4.  In other words, this letter was a clear warning to Debtor's Counsel that even if the

26   Settlement Agreement was executory and therefore rejected, any argument that Milner

27   could be held in contempt by filing her state court answer would very likely fail.  Milner

28   reiterated her argument based on *Taggart* in her attachment to the Joint Status Report,

1    filed on July 20, 2018.  ECF 2059 at 8.  While the court did not have to reach the issue of

2    Milner's good faith in answering CCM's State Court Complaint in its Memorandum

3    Decision, the court notes that Milner's Bankruptcy Rule 9011 Warning Letter, delivered on

4    July 11, 2018, included legal arguments addressing why the Settlement Agreement was

5    not executory, why the Settlement Agreement was not rejected in the bankruptcy case,

6    and why the discharge injunction would not apply to prevent Milner from defending her

7    rights in state court, and thus, effectively undercut any argument that Milner and Light

8    proceeded subjectively[20] in bad faith in the state court litigation.  *July 11, 2018 Letter from*

9    *Movant's Counsel to Debtor's Counsel,* Exhibit 1 to *Sanctions Motion,* ECF 2100-1 at 1-5;

10   *E-mail from Light to Debtor's Counsel, dated March 20, 2018, Exhibit L to the Declaration*

11   *of Harold J. Light,* ECF 2051 at 48-50.

12        In proceeding with CCM's Contempt Motion, Debtor's Counsel failed to rebut these

13   substantial legal arguments put forth by Milner, which he did at his peril.  Instead of

14   withdrawing the Contempt Motion after a reasonable inquiry in response to the Bankruptcy

15   Rule 9011 Warning Letter, Debtor's Counsel proceeded with his argument "that the

16   Settlement Agreement was an executory contract that was deemed rejected either upon

17   Plan Confirmation or on the Effective Date of the Plan, and that any action by Milner to

18   enforce the Settlement Agreement would violate the discharge injunction," *Memorandum*

19   *Decision,* ECF 2079 at 10 (citing *Contempt Motion,* ECF 2043 at 6-7), which argument, as

20   discussed below, was also frivolous and reckless.  Debtor's Counsel's complete failure to

21   address the Ninth Circuit case authority identified by Milner and discussed above

22   demonstrates that his argument that Milner and Light violated the discharge injunction for

23   merely answering CCM's State Court Complaint lacked a reasonable basis in fact and

24   law; he did not perform an objectively reasonable inquiry on this legal issue; and, his

25

26   _____
     [20]    At the time that the Contempt Motion was being litigated, the Supreme Court had not yet reversed
27   the Ninth Circuit and determined that "a court may hold a creditor in civil contempt for violating a discharge
     order if there is *no fair ground of doubt* as to whether the order barred the creditor's conduct."  *Taggart v.*
28   *Lorenzen,* 587 U.S. __, 139 S. Ct. 1795,1799, 204 L. Ed. 2d 129 (2019) (applying an objective standard)
     (emphasis in original).  Even under this standard, Milner and Light would not have been liable for contempt
     because there was a fair ground of doubt whether the discharge injunction barred her conduct.

**MEMORANDUM DECISION**

1   assertion of such an argument without addressing this relevant and controlling case law

2   was frivolous and reckless.

3       ***Debtor's Counsel's Argument that Milner Should Be Held in Contempt for***

4   ***Answering CCM's State Court Complaint Because the Settlement Agreement Was a***

5   ***Rejected Executory Contract Was Frivolous and Reckless***.  Milner contends that

6   Debtor's Counsel should be sanctioned for bad faith as the drafter and signer of CCM's

7   Contempt Motion in making a frivolous argument that the Settlement Agreement was

8   executory and thus rejected by the confirmed plan.  Debtor's Counsel's claim preclusion

9   argument, also referred to as the waiver argument, was premised on the assumption that

10  the Settlement Agreement was an executory contract.[21]  Debtor's Counsel apparently did

11  not consider that this assumption was even at issue, however, even after being put on

12  notice by Milner and her counsel in their correspondence with him (e.g., Light's March 30,

13  2018 letter to him).  Debtor's Counsel's lack of consideration of the issue of whether the

14  Settlement Agreement was executory is evident in his initial pleading in this matter, CCM's

15  Contempt Motion.  Debtor's Counsel only first addressed the purportedly executory nature

16  of the Settlement Agreement in his reply to Milner's objection to the Contempt Motion.

17      Debtor's Counsel's reply argument that the contract was executory is baseless as

18  he only argued that nonmaterial obligations unperformed by Milner made the contract

19  executory.  The evidence at trial indicated that Milner had no unperformed material

20  obligations under the Settlement Agreement.  In ruling on the merits of Debtor's Counsel's

21  argument in the Contempt Motion, the court determined that "the Settlement Agreement is

22  not an executory contract because it did not impose upon Milner any ongoing obligation

23  such that her failure to perform would constitute a material breach and excuse Debtor's

24  performance."  *Memorandum Decision,* ECF 2079 at 17.  As set forth in its Memorandum

25  Decision, ECF 2079, the court rejected all of Debtor's Counsel's arguments that various

26  provisions in the Settlement Agreement made it somehow executory.  *Id.* at 11-18.  As

27  _____

28  [21]    Even if Debtor's Counsel's claim preclusion argument could be construed as being premised solely on a pre-confirmation breach of a non-executory contract that did not require rejection, the court previously determined that this construction also had no merit.  *Memorandum Decision,* ECF 2079 at 19-20.

1  discussed herein, the court specifically found that Debtor's Counsel's arguments that the

2  Settlement Agreement was executory based on an alleged "duty of good faith" and an

3  alleged "duty to inspect", both purportedly unperformed by Milner, were unfounded and

4  could not support CCM's position that she violated the discharge injunction.

5  *Memorandum Decision,* ECF 2079 at 13-17.   Moreover, as the court previously

6  determined, "Debtor's failure to list the Settlement Agreement in [its Schedule G,

7  Executory Contracts and Unexpired Leases, its Amended Schedule G, or its Executory

8  Contract Rejection Motion during its bankruptcy case] demonstrates either that Debtor did

9  not believe the Settlement Agreement was an executory contract or that it had no intention

10  of rejecting the Settlement Agreement." *Id.* at 18; *see also Milner's Trial Brief,* ECF 2074

11  at 8.

12       In making the argument in support of CCM's Contempt Motion that the Settlement

13  Agreement was executory and rejected, Debtor's Counsel was required to make a

14  reasonable legal and factual inquiry before proceeding with the argument.  The Contempt

15  Motion threatened Milner and Light with monetary and reputational liability and

16  "foreseeably aroused a vigorous and costly defense."  *Unioil, Inc. v. E.F. Hutton & Co.,*

17  809 F.2d 548, 557 (9th Cir. 1986).

18       In *Unioil, Inc. v. E.F. Hutton & Co.,* the Ninth Circuit considered the reasonableness

19  of an attorney's legal and factual inquiry under Civil Rule 11, stating: "Just as the gravity of

20  foreseeable injury is relevant to determining a party's standard of care in a negligence

21  case, so should the cost of a foreseeable response by opposing parties be relevant to

22  determining an attorney's standard of reasonable inquiry." *Id.* at 557.  The Ninth Circuit

23  analyzed an attorney's argument that he did not violate Civil Rule 11 because he relied on

24  "forwarding co-counsel" and therefore conducted a reasonable inquiry.  809 F.3d at 558.

25  The Ninth Circuit found the attorney's defense to be unavailing, stating that

26       reliance on forwarding co-counsel may in certain circumstances satisfy
     an attorney's duty of reasonable inquiry.  In relying on another lawyer,
27       however, counsel must acquire knowledge of facts sufficient to enable
     him to certify that the paper is well-grounded in fact. An attorney who

28

1    signs the pleading cannot simply delegate to forwarding co-counsel his
     duty of reasonable inquiry.

2    *Id.* (internal quotations, alterations, and citations omitted); *see also, Phillips v. Burt (In re*

3    *Burt)*, 179 B.R. 297, 303 (Bankr. M.D. Fla. 1995) ("Even when relying on the information

4    furnished by the forwarding counsel, he or she must obtain knowledge or facts

5    independently that are adequate to allow him or her to certify that the signed pleading is

6    well grounded in fact. An attorney who signs a pleading may not rely on previous counsel

7    to satisfy his obligation to perform a reasonable inquiry." (citing *Unioil, Inc. v. E.F. Hutton*

8    *& Co.,* 809 F.2d at 558)).

9        In defending the executory contract argument that he made for CCM in the

10   Contempt Motion, Debtor's Counsel emphasized his reliance on certain legal opinions

11   indicated in letters written by other attorneys representing CCM in 2012[22], 2013,[23] and

12   2017[24] rather than his independent factual and legal inquiry in support of the executory

13   contract argument.  It is apparent that Debtor's Counsel did not perform any factual or

14   legal inquiry to support the argument on his own, instead relying on the work of others,

15   and this does not satisfy his duty of reasonable inquiry.  As set forth in the court's

16   Memorandum Decision on the Contempt Motion, the arguments that Debtor's Counsel

17   made on behalf of CCM, based on the representations of CCM's prior counsel, utterly

18   lacked merit.  Debtor's Counsel cannot use his reliance on the opinions of other attorneys

19   to demonstrate the reasonableness of his factual and legal inquiry in support of the

20   arguments that he made on behalf of CCM because, among other reasons, none of those

21   

22   [22]    *See Exhibit 28 to Declaration of Carl Grumer,* ECF 2066-2 at 11-14 (letter of Dennis W. Ghan, CCM's counsel, to Carl Grumer, Milner's counsel, dated June 25, 2012, asserting that the Settlement Agreement is not a valid agreement and even if the Settlement Agreement was valid, CCM has no obligation
23   to store and maintain the subject property indefinitely).

     [23]    *See Exhibit 6 to CCM's Attachment to the July 20, 2018 Joint Status Report,* ECF 2059 at 60
24   (CCM's counsel, Salus, in an email to Milner's counsel, Grumer, dated March 18, 2013, stated:  "Keep in mind that Carol [Milner]'s contract you refer to was rejected as part of the bankruptcy proceedings and therefore CCM has no obligation to continue to store the items for free – CCM has given sufficient statutory
25   notice, on several occasions, to have the materials retrieved or they will be disposed of as allowable under the law.").  The subject property was never disposed of, and apparently continues to be stored by CCM, as
26   previously discussed.

     [24]    *See Exhibit 1 to Declaration of Debtor's Counsel, attached to the Contempt Motion,* ECF 2043 at
27   37-38 (letter of Wesley R. Carter, of the law firm of Winters & King, Inc., to Milner sent by email dated April 17, 2017, asserting that the Settlement Agreement was rejected as of the Effective Date of the Plan, and
28   therefore "CCM is not obligated to any future performance on the agreement referenced in paragraph two, if such obligation existed in the first instance.").

**MEMORANDUM DECISION**

1   attorneys offered to raise those arguments in a signed pleading before this court.

2   Debtor's Counsel was the attorney making the arguments for CCM; he had to do the

3   reasonable inquiry of the law regarding executory contracts; and, he did not.  Thus,

4   Debtor's Counsel cannot demonstrate that he undertook and met his duty to perform a

5   reasonable inquiry in making the executory contract arguments for CCM in the Contempt

6   Motion.

7        There was no reason for Debtor's Counsel not to conduct a reasonable factual and

8   legal inquiry as it appears that he had ample time for investigation, and the record does

9   not indicate severe constraints of time or money that would impede his inquiry in support

10  of the arguments he advanced in CCM's Contempt Motion.  As discussed previously,

11  Debtor's Counsel was put on notice at least by March 30, 2018, when Light responded by

12  letter on behalf of Milner in response to CCM's threat to move for a temporary restraining

13  order or to strike Milner's answer in the State Court Action on grounds that her answer

14  violated the discharge injunction in this case, stating Milner's positions that the Settlement

15  Agreement could not have been rejected in the bankruptcy case because it was not an

16  executory contract, that there was nothing in the discharge injunction that precludes her

17  from defending herself in the State Court Action or deprived her of ownership of the Play

18  Property.  Yet Debtor's Counsel persisted in filing the Contempt Motion without

19  addressing Milner's arguments made by Light in his letter of March 30, 2018, as these

20  arguments were not addressed, let alonerebutted, in the Contempt Motion at all.

21       ***Debtor's Counsel's Argument that Milner Should Be Held in Contempt for***

22  ***Answering CCM's State Court Complaint Because the Settlement Agreement Was a***

23  ***Rejected Executory Contract Based on Her Purported Duty to Inspect the Subject***

24  ***Property Was Frivolous and Reckless***.  At the evidentiary hearing, Debtor's Counsel

25  affirmatively asserted that Ninth Circuit authority held that a party has an affirmative

26  obligation to inspect property that is being stored by another, and that responsibility

27  makes such an agreement executory.  *September 20, 2018 Evidentiary Hearing*

28  *Transcript*, ECF 2095 at 290-291; *see also CCM's Post-Trial Brief*, ECF 2077 at 5-7

**MEMORANDUM DECISION**

1    (arguing that Milner had a duty to inspect, which made the Settlement Agreement an

2    executory contract).   As discussed in the Memorandum Decision, Debtor's Counsel

3    specifically represented to the court at the evidentiary hearing that there was such

4    authority for the "duty to inspect" proposition, it was cited in one of his prior pleadings, but

5    that he could not find the citation.   Debtor's Counsel claimed that he did not remember the

6    case at the time, and that he would provide the citation to the authority for this proposition

7    in his post-trial brief.   *Evidentiary Hearing Transcript*, ECF 2095 at 291 ("I'll provide that.").

8    However, he failed to do so; the court noted that Debtor cited no legal authority for his

9    "duty to inspect" argument, and found the position lacking merit absent any supporting

10   legal authority.   *Memorandum Decision,* ECF 2079 at 16-17.   This showed that Debtor's

11   Counsel made a baseless representation of purported controlling law to the court, which

12   was frivolous as there is no showing that there was any such authority when he made the

13   representation in open court.   This behavior was also reckless because when Debtor's

14   Counsel made the representation, he departed from the ordinary standard of care and

15   should have known that the risk of harm to Milner would be high in having to expend

16   litigation resources to rebut this unfounded "duty to inspect" argument to show that the

17   Settlement Agreement was not executory.

18       ***Debtor's Counsel's Argument that Milner Should Be Held in Contempt for***

19   ***Answering CCM's State Court Complaint Because the Settlement Agreement***

20   ***Requiring CCM to Store the Subject Property Was Unenforceable For Lack of a Bill***

21   ***of Sale Transferring the Property to Milner Was Frivolous and Reckless***.   Debtor's

22   Counsel also erroneously argued that California law requires a bill of sale to transfer

23   property, misreading *Hull v. Ray*, 80 Cal.App. 284 (1926).   *See Memorandum Decision,*

24   ECF 2079 at 21.   At the July 31, 2018 Status Conference, Debtor's Counsel, for the first

25   time, contended that the Settlement Agreement may not be an enforceable contract

26   because no bill of sale evidenced any transfer of the subject property to Milner.   *Audio*

27   *Recording, July 31, 2018 Status Conference* at 2:17–2:18 p.m. ("Never a conveyance,

28   never a bill of sale      . . .")(statement of Debtor's Counsel); 2:20–2:22 p.m. ("Where after

1    [the Settlement Agreement] was entered into [was] there [sic] a bill of sale or a transfer of

2    any of these items that she now claims she owns? . . . We're simply asking them to

3    confirm that they don't have ownership rights transferred by a bill of sale or through some

4    kind of a conveyance on [the subject property]") (statement of Debtor's Counsel); 2:24

5    p.m. ("Correct. Unless the creditor can prove . . . that there was actually a completion of a

6    bill of sale that identified transfer of ownership . . .")(statements of Debtor's Counsel).  At

7    trial, Debtor's Counsel reiterated the position that the Settlement Agreement was not

8    enforceable because there was no bill of sale evidencing a transfer of ownership of the

9    subject property from CCM to Milner.  *Transcript, September 20, 2018 Evidentiary*

10   *Hearing,* ECF 2095 at 7-10.  The court rejected Debtor's Counsel's position because it

11   contradicted California statutory law.  *Memorandum Decision,* ECF 2079 at 21 ("As

12   explained by the court on the record at trial, Debtor misreads *Hull v. Ray,* 80 Cal.App. 284

13   (1926), which describes the form requirements of a bill of sale, but does not require that

14   *all* transfers of ownership in personal property must be evidenced by a bill of sale.  Such a

15   reading contradicts California law. [citing California Civil Code §§ 1000 1039 and 1052

16   indicating that property can be transferred without a writing].").  Moreover, as the court

17   noted in its Memorandum Decision, such assertion contradicted CCM's judicial

18   admissions in the Contempt Motion, the supporting declarations and the State Court

19   Complaint that Milner owned the Play Property.  *Memorandum Decision,* ECF 2079 at 22.

20   The court finds that Debtor's Counsel's argument based on the purported bill of sale

21   requirement was baseless under California law based on a misreading of the cited case

22   and a failure to consider applicable California statutory law, reflecting a failure to conduct

23   a reasonable legal inquiry for the proposition that he advanced, and this argument was

24   frivolous and reckless.

25       ***Debtor's Counsel's Misrepresentation of <u>Carma Developers (Cal.), Inc. v.</u>***

26   ***<u>Marathon Development California, Inc.</u>, 2 Cal.4th 342, 6 Cal. Rptr. 2d 467, 826 P.2d***

27   ***710 (Cal. 1992) Was Reckless***.  As discussed in the Memorandum Decision, ECF 2079

28   at 11-14, Debtor's Counsel misquoted the case of *Carma Developers* in support of a

1  proposition "in direct conflict" with California law.  *Id.* at 14.  That is, Debtor's Counsel

2  purportedly quoted the decision and argued that this case "affirmed" that a breach of a

3  covenant of good faith and fair dealing, "would constitute a material breach and thus

4  excuse the performance of the other," but as the court stated in the Memorandum

5  Decision, this purported quote was nowhere to be found in the cited decision and

6  contradicted other California case law stating the concept that the materiality of a breach

7  must be determined on a case-by-case basis.  *Id.* ( citing *Brown v. Grimes,* 192

8  Cal.App.265, 277 (2011)).  Although a similar misrepresentation could be construed under

9  various circumstances as an honest mistake, mere negligence, reckless incompetence, or

10 even willful misconduct, under the totality of the circumstances of this case, the court finds

11 that Debtor's Counsel's erroneous quotation of case authority in support of a frivolous

12 argument further indicates, at a minimum, a recklessness that is material to the court's

13 bad faith analysis.  *See* Rules of Professional Conduct of the State Bar of California, Rule

14 3.3(a)(2) ("A lawyer shall not:  . . . knowingly misquote to a tribunal the language of a

15 book, statute, decision or other authority") (available at

16 http://www.calbar.ca.gov/Portals/0/documents/rules/Rules-of-Professional-Conduct.pdf)

17 (last visited January 30, 2020).

18      ***Debtor's Counsel's Arguments that Milner Should Be Held in Contempt for***

19 ***Answering CCM's State Court Complaint Because the Settlement Agreement was***

20 ***Purportedly Not an Enforceable Agreement, or, a Transfer of Property from CCM to***

21 ***Milner Never Occurred, Were Frivolous and Reckless***.  Apparently feeling insecure

22 about the efficacy of his argument in the State Court Complaint and Contempt Motion that

23 the Settlement Agreement was a rejected contract from the bankruptcy case, Debtor's

24 Counsel advanced an alternative argument that Milner and Light should be held in

25 contempt on grounds that the Settlement Agreement did not legally transfer ownership to

26 her and that therefore, she could not assert contractual rights under the Settlement

27 Agreement for CCM to store the subject property because she did not own the property.

28

**MEMORANDUM DECISION**

1      Debtor's Counsel's new argument was baseless because it was flatly inconsistent

2   with the judicial admissions that he made on behalf of CCM in the State Court Complaint

3   and the Contempt Motion that the property belonged to her.  CCM's State Court

4   Complaint, signed and filed by Debtor's Counsel, described the property as belonging to

5   Milner.  *See Memorandum Decision,* ECF 2079 at 7-8 (citing *State Court Complaint,*

6   *Exhibit A to Debtor's Request for Judicial Notice*, ECF 2044 at 5-7 (¶¶ 12, 14-17, 20-21)).

7   As noted in the Memorandum Decision, citing the Jacobson Declaration in support of the

8   Contempt Motion signed and filed by Debtor's Counsel, CCM has performed under the

9   Settlement Agreement for years, and "according to Russell Jacobson, Debtor's Chief

10  Operating Officer, 'Pursuant to [the Settlement] Agreement, [Debtor] stored various

11  physical properties *belonging to Milner*. Much of that property remains in storage at

12  [Debtor]'s expense including screens, screen frames and truss props, puppets, scenic

13  elements and road cases' [ ]."  *Memorandum Decision,* ECF 2079 at 5 (citing *Russell*

14  *Jacobson Declaration attached to Contempt Motion,* ECF 2043 at 24 (¶ 11)); *see also,*

15  *Schedule 1 to Settlement Agreement*, *Respondents' Trial Exhibits 5 and 7,* ECF 2066-1 at

16  25, 35; *Exhibit 1 to Jacobson Declaration attached to Contempt Motion*, ECF 2043 at 33.

17     Debtor's Counsel's "lack of ownership" argument was also baseless because the

18  arguments he made in support of this position lacked legal and evidentiary support.  As

19  noted previously, Debtor's Counsel argued that the property could not transfer to Milner

20  without a bill of sale, which is not supported by California statutory law.  He argued that

21  the contract did not transfer the property to Milner for lack of a proper description of the

22  transferred property, which is not supported by a plain reading of the contract, which

23  included specific descriptions of categories of property transferred to Milner.  He argued

24  that the contract did not transfer the property to Milner for lack of consideration, which is

25  not supported by the evidence since the contract showed that she gave consideration for

26  the contract by releasing her claims against CCM pursuant to the Settlement Agreement.

27  *See Memorandum Decision,* ECF 2079 at 17.

28

**MEMORANDUM DECISION**

1    Beginning at the July 31, 2018 Status Conference, Debtor's Counsel took this

2  frivolous position that the subject property was never transferred to Milner and therefore

3  was not her personal property.  *Audio Recording, July 31, 2018 Status Conference,* at

4  2:35 – 2:36 p,m. ("[The Debtor] bought it. We owned it. We didn't convey it. [. . .] If you're

5  looking at a contract that was never formed, i.e. there was never any ownership

6  conveyance of personal property under it.  We're done in terms of the Debtor's position

7  . . . . Never ownership conveyed, therefore there cannot be a claim that we have to do

8  something for 'her' property.")(statements of Debtor's Counsel).  This assertion was not

9  supported by the record in the bankruptcy case, the communications between the parties,

10  or CCM's ongoing performance under the Settlement Agreement, and the court

11  determines that this argument was frivolous because it was made without a reasonable

12  factual basis.  *See Memorandum Decision*, ECF 2079 at 21 (". . . all other emails, letters,

13  or other evidence of communications from Debtor to Milner fell well short of conduct

14  tantamount to an express repudiation constituting anticipatory breach.  Moreover, the

15  evidence shows that Debtor continued to store the Play Property and continues to do so

16  to this day.").  The court finds that it was reckless for Debtor's Counsel to characterize the

17  subject property as Milner's property before the state court in the State Court Action,

18  make similar representations before this court in the Contempt Motion, and then

19  alternatively claim that CCM owned the property in later pleadings in support of the

20  Contempt Motion.  Moreover, Debtor's Counsel's alternative argument was without merit

21  and recklessly made because it would seem that if CCM had any confidence at all in its

22  position that it owned the property, it would have disposed of the subject property a long

23  time ago, or sought declaratory relief on that ground, at least since the effective date of

24  the plan in 2012, instead of filing the Contempt Motion asserting its rejected executory

25  contract argument based on the position that Milner owned the property.

26    The court also declines to absolve Debtor's Counsel of his obligation to make

27  reasonable inquiries as to the facts and law based on his reliance on the views and

28  opinions of CCM's prior counsel regarding the purported lack of enforceability of the

1    Settlement Agreement and its nature as executory or not.  Under the totality of the

2    circumstances and in light of the apparent lack of due diligence undertaken by Debtor's

3    Counsel in his legal and factual research, as discussed above, the court finds that a

4    reasonable attorney appearing before this court may not and would not rely, to the court

5    and opposing party's detriment, on other counsel's representations in the place of a

6    reasonable legal and factual inquiry of his own.

7    ***Debtor's Counsel's Failure to Address and Rebut Certain Cases Cited by***

8    ***Milner in Opposition to CCM's Contempt Motion Was Not Frivolous and Reckless***.

9    Milner contends that Debtor's Counsel's contract rejection argument was also frivolous

10   because he failed to rebut or otherwise address the case law cited by Movant's Counsel in

11   her Bankruptcy Rule 9011 Warning Letter of July 11, 2018, specifically, *In re Parkwood*

12   *Realty Corp.,* 157 B.R. 687 (Bankr. W.D. Wash. 1993) and *In re Continental Country Club,*

13   *Inc.,* 114 B.R. 763 (Bankr. M.D. Fla. 1990).  Because, among other reasons, *Parkwood*

14   and *Continental* are not binding authority, the court finds Debtor's Counsel's lack of

15   rebuttal of these case authorities, while some evidence to put him on notice that the

16   position he was taking was not supported in the case law, to be not significant.  Similarly,

17   although Debtor's Counsel erroneously claimed that the relevant date for purposes of

18   rejection or breach of the Settlement Agreement under 11 U.S.C. § 1141(b) was the date

19   the final decree was entered in the bankruptcy case, rather than the Effective Date of the

20   Plan, the court finds that Debtor's Counsel's misunderstanding was more negligent than

21   egregious conduct tantamount to bad faith as the difference in these circumstances was

22   not material.

23   ***Debtor's Counsel's Prefiling Inquiry as to the Law and Facts Was Not***

24   ***Reasonable and was Reckless.***  Debtor's Counsel stated in his declaration in opposition

25   to the Sanctions Motion that he made a reasonable legal inquiry for his arguments in

26   support of the Contempt Motion:  "I had a conviction the law supported each [argument]

27   based on extensive research[,]" and "I had a conviction that the facts that I argued

28   supported the arguments, and that my client was entitled to the relief sought."  *Declaration*

1  *of Debtor's Counsel attached to Opposition to Motion for Sanctions,* ECF 2120 at 16 (¶ 6-

2  7).  In describing specifically what Debtor's Counsel relied upon, he stated that he

3  "received the case from [Winters & King, Inc., which] evaluated and communicated to Ms.

4  Milner the exact same contentions on the subject contract being executory[,]" referring to

5  that law firm's letter to Milner dated April 21, 2017, attached as Exhibit 1 to the Contempt

6  Motion.  *Declaration of Debtor's Counsel attached to Opposition to Motion for Sanctions,*

7  ECF 2120 at 16-17 (¶ 8).  Debtor's Counsel noted in his declaration that the Winters &

8  King, Inc. letter asserted that the Settlement Agreement was not "Accepted or Rejected"

9  specifically in CCM's reorganization plan, and thus the contract was subject to Section

10  VIII.A.ii of the plan providing for the deemed rejection of any contract not designated for

11  assumption or rejection as of the effective date of the plan.  The Winters & King, Inc. letter

12  concluded that, therefore, CCM was not obligated to any future performance on the

13  agreement as of the effective date of the plan.  However, this Winters & King, Inc. letter

14  relied upon by Debtor's Counsel did not cite any legal authority for its contentions in the

15  letter, and specifically did not address the issue whether the Settlement Agreement was

16  executory, which would be necessary in order for the Settlement Agreement to be

17  deemed rejected pursuant to this plan provision.  *Id.*

18  Elaborating on his defense of adequate reasonable inquiry, Debtor's Counsel

19  stated that "I had in my possession from multiple other attorneys representing the Debtor

20  emails and letters to Ms. Milner's counsel making the same claim.  I relied in part on those

21  attorneys' position in concluding the argument had substantial merit as it was recognized

22  by several different attorneys over a span of years, looking at the same facts."  *Id.* at 17 (¶

23  9).  However, Debtor's Counsel did not specifically identify these emails and letters of

24  other counsel, so the legal authority for their contentions could not be ascertained and

25  evaluated.  *Id.*

26  According to Debtor's Counsel, "[t]he gravamen of my Motion re Contempt and

27  arguments was not just the executory contract claim, but was based on claim preclusion."

28  *Id.* at 17 (¶ 10).  In explaining his research underlying CCM's preclusion claim, he

**MEMORANDUM DECISION**

1   reviewed the bankruptcy case docket, noting that Milner had "listed the subject contract as

2   the basis of a bankruptcy claim she then lost with a judgment against her for attorney

3   fees[,] [Doc. 2013, pps. 16-17.]" and Debtor's Counsel "identified carefully in my briefs the

4   parts of the bankruptcy docket, the briefs, and the rulings that supported this argument."

5   *Declaration of Debtor's Counsel attached to Opposition to Motion for Sanctions,* ECF

6   2120 at 17 (¶ 11).  Debtor's Counsel further stated that he "cited to *Robertson vs*

7   *Isomedix, Inc.* (9th Cir) 28 F.3d 965, 969 in my opening motion re contempt, and I relied

8   upon established law of claim preclusion as a basis for my opening motion," adding that

9   *"Robertson* held, 'the claim could have been asserted at the time of the proceeding

10  confirming sale, and this opportunity is sufficient to satisfy that requirement of the doctrine

11  of res judicata."  *Id.* at 17 (¶ 13).  Furthermore, according to Debtor's Counsel,

12
13          I presented evidence that before the bankruptcy petition was filed,
            Milner was claiming the Debtor was in breach, and yet despite
            litigating another clause *in the same* contract, she failed to argue
14          that CCM had breached the storage obligation, even though she
            had contended that before the Petition, and was seeking damages.
            This was a waiver of ripe integrated claim, justifying claim
15          preclusion.  [See e.g., Milner Exhibit 10, attached to Doc. 2066].

16  *Id.* at 17-18 (¶ 14) (emphasis in original).  Debtor's Counsel then asserted in his

17  declaration that: "These arguments and this evidence were not addressed in the Court's

18  final decision, so I in good faith filed an appeal[,]" but that "I dismissed the appeal in good

19  faith[ ]" because "The appeal was then dismissed based on changed circumstances

20  involving the civil case, and the Court of Appeal denied Milner's request [to] recover fees

21  and costs against CCM [Case No. 18-1310, Doc 15]."  *Id.* at 18 (¶ 15-17).

22          Contrary to the assertions made in this declaration of Debtor's Counsel, the court in

23  its Memorandum Decision had addressed and ruled upon CCM's claim preclusion (or res

24  judicata) argument, rejecting it on grounds that Milner had no prepetition claim for breach

25  of the contract regarding the storage obligations, which claim would have been subject to

26  discharge as a prepetition claim, since there was no breach of those obligations before

27  confirmation.  *Memorandum Decision,* ECF 2079 at 19-20.  The evidence indicated that

28  CCM had complied and was complying with its contractual obligations to store the

1  property.  *Id*.  Debtor's Counsel referred to Milner's Exhibit 10 to ECF 2066, which was a

2  prepetition letter from her counsel to CCM, stating that she had not been fully paid the

3  settlement amount through the trust agreement, which may have been a prepetition claim

4  if it had not been paid as of the petition date, however, the evidence in the record

5  demonstrated that based on Milner's uncontroverted testimony at trial, CCM made all of

6  the settlement payments to Milner without funding the trust.  *Milner Trial Testimony*,

7  *Evidentiary Hearing Transcript, September 20, 2018,* ECF 2095 at 98-99, 253-254.

8  Nevertheless, it is legally baseless for Debtor's Counsel to argue that the discharge of

9  prepetition claims absolved a debtor of liability for post-discharge conduct.  *Memorandum*

10  *Decision,* ECF 2079 at 19-20 (citing *O'Loghlin v. County of Orange,* 229 F.3d 871, 874-

11  875 (9th Cir. 2000)).  As discussed previously, since the Settlement Agreement was not an

12  executory contract subject to rejection from the confirmed reorganization plan, its

13  obligations continued to be enforceable, including post-confirmation.  The declaration of

14  Debtor's Counsel in opposition to the Sanctions Motion contains mostly conclusory

15  assertions regarding his prefiling legal inquiry and does not otherwise specify what efforts

16  he made in undertaking a reasonable legal inquiry in connection with filing and litigating

17  the Contempt Motion, which has left the court to analyze the arguments that he made

18  during the proceedings of the Contempt Motion as discussed herein.

19      As set forth in the declaration of Debtor's Counsel in response to Milner's

20  supplemental points and authorities in support of the Sanctions Motion, ECF 2133,

21  Debtor's Counsel stated: "I always believed in good faith that the two primary arguments I

22  made to this Court had substantial factual and legal merit[,]" and "[m]y arguments were,

23  (1) that because Ms. Milner had litigated intellectual property claims arising out of the

24  exact same 2005 contract in the bankruptcy court, and (2) because all of her disputes

25  regarding storage and ownership existed pre-petition, that she waived her rights to further

26  litigate these matters after the discharge period."  *Debtor's Counsel Post-Trial Declaration*

27  *attached to Debtor's Counsel Opposition to Supplemental Memorandum,* ECF 2133 at 18

28  (¶ 4-5).

**MEMORANDUM DECISION**

1    In support of such arguments, Debtor's Counsel stated:

2        I cited strong Ninth Circuit authority that outlined the Doctrine of
         Claim Preclusion and *res judicata* and believed the facts and
3        circumstances qualified under the Doctrine.  I further believed that
         the subject contract was executory, and I made that argument in
4        good faith.  The same conclusion had been placed in writing to me
         by several other attorneys including Winters and King who had
5        referred the case to me and other attorneys that I had studies [sic]
         correspondence from that had represented the debtor during the
6        bankruptcy.  Exhibit 9 (attached hereto) is an example of a legal
         opinion provided by Richard Salus to Carl Grumer on March 18,
7        2013, that specifically stated Mr. Salus' opinion that the contract
         was executory and had been rejected as part of the bankruptcy
8        proceeding, stating 'and therefore CCM has no obligation to
         continue to store the items for free.'  I independently researched
9        this doctrine and believe that there were dual responsibilities under
         the subject contract, including Ms. Milner having an obligation to
10       retrieve her alleged items in a timely manner.  There was never any
         agreement that CCM would indefinitely store these items.  The
11       contract did not state that, and Ms. Milner could not in good faith
         expected CCM to do so.  I advocated in good faith that the entire
12       premise of this contract was a temporary storage to allow Ms.
         Milner to independently return to producing a play without the
13       budget of CCM funding it, and to then use the items for another
         play that she would be funding.  There was an inherent 'reasonable'
14       timeframe on this storage duty and after the items had been in
         storage for over ten years, I believed in good faith that the contract
15       was executory, and that Ms. Milner had breached her part of the
         contract by not retrieving the items.  Although the court disagreed
16       with my implied covenant of good faith argument, i.e., I asserted the
         argument in good faith and believed in its accuracy."

17

18   *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to*

19   *Supplemental Memorandum,* ECF 2133 at 18-19 (¶ 6-14).

20       Specifically, in support of his claim preclusion argument, Debtor's Counsel further

21   stated that, "I argued that the Claim Preclusion Doctrine applied based on numerous

22   exhibits that I had in my file, that were relied upon and/or offered at trial[,]" and Debtor's

23   Counsel attached copies of these exhibits to his declaration.  *Id.* at 19 (¶ 15-26, 28) and

24   Exhibits 1-11 attached thereto.

25       In this further declaration of Debtor's Counsel in opposition to Milner's

26   supplemental briefing, he elaborated on his description of his legal inquiry in support of

27   the Contempt Motion, but in substance, he did not add very much because this further

28   description of his inquiry was conclusory and lacked specific detail.  That is, Debtor's

79

**MEMORANDUM DECISION**

1   Counsel did not describe with any detail what legal research he did before filing the

2   Contempt Motion, and he instead reiterated what he described in his prior declaration in

3   response to Milner's Motion for Sanctions.  He said that he cited "strong Ninth Circuit

4   authority that outlined the Doctrine of Claim Preclusion and *res judicata*" without

5   identifying such authority, apparently referring to the case of *Robertson v. Isomedix, Inc.*

6   *(In re Intl Nutronics, Inc.),* 28 F.3d 965 (9th Cir. 1994) previously identified in his original

7   declaration in response to the Motion for Sanctions.  *Compare Debtor's Counsel*

8   *Declaration attached to Opposition to Motion for Sanctions,* ECF 2120 at 17 (¶ 13), *with*

9   *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to*

10  *Supplemental Memorandum,* ECF 2133 at 18 (¶ 6).  He reiterated that "I further believed

11  that the subject contract was executory, and I made that argument in good faith[,]" without

12  providing further details regarding his legal inquiry for such belief and argument.  *Debtor's*

13  *Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to Supplemental*

14  *Memorandum,* ECF 2133 at 18 (¶ 7).  He also referred to his reliance on the conclusions

15  of other lawyers without providing any further detail, except describing and attaching an

16  email from Richard Salas, CCM's counsel, to Carl Grumer, Milner's counsel, on March 18,

17  2013, as an example of a legal opinion that he had considered.  *Id.* at 18 (¶ 9), and Exhibit

18  9 attached thereto.  However, this email of Salus to Grumer, containing Salus's opinion

19  that the contract was executory and had been rejected as part of the bankruptcy

20  proceeding, "and therefore CCM has no obligation to continue to store the items for free,"

21  contained no legal analysis with citation to any legal authority for that opinion.  *Id.*  This

22  was the only identified example of a legal opinion of other counsel that Debtor's Counsel

23  considered and relied upon as his legal inquiry for his executory contract argument, which

24  inquiry by Debtor's Counsel is entirely unreasonable.

25      Debtor's Counsel asserts in the same post-trial declaration that he independently

26  researched the executory contract doctrine, but he did not describe specifically what his

27  research was, and the court could only ascertain what legal inquiry he did based on the

28  legal authorities he cited in support of his argument, which argument, as discussed herein,

**MEMORANDUM DECISION**

1  was baseless.  Regarding the reliance of Debtor's Counsel on numerous exhibits in

2  support of his claim preclusion argument, Milner has objected to some of the exhibits as

3  not being part of the record because the exhibits were not offered at trial or produced to

4  Milner, ECF 2136 at 1-2, but nonetheless, the exhibits do not support Debtor's Counsel's

5  argument that Milner had material unperformed duties which made the contract executory.

6  While the exhibits attached to the post-trial declaration may have contained legal

7  conclusions of some of the attorney-authors, there were no legal authorities cited in

8  support of such conclusions.  The exhibits were mainly communications between Milner

9  and CCM's representatives, such as Gwyn Myers and Jim Penner, which expressed

10  certain opinions about the Settlement Agreement, but did not support the assertions of

11  Debtor's Counsel that the contract was executory at the time of CCM's bankruptcy case.

12  Debtor's Counsel asserted that "I was not alone in my analysis from other bankruptcy

13  attorneys and I relied in good faith on both their opinions and my own independent

14  research."  *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel*

15  *Opposition to Supplemental Memorandum,* ECF 2133 at 21 (¶ 25).  Aside from failing to

16  lay any foundation that any of the attorneys that he identified, and whose opinions he

17  relied upon, were bankruptcy attorneys, the fact that Debtor's Counsel relied on the

18  opinions of other attorneys does not show that he made a reasonable inquiry before filing

19  the Contempt Motion because there was a complete and utter absence of legal authorities

20  or other bases for their opinions, which, as discussed in the Memorandum Decision, did

21  not support the arguments raised in the Contempt Motion.  Debtor's Counsel's assertion

22  that he did independent research is not supported in the record; Debtor's Counsel's

23  pleadings and oral arguments, the products of his research, were legally baseless, as

24  discussed herein.  In his declarations in response to the Motion for Sanctions and Milner's

25  supplemental briefing, Debtor's Counsel had the opportunity to show that he made efforts

26  to make a reasonable legal inquiry for his arguments, but he failed to make such a

27  showing.

28

**MEMORANDUM DECISION**

1    The importance of a reasonable legal inquiry before commencing litigation cannot

2 be overstated.  In this vein, the policy behind Civil Rule 11 also applies to the court's

3 inherent authority and may indicate conduct tantamount to bad faith.  While Debtor's

4 Counsel may have been sincere in his beliefs that his arguments were made in good faith,

5 as the Seventh Circuit stated about the importance of the policy of requiring a reasonable

6 prefiling legal inquiry under Civil Rule 11, "[a]n empty head but a pure heart is no defense"

7 and "[t]he Rule requires counsel to read and consider before litigating."  *Mars Steel Corp.*

8 *v. Continental Bank N.A.,* 880 F.2d 928, 932 (7th Cir. 1989) (citation omitted).  That is,

9 "[c]ounsel may not drop papers into the hopper and insist that the court or opposing

10 counsel undertake bothersome factual and legal investigation."  *Id.*  As the Seventh Circuit

11 further observed, the focus of Civil Rule 11

12          is ex ante (what should have been done before filing) rather than ex
            post (how things turned out).  How much investigation is justified
13          (i.e., 'reasonable') in light of the costs depends on the
            circumstances of the case, and Rule 11 does not allow an award of
14          sanctions just because things went poorly after an investigation that
            was adequate in light of what was known (and how much time was
15          available) before the paper was filed.  Sanctuary as a result of
            reasonable investigation ensures that counsel may take novel,
16          innovative positions—Rule 11 does not jeopardize aggressive
            advocacy or legal evolution.
17

18 *Id.* (citations omitted).  These observations about Civil Rule 11 equally apply to situations

19 where the court's inherent authority is involved with a pleading filed or an argument made

20 in court that is baseless or frivolous without prior reasonable legal inquiry.

21    As the Seventh Circuit further stated about the duty of an advocate under Civil Rule

22 11,

23          Rule 11 creates duties to one's adversary and to the legal system,
            just as tort law creates duties to one's client.  The duty to one's
24          adversary is to avoid needless legal costs and delay.  The duty to
            the legal system (that is, to litigants in other cases) is to avoid
25          clogging the courts with papers that wastes judicial time and thus
            defers the disposition of other cases or, by leaving judges less time
26          to resolve each case, increases the rate of error.  Rule 11 allows
            judges to husband their scarce energy for the claims of litigants
27          with serious disputes needing resolution.

28

**MEMORANDUM DECISION**

1    *Id.*  These concerns also apply to the court's consideration of its inherent authority to

2    sanction behavior in making arguments without first making a reasonable legal inquiry,

3    which may also be subject to Civil Rule 11.

4         Regarding what constitutes reasonable legal inquiry, the Seventh Circuit further

5    stated:

6         An objectively frivolous legal position supports an inference that the
          signer did not do a reasonable amount of research, but an
          inference, no matter how impressive, is still no more than an
7         inference.  In most cases the amount of research into legal
          questions that is 'reasonable' depends on whether the issue is
8         central, the stakes of the case, and related matters that influence
          whether further investigation is worth the costs.  The focus of Rule
9         11 on conduct rather than result, its close affiliation to tort law, and
          the fact that objectively frivolous filings support but do not compel
10        an inference of unreasonable investigation, mean that each Rule 11
          case in the district court is unique, just as every tort suit is unique.
11        How much investigation should have been done in a given case
          becomes a question of line-drawing, as much as a matter of 'fact'
12        as is the purpose behind the paper.

13   *Id.* at 932-933.  These observations are instructive to the court in determining under its

14   inherent authority the reasonableness of the legal inquiry by Debtor's Counsel in litigating

15   the Contempt Motion.

16        The record before the court shows that the arguments that Debtor's Counsel made

17   in support of the Contempt Motion were legally baseless and frivolous and that when he

18   filed the Contempt Motion, he had not conducted a reasonable legal inquiry to support his

19   arguments that Milner and Light violated the discharge injunction in filing their answer in

20   the State Court Action.  The applicable legal authorities and the facts of this case show

21   that the contract between CCM and Milner was not executory at the time of its bankruptcy

22   case because Milner had no material unperformed contractual obligations at the time of

23   the bankruptcy case.  The contract could not have been rejected as a result of the

24   bankruptcy case if it was not executory, and Milner could defend herself if the bankruptcy

25   debtor, CCM, had initiated litigation regarding prepetition acts against that other party,

26   Milner, post-discharge.  The record shows that Debtor's Counsel did not research the

27   applicable law to support these arguments before he filed the Contempt Motion as

28   indicated by the statements made in his declarations in response to the Sanctions Motion

83

**MEMORANDUM DECISION**

1    and in his pleadings and arguments in this contested matter.  Despite being put on notice

2    that his arguments had no legal support by Milner's counsel in Light's letter of March 30,

3    2018 and Movant's Counsel's Rule 9011 Warning Letter, stating that the arguments were

4    problematic and giving him an opportunity to do adequate legal research, he did not do so

5    and continued to defend the baseless arguments made in the Contempt Motion and

6    raised new and additional baseless arguments in support of the Contempt Motion in

7    opposition to Milner's meritorious arguments.

8          In considering the Sanctions Motion, the court is also mindful of its obligation to

9    exercise restraint and great or extreme caution, especially because such sanctions can

10   have "an unintended detrimental impact on an attorney's career and personal well-being."

11   *Conn v. Borjorquez,* 967 F.2d 1418, 1421 (9th Cir. 1992) (citation omitted).  As Debtor's

12   Counsel stated in his declaration in response to Milner's supplemental briefing, "[t]he

13   amount of sanctions requested is a substantial amount of money that would be crippling to

14   [his law office].  There is no ability to pay that level of sanctions and it appears punitive."

15   *Debtor's Counsel Post-Trial Declaration attached to Debtor's Counsel Opposition to*

16   *Supplemental Memorandum,* ECF 2133 at 22 (¶ 29).

17         The court believes it has exercised great and extreme caution in adjudicating the

18   Sanctions Motion by examining and discussing at great length the pleadings and other

19   papers and arguments in this contested matter and in this bankruptcy case, and the court

20   has analyzed at length whether the arguments of Debtor's Counsel were frivolously and

21   recklessly made, or with an improper purpose, and whether Debtor's Counsel made a

22   reasonable legal inquiry before he made such arguments.  .  The court understands that

23   the sanctions rules must not be construed to conflict with the primary duty to represent a

24   client zealously, and that forceful representation often requires that an attorney attempt to

25   read a case or an agreement in an innovative though sensible way, and that when an

26   attorney's legal theories fail to persuade the court it does not demonstrate by itself that the

27   attorney lacked good faith in attempting to advance the law.  *See Operating Engineers*

28   *Pension Trust v. A-C Co.,* 859 F.2d at 1344.  However, what the record shows here is the

84

1  failure of Debtor's Counsel did not involve the making of innovative but sensible

2  arguments or the simple failure to persuade the court, but the failure to do basic legal

3  research on the essential issue before the court of whether the Settlement Agreement

4  was an executory contract which could have been rejected through CCM's bankruptcy

5  case under 11 U.S.C. §365.  The record shows that Debtor's Counsel never understood

6  this, nor looked at the issue, when he filed the Contempt Motion, and did not understand it

7  until he had to respond in his reply to Milner's objection to the motion by raising baseless

8  arguments that she had material unperformed obligations under the contract.  In asserting

9  the primary argument that Debtor's Counsel made in the Contempt Motion that the court's

10  order confirming CCM's reorganization plan worked a rejection of the contract under 11

11  U.S.C. §365(g), the threshold issue was of bankruptcy law: whether the contract was still

12  executory where "the obligations of both parties are so underperformed that the failure of

13  either party to complete performance would constitute a material breach and thus excuse

14  the performance of the other" as stated in controlling law by the Ninth Circuit in *In re*

15  *Robert L. Helms Construction & Development Co.,* 139 F.3d at 705 and n. 7.  The other

16  argument that Debtor's Counsel made in support of the Contempt Motion based on claim

17  preclusion was dependent on the contract being executory because if it were not

18  executory, it could not have been rejected and rendered unenforceable by the bankruptcy

19  case.  There is no indication in the record that Debtor's Counsel has expertise in

20  bankruptcy law or any of the other lawyers whose opinions he says he relied upon had

21  any bankruptcy expertise, or that Debtor's Counsel consulted a standard bankruptcy law

22  specific treatise, such as Collier on Bankruptcy, for example, which has a fulsome

23  discussion defining executory contracts which could be rejected under 11 U.S.C. § 365(a).

24  *See* Levin and Sommer, *Collier on Bankruptcy,* ¶365.02 at 365-16 – 365-25 (16th ed.

25  2019).  Thus, Debtor's Counsel proceeded with filing and pressing the Contempt Motion

26  without a proper legal basis based on his failure to make a reasonable legal inquiry by

27  performing basic legal research.

28

In determining the Sanctions Motion, the court must necessarily engage in line-drawing, and the court observes that there is a line between zealous advocacy and frivolous, reckless advocacy, and on this record, Debtor's Counsel crossed the line because making the arguments that he did without doing the basic legal research was baseless and reckless.  For the reasons discussed herein, the court determines that Debtor's Counsel made objectively frivolous arguments in support of the Contempt Motion, in particular, the arguments that: Settlement Agreement was an executory contract subject to rejection in CCM's bankruptcy case, the plan confirmation order had preclusive effect under the doctrine of claim preclusion to bar Milner from asserting claims of ownership or for breach of contract based on post-confirmation conduct, and Milner and Light violated the discharge injunction by filing an answer in the State Court Action.  The court also determines that Debtor's Counsel failed to conduct a reasonable legal inquiry before he made these arguments in this contested matter forcing the court and opposing counsel to undertake bothersome factual and legal investigation in violation of his duty to his adversaries to avoid needless legal costs and delay and to the legal system to avoid clogging the court with arguments that wasted judicial time.  *See Mars Steel Corp. v. Continental Bank N.A.,* 880 F.2d at 932.

> ii.    Recklessness and Improper Purpose: Increasing Litigation and
> Expanding the Issues

On July 20, 2018 the parties filed a Joint Status Report.  *Joint Status Report,* ECF 2059.  Milner took the position that an evidentiary hearing or trial was unnecessary and improper, and the matter should be heard and argued as a motion.  *Id.* at 2-3.  Milner also contended that no discovery was needed.  *Id.* at 2.  Debtor's Counsel, however, requested a multi-day trial, written discovery, the depositions of Milner, Light and former bankruptcy counsel to Milner, a pre-trial conference, and he indicated that he intended to call six witnesses at trial.  *Id.* at 2-3.  In Milner's attachment to the Joint Status Report, she argued, "Plaintiff is obviously trying to use discovery in this proceeding in a bad faith effort to bludgeon Respondent Milner into signing a release of claims in relation to her property

1  without being given an opportunity first even to view that property." *Id.* at 5 (Attachment of

2  Defendants/Respondents).  The court ultimately stayed discovery in the matter before

3  conducting the evidentiary hearing.  *Audio Recording, July 31, 2018 Status Conference* at

4  2:37–2:38 p.m.

5        At the July 31, 2018 Status Conference, Debtor's Counsel raised for the first time

6  arguments discussed above that lacked a sound basis in the factual record and the law,

7  namely, that the executory contract issue need not be addressed because there was

8  never a transfer of the subject property because there was no bill of sale, and that there

9  was no meeting of the minds so the Settlement Agreement was not an enforceable

10  contract at all.  *Audio Recording, July 31, 2018 Status Conference* at 2:35 – 2:39 p.m.

11  (explaining Debtor's position that (i) there was never a conveyance of property or

12  enforceable contract and (ii) the contract, if it was enforceable, is executory.  Debtor's

13  Counsel had not raised in his initial pleading in this contested matter, the Contempt

14  Motion, these arguments that no transfer of property ever occurred, or that there was no

15  meeting of the minds establishing an enforceable contract, which arguments were

16  inconsistent with his assertions in the Contempt Motion and State Court Complaint that

17  there was a contract, but it was rejected through the bankruptcy case.  At the evidentiary

18  hearing, Debtor's Counsel pursued the argument that CCM disputed that the Settlement

19  Agreement "ever reached the point of a binding agreement to transfer ownership."

20  *Evidentiary Hearing Transcript,* ECF 2095 at 57; *see also id.* at 8-9.  Yet Debtor's Counsel

21  at the same time continued to assert the argument that the Settlement Agreement was an

22  executory contract which had been rejected based on a new theory that Milner had some

23  duty to inspect the property, which made the agreement executory.  *Id.* at 279-280.

24        In this case, Debtor's Counsel made new and inconsistent arguments because

25  Milner, by her arguments in her pleadings and her counsel's Bankruptcy Rule 9011

26  Warning Letter, had raised serious doubts about his initial arguments in the Contempt

27  Motion.  Debtor's Counsel needlessly expanded the litigation between CCM and Milner

28  because his arguments were frivolous and reckless, lacking a reasonable basis in fact and

**MEMORANDUM DECISION**

1   law and were made without a reasonable legal inquiry.  Debtor's Counsel's conduct and

2   pleadings indicate that instead of pursuing CCM's claims in the existing State Court Action

3   that he brought against Milner, he multiplied litigation proceedings against her by

4   instituting new litigation in another forum by filing the Contempt Motion in this case in an

5   effort to coerce Milner into releasing her claims against CCM, the same objective that he

6   sought in the state court litigation, which conduct is forum shopping.  Debtor's Counsel

7   admits as much in his opposition to Milner's supplemental brief in support of the Sanctions

8   Motion, where he states that "the state case filed against Milner listed the discharge as a

9   basis of recovery. [. . .] However, presenting bankruptcy law and arguments to a state

10  judge is not ideal when the actual bankruptcy case could be reopened and this issued [sic]

11  decided by the same bankruptcy court."  *Debtor's Counsel Opposition to Supplemental*

12  *Memorandum,* ECF 2133 at 16-17.  In his original opposition to the Sanctions Motion,

13  Debtor's Counsel stated, regarding the Contempt Motion he filed for CCM: "The purpose

14  of the motion was to expedite a resolution of the parties' dispute by a single motion, as

15  opposed to a drawn-out State Court action."  ECF 2120 at 10.  This statement is another

16  admission of forum shopping.  According to Debtor's Counsel in his response to Milner's

17  supplemental brief in support of the Sanctions Motion, this multiplying of litigation and

18  forum shopping was justified because he "believed in good faith that a single hearing with

19  this court could end the dispute if the outcome was favorable to CCM[,]" which he says

20  "was not an improper purpose, [sic] it was the intended purpose of streamlining the legal

21  disputes between the parties."  ECF 2133 at 17.

22          The court determines that contrary to Debtor's Counsel's assertions that the

23  initiation of the additional litigation proceeding in this court was "streamlining" or

24  "expediting" a resolution of the parties' dispute, it increased the litigation between them by

25  multiplying litigation proceedings.  On this record, when Debtor's Counsel says that he

26  was concerned about a drawn-out State Court Action or that a state judge would not be

27  ideal to resolve the dispute, he indicates that he was evidently dissatisfied with the

28  progress of the State Court Action that he initiated for CCM against Milner, and he wanted

**MEMORANDUM DECISION**

1    to forum shop instead of proceeding in that action.  Debtor's Counsel chose the state

2    court as the forum to commence the initial litigation against Milner to vindicate his client's

3    rights, and even though his theory of relief was based on bankruptcy law, i.e., the effect of

4    the plan confirmation order on the Settlement Agreement, Debtor's Counsel chose to

5    litigate in the state court by filing the State Court Complaint.

6         As indicated in the correspondence between Debtor's Counsel and Milner's

7    counsel, Light, before the Contempt Motion was filed, Debtor's Counsel notified Light that

8    he was considering bringing an "ex-parte" application for a temporary restraining order

9    against Milner or moving to strike her answer in the State Court Action and to schedule

10   the hearings at the time when Light was busily preparing for trial in another case, while at

11   the same time, offering to settle if Milner released her claims against CCM, *Exhibit 3-6 to*

12   *Declaration of Debtor's Counsel attached to Contempt Motion,* ECF 2043 at 44-59.

13   Instead, Debtor's Counsel initiated new litigation in this court by filing the Contempt Motion

14   to hold Milner and her counsel, Light, in contempt for defending herself in the State Court

15   Action by filing an answer asserting affirmative defenses.  These circumstances indicate

16   that Debtor's Counsel intended to put more pressure on Milner by increasing litigation

17   costs and starting new litigation proceedings to hold her and her attorney in contempt.  If it

18   were more expeditious or in the interests of streamlining litigation to have this court

19   adjudicate a matter involving bankruptcy law rather than the state court, Debtor's Counsel

20   should have come to this court first instead of initiating the State Court Action and then

21   bypassing that court by filing the Contempt Motion.  It is evident on this record that before

22   he filed the Contempt Motion, Debtor's Counsel did not make a reasonable inquiry of the

23   applicable law to support the claims made in the Contempt Motion, even though Milner

24   through her counsel, Light, put him on notice that the theories on which the claims were

25   based were legally dubious.  Under these circumstances, the forum shopping and filing of

26   new litigation to put pressure on Milner in the hopes of dissuading her from defending

27   herself in the existing State Court Action, and to cause Milner to capitulate, settle and

28   release her claims, along with the baseless nature of CCM's claims and the lack of

89

**MEMORANDUM DECISION**

1  reasonable inquiry attributable to Debtor's Counsel, all indicate an improper purpose for
2  this litigation.

3          In *Skies Unlimited, Inc. of Colorado v. King,* 72 B.R. 536, 539 (Bankr. D. Colo.
4  1987), a dispute arose between a creditor and two debtors after plan confirmation.  After
5  the creditor initiated state court litigation and filed a notice of lis pendens against the
6  debtors' property, the debtors filed a complaint in the bankruptcy court and filed a motion
7  for an order to show cause why the creditor should not be held in contempt for violation of
8  the automatic stay.  *Id.* at 537-538.  The court granted the creditor's motion to dismiss the
9  complaint because the automatic stay had no application to a dispute arising post-
10 confirmation over property of the reorganized debtors since there was no longer a
11 bankruptcy estate for which a stay would apply.  *Id.* at 537.  The court granted the
12 creditor's motion for sanctions against debtors' counsel under Bankruptcy Rule 9011
13 because the arguments that the debtors made concerning the applicability of the stay
14 under 11 U.S.C. §362 were "totally unfounded and without merit," and the complaint and
15 motion for an order to show cause were brought for an improper purpose as these
16 pleadings were "replete with claims that [creditor] violated the clearly inapplicable section
17 362, and the repeated assertions that [creditor] is therefore in contempt of the orders of
18 this court, it is . . . clear to this court that the complaint and the order to show cause were
19 filed for the purposes of placing unwarranted pressure on [creditor] and to harass him."
20 *Id.* at 539.  The court further concluded that there was "no question that these Debtors,
21 through their attorneys, were seeking to browbeat the Defendant with threats of potential
22 contempt orders and thereby dissuade him from pursuing his claims in the state court."
23 *Id.*  The court imposed sanctions against the debtors' attorneys under Bankruptcy Rule
24 9011 on grounds that their actions were frivolous and were taken with the improper
25 purpose of harassing the creditor.  *Id.*

26         The court determines that similar to the sanctioned litigation by debtors' counsel in
27 *Skies Unlimited,* the Contempt Motion filed by Debtor's Counsel was a baseless attempt
28 to gain an advantage over Milner in litigation and coerce a release of claims by instituting

1  new litigation as additional pressure on her.  CCM's claims that it was no longer obligated

2  to comply with the Settlement Agreement could have been litigated in the existing State

3  Court Action where it originally chose to litigate, and Debtor's Counsel abused the judicial

4  process by bringing new litigation in the form of a contempt motion based on baseless

5  legal positions.  Debtor's Counsel then compounded the problem by expanding the issues

6  further with additional baseless legal positions after Milner presented him with compelling

7  arguments rebutting his positions in the original motion, thereby imposing needless

8  litigation costs on Milner.  In his Opposition to the Sanctions Motion, Debtor's Counsel

9  asserted:

> The purpose of the motion was to expedite a resolution of the parties' dispute by a single motion, as opposed to a drawn-out State Court action.  There was not intent to harass Ms. Milner by Debtor's Counsel or his client in filing the motion.  It was based on the available remedies unique to a discharged Chapter 11 Debtor where the same creditor that had demanded damages for the alleged breach of contract before and during the bankruptcy case, was continuing to seek those same damages post discharge.

14  *Debtor's Counsel's Opposition to the Sanctions Motion,* ECF 2120 at 10-11 and 16.

15  Based on the record as described herein, the court determines that the Contempt Motion

16  was brought by Debtor's Counsel for the purpose of browbeating Milner into releasing her

17  claims by forum shopping and bringing additional litigation in another court because he

18  was not making the progress that he wanted in the pending state court litigation.  Debtor's

19  Counsel hoped to exert additional pressure on Milner by suing her and her counsel for

20  asserting defenses in the pending state court litigation, thereby compelling her to release

21  her state court claims and obtaining a more favorable forum for his client.  This purpose of

22  filing the Contempt Motion was improper and, taken together with the frivolous arguments

23  discussed above, the court finds under its inherent authority that Debtor's Counsel acted

24  in bad faith in filing and litigating the Contempt Motion and that Milner's motion for

25  sanctions should be granted in part as to him.

26  ///

27

28

**MEMORANDUM DECISION**

1        **iii.     Milner Has Not Met Her Burden of Proving that CCM Should Be**

2                   **Sanctioned for Conduct Tantamount to Bad Faith**

3       As discussed above, a court may not sanction a litigant or counsel by invocation of

4 its inherent powers absent a specific finding of bad faith.  In an analysis of sanctions

5 under the court's inherent power the court therefore may not impute the bad faith of one

6 litigant or counsel to another.  *Primus Automotive Financial Services, Inc. v. Batarse*, 115

7 F.3d at 648 (requiring an "explicit" finding of bad faith) (citation omitted); *see also In re*

8 *Keegan Management Company Securities Litigation*, 78 F.3d at 436 (requiring a "specific"

9 finding of bad faith) (citation omitted).  Although neither *Primus Automotive Financial*

10 *Services, Inc. v. Batarse* nor *In re Keegan Management Company Securities Litigation*

11 expressly held that bad faith may not be imputed, the court reaches this conclusion based

12 on authorities cited herein interpreting the court's inherent authority to sanction, *see e.g.*

13 *Fink v. Gomez,* 239 F.3d at 993 (requiring a "specific finding") (citation omitted),

14 Bankruptcy Rule 9011,[25] and other authorities addressing a client's accountability for her

15 counsel's conduct.

16       In a different context, such as non-jurisdictional dismissals, a client is normally

17 chargeable with her counsel's conduct.  *Link v. Wabash Railroad Co.,* 370 U.S. 626, 633-

18 634 (1962) (dismissal by the district court for counsel's unexcused failure to prosecute

19 was not an "unjust penalty on the client").[26]  In *Link v. Wabash Railroad Co.,* the Supreme

20 Court in dicta noted that a party voluntarily chooses her attorney as her representative in

21 an action, and she "cannot [ ] avoid the consequences of the acts or omissions of this

22 freely selected agent."  *Id.*  "Any other notion would be wholly inconsistent with our system

23 of representative litigation, in which each party is deemed bound by the acts of his lawyer-

24

25 [25]     Pursuant to Bankruptcy Rule 9011(c)(2)(A), "Monetary sanctions may not be awarded against a
represented party for a violation of subdivision (b)(2)."  Subdivision (b)(2) is the frivolousness prong of Rule
9011: "the claims, defenses, and other legal contentions . . . are warranted by existing law or by a

26 nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new
law[.]"  In other words, a represented party relies on her counsel's expertise and may not be held
accountable for legal arguments that are baseless and made without a reasonable inquiry.  *See Hamel v.*

27 *Lalliss (In re Hamel),* 2009 WL 7751431, at \*11 (9th Cir. BAP 2009).

      [26]     In *Link v. Wabash Railroad Co.,* the Supreme Court held that "the failure to appear at a pretrial

28 conference may, in the context of other evidence of delay, be considered by a District Court as justifying a
dismissal with prejudice."  370 U.S. at 635.

**MEMORANDUM DECISION**

1   agent and is considered to have 'notice of all facts, notice of which can be charged upon

2   the attorney.'" *Id.* at 634 (citation omitted); *see also, In re Hill,* 775 F.2d 1385, 1387 (9th

3   Cir. 1985)("We have no intent to disavow the established principle that the faults and

4   defaults of the attorney may be imputed to, and their consequences visited upon, his

5   client.").

6        In *Community Dental Services v. Tani,* 282 F.3d 1164 (9th Cir. 2002), the Ninth

7   Circuit, applying Federal Rule of Civil Procedure 60(b)(6),[27] reversed the district court's

8   denial of a motion for relief from default judgment after the district court had concluded

9   that no "extraordinary circumstances" beyond the party's control existed, because the

10  party was chargeable with his counsel's conduct.  282 F.3d at 1169.  In reversing the

11  district court, the Ninth Circuit distinguished between the general imputation rule that a

12  client is accountable for her counsel's "neglectful or negligent acts," and a client's

13  purported responsibility for "the more unusual circumstances of his attorney's extreme

14  negligence or egregious conduct."  *Id.* at 1168.  The Ninth Circuit held that "where the

15  client has demonstrated gross negligence on the part of his counsel, a default judgment

16  against the client may be set aside pursuant to Rule 60(b)(6)."  *Id.* at 1169.  Although the

17  "extraordinary circumstances" analysis under FRCP 60(b)(6) is not at issue in this case,

18  the court finds *Community Dental Services v. Tani* persuasive as to when it may be proper

19  to impute attorney conduct to a client.  Because the court may only invoke its inherent

20  authority to sanction a party upon an explicit finding of bad faith or egregious conduct

21  tantamount to bad faith, it follows that such a finding may not be imputed to an attorney or

22  client but must be specifically supported by the party or counsel's conduct.

23                    i.  Recklessness and Frivolousness: Misstatements of Law and Fact

24       The court cannot make a finding of misconduct on the part of CCM demonstrating

25  bad faith on its part either under a clear and convincing or a preponderance of the

26  evidence standard.  The record does not demonstrate that CCM did anything more than

27  _____

28  [27]    Federal Rule of Civil Procedure 60(b)(6) provides that "the court may relieve a party or its legal
representative from a final judgment, order, or proceeding for . . . any other reason that justifies relief."

1    rely on Debtor's Counsel to develop the legal theories for the claims it made to pursue the

2    Contempt Motion against Milner and Light.  As set forth in the Declaration of Russell

3    Jacobson, CCM's Chief Operating Officer: "At the time the underlying Motion for an Order

4    to Show Cause ('Motion for OSC') was filed, CCM was represented solely by [Debtor's

5    Counsel] in this bankruptcy proceeding.  Furthermore, at that time, CCM believed that

6    [Debtor's Counsel] understood the relevant law and that the Motion for OSC was proper."

7    *Jacobson Declaration in Support of CCM Opposition to Sanctions Motion,*  ECF 2116 at 2

8    (¶ 4).  The record before the court does not show that CCM had knowledge that the legal

9    arguments made by Debtor's Counsel on its behalf, discussed above, were baseless.

10   Based on the Jacobson Declaration, CCM believed that Debtor's Counsel understood the

11   relevant law, and thus, undertook a reasonable inquiry into all factual and legal matters

12   asserted in the State Court Action and the Contempt Motion.  The court attributes the

13   arguments frivolously and recklessly made in support of the Contempt Motion, related

14   misstatements of law, and overall lack of reasonable inquiry to Debtor's Counsel, not

15   CCM.

16                  ii.   <u>Recklessness and Improper Purpose</u>

17         The record does demonstrate, however, that CCM was not entirely blameless in

18   transmitting mixed messages and acting inconsistently leading up to the filing of the

19   Contempt Motion, including not giving sufficient notice of its attempt to reject the contract

20   with Milner in its bankruptcy case.  The court finds, however, that CCM's conduct is not so

21   beyond the pale that the imposition of sanctions under the court's inherent authority is

22   appropriate.  "It is, of course, beyond cavil that the attorney-client relationship is an agent-

23   principal relationship."  *McCarthy v. Recordex Services, Inc.,* 80 F.3d 842, 853 (3d Cir.

24   1996).  This relationship "serves as ratification of any actions taken by the attorney."

25   *Campbell v. Conway,* 611 B.R. 38, 48 (M.D. Pa. 2020).  "Where sanctions are concerned .

26   . . 'if the fault lies with the attorneys, that is where the impact of the sanction should be

27   lodged.'"  *M.E.N. Co. v. Control Fluidics, Inc.,* 834 F.2d 869, 873 (10th Cir. 1987) (citation

28   omitted).  "A debtor cannot, [however,] merely by playing ostrich and burying his head

1  deeply enough in the sand, disclaim all responsibility for statements which he has made

2  under oath." *In re Tully,* 818 F.2d 106, 111 (1st Cir. 1987) (affirming bankruptcy court's

3  denial of discharge where debtor knowingly failed to disclose material facts in his

4  schedules).

5          In Milner's Reply to the Supplemental Opposition filed by CCM, ECF 2135, filed on

6  December 16, 2019, she argued that CCM was "intimately involved" in the filing of the

7  Contempt Motion for the "improper purpose" of harassing and coercing her to sign a

8  release of claims.  ECF 2135 at 3.  In support, Milner contends that CCM first discussed

9  rejection or breach of the continuing obligation to store the subject property in 2011, when

10 the CCM Board of Directors passed a resolution to reject the Settlement Agreement.  *Id.*

11 Notwithstanding the resolution, CCM never took formal action to reject the contract with

12 notice to Milner in the bankruptcy case and never breached the contract during the

13 bankruptcy to give her notice that it was repudiating or rejecting the contract.   Milner

14 asserts that the board minutes indicate that CCM must have known at that point that it

15 could not follow through on the resolution because the agreement was not executory.  *Id.*;

16 *see also Trial Exhibit 39, Supplemental Appendix,* ECF 2128 at 366-370.  Perhaps such

17 an inference could be drawn, but the court cannot speculate as to what advice former

18 bankruptcy counsel may have given to CCM regarding the Settlement Agreement being

19 an executory contract.

20         As discussed further below, however, the court finds in some respects that CCM's

21 efforts to extricate itself from the obligations of the Settlement Agreement, specifically,

22 storing the subject property in like condition, concerning.  In November 2010,

23 approximately one month after CCM filed its bankruptcy petition, Milner was in

24 communication with CCM regarding certain light fixtures, "Martin Macs," some of which

25 CCM retained and others CCM transferred to her pursuant to the Settlement Agreement.

26 *Exhibit 13 to Milner Declaration,* ECF 2066-1 at 61-63.  Jim Penner of CCM ("Penner")

27 responded to Milner's concern that her property might be errantly recorded on the

28 schedules, stating that "whatever is yours on the settlement record is yours, not a

1  problem." *Id.* at 62-63.  When Milner responded and asked Penner what would be listed

2  as assets of CCM, Penner responded, "[j]ust what the cathedral owns. The Ministry can't

3  list your Mac's as our assets as that would go against the agreement. They were handed

4  over to you, . . . ." *Id.*  Here, CCM's representative indicates to Milner that the contract

5  between CCM and Milner is valid and the property is hers.

6          At the March 24, 2011 meeting of CCM's Board of Directors, Gwyn Myers raised

7  the issue of the status of the 2006 Settlement Agreement between CCM and Milner in

8  light of CCM's pending bankruptcy case.  *Trial Exhibit 39, Supplemental Appendix,* ECF

9  2128 at 366-368.  Richard Salus ("Salus") and Marc Winthrop ("Winthrop"), bankruptcy

10 counsel to CCM, and Carl Grumer ("Grumer"), counsel to Robert and Arvella Schuller

11 (and Milner), attended the meeting.  *Id.* at 366.[28]  The minutes of the board meeting

12 recited:

13          The settlement contract with Carol Milner was discussed.  It was noted
            that all cash and property items in the settlement contract have all be
14          [sic] fulfilled, but that there is a clause in the contract that requires
            CCM to store set items from Creation owned by Carol Milner and
15          maintain and preserve these items in "like condition".  The agreement
            between CCM and Carol Milner is silent on the term for CCM's
16          obligation to store said items.  Noting that it was an extremely difficult
            task to store physical items in an unchanged state, and with no end
17          date given, Gwyn Myers recommended that the contract be rejected,
            and that Carol Milner should be given reasonable notice to retrieve her
18          physical items from ministry storage.  After discussion the Board
            passed the following resolution, with Gwyn Myers making the motion.
19          Rick Mysse seconding and all voting in favor, with Dr. Robert Schuller
            abstaining, and Arvella Schuller voting in opposition.  **RESOLVED, the**
20          **contract between CCM and Carol Milner dated July 8, 2006 be**
            **rejected.  RESOLVED FURTHER, that Carol Milner shall be given**
21          **thirty (30) days to remove her items from CCM's custody and**
            **control, at her expense.**
22
    *Trial Exhibit 39, Supplemental Appendix,* ECF 2128 at 368.   Thus, a year after Penner
23
    tells Milner that the property is hers, CCM's board of directors passes a corporate
24
    resolution to reject the contract with Milner, though the resolution acknowledges that the
25
    property is hers.
26

27  ───────────────────
    [28]       The other attendees at the CCM board meeting on March 24, 2011 included Robert Schuller,
28  Arvella Schuller, Gwyn Myers, Rick Mysse, Jim Penner and Sheila Schuller Coleman, the then-CEO of
    CCM. *Id.*

**MEMORANDUM DECISION**

1    On or about May 4, 2012, more than a year after this resolution of the CCM board

2   of directors to "reject" the Settlement Agreement and less than a week after the Effective

3   Date of the Plan, May 1, 2012, John Charles, CCM's then-President and CEO, wrote a

4   letter to Milner requesting that she retrieve all of the subject property in CCM's warehouse

5   and trailers by around the end of June 2012, or CCM would consider the property

6   abandoned and dispose of it.  *Exhibit 15 to Milner Declaration,* ECF 2066-1 at 68-69.  It is

7   undisputed that as reflected on the case docket of this bankruptcy case, CCM did not file

8   a formal motion to reject the Settlement Agreement as an executory contract before the

9   effective date of the plan.  That is, a year after the CCM board passed its resolution to

10  reject its contract with Milner, it had not taken any action in the bankruptcy case to obtain

11  an order to reject the Settlement Agreement with sufficient notice to Milner, but its

12  president requested her to remove her property, or otherwise CCM would consider the

13  property abandoned by her, which still indicated that CCM considered the property hers.

14   On June 25, 2012, Dennis W. Ghan ("Ghan"), also CCM's counsel, in a letter to

15  Grumer, Milner's counsel, reiterated CCM's position that Milner needed to retrieve the

16  items by approximately June 30, 2012.  *Exhibit 28 to Grumer Declaration,* ECF 2066-2 at

17  11-14.  Ghan referenced the May 4, 2012 letter from John Charles, the then-President of

18  CCM, to Milner and stated, "I am giving you written notice of CCM's intent to remove and

19  dispose of the Creation Items in accordance with California law and the procedures

20  outlined below if Ms. Milner fails to remove the Creation Items from the warehouse and

21  trailers by June 30, 2012."  *Exhibit 28 to Grumer Declaration,* ECF 2066-2 at 12; *Exhibit 1*

22  *to Ghan Declaration attached to CCM Reply to Milner's Objection to Contempt Motion,*

23  ECF 2053 at 14 (same).  Ghan went on to assert that pursuant to the California

24  Commercial Code, CCM as "warehouse-bailee" would be forced to sell the subject

25  property and deduct storage, moving and preservation costs incurred by CCM if Milner did

26  not retrieve the subject property.  *Exhibit 28 to Grumer Declaration,* ECF 2066-2 at 13.

27  Ghan further stated in this letter: "[h]owever, if Ms. Milner timely removes the goods from

28  the warehouse and the trailers, *CCM is willing to abandon the Creation Items to Ms.*

97

**MEMORANDUM DECISION**

1    *Milner* and waive its claims for storage, moving and preservation costs." *Id.* (emphasis

2    added).  Ghan made the following assertion in his letter:

3              . . . Ms. Milner's alleged ownership interest in the Creation Items stems
               from the agreement dated July 8, 2006 between Ms. Milner and CCM
4              (the "Settlement Agreement").  CCM does not believe that the
               Settlement Agreement is a valid agreement because it was a "self-
5              dealing transaction" that was not reviewed or ratified by CCM's board
               of directors. . . . based on its determination that the Creation Items
6              have limited to no value and the cost of storing the Creation Items is
               cost prohibitive, CCM is willing to abandon the Creation Items to Ms.
7              Milner if she  timely removes them from the warehouse and trailers by
               June 30, 2012. . . . [E]ven assuming that the Settlement Agreement is
8              valid, it does not require CCM to store and maintain the Creation
               Items, which it has been forced to do for the past six years during a
9              time of extreme financial difficulty.  Ms. Milner could have and should
               have removed the Creation Items during the last six years.  Therefore,
10             CCM is not responsible for any alleged loss or damage to the Creation
               Items.
11

12   *Id*.  However, Ghan in this letter did not cite any legal authority to support the proposition

13   that the Settlement Agreement was not a valid agreement because it was a "self-dealing

14   transaction" that was not reviewed or ratified by CCM's board of directors.  Salus,

15   Winthrop, and a third attorney for CCM, Kavita Gupta, all received email copies of Ghan's

16   June 25, 2012 letter to Grumer.  *Id.* at 14.  Here, a month after CCM's president, Charles,

17   requested that Milner remove her property, a lawyer for CCM wrote Milner, telling her that

18   CCM considered the contract to be an invalid "self-dealing" transaction and that CCM was

19   willing to "abandon" the property to her if she promptly removed it, which indicates that

20   CCM's position about ownership of the Play Property had changed and that the property

21   was purportedly not hers.

22         Between June 2012 and March 2013, the parties attempted to coordinate Milner's

23   inspection and retrieval of the subject property to no avail.  In March 2013, Salus, CCM's

24   counsel, had numerous communications with Grumer, Milner's counsel, regarding the

25   subject property.  On March 5, 2013, Salus, requesting that Milner retrieve the subject

26   property, wrote to Grumer, "the items are allegedly her property – she should come and

27   get her "stuff"; . . . the Ministry cannot [sic] longer front the cost of storing Carol's items

28   and with the pending move this matter must be resolved."  *Exhibit B to Milner Attachment*

*to the July 20, 2018 Joint Status Report,* ECF 2059 at 23 (internal pagination, Exhibit B at

21).  Grumer responded, noting the logistical challenges for retrieving the subject property

in CCM's trailers.  *Id.* at 22-23 (internal pagination, Exhibit B at 20-21).  On March 18,

2013, Salus replied in a letter to Grumer with a copy to John Charles, CCM's then-

President and CEO, writing,

> Keep in mind that [Milner]'s contract you refer to was rejected as part
> of the bankruptcy proceedings and therefore CCM has no obligation to
> continue to store the items for free—CCM has given sufficient statutory
> notice, on several occasions, to have the materials retrieved or they
> will be disposed of as allowable under the law. . . . If [Milner] actually
> wants to [sic] items, which I highly doubt since there is no resale value
> to the items and absolutely no use for them, she should get a moving
> company and arrange to haul away the stuff.

*Id.* at 22 (internal pagination, Exhibit B at 20).  In these communications, CCM's counsel

wrote Milner's counsel requesting that Milner remove the property referring to it as her

"stuff" or "allegedly her property."

From 2013 to 2017, the parties continued to exchange communications without

resolving their differences.  On April 21, 2017, Wesley R. Carter ("Carter") of Winters &

King, Inc., counsel to CCM, wrote a letter to Milner, stating: "CCM can no longer store

your property at its own expense.  CCM does not believe it has any contractual obligation

to do so and does not intend to keep the property if you do not take possession of it."

*Exhibit 1 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 38;

*see also Exhibit 22 to Milner Declaration,* ECF 2066-1 at 86-88 (arguing that the

Settlement Agreement was rejected by operation of the Plan and therefore "CCM is not

obligated to any future performance . . . if such obligation existed in the first instance.").

Milner responded in a letter, disagreeing with Carter's "assertion that the agreement was

rejected under the bankruptcy matter" and stating that CCM "certainly has no right to

discard the property and I will seek damages if the property has not been or does not

continue to be preserved per the agreement and for any other breach of agreement."

*Exhibit 23 to Milner Declaration,* ECF 2066-1 at 90.

**MEMORANDUM DECISION**

1    Carter replied to Milner by letter of May 12, 2017, wherein he reiterated CCM's

2  position that it "will not store the subject property forever as you continue to allege it is

3  obligated to do." *Exhibit 2 to Debtor's Counsel Declaration attached to Contempt Motion*,

4  ECF 2043 at 41.  Carter asserted CCM's position that:

5           It has been over a decade since the [Settlement Agreement] with CCM
            [was entered into,] and CCM continues to store your property at a
6           substantial cost to CCM. . . . CCM denies any assumption of the
            agreement post-bankruptcy. . . . Attempts by the ministry to avoid
7           additional conflict with you should not be construed as an assumption
            of any official contract.  I must also make clear that CCM does not
8           agree with your interpretation of the underlying agreement in the first
            instance.  Your interpretation relies on a single sentence in Schedule 1
9           which reads: 'CCM will keep all goods in same condition as they were
            in at the end of the '05 season.'  However, that schedule is simply a list
10          of how the assets were to be distributed to the respective parties.  This
            sentence does not create an ongoing obligation for CCM to store your
11          property forever.  It is a common contractual term that requires a party
            to keep property in a similar condition until it can be transferred.  A
12          reasonable time to take possession of the property would be inferred in
            the contract and I believe any reasonable person would see a decade
13          as a reasonable amount of time.  CCM does not believe it has any
            contractual obligation to do so and does not intend to keep the
14          property if you do not take possession of it.

15  *Id.* at 41-42.  In these later communications between counsel for the parties,

16  CCM's counsel once more refers to the property as Milner's property.

17          As previously discussed, Debtor's Counsel also relied upon some of these

18  communications, specifically, the opinion of CCM's counsel, Salus, as set forth in the

19  March 18, 2013 letter to Grumer, Milner's counsel.  *Debtor's Counsel Post-Trial*

20  *Declaration attached to Debtor's Counsel Opposition to Supplemental Memorandum,* ECF

21  2133 at 21 (¶ 25).  However, Debtor's Counsel's reliance on these opinions was not

22  reasonable because the opinions were just assertions by CCM's prior counsel not

23  supported by any analysis citing applicable legal authority.  Debtor's Counsel was

24  required to make his own independent legal inquiry.  At issue here and discussed below,

25  however, is *CCM's* knowledge and conduct from when it filed its bankruptcy petition on

26  October 18, 2010 through the date of the filing of the Contempt Motion on June 8, 2018.

27  What distinguishes CCM from Debtor's Counsel, however, is that CCM was and is a

28

**MEMORANDUM DECISION**

1  represented party, as opposed to counsel with the independent duty of reasonable legal

2  inquiry.

3       ***The Jacobson Declaration and Role.***  In asserting that CCM should be

4  sanctioned for conduct tantamount to bad faith, Milner focuses on the role of Russell

5  Jacobson, CCM's chief operating officer.  *Reply to CCM Supplemental Opposition,* ECF

6  2135 at 2, 5 and 9.  Milner argues:

7           CCM claims that the Myers Declaration was truthful and suggests
            conflicting evidence, including undisputed testimony of Ms. Milner,
8           should be disregarded.  As described in the Supplemental Brief and
            below, the Myers Declaration was untrue and intended to mislead
9           the court.  Moreover, Mr. Jacobson, CCM's chief operating officer,
            participated in the filing and pursuit of Ms. Milner through trial, and
10          knew or should have known that the information and testimony
            presented was not true.  Additionally, since [Debtor's Counsel] was
11          relatively new to the case and facts, the information that [Debtor's
            Counsel] used to prepare for trial, including for preparation of the
12          Myers Declaration must have come from CCM.

13  *Id.* at 5-6.

14       In his declaration filed in support of the Contempt Motion, Jacobson stated that

15  the matter concerned "CCM's efforts to have [Milner] retrieve the remaining property she

16  previously owned that CCM has been storing for several years at CCM's expense."

17  *Jacobson Declaration attached to Contempt Motion,* ECF 2043 at 23 (¶ 2).  Jacobson

18  stated his view that Milner lost ownership of the property as a result of CCM exiting

19  bankruptcy.  *Id.* (¶ 5).  However, Jacobson also characterized the Settlement Agreement

20  as a "2006 contract to which Milner and CCM were parties," *id.* at (¶ 3), whereby "CCM

21  stored various physical properties *belonging to Milner* . . . . at CCM's expense . . . and it

22  costs CCM thousands of dollars a year to continue to store the subject box trailers full of

23  *Milner's Play related equipment*.  It will cost CCM thousands of dollars to empty and haul

24  to a waste site all of the belongings in the seven trailers[,]" *id.* at 24 (¶¶ 11, 13) (emphasis

25  added).  Jacobson's characterization of the subject property, the Play Property, as

26  Milner's property, notwithstanding his view that she lost ownership through CCM's

27  bankruptcy case, is consistent with CCM's representations in the State Court Complaint

28  that the Play Property was transferred by CCM to Milner pursuant to the Settlement

101

**MEMORANDUM DECISION**

1    Agreement.  *See State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice,*

2    ECF 2044 at 4-10.  In the State Court Complaint, CCM referenced Milner's ownership

3    interest in the Play Property no less than thirteen times.[29]  The court finds that Jacobson's

4    declaration was not misleading or fraudulent because while it is argumentative, it

5    accurately stated CCM's position and views about the characterization of the Play

6    Property.  There is no evidence in the record that CCM or Jacobson directed Debtor's

7    Counsel to assert that the property was never transferred to Milner or that her ownership

8    interest in the property was somehow terminated.

9        Milner does not cite any evidence to show that Jacobson "participated in the filing

10   and pursuit of Ms. Milner through trial" for an improper purpose, and it is unclear what she

11   meant by "filing and pursuit of Ms. Milner through trial."  *Reply to CCM Supplemental*

12   *Opposition,* ECF 2135 at 5-7.  The evidence, based on Jacobson's declaration in

13   opposition to the Sanctions Motion, is that he is the representative of CCM, the client.

14   There is no evidence showing that Jacobson was actively involved in directing the conduct

15   and course of the litigation.  Furthermore, Milner does not cite any evidence to show that

16   Jacobson knew that the information and testimony presented at trial was not true or that

17   the alleged false information must have come from CCM.  There is a good faith dispute

18   between the parties about the veracity of the Myers Declaration, and, as discussed below,

19   the court determines that the testimony in the Myers Declaration was not false or

20   perjurious, but mistaken.  On this record, the evidence is insufficient to show by a

21   preponderance of the evidence that Jacobson's role in the litigation was more than being

22   a passive representative of a client who relied upon an attorney to handle a legal dispute

23   that resulted in litigation.

24       ***The Myers Declaration.***  Milner also argued that the Declaration of Gwyn Myers,

25   ECF 2075, filed September 19, 2018, was false testimony, and reflected on CCM because

26

---

27   [29]    *State Court Complaint, Exhibit A to Debtor's Request for Judicial Notice,* ECF 2044 at 6 (¶
     12)("physical properties belonging to [Milner]"); *id.* at 7 (¶ 17)("equipment of [Milner]"); *id.* (¶ 18)("her
     personal property"); *id.* (¶ 20)("[Milner]'s items"); *id.* (¶ 21)(same); *id.* (¶ 21)(same); *id.* (¶ 21)(same); *id.* at 8
28   (¶ 23)("[Milner]'s property"); *id.* (¶ 26)("her personal property"); *id.* (¶ 27)("her property"); *id.* at 9 (¶ 32)("her
     items"); *id.* (¶ 34)("[Milner]'s property"); *id.* at 10 (¶ 1)(same).

**MEMORANDUM DECISION**

1    the declaration was in support of the Contempt Motion, and Myers was a representative of

2    CCM. *Milner Supplemental Memorandum re Bad Faith,* ECF 2127 at 12-13. Specifically,

3    Milner took issue with paragraph 8 of the Myers declaration, ECF 2075 at 2, where Myers,

4    a former board member and Chief Restructuring Officer of CCM, testified that CCM's

5    board of directors agreed with the advice of CCM's attorney, Robert Gipson, that the

6    Settlement Agreement was not valid until a disinterested majority of the CCM board of

7    directors approved it and that CCM would need to quit claim the Play Property to Milner.

8    *Milner Supplemental Memorandum re Bad Faith,* ECF 2127 at 13. Milner also asserted

9    that paragraph 8 of the Myers declaration was fraudulent because Myers declared that

10   based on July 2006 e-mails from CCM's counsel, Myers understood that the subject

11   property would need to be quitclaimed to Milner apart from the Settlement Agreement,

12   and that an inventory of the subject property would also need to be done. *Id.* Milner

13   contends that later e-mails between Myers and Milner demonstrate that these statements

14   were false because they were contradicted by these later emails wherein Myers's

15   understanding changed, and Myers stated that no quitclaim deed or further board

16   approval would be necessary to effectuate the transfer of property to Milner despite

17   counsel's advice. *Id.* (citing *Trial Exhibit 8 and 9, Supplemental Appendix,* ECF 2128 at

18   353-355 and 356-359). The court does not find it perjurious or fraudulent that Myers's

19   understanding of CCM's corporate governance procedures required to render the

20   Settlement Agreement enforceable may have changed between 2006 and 2007, or some

21   years after.

22         Myers declared under penalty of perjury her understanding of the facts related to

23   this dispute. She did not have a duty to describe in her declaration every e-mail she sent

24   to Milner, and the court does not find her declaration fraudulent. For instance, in

25   paragraph fourteen of her declaration, Myers describes sending an August 21, 2006 e-

26   mail to Milner in which Myers stated that the Settlement Agreement would require CCM

27   board approval. *Myers Declaration,* ECF 2075 at 4 (¶ 14). In paragraph fifteen, Myers

28   states that to her knowledge no final majority vote of the CCM board approved the

1   Settlement Agreement. *Id.* (¶ 15).  These statements of Myers are not patently false

2   because they reflect her understanding of the circumstances surrounding the execution of

3   the Settlement Agreement, but it appears that these statements were factually incomplete

4   as other emails in evidence show, as Milner points out, that Myers' understanding

5   changed in that no quitclaim deed or further board approval was needed to effectuate the

6   property transfer as discussed above.

7       The court did not find credible Myers' statements that the Settlement Agreement

8   was not valid until a disinterested majority of the CCM board of directors approved it, or

9   that a quitclaim deed was needed to effectuate a transfer of the Play Property to Milner,

10  because such statements were Myers' statements of legal opinion, which are not

11  authoritative or dispositive here.  It is undisputed that Myers, as a member of CCM's

12  executive committee and board of directors, signed and initialed the Settlement

13  Agreement to execute the agreement on behalf of CCM.  If further board approval was

14  required, then she should not have executed the agreement on behalf of CCM, which she

15  did, and she should have done so only *after* such board approval.  Thus, the court did not

16  find Myers' declaration on this point to be credible.  Myers' statements of her

17  understanding of the circumstances of the execution of the Settlement Agreement may

18  have been true, and in the court's view, they were selective and incomplete as shown by

19  other evidence identified by Milner, and thus, not credible, but also, not perjurious.

20  Moreover, while it appears that Debtor's Counsel solicited Myers' declaration as part of his

21  representation of CCM, there is no credible evidence that CCM directed the drafting of

22  Myers' declaration.

23      The totality of the circumstances of CCM's conduct, specifically its years long

24  strategy to extricate itself from the obligations of the Settlement Agreement by giving

25  ultimatums to Milner based on dubious legal arguments through its attorneys, is very

26  concerning.  The record, however, does not demonstrate conduct tantamount to bad faith

27  because CCM relied on its legal counsel, including Debtor's Counsel, to represent its

28  interests in this dispute from the commencement of its bankruptcy case to the present

1   time.  There is no credible evidence in the record that a CCM representative such as

2   Jacobson or Myers committed a fraud upon the court or directed the assertion by Debtor's

3   Counsel of baseless litigation positions advocated in support of the Contempt Motion.

4          Myers in her declaration, like other representatives and counsel for CCM,

5   described the financial burden on CCM under the Settlement Agreement, ECF 2075 at 1-2

6   (¶¶ 3-5),[30] and other factual issues that purportedly rendered the Settlement Agreement

7   unenforceable.  *Id.* at 2-4 (¶¶ 7-15)(asserting that the board never approved the

8   agreement and/or there was no transfer of ownership to Milner); *id.* at 4-5 (¶¶ 16-

9   20)(arguing that disagreements as to enforceability of the Settlement Agreement or a

10  prepetition breach existed); *see also, Trial Exhibit 39, Supplemental Appendix,* ECF 2128

11  at 368 (noting the difficulty in storing physical property in like condition indefinitely at

12  March 24, 2011 board meeting);  *June 25, 2012 Letter from Ghan to Grumer, Exhibit 28 to

13  Grumer Declaration,* ECF 2066-2 at 13 (describing storage of the subject property as "cost

14  prohibitive" and noting the then-six years of storage during a time of "extreme financial

15  difficulty");  *March 5, 2013 E-mail from Salus to Grumer, Exhibit B to Milner Attachment to

16  the July 20, 2018 Joint Status Report,* ECF 2059 at 23 (internal pagination, Exhibit B at

17  21) (stating that "the Ministry cannot [sic] longer front the cost of storing Carol's items");

18  *April 21, 2017 Letter from Carter to Milner, Exhibit 1 to Debtor's Counsel Declaration

19  attached to Contempt Motion*, ECF 2043 at 37-38 (stating that "CCM continues to store

20  your property at a substantial cost to CCM. [. . .] CCM can no longer store your property at

21  its own expense.").  CCM's counsel, not its representatives, however, asserted the

22  baseless legal claims and internally inconsistent arguments in these proceedings, as

23  discussed herein.

24         The record here indicates that CCM, although unwilling to stop performing its

25  obligation to store Milner's property under the Settlement Agreement, has and does rely

26  upon its counsel to characterize CCM's storage obligation and the ownership of the Play

27  _____

28  [30]      As noted previously, Myers's declaration testimony relating to the alleged loss in staging the play
     was not admitted at trial, though it is considered here since it was relied upon and offered by CCM through
     Debtor's Counsel, which reliance is relevant to the issue of bad faith.

**MEMORANDUM DECISION**

1  Property as its counsel saw fit to argue in this matter: at times as a rejected or

2  unenforceable agreement, and at other times property that was never transferred from

3  CCM to Milner at all.  The fault in making arguments that lacked good faith, however, lies

4  with CCM's counsel.  *Cf. American Rena International Corporation v. Sis-Joyce*

5  *International Company,* 2015 WL 12732433, at *46 (Olguin, J.) (C.D. Cal.

6  2015)("Defendants' pattern of bad faith litigation misconduct shows that defendants do

7  'not take their oath to tell the truth seriously and . . . will say anything at any time in order

8  to prevail in this litigation.' [citation]. Defendants provide shifting explanations depending

9  on the day or attorneys that happen to represent them.").  In *American Rena International*

10  *Corporation v. Sis-Joyce International Company*, the court found that the party defendant

11  drafted false declarations and devised a scheme to keep plaintiffs from deposing a

12  witness, demonstrating that the party defendant was "sophisticated, disingenuous, and in

13  control of the direction of defendants' litigation."  *Id.* at *25.  Here, the evidence does not

14  indicate that CCM or any of its representatives directed to CCM's counsel a strategy in

15  this litigation to present legally unfounded arguments to the court.  To the contrary, the

16  record indicates that CCM has for years performed its storage obligation under the

17  Settlement Agreement while relying on its counsel to assert various legal positions on its

18  behalf to extricate itself from its burdensome obligation under the agreement.  While

19  CCM's reliance on counsel was misplaced in light of the baseless and reckless legal

20  arguments that were made on its behalf, this reliance of a client on counsel by itself is not

21  tantamount to bad faith, although perhaps such reliance may have been negligent,

22  particularly in knowing that litigation positions were being asserted that were inconsistent

23  with its prior positions.

24      Perhaps CCM should have known that the litigation positions advanced by its

25  counsel were not in good faith.  For example, in his May 4, 2012 letter to Milner, then

26  President and CEO of CCM John Charles notified Milner that if she did not take

27  possession of the subject property at her own expense CCM would consider the property

28  "abandoned" and would dispose of it.  *May 4, 2012 Letter from Charles to Milner, Exhibit*

106

**MEMORANDUM DECISION**

1  *15 to Milner Declaration,* ECF 2066-1 at 69.  CCM and Charles could not have considered

2  the property subject to abandonment *by* Milner if it did not assume that the property had

3  been transferred from CCM *to* Milner and that she owned it.  Additionally, less than two

4  months later, Ghan, CCM's counsel at the time, stated in a letter to Milner's counsel at the

5  time, Grumer, that CCM would be willing to "abandon" the subject property "*to* Milner," and

6  characterized Milner's ownership as "alleged" in the letter because, among others, the

7  agreement was purportedly a self-dealing transaction and was not properly ratified by

8  CCM's board of directors.  *June 25, 2012 Letter from Ghan to Grumer, Exhibit 28 to*

9  *Grumer Declaration,* ECF 2066-2 at 12-13 (emphasis added).  Salus, counsel to CCM, in

10 a March 5, 2013 e-mail to Milner's counsel, Grumer, characterized the subject property as

11 both "allegedly" belonging to Milner and "Carol's items[.]"  *March 5, 2013 E-mail from*

12 *Salus to Grumer, Exhibit B to Milner Attachment to the July 20, 2018 Joint Status Report,*

13 ECF 2059 at 23 (internal pagination, Exhibit B at 21).  In a March 18, 2013 response to

14 Grumer, Salus then described the property as Milner's "belongings" and "her items[.]"

15 *March 18, 2013 E-mail from Salus to Grumer, Exhibit B to Milner Attachment to the July*

16 *20, 2018 Joint Status Report,* ECF 2059 at 22 (internal pagination, Exhibit B at 20).  In the

17 April 21, 2017 letter to Milner, Carter, CCM's counsel, characterized the subject property

18 as Milner's property *and* property she only claimed ownership to, while arguing that CCM

19 "is not obligated to any future performance on the [Settlement Agreement], if such

20 obligation existed in the first instance."  *April 21, 2017 Letter from Carter to Milner, Exhibit*

21 *1 to Debtor's Counsel Declaration attached to Contempt Motion*, ECF 2043 at 37-38.

22 These assertions made on behalf of CCM were erroneous, but were apparently made

23 based on the advice of counsel, or by counsel.  However, Debtor's Counsel's conduct is

24 distinguishable because he was the only counsel to assert internally inconsistent and

25 baseless positions in pleadings filed in, and arguments made in, court.  Thus, here, the

26 fault lies with Debtor's Counsel, and his conduct warrants sanctions.

27     The representations of CCM and its counsel as to the enforceability of the

28 Settlement Agreement, the ownership or purported transfer of the subject property, and

1    CCM's obligations, if any, under the Settlement Agreement, indicate that CCM had for

2    years desired to rid itself of the burdensome storage obligation.  CCM may have taken

3    conflicting positions, but it relied upon counsel to take these positions.  The court's finding

4    that Debtor's Counsel's inquiry was unreasonable and certain legal arguments he

5    presented were baseless may not be imputed to CCM based on the evidence here.  In

6    this case, CCM as principal may avoid sanctions because the conflicting positions as to

7    the subject property and Settlement Agreement were presented by counsel as agent in

8    this litigation, rather than representatives of CCM, the client, in its effort to end the storage

9    obligation.  The court finds that CCM did not act in bad faith when it authorized Debtor's

10   Counsel to file the Contempt Motion, even though it may have had knowledge that its

11   representatives and counsel had taken somewhat conflicting positions during this dispute

12   and in the years before.  While CCM *may* have authorized Debtor's Counsel to bring the

13   Contempt Motion for the purpose of coercing Milner into releasing claims for damages she

14   may or may not be owed under the Settlement Agreement, which purpose the court

15   determines was improper, the evidence indicates that CCM only could have done so in

16   reliance on the advice of counsel that there was a proper legal basis for filing the

17   Contempt Motion, and Milner has not shown by a preponderance of the evidence that

18   CCM authorized the filing of the Contempt Motion for this improper purpose.  Accordingly,

19   Milner has not shown that CCM acted in bad faith either by clear and convincing evidence

20   or a preponderance of the evidence in authorizing the filing of the Contempt Motion.

21        "The concept of 'efficient breach' is built into our system of contracts, with the

22   understanding that people will sometimes intentionally break their contracts for no other

23   reason than that it benefits them financially."  *Lockerby v. Sierra,* 535 F.3d 1038, 1042

24   (9th Cir. 2008) (citation omitted).  It is worth noting that at paragraph 20 of the Declaration

25   of Carol Schuller Milner, ECF 2066, filed on September 7, 2018, Milner stated that before

26   the 2006 Settlement Agreement was ever contemplated, she tried to explain to CCM that

27   failing to restage her play would be financially reckless.  *Milner Declaration,* ECF 2066 at

28   8 (¶ 20).  Milner "summarized the various agreements in place [between Milner and CCM]

108

**MEMORANDUM DECISION**

1  and explained [to the CCM Leadership Team] that CCM would be in breach of the various

2  agreements and that such breach would be more costly than staging the show.  My

3  warnings went unheeded." *Id.*[31]  Strictly in hindsight, perhaps CCM would have been

4  better off if any of its numerous attorneys over the past fourteen years, after reviewing the

5  2006 Settlement Agreement, might have provided a similar warning regarding the

6  consequences of a breach of the Settlement Agreement versus the cost of years of future

7  performance, i.e. storage in "like condition."

8        As stated in the Memorandum Decision, "any breach by Debtor occurred post-

9  confirmation, so Milner could not have violated the discharge injunction by asserting her

10  affirmative defenses in the State Court Action.  At no time before the Plan was confirmed

11  did Debtor breach the Settlement Agreement" with regard to the Play Property.

12  *Memorandum Decision,* ECF 2079 at 19.  The record indicates that pursuant to the

13  Settlement Agreement, CCM has stored the subject property for Milner for nearly 14 years

14  and apparently stores the property today.  In the Contempt Motion, CCM described its

15  conundrum:

16          "[Milner] refuses to sign a mutual release of her claims . . . . This has
        forced the discharged Debtor into a no win circumstances as disposing

17          of the property will result in a suit by Milner, and releasing the property
        to Milner without a release will result in a suit by Milner."

18

19  *Contempt Motion,* ECF 2043 at 7.  CCM by Debtor's Counsel originally sought to resolve

20  this conundrum by filing the State Court Action for declaratory and injunctive relief, but

21  apparently, Debtor's Counsel was not satisfied with the progress of the State Court Action,

22  so he filed new litigation in this court, which was an exercise in forum shopping.  The filing

23  of the Contempt Motion, however, did not resolve CCM's conundrum because the

24  Contempt Motion was based on frivolous and reckless claims asserted on CCM's behalf

25  ─────────────────
[31]      Milner's testimony indicates that there was a factual basis for CCM to enter into the Settlement

26  Agreement in 2006 in order to obtain releases of her claims, which was consideration for the contract.  If
Milner's releases were not consideration, there is no rational reason why Gwyn Myers, in light of her

27  fiduciary duty as a non-insider member of CCM's executive committee, signed off on the agreement for
CCM, or why CCM consistently, though later grudgingly, performed under the agreement to store Milner's
property at its expense for almost 14 years.  In hindsight, the financial viability of re-staging Milner's play

28  was and is somewhat doubtful, especially considering that Milner has not retrieved her property, nor has she
re-staged the play herself in the nearly 14 years since the execution of the agreement.

**MEMORANDUM DECISION**

1  by Debtor's Counsel.  This litigation did not expedite or streamline the dispute between

2  the parties; it made things worse.  CCM relied upon Debtor's Counsel, whom it thought

3  understood the relevant law.  Because of this reliance, CCM is not liable for sanctions

4  under the court's inherent authority, and Milner has not demonstrated by a preponderance

5  of the evidence, nor, necessarily, clear and convincing evidence, conduct tantamount to

6  bad faith by CCM.

7  **D.    Reasonableness of Attorney Fees**

8          Milner seeks an award of $151,391 for the fees and expenses incurred during the

9  pendency of the contempt proceeding, including the filing of the Sanctions Motion.  *Milner*

10 *Supplemental Memorandum re Bad Faith,* ECF 2127 at 19-20 (including Light's fees of

11 $38,822.50 and Movant's Counsel's fees and expenses of $112,569.26).  Milner provided

12 the billing entries showing the fees and expenses billed by her attorneys, Movant's

13 Counsel and Light, which the court has reviewed in detail.  The court determines that a

14 reasonable compensatory sanction of $69,400.00 in attorneys' fees and $729.26 in

15 expenses is appropriate in this case in consideration of the complexity of this contested

16 matter and the legal standards discussed below.

17         In *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017), the

18 Supreme Court recognized that a bankruptcy court's inherent authority to sanction

19 includes an "order . . . instructing a party that has acted in bad faith to reimburse legal

20 fees and costs incurred by the other side." (citation omitted).  Such an order must be

21 compensatory, however, not punitive; the court must "establish a causal link—between

22 the litigant's misbehavior and legal fees paid by the opposing party."  *Id.*  Any award of

23 attorneys' fees pursuant to the court's inherent authority therefore may only include the

24 fees that the complaining party would not have paid but for the misconduct.  *Id.* at 1187.

25 In sum, "the award is . . . the sum total of the fees that, except for the misbehavior, would

26 not have accrued."  *Id.* (citation omitted).

27         Additionally, although the court's consideration of attorneys' fees in this case is not

28 governed by 11 U.S.C. § 330, the fees awarded must only be compensatory and must be

1   reasonable.  "The customary method for assessing the amount of reasonable attorney's

2   fees to be awarded in a bankruptcy case is the 'lodestar.'  Under this approach, 'the

3   number of hours reasonably expended' is multiplied by 'a reasonable hourly rate' for the

4   person providing the services.'"  *Wechsler v. Macke International Trade, Inc. (In re Macke*

5   *International Trade, Inc.),* 370 B.R. 236, 254 (9th Cir. BAP 2007) (citation omitted).  A

6   bankruptcy court has broad discretion to determine the number of hours reasonably

7   expended.  *Id.*  "Even where evidence supports that a particular number of hours were

8   worked, the court may give credit for fewer hours if the time claimed is 'excessive,

9   redundant, or otherwise unnecessary.'"  *Id.* (quoting *Dawson v. Washington Mutual Bank,*

10  *F.A. (In re Dawson)*, 390 F.3d 1139, 1152 (9th Cir. 2004)) (alterations omitted).  Courts

11  undertaking a fee analysis may also consider "(1) the time and labor required, (2) the

12  novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal

13  service properly, . . . (8) the amount involved and the results obtained, . . . and (12)

14  awards in similar cases."  *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.

15  1975).

16       As discussed above in Section C.ii., the court finds that Debtor's Counsel's

17  conduct, specifically, filing the Contempt Motion, failing to withdraw the Contempt Motion,

18  and expanding the issues in his briefing and by argument at the evidentiary hearing, was

19  tantamount to bad faith and caused Milner to incur costs by having to respond to frivolous

20  arguments, prepare for the expanded evidentiary hearing, and file a reply to the post-trial

21  briefing that Debtor's Counsel requested.  Because Debtor's Counsel acted recklessly and

22  made arguments in the Contempt Motion and subsequent filings that were baseless and

23  without reasonable inquiry, and acted with an improper purpose tantamount to bad faith in

24  an effort to exert pressure in the state court litigation, the majority of the attorneys' fees

25  incurred by Milner were caused by Debtor's Counsel's filing of the Contempt Motion.

26  Milner would not have incurred attorney fees related to the Contempt Motion and its

27  appeal from July 11, 2018 to June 2019 but for Debtor's Counsel's bad faith conduct in

28  filing the Contempt Motion, refusing to withdraw the Contempt Motion, and pursuing

1  frivolous litigation positions.  Milner also would not have incurred attorney fees related to

2  the Sanctions Motion from June 2019 to September 20, 2019, but for Debtor's Counsel's

3  bad faith conduct.

4         As to the attorneys' fees incurred by Milner from September 20, 2019 onward,

5  which fees were related to the supplemental briefing on evidence of bad faith, the court

6  finds that those fees are not compensable because no causal link exists between Debtor's

7  Counsel's bad faith conduct and the supplemental briefing on bad faith.  During the

8  September 18, 2019 hearing on the Sanctions Motion, Milner requested a briefing

9  schedule and the court allowed Milner the opportunity to amend or supplement her

10  Sanctions Motion to identify express evidence of bad faith in lieu of the court denying the

11  Sanctions Motion without prejudice.  *Audio Recording, September 18, 2019, Sanctions*

12  *Motion Hearing* at 12:59–1:01 p.m. ("We thought this was sufficient, but obviously it isn't. .

13  . . Can we have a briefing schedule so we can go ahead . . .") (statement of Movant's

14  Counsel); *see also id.* at 1:04–1:09 p.m.  No conduct by Debtor's Counsel or CCM caused

15  Milner to incur fees related to the supplemental briefing.  Milner explained in her Reply to

16  Debtor's Counsel's Supplemental Opposition, ECF 2136, that she offered no additional

17  evidence in her Supplemental Brief or the Reply, and all of the exhibits included in Milner's

18  appendix were trial exhibits previously filed with the Court. *Reply to Debtor's Counsel*

19  *Supplemental Opposition,* ECF 2136 at 4.  Other than the Trial Transcript and Trial Exhibit

20  39 (offered by Debtor's Counsel), Milner presented no new evidence in her Supplemental

21  Brief.  This is consistent with the court's comments at the September 18, 2019 hearing—in

22  the court's view, Milner did not sufficiently identify citations to the record that supported a

23  finding of bad faith as to Debtor's Counsel or CCM in her previous filings since her primary

24  reliance was on Bankruptcy Rule 9011.  Upon Movant's Counsel's request, the court

25  allowed Milner to amend or supplement in order to do so.  Accordingly, no fees incurred

26  by Milner after September 20, 2019 are compensable under the court's inherent authority

27  because no causal link exists between the supplemental briefing on bad faith, related

28  legal fees incurred by Milner, and Debtor's Counsel's bad faith conduct.

**MEMORANDUM DECISION**

1    As to the fees requested by Light in connection with the Contempt Motion, the court

2  determines that Light's fees were redundant and unnecessary because only one attorney

3  was needed to represent Milner in this contested matter, which was primarily a bankruptcy

4  law matter for which Movant's Counsel had sufficient expertise to handle by herself, i.e.,

5  whether Milner violated the discharge injunction by defending herself in the state court

6  action by filing an answer that asserted as an affirmative defense that the Settlement

7  Agreement was not rejected and terminated from the plan confirmation order.  The

8  primary issue in this contested matter was whether the Settlement Agreement was or was

9  not an executory contract when CCM's bankruptcy case was filed, which was mainly an

10  issue of contract interpretation and a factual issue of whether both sides had material

11  unperformed obligations.  Although Debtor's Counsel needlessly complicated the matter

12  by expanding the issues and raising baseless arguments, the resolution of the matter was

13  a matter of determining whether the contract was still executory when CCM filed for

14  bankruptcy, which issue also addresses Debtor's Counsel's alternative argument based

15  on claim preclusion or waiver, as he called it.  Movant's Counsel's Bankruptcy Rule 9011

16  Warning Letter demonstrated her knowledge of the bankruptcy law and related contract

17  law issues that arose in this matter, and the court finds that Movant's Counsel was entirely

18  able to manage this case on her own.  While Light is Milner's counsel in the State Court

19  Action, it was not necessary for him to be involved in the bankruptcy law issues, and his

20  continued involvement resulted in unnecessary costs, which is unreasonable.

21    Even if the court found that Light's fees were necessary, the amount of the fees

22  would still be unreasonable and should be reduced by at least 50% because Milner asks

23  the court to assume that Light billed zero time to his own defense as a respondent in the

24  Contempt Motion.  Light's interests as a respondent were entirely aligned with Milner's on

25  the Contempt Motion, and no factual or legal issues were distinguishable as to the two

26  respondents; there is no indication in Light's fees on his billing entries that his services did

27  not benefit him as a respondent, nor did Light distinguish between services provided in

28  defense of Milner alone and those provided in his own defense.  *Dipaolo v. Moran,* 277 F.

**MEMORANDUM DECISION**

1  Supp. 2d 528, 536-537 (E.D. Pa. 2003) ("In short, while [the attorney-defendant] may not

2  receive fees for defending himself, the language of the [sanctioning] statutes leads to the

3  conclusion that he may be entitled to fees incurred for defending his law firm to the extent

4  that they are not included in the time spent representing himself.").  In the Ninth Circuit,

5  "pro se litigants, attorneys or not, cannot recover statutory attorneys' fees."  *Elwood v.*

6  *Drescher,* 456 F.3d 943, 947 (9th Cir. 2006) (noting that courts have viewed *Kay v. Ehrler,*

7  499 U.S. 432 (1991), as precluding the award of fees to pro se attorney-defendants under

8  42 U.S.C. § 1988 and other fee shifting statutes, including those for sanctions under Rule

9  11 and 28 U.S.C. § 1927 (citing *Dipaolo v. Moran,* 277 F. Supp. 2d 528, 536 (E.D. Pa.

10  2003)); *S.E.C. v. Chapman,* 602 Fed. Appx. 407, 407 (9th Cir. 2015)("Applying *Kay,* we . .

11  . determined that all pro se litigants (including attorneys) are not entitled to attorneys' fees

12  under fee-shifting statutes, such as the EAJA." (citing *Elwood v. Drescher,* 456 F.3d at

13  946-947)); *Massengale v. Ray,* 267 F.3d 1298, 1302-1303 (11th Cir. 2001)("the word

14  'attorney' generally assumes some kind of agency (that is, attorney/client) relationship.

15  The fees a lawyer might charge himself are not, strictly speaking, 'attorney's

16  fees.'")(citation and alteration omitted); *Pickholtz v. Rainbow Technologies, Inc.,* 284 F.3d

17  1365, 1375 (Fed. Cir. 2002) ("one cannot 'incur' fees payable to oneself, fees that one is

18  not obliged to pay.") (citation omitted); *Upson v. Wallace,* 3 A.3d 1148, 1169 (D.C. 2010)

19  (quoting *Chambers v. NASCO, Inc.,* 501 U.S. at 46, and finding that the rationale in *Kay v.*

20  *Ehrler,* 499 U.S. at 432, "applies just as forcefully in [the inherent authority sanctions]

21  context" as in the statutory sanctions context).

22              i.    **Contempt Motion Fees**

23        Below, the court includes a table setting forth Movant's Counsel's professional fees

24  in connection with the contempt proceeding alone.  After a review of all billing entries, the

25  court has categorized the fees into seven groups, as set forth below:

26

27

28

| Fee Category | Total Fees Billed | Movant's Counsel Hours at $400/hr |
|---|---|---|
| *Objection to the OSC* | 9,440.00 | 23.6 |
| *Joint Status Report, Discovery, and Status Conference* | 10,560.00 | 26.4 |
| *Trial Declarations, Exhibits, and Evidentiary Objections* | 12,320.00 | 30.8 |
| *Trial Brief* | 14,880.00 | 37.2 |
| *Trial Preparations and Trial* | 7,360.00 | 18.4 |
| *Post-Trial Brief* | 6,840.00 | 17.1 |
| *Appeal* | 4,600.00 | 11.5 |
| **Totals** | 66,000.00 | 165 |

The court determines for the purposes of the lodestar method that Movant's Counsel's professional billing rate of $400 an hour is reasonable.[32]  The court next addresses the fees in each of the seven categories included in the above table.  The court determines that certain requested fees are excessive, redundant, or otherwise unnecessary and disallows those fees.

The court has authority to reduce hours when the hours are block-billed or when the services are "lumped" together in a single entry.  *Welch v. Metropolitan Life Insurance*

---

[32]    For some unknown reason, Movant's Counsel did not state her professional qualifications in her declaration in support of the motion, but based on her information listed on the website of the State Bar of California, she was admitted to the State Bar of California on December 10, 1985 and her law school was USC (University of Southern California) Law School, which information the court can take judicial notice of. Federal Rule of Evidence 201.  The court determines that based on its observation of the legal practice community, in light of her experience as a lawyer for over 34 years, Movant's Counsel's hourly rate of $400 is within the range of reasonableness in the Los Angeles legal community.

**MEMORANDUM DECISION**

1    *Co.*, 480 F.3d 942, 948 (9th Cir. 2007) ("We do not quarrel with the district court's

2    authority to reduce hours that are billed in block format.").  "The fee applicant bears the

3    burden of documenting the appropriate hours expended in the litigation and must submit

4    evidence in support of those hours worked." *Id.* (citation omitted).  "[B]lock billing makes it

5    more difficult to determine how much time was spent on particular activities." *Id.* "Given

6    that lumping may prevent a Court from being able to ascertain the reasonableness of the

7    fees requested, lumping may be cause for reduction or elimination of fees in bankruptcy."

8    *Roger v. Burns (In re Roger)*, 2017 WL 4097810 at *5 (Bankr. C.D. Cal. 2017) (citations

9    omitted). The court has observed lumping of services in many billing entries submitted by

10    Movant's Counsel.[33]  Accordingly, because the lumping described above prevents the

11    court from determining the reasonableness of the fees billed for each service, the court

12    may reduce the allowed amount of the entries for lumped services.

13        ***The Objection to Contempt Motion.***  On June 12, 2018, Milner through Movant's

14    Counsel, filed the Objection to Contempt Motion, ECF 2050, which included approximately

15    six pages of factual history and six pages of legal analysis, citing to two statutes and six

16    cases.  Movant's Counsel prepared and filed the objection promptly in accordance with

17    the local rules and included exhibits, along with declarations from Milner and Light.  *See*

18    ECF 2051.  Because the State Court Action had been filed by Debtor's Counsel and CCM

19    more than six months before the Contempt Motion, and Debtor's Counsel forewarned

20    Light that he would be filing an "ex parte" action of some sort, the court finds it reasonable

21    to presume that Milner and Light were quite familiar with the facts underlying this dispute.

22    Milner's declaration (five pages) and Light's declaration (eight pages) were not extensive.

23    Further, the language of the Settlement Agreement was straightforward and consisted of

24    _____

[33]    The billing entries submitted by Movant's Counsel are replete with block-billed time entries.

25    Representative examples are for $1,480.00 for 3.70 hours on 8/29/18 for "Review and revise Milner
declarations and sent it to Carol and Hal; telephone conference with Carol re highlighted paragraphs in her
declaration; revise request to take judicial notice and sent it to Hal; draft face page for the declaration with

26    proposed title and send it to Hal; review Hal's prior declaration and send him an email re suggestion that we
do not include his declaration," and for $1,680.00 for 4.20 hours on 8/30/18 for "Telephone calls with Carol

27    Milner and Hal Light regarding Declarations and the titles of documents so as to frame the issues for the
court; revise the Milner declaration; revise the Request to Take Judicial Notice; begin drafting the supporting
brief."  Movant's Counsel billed over $3,000, a substantial sum, on two consecutive days as reflected on

28    these block-billed time entries, making it difficult for the court to review the entries for reasonableness.

**MEMORANDUM DECISION**

1  only seven pages.  *Settlement Agreement, Exhibit A to Carol Schuller Milner Declaration,*

2  ECF 2051 at 15-22.  Accordingly, the court finds that the total hours of 23.6 hours spent

3  on the objection by Movant's Counsel is excessive.  While the objection's legal arguments

4  were concise and well-pleaded, they are not so complex as to require nearly three full

5  business days of work done by an experienced litigator, as the fundamental issue was

6  whether the Settlement Agreement was executory, which issue was already known to

7  Milner and Light from the state court litigation.  The court determines that Movant's

8  Counsel could have prepared the objection with minimal assistance from Light, who was

9  familiar with the dispute as Milner's state court counsel, particularly, the executory

10  contract issue.  Light's minimal assistance could have efficiently gotten Movant's Counsel

11  up to speed on the State Court Action and underlying facts.  In the court's view, Movant's

12  Counsel thereafter could have prepared the 12-page objection in approximately 18 hours.

13  Accordingly, the court reduces Movant's Counsel's allowed fee from 23.6 hours to 18

14  hours, because the four legal arguments in the objection were fairly straightforward, the

15  legal research could not have been voluminous, the factual background should have been

16  provided efficiently from the State Court Action pleadings and the clients, Milner and Light,

17  and some of the billing entries for this work were block-billed.

18      ***The Joint Status Report, Discovery, and Status Conference.***  On July 20, 2018,

19  the parties filed a Joint Status Report with attachments, and subsequently attended the

20  Status Conference on July 31, 2018.  In the Joint Status Report, Milner argued that "in

21  light of the fact that the issues presented are so limited (with the relevant evidence being

22  bankruptcy court filings and correspondence between the parties)," an evidentiary hearing

23  was unnecessary, and no discovery was needed.  *Joint Status Report,* ECF 2059 at 2-4.

24  Milner by counsel also attached a four-page addendum and two exhibits addressing

25  discovery issues, prior correspondence between the parties that bore on the underlying

26  dispute, and one paragraph restating arguments from the objection that "the suggestion

27  that Respondents should be held in contempt for responding to Plaintiff's declaratory relief

28  complaint is baseless."  *Id.* at 8.  While meeting and conferring with opposing counsel

**MEMORANDUM DECISION**

1   necessarily takes time and preparation, the court finds that the Joint Status Report,

2   accompanying addendum, and exhibits included in the report by Milner could have been

3   prepared in less than the 26.4 hours billed in Movant's Counsel's fee request because the

4   status report is simply a report on the state of the litigation, and not a forum for extensive

5   briefing and argument of the parties with voluminous exhibits attached, which was

6   "overkill."  See Local Bankruptcy Rule 7016-1.

7       First, Movant's Counsel could have prepared for the Status Conference, including

8   preparing arguments and an outline as set forth in her billing entries, without the

9   assistance of Light because she is an experienced lawyer and the issues to be raised at

10  the Status Conference were not overly complex or novel.  The primary issue was whether

11  the contract between CCM and Milner was still executory at the time of the bankruptcy

12  case.  Secondly, lengthy telephone conferences with Light regarding revisions to the Joint

13  Status Report and preparations for the Status Conference are excessive and

14  unreasonable because Movant's Counsel did not require constant input, supervision, and

15  consultation from or with Light, who was also her client, related to a "meet and confer"

16  conference with opposing counsel and preparation of the joint status report.  Accordingly,

17  the court reduces Movant's Counsel's allowed fee from 26.4 hours to 20 hours because

18  the extensive status report submitted was "overkill" resulting in part from unnecessary

19  consultation with Light, and some of the billing entries for this work were block-billed.

20      ***Trial Declarations, Exhibits, and Evidentiary Objections.***  On September 7,

21  2018, Milner by Movant's Counsel filed declarations of Milner, Grumer and Light in

22  connection with the evidentiary hearing in this matter, along with 48 exhibits and a request

23  for judicial notice.  *See* ECF 2066, 2066-1, 2066-2 and 2067.  On September 13, 2018,

24  Milner by Movant's Counsel also filed evidentiary objections to the declaration of Gwen

25  Myers.  ECF 2072.  In anticipation for her testifying at the evidentiary hearing, Milner's

26  declaration was more than 20 pages and established much of the factual record the court

27  relied upon in reaching its decision on the Contempt Motion.  The court allows the

28  requested total hours of 30.8 hours for this category of fees.

**MEMORANDUM DECISION**

1    ***The Trial Brief.***  The Milner Trial Brief, filed on September 13, 2018, addressed

2    whether Milner was the owner of the subject property identified in the Settlement

3    Agreement and whether the Settlement Agreement was an executory contract at the time

4    of CCM's bankruptcy case.  ECF 2074.  Because the Milner Trial Brief restated multiple

5    arguments that Milner already presented to the court, the court reduces the total hours

6    requested by Movant's Counsel from 37.2 to 24 hours as reasonable.  For example,

7    Milner's argument that the Settlement Agreement was not an executory contract at the

8    time of the CCM bankruptcy was copied nearly verbatim from her Objection to the

9    Contempt Motion.  *Compare Milner Trial Brief,* ECF 2074 at 15-17, *with Objection to*

10   *Contempt Motion,* ECF 2050 at 6-7.  Similarly, Milner by Movant's Counsel restated in the

11   Trial Brief her previous argument from the Bankruptcy Rule 9011 Warning Letter that

12   boilerplate plan language does not amount to a rejection of a contract such as the

13   Settlement Agreement, citing *In re Parkwood Realty Corp.,* 157 B.R. 687 (Bankr. W.D.

14   Wash. 1993) and *In re Continental Country Club, Inc.,* 114 B.R. 763 (Bankr. M.D. Fla.

15   1990), which should not have been time-consuming to include.  *Compare Milner Trial*

16   *Brief,* ECF 2074 at 17-19, *with E-mail from Movant's Counsel to Debtor's Counsel, dated*

17   *July 11, 2018, Exhibit 1 to Sanctions Motion,* ECF 2100-1 at 3.  The court therefore

18   reduces the total hours requested in this category as set forth above.

19   ***Trial Preparations and Trial.***  The court determines that the fees for Movant's

20   Counsel's time of 18.4 hours spent preparing for the evidentiary hearing and representing

21   Milner and Light at the hearing are reasonable and should be allowed.

22   ***The Post-Trial Brief.***  The Milner Post-Trial Brief, ECF 2078, filed October 10,

23   2018, responded to the CCM Post-Trial Brief, ECF 2077, citing two cases and otherwise

24   rebutting factual arguments that CCM asserted by Debtor's Counsel in its post-trial brief.

25   Because Milner's Post-Trial Brief was essentially a factual rebuttal to the CCM Post-Trial

26   Brief, based almost entirely on citations to the record and requiring almost no legal

27   analysis, the court determines that Movant's Counsel may only be compensated for 10

28   allowed hours in respect of preparing Milner's response to the CCM Post-Trial Brief.  The

119

**MEMORANDUM DECISION**

1 | Milner Post-Trial Brief required minimal additional legal research and while effective, the

2 | filing was more akin to a closing argument outline, which should not have required 17

3 | hours of attorney time, rather than a supplemental brief addressing novel legal questions.

4 |      ***The Dismissed Appeal.***  The court determines that the fees for Movant's

5 | Counsel's time of 11.5 hours spent defending CCM's appeal, which was ultimately

6 | abandoned and dismissed, are reasonable and should be allowed.

7 |      Pursuant to *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186 (2017)

8 | and the reasons set forth above, the court determines that total aggregate hours of 132.7

9 | hours at a rate of $400 an hour for Movant's Counsel's services in defending the

10 | Contempt Motion is a reasonable attorneys' fee as a sanction under the court's inherent

11 | authority compensating Milner for having to defend this action as a result of Debtor's

12 | Counsel's bad faith conduct.  The allowed fee amount in connection with the Contempt

13 | Motion is therefore $53,080.00.

14 |         **ii.    Sanctions Motion Fees**

15 |      Below, the court includes a table setting forth Movant's Counsel's professional fees

16 | requested by Milner in connection with the Sanctions Motion.  As noted above the court

17 | has determined that the fees requested in connection with the Sanctions Motion

18 | supplemental briefing on bad faith are not compensable.  After a review of all requested

19 | billing entries, the court has categorized the fees into three groups, as set forth below:

20 |      ///

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

**MEMORANDUM DECISION**

| Fee Category | Total Fees Billed | Total Hours Billed (Movant's Counsel at $400/hr) |
|---|---|---|
| *Motion for Sanctions* | 8,640.00 | 21.6 |
| *Reply to CCM and Debtor's Counsel Oppositions* | 13,120.00 | 32.8 |
| *Hearing Preparations and Hearing* | 3,920.00 | 9.8 |
| Totals | 25,680.00 | 64.2 |

As discussed above for the Contempt Motion Fees, the court determines for the purposes of the lodestar method that Movant's Counsel's billing rate of $400 an hour is reasonable.  The court next addresses the fees in each of the three categories included in the above table.  The court determines that certain fees in each category are excessive, redundant, unnecessary, or otherwise not compensable.

***Motion for Sanctions.***  Milner through Movant's Counsel filed the Sanctions Motion, ECF 2100 on July 2, 2019.  As discussed above, the Sanctions Motion principally relied upon case law and argument set forth by Milner in the briefing filed in connection with the Contempt Motion, and in particular, the Bankruptcy Rule 9011 Warning Letter Movant's Counsel sent to Debtor's Counsel by e-mail on July 11, 2018.  *Compare E-mail from Movant's Counsel to Debtor's Counsel, dated July 11, 2018, Exhibit 1 to Sanctions Motion,* ECF 2100-1 at 1-5 (citing *In re Parkwood Realty Corp.,* 157 B.R. 687 (Bankr. W.D. Wash. 1993), *In re Continental Country Club, Inc.,* 114 B.R. 763 (Bankr. M.D. Fla. 1990), *In re Ybarra,* 424 F.3d 1018 (9th Cir. 2005), and *In re Taggart,* 888 F.3d 438 (9th Cir. 2018)), *and Objection to Contempt Motion,* ECF 2050 (citing *In re Robert L. Helms Construction & Development Company, Inc.,* 139 F.3d 702 (9th Cir. 1998)), *with Sanctions Motion,* ECF 2100 (citing same).  Moreover, as to the "the amount involved and the results obtained,"  *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d at 70, Milner's principal argument in

**MEMORANDUM DECISION**

1    the Sanctions Motion was a request for sanctions under Bankruptcy Rule 9011.

2    *Sanctions Motion,* ECF 2100 at 12-17.  Absent one paragraph on the penultimate page of

3    the Sanctions Motion addressing the court's inherent authority, citing *Chambers v.*

4    *NASCO, Inc.*, 501 U.S. 32 (1991), Milner's motion was premised on Bankruptcy Rule

5    9011.  *Id.* at 17.  Accordingly, the result sought in the Sanctions Motion—at least on

6    Milner's primary argument based on Bankruptcy Rule 9011—was not achieved.

7         As discussed above and at the September 18, 2019 hearing, the court determined

8    that Milner's arguments failed to satisfy the Ninth Circuit's stringent procedural

9    requirements for compliance with Bankruptcy Rule 9011.[34]  Although it might not be an

10   abuse of discretion for a court to broadly grant all fees that arose subsequent to a party

11   filing a contempt motion in bad faith, here, the court finds the exercise of "restraint and

12   discretion[ ]" acknowledged by the Supreme Court in *Chambers v. NASCO, Inc.,* 501 U.S.

13   at 44, appropriate in light of the "result obtained" and the legal complexity of the Sanctions

14   Motion.  The court therefore reduces Movant's Counsel's allowed fee as to the Sanctions

15   Motion from 21.6 hours to 14 hours based on Movant's Counsel having already

16   researched and briefed the arguments included therein and the failure to obtain a result

17   under Bankruptcy Rule 9011 as requested in the motion.

18        ***Preparing Milner's Reply to CCM and Debtor's Counsel Oppositions.***  On

19   September 11, 2019, Milner by Movant's Counsel filed her reply to the CCM and Debtor's

20   Counsel oppositions to the Sanctions Motion, ECF 2121.  Like the Sanctions Motion

21   discussed above, Milner's arguments in the reply were focused on addressing Bankruptcy

22   Rule 9011, her primary claim.  *See Reply to CCM and Debtor's Counsel Oppositions,* ECF

23   2121 at 4-14.  The reply, however, required Milner to respond to legal and factual

24   assertions newly and separately raised by CCM and Debtor's Counsel.  Milner also

25   identified persuasive authorities in the reply that had not been presented in prior briefing

26

27   [34]   *Audio Recording, September 18, 2019, Sanctions Motion Hearing* at 01:03–01:04 p.m. ("Is [allowing
     supplemental briefing] better than letting them file another amended motion?") (statements of the court); *id.*

28   at 01:08–01:09 p.m. ("Should I give them an opportunity to amend and we do this again, or should we just
     have supplemental [briefing]?") (statements of the court).

**MEMORANDUM DECISION**

1    or the adjudication of the Contempt Motion.  Accordingly, the court reduces Movant's

2    Counsel's allowed fee as to the Reply to CCM and Debtor's Counsel Oppositions from

3    32.8 hours to 17 hours because Milner failed to prevail on her primary claim under

4    Bankruptcy Rule 9011, which was the focus of her Reply to CCM and Debtor's Counsel

5    Oppositions.

6       ***Hearing Preparations and Attendance.***   The court determines that Movant's

7    Counsel's time of 9.8 hours spent preparing for and attending the hearing on the

8    Sanctions Motion[35] is reasonable.

9       Pursuant to *Goodyear Tire & Rubber Co. v. Haeger*, 137 S.Ct. at 1186, and the

10   reasons set forth above, the court determines that total aggregate hours of 40.8 hours at a

11   rate of $400 an hour for Movant's Counsel's professional services in prosecuting the

12   Sanctions Motion are reasonable attorneys' fees as a sanction under the court's inherent

13   authority compensating Milner for prevailing on the Sanctions Motion as to Debtor's

14   Counsel, as a result of Debtor's Counsel's bad faith conduct.  The allowed fee amount in

15   connection with the Sanctions Motion is therefore $16,320.00.

16      Having determined the reasonable fees in connection with the Contempt Motion

17   and Sanctions Motion, below the court includes a table setting forth the reasonable fee

18   award owing by Debtor's Counsel to Milner as a compensatory sanction in light of

19   Debtor's Counsel's conduct:

20      ///

21

22

23

24

25

26

27

28

---

[35]    Movant's Counsel's billing entries included a total of 12.3 hours that the court categorized into group three, billing entries from September 17, 2019, to September 20, 2019, however Movant's Counsel categorized 2.5 hours as "No Charge" for certain services related to reviewing and editing time entries.

**MEMORANDUM DECISION**

| Fee Category | Total Fees Billed | Movant's Counsel Hours at $400/hr | Allowed Hours | Adjusted Fees |
|---|---|---|---|---|
| *Objection to the OSC* | 9,440.00 | 23.6 | 18 | $7,200.00 |
| *Joint Status Report, Discovery, and Status Conference* | 10,560.00 | 26.4 | 20 | $8,000.00 |
| *Trial Declarations, Exhibits, and Evidentiary Objections* | 12,320.00 | 30.8 | 30.8 | $12,320.00 |
| *Pre-Trial Brief* | 14,880.00 | 37.2 | 24 | $9,600.00 |
| *Trial Preparations and Trial* | 7,360.00 | 18.4 | 18.4 | $7,360.00 |
| *Post-Trial Brief* | 6,840.00 | 17.1 | 10 | $4,000.00 |
| *Appeal* | 4,600.00 | 11.5 | 11.5 | $4,600.00 |
| **Totals** | **66,000.00** | **165** | **132.7** | **$53,080.00** |

| Fee Category | Total Fees Billed | Total Hours Billed (Movant's Counsel at $400/hr) | Allowed Hours Billed | Allowed Fees Billed |
|---|---|---|---|---|
| *Motion for Sanctions* | 8,640.00 | 21.6 | 14 | $5,600.00 |
| *Reply to CCM and Debtor's Counsel Oppositions* | 13,120.00 | 32.8 | 17 | $6,800.00 |
| *Hearing Preparations and Hearing* | 3,920.00 | 9.8 | 9.8 | $3,920.00 |
| **Totals** | **25,680.00** | **64.2** | **40.8** | **$16,320.00** |

| | | | | |
|---|---|---|---|---|
| | | | **TOTAL Allowed Fee Award** | **$69,400.00** |

Additionally, having reviewed the amount of $729.26 in expenses requested by Milner in connection with Movant's Counsel's professional services, the court determines that such expenses are reasonable and are allowed.

As discussed herein, CCM and Debtor's Counsel each made requests for sanctions against Milner for her filing the Sanctions Motion through Movant's Counsel. *CCM's Opposition to Sanctions Motion,* ECF 2114 at 27-28; *Debtor's Counsel's Opposition to Sanctions Motion,* ECF 2120 at 14.  Because Debtor's Counsel is not a

**MEMORANDUM DECISION**

1  prevailing party on the Sanctions Motion, the court declines to award any fees to Debtor's

2  Counsel pursuant to Bankruptcy Rule 9011(c )(1)(A), even though he prevailed on

3  Milner's claims under Bankruptcy Rule 9011 against him.  Such fees are not warranted

4  under Bankruptcy Rule 9011( c)(1)(A) because he engaged in conduct that would be

5  sanctionable under Bankruptcy Rule 9011, but for Milner's failure to comply with the

6  requirements of the Bankruptcy Rule 9011 safe harbor.  Although CCM is a prevailing

7  party on the Sanctions Motion because the court does not grant the motion as to CCM

8  under either Bankruptcy Rule 9011 or the court's inherent authority, such "reverse"

9  sanctions are not warranted under Bankruptcy Rule 9011(c)(1)(A).  Even though the ruling

10  on Milner's Bankruptcy Rule 9011 claims were in CCM's favor and against Milner, and her

11  request for Bankruptcy Rule 9011 sanctions did not satisfy the Ninth Circuit's stringent

12  requirements, her arguments, among others, that she filed the Sanctions Motion as soon

13  as practicable and the Bankruptcy Rule 9011 Warning Letter satisfied the safe harbor,

14  were not so baseless as to warrant sanctions.  It was not unreasonable for Milner to

15  request an extension of the law as to Bankruptcy Rule 9011 based on actual notice of her

16  intent to seek Bankruptcy Rule 9011 sanctions in the emailed letter, though not formally a

17  motion as required by the rule.  Milner's assertion that there was some factual support for

18  seeking sanctions against CCM, though ultimately unpersuasive, was not baseless.

19  Moreover, as discussed above, CCM is not entirely blameless in this situation on account

20  of the mixed messages in its communications with Milner and its inconsistent positions

21  regarding the Settlement Agreement and the Play Property.  Therefore, the court

22  determines that Milner's unsuccessful claims as to CCM under Bankruptcy Rule 9011 or

23  its inherent authority were not frivolous and do not warrant "reverse" Bankruptcy Rule

24  9011 sanctions.

25       ///

26

27

28

**MEMORANDUM DECISION**

## IV.    CONCLUSION

For the foregoing reasons, the court determines the following:

1.  The Sanctions Motion should be denied to the extent that Milner seeks relief under Bankruptcy Rule 9011 for failure to meet the safe harbor requirements of the rule.

2.  The Sanctions Motion should be denied in part to the extent that Milner seeks relief under the court's inherent authority as to CCM because she has not met her burden of proving her claim that CCM acted in bad faith either by clear and convincing evidence or the preponderance of the evidence.

3.  The Sanctions Motion should be granted in part to the extent that Milner seeks relief under the court's inherent authority as to Debtor's Counsel because she has met her burden of proving her claim that he engaged in conduct tantamount to bad faith by clear and convincing evidence, and therefore also by the preponderance of the evidence.

4.  The court determines under its inherent authority that an award of reasonable attorneys' fees of $69,400.00 and reasonable expenses of $729.26 should be awarded as a compensatory sanction in favor of Milner and against Debtor's Counsel, Douglas L. Mahaffey, Esquire.

Milner as the prevailing party on the Sanctions Motion is ordered to lodge a proposed final order granting the motion consistent with this memorandum decision within 30 days of the date of entry of this decision pursuant to Local Bankruptcy Rule 9021-1.

IT IS SO ORDERED.

Date: March 31, 2020

_____
Robert Kwan
United States Bankruptcy Judge

**MEMORANDUM DECISION**